**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

- - - - - - - - - - - - - - - - - -x
RUSSELL CARLSON, Individually and    :
On Behalf Of All Others Similarly    :
Situated,                            :
                                     :
                  Plaintiffs,        :
                                     :
v.                                   :    Case No. 3:00CV1621(AWT)
                                     :    **ALL CASES**
XEROX CORPORATION, et al.,           :
                                     :
                  Defendants.        :
                                     :
MASTER CASE                          :
- - - - - - - - - - - - - - - - - -x
FLORIDA STATE BOARD OF               :
ADMINISTRATION, et al.,              :
                                     :
                  Plaintiffs,        :
                                     :
v.                                   :
                                     :
XEROX CORPORATION, et al.,           :
                                     :
                  Defendants.        :
                                     :
MEMBER CASE                          :
- - - - - - - - - - - - - - - - - -x


<u>**RULING ON MOTIONS TO DISMISS**</u>

_____The plaintiffs bring this class action on behalf of all

persons who purchased common stock or bonds of Xerox Corporation

("Xerox") during the period from February 17, 1998 through

June 28, 2002, seeking redress for alleged violations of the

Securities Exchange Act of 1934 (the "Exchange Act").  The

plaintiffs bring their claims under Sections 10(b) and 20(a) of

the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively,

and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated by the
Securities and Exchange Commission ("SEC") pursuant to
Section 10(b).[1]  Xerox and six executive officers of Xerox have
moved to dismiss the plaintiffs' third amended consolidated
complaint, arguing that the plaintiffs have failed to adequately
plead scienter with respect to them.  Defendant KPMG LLP ("KPMG")
has moved separately to dismiss the plaintiffs' third amended
consolidated complaint, arguing that the plaintiffs have failed
to adequately plead scienter with respect to KPMG and also that,
in any event, the claims of plaintiffs who purchased Xerox stock
after February 6, 2002 are time barred because the plaintiffs had
actual notice of their claims on February 6, 2001.    For the
reasons set forth below, the defendants' motions to dismiss are
being denied.

## I.    <u>FACTUAL BACKGROUND</u>

For purposes of these motions, the court accepts as true the
plaintiffs' factual allegations set forth in the third amended
consolidated complaint (the "Complaint"), as supplemented by the
factual allegations in the amended complaint in <u>Florida State
Board of Administration v. Xerox Corp.</u> (Docket No. 3:02CV1303)
(the "FSB Complaint").[2]

---

[1] The plaintiffs in <u>Florida State Board of Administration v.
Xerox Corp.</u>, a member case, bring additional claims that are not
the subject of these motions to dismiss.

[2] <u>See</u> Stipulation and Order (Doc. No. 172).

2

The plaintiffs are individuals or entities who purchased Xerox common stock or bonds during the period from February 17, 1998 through June 28, 2002 (the "Class Period"), when Xerox disclosed a restatement of its 1997 to 2001 financial statements (the "Second Restatement").  The defendants are: Xerox, a New York corporation with its executive offices located in Stamford, Connecticut, whose common stock is publicly traded on the New York Stock Exchange; Paul Allaire ("Allaire"), who served as Chief Executive Officer from May 1991 to April 1999 and from May 2000 to July 2001, served as a member of the Board of Directors commencing in 1986 and Chairman of the Board of Directors from May 1991 to the end of 2001, and served as Chairman of the Board of Directors' four-member Executive Committee; G. Richard Thoman ("Thoman"), who served as President and Chief Operating Officer from June 1997 to April 1999, served as Chief Executive Officer from April 1999 through May 11, 2000, and served as a member of the Board of Directors and as a member of the Executive Committee from June 1997 through May 2000; Barry Romeril ("Romeril"), who served as Executive Vice President and Chief Financial Officer from 1993 until the end of 2001, and served as Vice Chairman of the Board of Directors commencing in April 1999; Philip Fishbach ("Fishbach"), who served as Vice President and Controller from 1995 to April 1, 2000; Gregory Tayler ("Tayler"), who replaced defendant Fishbach as Vice President and Controller on April 1, 2000; Ann Mulcahy ("Mulcahy"), who served as President of General

3

Markets Operations for Xerox from January 1999 until May 11, 2000, when she was appointed President and Chief Operating Officer to replace defendant Thoman, has served as Chief Executive Officer since July 2001, and served as a member of the Board of Directors throughout the Class Period and succeeded defendant Allaire as Chairman of the Board of Directors effective January 1, 2002; and KPMG, an accounting and consulting firm which served as Xerox's outside auditor until October 4, 2001. Allaire, Thoman, Romeril, Fishbach, Tayler and Mulcahy are referred to collectively as the "Individual Defendants."  Xerox and the Individual Defendants are referred to collectively as the "Xerox Defendants."

Throughout the early and mid-1990s, Xerox had a significant market share in the digital copying products industry.  Its financial reports reflected healthy, constant growth; operating income was increasing in regular, quarterly increments, and revenues were rising at a double-digit rate.  By the late 1990s, however, Xerox faced increasing competition from Japanese competitors in the digital copier market and it was able to meet Wall Street's earning expectations only by engaging in massive accounting fraud.

Based on conclusions reached by an official at the SEC following an almost two-year investigation, the plaintiffs allege that "Xerox's senior management orchestrated a four-year scheme to disguise the company's true operating performance."  (Compl.

4

¶ 6.)  Based on conclusions reached by another official at the SEC, the plaintiffs allege that "Xerox employed a wide variety of undisclosed and often improper top-side accounting actions to manage the quality of its reported earnings," and that "[a]s a result, the company created the illusion that its operating results were substantially better than they really were."  (Id.)

Based on the SEC investigation, the plaintiffs also allege as follows:

> The Xerox Defendants knew of Xerox's accounting manipulations and knew that they were done to enable the [c]ompany to meet Wall Street's earnings estimates.  The Xerox Defendants approved of and expressly directed the use of "accounting actions."  The SEC concluded that "Xerox Senior Management was informed of the most material of these accounting actions and the fact that they were taken for the purpose of what the [c]ompany called 'closing the gap' to meet performance targets. These accounting actions were directed and approved by senior Xerox management, sometimes over protests from managers in the field who knew the actions distorted their operational results."  SEC Compl. ¶ 16.

(Compl. ¶ 214.)

In the mid-1990s, Xerox accelerated a shift from renting or selling equipment to long-term leasing of the equipment.  When Xerox leases a copier to a customer, it typically bundles into a single monthly fee a payment for equipment financing, service and supplies.  By 2000, bundled arrangements represented 64, 65 and 57 percent of the total value of transactions in the United States, Europe and developing markets.  Statement of Financial Accounting Standard ("SFAS") 13 sets forth the rules accountants must follow under Generally Accepted Accounting Principles

("GAAP") in accounting for leases. "Under SFAS 13, monthly payments due under operating leases are recognized as revenue only as they become due during the lease term, whereas a 'sales-type' lease is accounted for as if the lessor sold the equipment and provided financing for the sale, resulting in immediate revenue recognition of the equipment portion of the lease, with a smaller portion being recognized ratably as finance income over the lease term." (Compl. ¶ 35.)

Paragraph 14 of the Complaint sets forth an overview of accounting actions taken to disguise Xerox's true operating performance:

> Defendants used a smorgasbord of methods to misstate Xerox's earnings, revenues and margins in virtually every reporting period throughout the Class Period. Xerox repeatedly and improperly changed the manner in which it accounted for lease revenue, pulling forward nearly $3.1 billion in equipment revenue and $717 million of pre-tax earnings into 1997 through 2000, and improperly failed to disclose that these gains were a result of accounting changes rather than improved operational performance, thereby misleading investors. *See* SEC Compl. ¶ 35. Xerox's other improper accounting methodologies throughout the Class Period included:

>> **ROE:** Xerox used artificially low interest rate assumptions to artificially inflate the recognized "present value" of long-term leases. In fact, the Akin Gump report specifically determined that KPMG expressly approved Xerox's use of such artificially depressed interest rates in Mexico and Brazil when calculating revenues from leases. The SEC concluded that ROE was a series of "top-side" adjustments directed by Xerox corporate headquarters, and that KPMG never tested Xerox's claim that the top-side adjustments were necessary to arrive at the actual

prevailing equipment finance rates appropriate to the customer.  SEC Compl. ¶¶ 11, 42, 43.

**Reallocating Revenues Via Assumed Margins, or "Margin Normalization":**  Xerox reallocated revenues from service to the equipment portion of sales-type leases by assuming an artificial gross margin differential between the two lease components (or an assumed profit margin) that had no basis in economic reality. Equipment margins were in fact falling.  Xerox used this method to pull forward $617 million of equipment revenues from 1997-2000. Internally, KPMG referred to this method as "half-baked revenue recognition."  SEC Compl. ¶¶ 47-48.

**Price Increases and Extension:**  In certain contracts, principally in Brazil, Xerox negotiated or unilaterally imposed price increases and loan extensions on existing lease customers.  While Xerox immediately recognized revenues from these increases and extensions, GAAP required Xerox to realize such revenues over the life of the lease. According to the SEC, in 1999, KPMG informed Xerox that this practice violated GAAP, but Xerox refused to follow this advice. Nevertheless, KPMG certified Xerox's 1999 and 2000 financial statements.  SEC Compl. ¶¶ 50, 51.

**Residual Value Adjustments:**  Xerox recorded adjustments of at least $95 million as a result of retroactive revisions to residual values.   GAAP prohibits increasing the estimated residual value of leased equipment for any reason after it is first established. By relying on this methodology, from 1997 to 1999, Xerox inflated its pre-tax earnings by a net of $43 million.  According to the SEC, in 1996, KPMG objected to this practice as violating GAAP but, after arguments with Xerox senior management, approved its implementation in 1998, while continuing to criticize its use.  SEC Compl. ¶¶ 53, 54.

**Undisclosed Factoring Transactions:** Xerox fraudulently failed to disclose $288 million of 1999 year-end factoring transactions, resulting in a reported positive year-end cash balance, instead of the actual negative number, and misleading investors by falsely appearing to generate cash from operations while receivables were in reality sold at a discount. SEC Compl. ¶ 72.

**Cookie Jar Reserves:** Xerox pumped up earnings by nearly $500 million by systematically releasing into income excess or "cushion" reserves established for other purposes, thereby violating GAAP, and fraudulently failed to disclose this use of reserves. SEC Compl. ¶ 58. For example, when Xerox acquired the Rank Group Plc, in June 1997, Xerox established a $100 million reserve. According to the SEC, by year-end 1997, Xerox had informed KPMG that Xerox had no contingent liabilities arising from that acquisition. Nevertheless, Xerox used, and KPMG permitted, Xerox to use the reserve to absorb expenses, thereby hiding material expenses, causing Xerox's earning to be artificially inflated by $24 million in 1998 and $76 million in 1999. SEC Compl. ¶ 62.

(Compl. ¶ 14.)

Based on the SEC investigation, the plaintiffs allege that "Xerox separately tracked these accounting actions to quantify their impact on the financial results reported to the public as compared to the company's underlying operating results." (Compl. ¶ 8.) "[It] documented the impact in schedules and lists of 'one offs,' year-over-year causal reports and monthly and quarterly performance summaries that were distributed to and discussed by Xerox's financial management. Xerox's operating units also documented the impact of accounting actions on their financial

performance, comparing 'reported' and 'underlying' results.
Xerox also regularly received information from its outside
auditor quantifying the impact of its accounting actions."
(Compl. ¶ 9 (emphasis omitted).)

Based on the SEC investigation, the plaintiffs allege that
Xerox "senior management reviewed . . . excess reserves on a
quarterly basis and released them when needed to close the gap
between operational earnings and Wall Street expectations," and
that" [i]n fact, Xerox's corporate accounting department tracked
these excess reserves by preparing schedules called
'Interdivisional Opportunities' and 'List of Unencumbered & Other
Reserves.'" (Compl. ¶ 222 (internal quotation marks omitted).)
"Xerox also documented, in an internal presentation that was over
70 pages long, how one Xerox unit could make up for an earnings
deficiency by using a variety of accounting manipulations.  These
manipulations included improperly boosting revenues by
retroactively changing the accounting methods used in previous
quarters for equipment-leasing transactions."  (Compl. ¶ 221.)

In November of 1999, Romeril informed other Xerox senior
management, including Allaire and Thoman, that in the absence of
such accounting actions, Xerox had essentially no growth through
the late 1990s.  "Xerox's vice chairman, William Buehler,
conveyed the same conclusion in October 1999 with respect to
Xerox Europe after reviewing information on the subsidiary's
performance in the late 1990s.  The president of Xerox Europe,

Pierre Danon, confirmed this conclusion, stating that Xerox
Europe's profit before tax was in steady decline from 1996-1999,
but one time 'accounting actions' helped contain the declining
trend in reported profit."  (Compl. ¶ 220.)

     In fact, "[w]ithout such accounting manipulations, Xerox
would not have met earnings expectations in 11 of 12 quarters
during 1997-1999 . . . Moreover, by 1998, almost $3 of every $10
of annual pre-tax reported earnings and up to 37 percent of
Xerox's reported quarterly pre-tax earnings were generated
[through] undisclosed accounting manipulations."  (Compl. ¶ 15.)

     During the period from June 16, 2000 to June 28, 2002, when
Xerox disclosed the Second Restatement, the details of Xerox's
improper accounting actions gradually came to light.

     The first indication of any problems with Xerox's accounting
was when Xerox announced on June 16, 2000 that it would fail to
meet its estimated second quarter earnings in part because of the
"unexpected" discovery of bad debts in its Mexican subsidiary,
Xerox Mexico ("XMEX"), which would lead to a $.05 to $.06
reduction in earnings per share.  In connection with the
disclosure, Xerox downplayed to analysts the effect of this
situation, claiming it was an isolated incident.  Romeril told
analysts during a conference call that "the company's troubles in
Mexico appear to have been caused by problems with customer
receivables accounts" (Compl. ¶ 37.a.); he also told them that
"there was no reason to believe the Mexican problem would spread

to other countries" (Compl. ¶ 37.b.).  Notwithstanding the
efforts of the Xerox Defendants to portray the problem as limited
to XMEX operations, analysts expressed concerns about whether
Xerox's internal controls were adequate.  One analyst stated that
the troubling aspect of the unexpected discovery of bad debts in
XMEX was that it "point[ed] to lapses of control, which seemed to
be general and somewhat endemic throughout the company" and that
such lapses were "emblematic of less than air-tight business
practices throughout Xerox."  (Compl. ¶ 38.)

On June 29, 2000, Xerox issued a press release announcing
that the SEC had begun an investigation into accounting issues at
XMEX.  Xerox stated that it intended to fully cooperate with the
SEC in the investigation.  Notwithstanding this representation by
the Xerox Defendants, Xerox was subsequently fined by the SEC, in
part, for a lack of full cooperation in the SEC investigation.

On July 26, 2000, Xerox announced its second quarter
results.  Although it had estimated a $.05 per share charge as a
result of accounting problems at XMEX, Xerox disclosed that it
actually took an $.11 per share charge associated with its
Mexican subsidiary.  Allaire noted that the situation at XMEX was
the subject of an ongoing investigation by Xerox and the SEC.  He
commented that the problem at XMEX was a consequence of the fact
that several senior managers at XMEX had collaborated, over a
period of years, to circumvent Xerox's accounting policies and
administrative procedures.  Allaire stated, "We have no reason to

11

believe that the special circumstances that existed in Mexico are replicated in any other country." (Compl. ¶ 40.)  He reiterated that Xerox was cooperating fully with the SEC.

Notwithstanding the Xerox Defendants' representations as to the limited scope of Xerox's accounting problems, the financial press commented on the fact that the $78 million charge was "a big number" and noted that the question was what management systems were in place in Mexico and could what was going on in Mexico have been going on without the people at headquarters back in Stamford, Connecticut "being on the ball about it."  (Compl. ¶ 42.)

Analysts also reported on the larger-than-expected size of the charge for the accounting problems at XMEX included in Xerox's second quarter results.  One analyst reported the following:

> Xerox also recorded an $0.11 after-tax charge ($115 million pre-tax) related to the "Mexican receivables debacle."  This amount was about $0.05 per share more than we had anticipated. In Mexico, several senior managers collaborated to circumvent company accounting policies and procedures, resulting in a charge for uncollectible receivables and unrecorded liabilities.  Xerox's independent auditors and the SEC are each still investigating the situation and we do not yet know whether Xerox will need to restate results. Xerox is also embarking on an extensive review of its practices in other countries.

(Compl. ¶ 44.)

In July of 2000, Xerox Assistant Treasurer James F. Bingham ("Bingham") accompanied senior Xerox management, including Romeril and Mulcahy, on a trip to certain Xerox offices, which

included XMEX.  "In connection with that trip, Bingham prepared a memorandum outlining 'significant accounting and reporting irregularities being perpetrated by . . . Xerox.'" (Compl. ¶ 232.)  Bingham sent the memorandum to Xerox Treasurer Eunice Filter ("Filter"), warning that Xerox's accounting irregularities extended beyond Mexico.  Filter instructed Bingham not to distribute the memorandum, asking him if he "wanted people to go to jail."  (Compl. ¶ 233.)  Bingham then sent a revised memorandum to Romeril and Mulcahy, but Filter's assistant ordered Bingham to recall the memorandum and destroy it.  "Thereafter, Filter removed Bingham from his position as Assistant Treasurer of the [c]ompany.  Romeril subsequently met with Bingham and offered him a different position within Xerox, but later withdrew the offer when Bingham indicated that he intended to pursue the disclosure and correction of Xerox's accounting and financial irregularities."  (Compl. ¶ 234.)

Also, Bingham testified before the SEC that "following revelations of the Mexican accounting problems in 2000, he attended a meeting in the office of Kevin Colburn, Xerox's director of worldwide audit, in which he, Colburn and Peter Gallagher, an accounting manager, discussed more than $500 million in special accounting actions in 1998 and 1999 and Xerox's need to do 'everything' it could 'to keep the investigation to Mexico.'"  (Compl. ¶ 240.)

13

On August 28, 2000, Bingham met with Romeril, Colburn and one other senior executive, and he told them that Xerox's accounting irregularities were not limited to Mexico and that there was a "high likelihood" that Xerox had issued "misleading financial statements and public disclosures." (Compl. ¶ 56.) Bingham specifically addressed at least three areas in which there were accounting irregularities. One, Bingham addressed Xerox's interest rate manipulations in developing countries. Two, Bingham alerted his superiors that Xerox had recorded the $100 million reserve for the Rank Group, Plc. acquisition (the "Rank Reserve") on its books in 1997 without having any basis for doing so. Three, Bingham informed his superiors that Xerox had entered into complex transactions with banks and other financial institutions, pursuant to which Xerox sold rights to future income streams from certain equipment rentals at a discount, thereby enabling Xerox to book revenue and profit up front rather than over time. Bingham stated that Xerox corporate officers had offered verbal and written assurances to some banks that Xerox would never allow the transactions to go bad and that the disclosure of these guarantee agreements was inadequate, i.e., Xerox should not have booked the profits up front from these sales because they were, in effect, loans from the banks. Bingham stated that for the previous five-year period, Xerox had improperly reported $247 million in pre-tax income from sales of

14

rental streams in Brazil, Argentina and Mexico, as well as the United States, Canada and Europe.

A few days after Bingham made his presentation to Romeril, Colburn and the other senior executive, Xerox fired him, giving as the reason for his discharge that he had engaged in disruptive and insubordinate behavior.

On October 24, 2000, Xerox issued a release announcing its results for the third quarter. It announced that it had been forced to make a $55 million pre-tax provision for problems associated with XMEX. It took an after-tax charge of $41 million, or $.06 per share, related to the accounting irregularities at XMEX. Xerox announced that it did not anticipate any further related charges and that the problems were isolated.

On February 1, 2001, Xerox announced the results of its independent investigation of XMEX. Xerox once again stated that the accounting irregularities at the Mexican subsidiary were the result of collusion on the part of a small group of senior XMEX and Latin American group executives acting to circumvent Xerox's policies and practices. Xerox assured investors in a press release that it had launched a worldwide review of its internal audit controls to ensure that the problems that had been discovered at XMEX were not present elsewhere. It stated that this worldwide review had recently been completed and that the

issues identified at XMEX were not found in any other major unit operated by Xerox.

On February 6, 2001, <u>The Wall Street Journal</u> reported on allegations by Bingham that Xerox's accounting problems were not limited to Mexico but were worldwide. The article described the August 28, 2000 meeting, as well as the memorandum Bingham sent to Filter and Filter's instruction to Bingham not to distribute the memorandum, including the question about whether Bingham wanted people to go to jail. Xerox's response was that Bingham was a disgruntled ex-employee who had been dismissed "for cause" and that Bingham's allegations had no merit. (Compl. ¶ 61.)

Around the same time, it was reported in the press that current and former XMEX executives supported the accuracy of Bingham's allegations about the leasing transactions and that they also agreed with Bingham about his assertion that the reason behind the accounting problems was a "corporate culture that cut bookkeeping corners to make up for deteriorating business fundamentals and maximize short-term results." (Compl. ¶ 63.) It was reported that Bingham had stated that many executives at Xerox had developed the attitude "There is no accounting standard we can't beat." (<u>Id.</u>)

In response to these reports, Tayler represented that Xerox had looked at the issues raised by Bingham and concluded that they were factually without merit. Tayler said that Xerox was quite comfortable with its reporting in terms of GAAP. However,

an analyst noted, in a report dated February 8, 2001, the

following:

> We believe that when considered within the timeline of events
> and other known facts, the allegations of financial and
> accounting regularities warrant investor scrutiny and further
> analysis.
>
>            ***
>
> It is not hard to visualize a slippery slope where accounting
> integrity is degraded in tiny increments in the pursuit of
> earnings consistency. In the case of Xerox, it is troubling
> that the company could become so financially distressed in
> such a short period of time. We believe the specter of these
> allegations enhances the already high risk profile of Xerox
> . . . .

(Compl. ¶ 67.)

On April 3, 2001, it was reported that Xerox would be

delaying the filing of its annual report due to a disagreement

with KPMG over accounting issues. It was also noted that Xerox

was facing a widening probe by the SEC into its accounting

practices. Analysts noted that if Xerox's financial statements

needed to be revised downward, that could have significant

negative implications in terms of the company's stock price and

its bond rating. Another analyst's report, dated April 20, 2001,

revealed that unless Xerox delivered its audited financial

statements to lenders by May 31, 2001, it could be in default

under its debt covenants.

On May 22, 2001, it was reported that the SEC had broadened

its investigation into Xerox's accounting practices and was

examining unusual transactions between Xerox and Citibank.

Bingham had told SEC investigators that the Citibank deals had the effect of accelerating into just two quarters much of the revenue and profit from renting copiers to customers in Brazil in the next several years.  In response, Xerox stated that it had looked carefully into the issues raised by Bingham and found them to be untrue and without merit.  It stated that the type of transaction at issue was in complete compliance with GAAP.

On May 31, 2001, Xerox issued restated financial statements for 1998 and 1999 and revised results for 2000 (the "First Restatement").  "The First Restatement indicated that Xerox's 1998 pre-tax income was overstated by $184 million, or $.19 per share, and 1999 pre-tax income was overstated by approximately $128 million, or $.13 per share.  Pre-tax loss for 2000 was reduced by $172 million, or $.19 per share, because certain revenue was prematurely recognized in 1998 and 1999 rather than during 2000.  Thus, over the three-year period, pre-tax income was reduced by $140 million on a net basis."  (Compl. ¶84.)

Allaire represented that the First Restatement had been issued only after rigorous reviews of Xerox's accounting.  Similarly, Xerox's Form 10-K for 2000 stated that Xerox had completed a review of its worldwide internal controls to determine whether the issues identified at XMEX were present elsewhere.  It stated that the issues identified at XMEX were not found to be in evidence in any other major unit, although several small affiliates were found to have used imprudent business

18

practices that required certain adjustments reflected in the
First Restatement.

The First Restatement involved principally accounting
irregularities at XMEX, misapplications of GAAP under SFAS 13,
"Accounting for Leases," and an improper $100 million reserve for
the Rank Group acquisition.  As to one aspect of the accounting
irregularities in the Mexican subsidiary, officials at XMEX had
improperly recorded revenues from customers despite knowing that
those revenues would never be received.  However, the senior
officers of XMEX all asserted that they were merely following the
accounting policies and directions they received from corporate
headquarters in Stamford, Connecticut.  As to another aspect of
the accounting irregularities in the Mexican subsidiary, it was
determined that XMEX had improperly recorded as current revenue
certain portions of long-term lease contracts that should have
been recorded over the life of a lease as service and supplies
were provided.  However, the finance manager for XMEX asserts
that XMEX was merely following directions from Xerox's corporate
headquarters.

The Rank Reserve was established in 1997 in connection with
Xerox's acquisition of the remaining 20 percent of Xerox Limited
from Rank Group, Plc.  It was recorded to account for what Xerox
claimed were "unknown risks."  (Compl. ¶ 94.)  Under GAAP,
"reserves may only be recorded when there is an identifiable
basis for the happening of an event that is 'probable,' and the

effects on the financial statements are 'reasonably estimable.'" (Compl. ¶ 95.)  Xerox did not use any of the Rank Reserve for liabilities related to the Xerox Limited acquisition.  Instead, beginning in mid-1998, Xerox began charging expenses against the Rank Reserve for things such as expenses related to the consolidation of European back office operations that were entirely unrelated to Xerox Limited.  This was one of the reserves referred to by Xerox as an "Interdivisional Opportunity" or an "Unencumbered Reserve."  (Compl. ¶ 97.)

Following the First Restatement, Xerox stated that while it had not complied with GAAP, the First Restatement effectively rebutted Bingham's allegations because KPMG and an investigation by the Board of Directors had found only one of Bingham's charges to have some merit.  Xerox also commented that it was continuing to cooperate with the SEC investigation into its accounting practices.  The First Restatement and the statements by Xerox left investors relieved and thus negated any negative effect which may have accompanied the disclosure of limited violations of GAAP by Xerox.

On October 5, 2001, Xerox announced that PriceWaterhouse Coopers, LLP ("PwC") was replacing KPMG as the company's new auditor for the 2001 fiscal year.

On January 7, 2002, Xerox disclosed that the SEC had advised Xerox that the SEC believed that Xerox's accounting methodology for sales-type leases did not comply with the requirements of

SFAS 13.  Xerox stated that it disagreed with the SEC's
assessment.  It represented that it applied a methodology that
resulted in no material difference from the result flowing from
application of the methodology favored by the SEC.  On
January 28, 2002, during a conference call with analysts, Mulcahy
stated that Xerox continued to believe that its methodology
produced financial results that were fairly representative in
accordance with GAAP and that Xerox had done substantial work to
demonstrate that there was no material difference between its
methodology and the SEC's methodology.

On April 11, 2002, the SEC filed a complaint (the "SEC
Complaint") against Xerox in federal court and announced a
settlement with Xerox.  Among other things, Xerox agreed to
restate its financial statements for the years 1997 to 2001 and
pay a $10 million dollar fine.  In a press release issued
simultaneously with the filing of the SEC Complaint, Xerox stated
"that the restatement could 'primarily reflect adjustments in the
timing and allocation of lease revenue and could involve a
reallocation of equipment sales revenue in excess of $2 billion
from 1997 through 2000,' and would also include adjustments of
more than $300 million because of the establishment and release
of certain reserves before 2001 and other miscellaneous items."
(Compl. ¶ 125.)  The SEC Complaint is attached to and
incorporated into the Complaint by reference.

The $10 million fine was the largest ever paid by a public company to settle a case brought by the SEC, with the largest fine prior to that time being $3.5 million.  The SEC stated that the "largest fine ever obtained by the SEC against a public company in a financial fraud case" was called for "because of the fact that Xerox's senior management orchestrated a four-year scheme to disguise the company's true operating performance" and that the size of the fine also reflected, in part, a sanction "for the company's lack of full cooperation in the investigation."  (Compl. ¶ 124.)

Allaire, Thoman, Romeril, certain other Xerox executives, KPMG and Michael Conway received Wells Notices from the SEC; Conway was a KPMG partner who replaced the senior audit engagement partner, Ronald Safran, after Safran refused to sign off on a plan to manipulate Xerox's financial results and Xerox insisted that Safran be replaced.  A Wells Notice notifies the recipient that the SEC's Enforcement Division is close to recommending to the full Commission an action against the recipient and provides the recipient the opportunity to set forth his version of the law or facts.

The Second Restatement was released on June 28, 2002.  With respect to the Second Restatement, the plaintiffs allege as follows:

It reduced [Xerox's] reported revenues (from the [First] Restatement) for 1997 from $18.2 billion to $17.5

billion; for 1998 from $19.6 billion to $18.8 billion; and for 1999 from $19.6 billion to $19 billion – a net reduction of $2.2 billion in revenue from the [First] Restatement to the [Second] Restatement. Further, in the [Second] Restatement, Xerox significantly reduced its pre-tax profits. Comparing Xerox's pre-tax profits for 1997 through 1999, based solely on a comparison between the [First] and [Second] Restatements, shows a decline of more than $1.9 billion: 1997 – $2.01 billion to $1.29 billion; 1998 – $579 million to a loss of $13 million; and 1999 – $1.91 billion to $1.29 billion. The decline is far more pronounced when the effect of the [First] and [Second] Restatements is combined, resulting in a total reduction in profits of nearly $2.4 billion for the years 1997 to 1999. Further, the [Second] Restatement sets forth a 1997 net income number – $2.005 billion – which it attributes to the [First] Restatement. That number is $136 million less than the net profit originally reported for 1997 ($2.141 billion) in the 1997 10-K. The [First] Restatement, however, did not state anywhere in the text that Xerox was restating its pre-tax earnings for 1997.

(FSB Compl. ¶ 9.)

"[T]he Second Restatement involved the following issues: (1) SFAS 13 (lease accounting); 2) other revenue issues; 3) South Africa deconsolidation[;] 4) purchase accounting reserves; 5) restructuring reserves; 6) tax refunds; and 7) other miscellaneous adjustments." (Compl. ¶ 140.) It "identified $6.4 billion in equipment sales revenue that Xerox improperly booked over the five-year period including: (a) $2.8 billion from Latin America equipment sales which should have been considered rentals; (b) $2.4 billion incorrectly designated as equipment sales within bundled leases; (c) $1.1 billion originally misclassified as sales-type leases and now reported as operating leases; and (d) $100 million from deconsolidation of a South African affiliate." (Compl. ¶ 138.)

23

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

Dismissal pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure for failure to state a claim upon which relief
may be granted is not warranted "unless it appears beyond doubt
that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." Conley v. Gibson, 355
U.S. 41, 45-46 (1957).  The task of the court in ruling on a Rule
12(b)(6) motion "is merely to assess the legal feasibility of the
complaint, not to assay the weight of the evidence which might be
offered in support thereof." Ryder Energy Distrib. Corp. v.
Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)
(internal quotation marks and citation omitted).  The court is
required to accept as true all factual allegations in the
complaint and must draw all reasonable inferences in favor of the
plaintiff. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.
1994).  However, "[w]hile the pleading standard is a liberal one,
bald assertions and conclusions of law will not suffice." Leeds
v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996).  See also DeJesus v.
Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996)("A complaint
which consists of conclusory allegations unsupported by factual
assertions fails even the liberal standard of Rule 12(b)(6).");
Furlong v. Long Island Coll. Hosp., 710 F.2d 922, 927 (2d Cir.
1983)(noting that while "Conley permits a pleader to enjoy all

favorable inferences from facts that have been pleaded, [it] does not permit conclusory statements to substitute for minimally sufficient factual allegations.").

### B. **Rule 9(b) and the PSLRA**

Allegations of securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).  "A complaint making such allegations must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127-28 (2d Cir. 1994)(internal citations omitted).

In 1995, Congress amended the Exchange Act pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See Pub. L. No. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5). Congress intended through the PSLRA to address the perceived need to deter meritless private securities fraud actions, "including 'the routine filing of lawsuits against issuers of securities and

others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer,' and 'the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle.'" Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)(quoting H.R. Rep. No. 104-369, at 31 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730). In particular, two provisions of the PSLRA impose stringent pleading requirements on plaintiffs bringing private securities fraud actions. First, the PSLRA requires that:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant —
>     (A) made an untrue statement of a material fact; or
>     (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1)(2000). Second, it requires that:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u-4(b)(2)(2000)(emphasis added).

To satisfy the requirement for pleading scienter, as set forth in 15 U.S.C. § 78u-4(b)(2), "a complaint may (1) allege

26

facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." Rombach v. Chang, 355 F.3d 164, 176 (2d Cir. 2004)(quoting Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)). "Although speculation and conclusory allegations will not suffice, neither [does the Second Circuit] require great specificity provided the plaintiff alleges enough facts to support a strong inference of fraudulent intent." Ganino v. Citizens Utils. Co., 228 F.3d 154, 169 (2d Cir. 2000)(citation and quotation marks omitted).

Each allegation made by the plaintiff must be considered in light of whether, and if so, how, it supports a strong inference of fraudulent intent under one of these two prongs, and "the Complaint need only plead scienter by alleging either motive and opportunity, or conscious or reckless misbehavior . . . ." Id. at 170. If the court decides that the plaintiff's complaint has successfully pleaded either the conscious misbehavior prong or the motive and opportunity prong of scienter, it need not also consider the other prong. Id. at 170 ("Of course, if the court decides on remand that the Complaint successfully pleaded the defendants engaged in conscious or reckless misbehavior, it need not also consider the motive and opportunity prong of scienter.").

In Novak, the Second Circuit reviewed its prior case law and provided guidance as to what kinds of allegations do and do not

27

meet the "strong inference" standard.  <u>Novak</u>, 216 F.3d at 311.

The court stated, as to the "motive and opportunity" approach,

that:

> Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.  Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

<u>Id.</u> at 307 (quoting <u>Shields</u>, 25 F.3d at 1130).  "[T]he inference

may arise where the complaint sufficiently alleges that the

defendants . . . benefitted in a concrete and personal way from

the purported fraud . . . ."  <u>Id.</u> at 311.  The court also took

note of precedent holding that a plaintiff cannot establish

motive and opportunity

> based on motives possessed by virtually all corporate insiders, including: (1) the desire to maintain a high corporate credit rating, or otherwise sustain the appearance of corporate profitability, or of the success of an investment; and (2) the desire to maintain a high stock price in order to increase executive compensation or prolong the benefits of holding corporate office.

<u>Id.</u> at 307 (citations and quotations omitted).  Plaintiffs are

instead required to allege that the defendants benefitted in a

"concrete and personal way" from the alleged fraud.  This

requirement could be met in the ordinary case by showing the

defendants' "desire to profit from extensive insider sales."  <u>Id.</u>

at 308.

As to the "conscious misbehavior or recklessness" approach,

the court identified several ways in which a plaintiff could

satisfy the pleading standard.  "Intentional misconduct is easily

identified since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." Id. at 308 (citations omitted).

A plaintiff may sufficiently plead recklessness under this approach by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." Id. at 308.

> Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation. Thus, for example, the pleading standard was met where the plaintiffs alleged that the defendants made or authorized statements that sales to China would be "an important new source of revenue" when they knew or should have known that Chinese import restrictions in place at the time would severely limit such sales. Similarly, the pleading standard was met where the plaintiffs alleged that the defendants released to the investing public several highly positive predictions about the marketing prospects of a computer system to record hotel guests' long-distance telephone calls when they knew or should have known several facts about the system and its consumers that revealed "grave uncertainties and problems concerning future sales of" the system.

Id. at 308 (internal citations omitted). Also, under certain circumstances it may be sufficient for a plaintiff to "allege[] facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Id. at 308. For example, "the pleading standard was met where the plaintiff alleged that the defendant, his broker, consistently reassured the plaintiff that the

29

investment advisor responsible for the plaintiff's portfolio

"knew what he was doing" but never actually investigated the

advisor's decisions to determine "whether there was a basis for

the [defendant's] assertions."  Id. at 308-09 (internal citation

omitted).

    However, the court observed that liability based upon

reckless conduct is limited in several important ways.

> First, . . . allegations that defendants should have
> anticipated future events and made certain disclosures
> earlier than they actually did do not suffice to make out
> a claim of securities fraud.  Second, as long as the
> public statements are consistent with reasonably
> available data, corporate officials need not present an
> overly gloomy or cautious picture of current performance
> and future prospects.  . . . Third, there are limits to
> the scope of liability for failure to adequately monitor
> the allegedly fraudulent behavior of others.  Thus, the
> failure of a non-fiduciary accounting firm to identify
> problems with the defendant-company's internal controls
> and accounting practices does not constitute reckless
> conduct sufficient for § 10(b) liability.  Similarly, the
> failure of a parent company to interpret extraordinarily
> positive performance by its subsidiary--specifically, the
> "unprecedented and dramatically increasing profitability"
> of a particular form of trading--as a sign of problems
> and thus to investigate further does not amount to
> recklessness under the securities laws.  . . . Finally,
> allegations of GAAP violations or accounting
> irregularities, standing alone, are insufficient to state
> a securities fraud claim.

Id. at 308-09 (citations omitted).

## III.  **DISCUSSION**

    The plaintiffs undertake to plead a claim that the

defendants violated § 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R.

§ 240.10b-5, which prohibit fraudulent activities in connection

with securities transactions.  Section 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale
> of any security registered on a national securities
> exchange or any security not so registered, any
> manipulative or deceptive device or contrivance in
> contravention of such rules and regulations as the
> Commission may prescribe as necessary or appropriate in
> the public interest or for the protection of investors.

15 U.S.C. § 78j(b)(1999).  Rule 10b-5 specifies the following

actions as being among the types of behavior proscribed by the

statute:

> To make any untrue statement of a material fact or to
> omit to state a material fact necessary in order to make
> the statements made, in the light of the circumstances
> under which they were made, not misleading . . . .

17 C.F.R. § 240.10b-5 (2000).  The Second Circuit has held that

> [i]n order to state a cause of action under section 10(b)
> and Rule 10b-5, "a plaintiff must plead that in
> connection with the purchase or sale of securities, the
> defendant, acting with scienter, made a false material
> representation or omitted to disclose material
> information and that plaintiff's reliance on defendant's
> action caused [plaintiff's] injury."

Chill v. General Elec. Co., 101 F.3d 263, 266 (2d Cir. 1996)

(quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.

1996)).

The plaintiffs also undertake to plead a claim that the

Individual Defendants violated § 20(a) of the Exchange Act.

Section 20(a) reads, in relevant part, as follows:

> Every person who, directly or indirectly, controls any
> person liable under any provision of this chapter or of
> any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such

31

```
controlled person to any person to whom such controlled
person is liable, unless the controlling person acted in
good faith and did not directly or indirectly induce the
act or acts constituting the violation or cause of
action.
```

15 U.S.C. § 78t(a)(2000).

## A.   **The Xerox Defendants' Motion to Dismiss**

The Xerox Defendants contend that the plaintiffs have failed to satisfy the requirements for pleading scienter as to them under either the motive and opportunity prong or the conscious misbehavior or recklessness prong of scienter. Because the court concludes that the plaintiffs have clearly pled scienter under the conscious misbehavior or recklessness prong, the court does not address the motive and opportunity prong. Also, in addition to arguing generally that the plaintiffs have failed to adequately plead scienter as to them, the Xerox Defendants argue specifically as to three accounting violations at XMEX that the plaintiffs have failed to adequately plead scienter.

### 1.   **Scienter Generally**

The Xerox Defendants contend, <u>inter</u> <u>alia</u>, that the plaintiffs have failed to satisfy the requirements for pleading conscious misbehavior or recklessness as to them. They argue that the plaintiffs allege that KPMG was intimately involved in the planning and implementation of the accounting policies and practices at issue here; that KPMG reviewed those accounting policies and practices at the time of the First Restatement and,

knowing that the SEC was conducting a wide-scale investigation,
only made a "relatively modest restatement" (Compl. ¶ 311) of
Xerox's financial statements in the form of the First
Restatement; and that KPMG continues to stand behind those
policies and practices.  Thus, they argue, viewed in the context
of these key facts, the plaintiffs' other factual allegations do
not constitute strong circumstantial evidence of conscious
misbehavior or recklessness.

However, accepting as true the factual allegations contained
in the Complaint and drawing all reasonable inferences therefrom
in favor of the plaintiffs, the court concludes that the
plaintiffs have satisfied the standard for pleading conscious
misbehavior or recklessness as to the Xerox Defendants.

While the fact that a company's accountants were intimately
involved in the planning and implementation of, and gave their
approval to, a company's accounting policies and practices would,
in the absence of strong circumstantial evidence to the contrary,
serve to negate an inference of consciousness misbehavior or
recklessness on the part of the company, in this case factual
allegations in the Complaint that have been stated with
particularity provide strong circumstantial evidence to the
contrary.  It is possible for a plaintiff in this type of case to
allege scienter on the part of the company and/or its
accountants, and here the plaintiffs have alleged scienter on the
part of the company <u>and</u> its accountants.

When the factual allegations in the Complaint are viewed as a whole, the plaintiffs have at a minimum alleged facts constituting strong circumstantial evidence of recklessness based on the Xerox Defendants' knowledge of facts and access to information contradicting their public statements; those factual allegations also make it clear that this is not a case of a client innocently relying on advice from its accountants.  The plaintiffs have alleged in the manner required under the PSLRA, inter alia,

(i)    that the Xerox Defendants knew the company was underperforming and used accounting manipulations to bridge the gap between actual versus desired financial results; and that the Xerox Defendants kept track of the impact on the company's actual financial results of these accounting manipulations, and reports documenting the impact of these accounting manipulations were distributed to and discussed by Xerox's financial management;

(ii)   that, in November of 1999, the chief financial officer of the company informed Xerox senior management, including both the chief executive officer and the chairman of the Board of Directors, that without the benefit of the accounting actions, Xerox had essentially no growth through the late 1990s;

34

(iii)   that the directives as to the accounting manipulations
        emanated from Xerox senior management at corporate
        headquarters, sometimes over protests from managers in
        the field who knew the accounting actions distorted
        their operational results;

(iv)    that many of the Xerox Defendants' accounting
        manipulations involved violations of simple and
        unambiguous accounting principles, and in specified
        instances, the Xerox Defendants were told by their
        accountants that the accounting action violated GAAP
        but proceeded with the action anyway;

(v)     that the Xerox Defendants insisted that KPMG replace
        its senior audit engagement partner when he refused to
        sign off on one of their proposals, i.e., "Project
        Mozart," to manipulate the reporting of the company's
        financial results;

(vi)    that, in an effort to keep the true extent of the
        accounting manipulations at the company from being
        discovered, the Xerox Defendants issued statements they
        knew to be untrue about the accounting problems at
        XMEX, attempted to limit the scope of the investigation
        to Mexico, fired Bingham for reasons that were
        pretextual when he disclosed that the accounting
        irregularities at the company extended beyond XMEX, and
        made statements they knew to be untrue in response to

subsequent reports in the press about Bingham's allegations; and

(vii)  that, with respect to the First Restatement, the Xerox Defendants "filed a minimal restatement and came out with a press release saying they had cleaned everything up, knowing full well that the staff [of the SEC] still had serious problems" with Xerox's accounting.  (Compl. ¶ 315.)

The already strong inference of fraudulent intent that can be drawn from this circumstantial evidence is only made stronger by two sets of allegations concerning the SEC investigation.  First, the plaintiffs allege that the Xerox Defendants failed to cooperate with the SEC investigation, and in support of that allegation, they make note of the statement from the SEC concerning the $10 million fine.  Second, the plaintiffs allege that on numerous occasions the Xerox Defendants represented that they were fully cooperating with the SEC, when, in fact, they were not.  See SEC v. Grossman, 87 CIV.No. 1031, 1987 U.S. Dist. LEXIS 1666, at *34 (S.D.N.Y. Feb. 17, 1987)("Exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force. Such evidence may be offered directly in support of the Commission's allegations." (citations omitted)).

## 2.  __Three of the Allegations as to XMEX__

Subparagraph 136.e. of the Complaint reads as follows:

> **Xerox Mexico:** From 1997 through the first quarter of 2000, to meet Xerox corporate management's demanding profit and revenue targets, senior management of Xerox's Mexico subsidiary fraudulently overstated revenue by $170 million. This overstatement was accomplished by concealing $129 million in uncollectible receivables (through, among other things, constantly renegotiating contracts with delinquent customers and changing invoice dates to make overdue receivables appear current), failing to record $27 million in notes due to third-party resellers of Xerox equipment (which was accomplished by secretly renting warehouses to store trade-ins to prevent the accounting system from automatically generating credits due to third-party resellers of Xerox equipment), and improperly recognizing $14 million in revenue from equipment leased to government customers (such contracts did not meet the three-year lease term and set minimum monthly payment requirements that made it necessary to recognize these contracts immediately). SEC Compl. ¶¶ 77-83.

(Compl. ¶ 136.e.)

Xerox argues that "the Complaint also contains three allegations of violations of Xerox's accounting policies, all by Xerox's Mexican subsidiary, XMEX, which [the] plaintiffs claim Xerox knew about while allegedly making false and misleading statements about its operations in Mexico" and that the plaintiffs "do not allege any facts showing that Xerox knew of the second or third alleged accounting violations by XMEX at the time it made the alleged misstatements." (Xerox Defs.' Supp. Mem. (Doc. No. 162) at 26-27.) The Individual Defendants join Xerox's argument with respect to the failure to record the $27 million in notes due to third-party resellers of Xerox equipment and with

37

respect to improperly recognizing $14 million in revenue from equipment leased to government customers, i.e., what Xerox refers to as the second and third alleged accounting violations by XMEX. In addition, they argue that the plaintiffs' allegations as to scienter on the part of the Individual Defendants with respect to the $129 million in uncollectible receivables is insufficient as a matter of law because nowhere in the Complaint do the plaintiffs allege that any of the Individual Defendants had any knowledge concerning these uncollectible receivables.

The court finds the Xerox Defendants' arguments unpersuasive. As an initial matter, the court notes that for purposes of this argument the Xerox Defendants attempt to isolate this part of the overall fraudulent scheme alleged by the plaintiffs from the rest of the scheme of which it was an integral part. However, the factual allegations in the Complaint make it clear that the accounting fraud at XMEX was not an isolated fraud, but rather was simply one aspect of a corporate-wide accounting fraud directed by Xerox senior management at corporate headquarters. Also, the Complaint does not characterize the accounting violations at XMEX as violations of Xerox's accounting policies and practices, but rather as violations of GAAP, and it alleges that the officials at XMEX were following directives that emanated from Xerox senior management at corporate headquarters.

As discussed above, the plaintiffs have alleged in the manner required under the PSLRA that the Xerox Defendants knew the company was underperforming and used accounting manipulations to bridge the gap between actual versus desired financial results; that the Xerox Defendants kept track of the impact on the company's actual financial results of these accounting manipulations, and reports documenting the impact of these accounting manipulations were distributed to and discussed by Xerox's financial management; and that the directives as to the accounting manipulations emanated from Xerox senior management at corporate headquarters.  With respect to XMEX specifically, the plaintiffs have alleged, based on information from the individual who served as XMEX's General Manager from 1994 until 1999, "that the accounting practices at Xerox Mexico were arrived at with the consultation, if not the direction of the Xerox Corporation accounting department," and that "Xerox corporate headquarters approved all accounting policies in Mexico."  (Compl. ¶ 227 (internal quotation marks omitted).)  In addition, the plaintiffs specifically allege in connection with the uncollectible receivables at XMEX that the senior officers at XMEX "all assert that they were merely following Xerox's accounting policies and directions from corporate headquarters" (Compl. ¶ 89), and they specifically allege with respect to improperly recognizing revenue that "the finance manager at the Mexican unit . . . revealed that Xerox corporate headquarters directed the Mexican

unit to not segregate service and supply revenue from equipment
rental revenue from long-term lease contracts" (Compl. ¶ 92).  In
further support of their contention that Xerox corporate
headquarters approved all accounting policies in Mexico, the
plaintiffs specifically allege that "[i]n Mexico, for example,
Xerox rapidly reduced the discount rate used in valuing its long-
term leases far below local interest rates between 1996 and 1999"
and that "[a]t the direction of Xerox Headquarters, [XMEX]
reduced [the discount] rate to 18 [percent] in 1997, 10 [percent]
in 1998, and 6 [percent] in 1999."  (Compl. ¶ 169.)

     Moreover, based on information from a former Xerox manager,
the plaintiffs allege that "Mexico's accounting practices were
brought up on numerous occasions during Mexican monthly
management and business meetings.  These monthly meetings were
attended by the vice presidents of various Xerox business groups.
Mexican employees were discouraged from discussing accounting
issues at these meetings."  (Compl. ¶ 225.)  The plaintiffs
allege further that the Xerox vice president in charge of the
meetings refused to discuss such accounting issues and problems
and cut off discussion when accounting issues were raised.

     Thus, when the factual allegations in the Complaint are
viewed as a whole, and the court accepts them as true and draws
all reasonable inferences therefrom in favor of the plaintiffs,
the plaintiffs have at a minimum alleged facts constituting
strong circumstantial evidence of recklessness based on the Xerox

Defendants' knowledge of facts and access to information
contradicting their public statements.  The already strong
inference of fraudulent intent that can be drawn from this
circumstantial evidence is only made stronger by the allegations
of a coverup by the Xerox Defendants, who represented that the
problems in Mexico were a result of the fact that "[o]ver a
period of years, several senior managers in Mexico had
collaborated to circumvent Xerox accounting policies and
administrative procedures . . . ."  (Compl. ¶ 40.)  See Grossman,
1987 U.S. Dist. LEXIS 1666, at *36.

        The court finds unpersuasive the argument by the Individual
Defendants that the plaintiffs' allegations of scienter as to
them are inadequate with respect to the $129 million in
uncollectible receivables because the plaintiffs do not allege
that any of the Individual Defendants had any knowledge
concerning these uncollectible receivables.  "Even with the
heightened pleading standard under Rule 9(b) and the Securities
Reform Act [the Second Circuit does] not require the pleading of
detailed evidentiary matter in securities litigation."  In re
Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001).
Moreover,

        When making the assessment whether scienter has been
        adequately pleaded, it is prudent to keep in mind that
        the PSLRA does not require a plaintiff to prove his case
        in his complaint. And, it is appropriate to recall that
        the heightened standard of pleading scienter was meant
        simply to prevent strike suits and other abuses that had
        arisen in securities fraud litigation. . . . Plaintiff

41

> generally must frame the facts respecting the defendant's
> mental state (i.e., the scienter element of the claim)
> without the benefit of discovery, and therefore, most
> often, allegations about a defendant's culpable state of
> mind must be drawn from limited state of mind evidence
> augmented by circumstantial facts and logical inferences.

Arnlund v. Deloitte & Touche LLP, 199 F. Supp. 2d 461, 475 (E.D.
Va. 2002).

The Individual Defendants also argue that the plaintiffs
attempt to satisfy their burden of pleading scienter by "alleging
that the Individual Defendants should have known about the
alleged fraudulent conduct at Xerox's Mexican subsidiary because
they were officers and directors of Xerox, the subsidiary's
corporate parent." (Ind. Defs.' Supp. Reply (Doc. No. 186) at 2.)
However, it is clear that this is not the approach being taken by
the plaintiffs.  The plaintiffs do not allege scienter on the
part of the Individual Defendants simply by virtue of the
positions those individuals held at Xerox, but rather by virtue
of the fact that Xerox's senior management orchestrated the
scheme to disguise the company's true operating performance and
the directives as to the accounting manipulations emanated from
Xerox senior management at corporate headquarters.

**B.    KPMG's Motion to Dismiss**

KPMG contends that the plaintiffs have failed to allege
scienter as to it under either the motive and opportunity prong
or the conscious misbehavior or recklessness prong of scienter.
Because the court concludes that the plaintiffs have clearly pled

scienter under the conscious misbehavior or recklessness prong, the court does not address the motive and opportunity prong. Also, in addition to its argument as to scienter, KPMG argues that the claims of plaintiffs who purchased Xerox securities after February 6, 2002 are barred by the statute of limitations.

### 1.  **Scienter**

"For 'recklessness on the part of a non-fiduciary accountant' to satisfy securities fraud scienter, 'such recklessness must be conduct that is 'highly unreasonable', representing 'an extreme departure from the standards of ordinary care.'  It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.'" Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)(quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120-21 (2d Cir. 1982)).

KPMG argues, inter alia, that the plaintiffs have failed to satisfy the requirements for pleading conscious misbehavior or recklessness as to it.  KPMG contends that the essence of the plaintiffs' claim that KPMG acted with scienter is that Xerox's accounting for lease transactions violated GAAP, and it also argues that the plaintiffs' contention that KPMG acted with scienter is supported only by conclusory allegations.  In presenting its arguments, KPMG ignores the numerous detailed factual allegations about it that are set forth with particularity in the Complaint.  Accepting as true the factual

43

allegations contained in the Complaint and drawing all reasonable inferences therefrom in favor of the plaintiffs, the court concludes that the plaintiffs have satisfied the standard for pleading conscious misbehavior or recklessness as to KPMG.

When the factual allegations in the Complaint are viewed as a whole, the plaintiffs have at a minimum alleged facts constituting strong circumstantial evidence of recklessness on the part of KPMG.  The plaintiffs have alleged in the manner required under the PSLRA, inter alia,

(i)  that KPMG also tracked Xerox's accounting manipulations and "regularly provided Xerox with documents quantifying the impact of the [c]ompany's accounting actions" (Compl. ¶ 288);

(ii)  that Xerox used artificially low interest rate assumptions to artificially inflate the recognized present value of long-term leases, and KPMG expressly approved Xerox's use of such artificially depressed interest rates in countries with extremely high interest rates, such as Mexico and Brazil, for purposes of calculating revenues from leases; and that ROE was a series of top-side adjustments, and KPMG never tested Xerox's claim that the top-side adjustments were necessary, notwithstanding the fact that in 1998 the American Institute of Certified Public Accountants issued an Audit Risk Alert pointing out the increased

44

risk associated with such non-standard journal entries and counseling auditors to review all non-standard journal entries "to ensure they are not being used to manipulate financial results" (Compl. ¶ 304);

(iii)    that KPMG knew that Xerox engaged in a practice referred to as "margin normalization," knew this practice violated GAAP, and internally referred to the practice as "half-baked revenue recognition" (Compl. ¶ 290); and that KPMG expressed concern to Xerox about the frequency with which Xerox's long-term leasing revenue recognition methodology was changing, but took no corrective action and permitted Xerox to recognize the revenue in violation of GAAP;

(iv)    that although GAAP prohibits increasing the estimated residual value of leased equipment for any reason after it is first established, Xerox recorded adjustments of at least $95 million as a result of retroactive revisions to residual values, and while KPMG initially objected to this practice as being in violation of GAAP, after "heated debates with Xerox management, KPMG approved its implementation in 1997 and allowed the practice to continue through 1998" (Compl. ¶296);

(v)    that when Xerox acquired the remaining 20 percent of Xerox Limited from Rank Group, Plc. in June 1997, Xerox established a $100 million reserve "for what it claimed

45

were 'unknown risks' of Xerox Limited" (Compl. ¶ 94),
while "[u]nder GAAP, reserves may only be recorded when
there is an identifiable basis for the happening of an
event that is 'probable,' and the effects on the
financial statements are 'reasonably estimable . . .'"
(Compl. ¶ 95); and that by the end of 1997, Xerox had
informed KPMG that Xerox had no contingent liabilities
arising from that acquisition but, nevertheless,
beginning in mid-1998 and continuing in 1999, Xerox
"charg[ed] expenses against the Rank Reserve for items
unrelated to any risks arising from the acquisition"
(Compl. ¶ 97), and "KPMG permitted [] Xerox to use the
reserve to absorb expenses . . ." (Compl. ¶ 14);

(vi)    that after KPMG informed Xerox in 1999 that Xerox's
practice of immediately recognizing revenue from price
increases and extensions on leases with existing lease
customers violated GAAP, Xerox did not cease this
practice but merely reduced the amount of revenue it
recognized, and KPMG nonetheless signed off on Xerox's
1999 and 2000 financial statements;

(vii)   that after the 1999 audit, Xerox "approached KPMG with
a plan dubbed 'Project Mozart,' that would have shifted
Xerox's big losses from selling copiers to homes and
small businesses to an off-balance sheet vehicle," but
the plan was scrapped after Ronald Safran, the senior

46

audit engagement partner at KPMG, refused to sign off
on the plan, after which Xerox insisted that KPMG
replace Safran as the engagement partner and KPMG did
so, replacing him with Michael Conway (FSB Compl.
¶ 221); and

(viii)   that in the second half of 2000 there had been a good
deal of discussion by analysts and in the financial
press about the fact that a $78 million charge for
problems at XMEX was a big number, and concerns had
been expressed about lapses of control "being general
and somewhat endemic throughout the company" (Compl.
¶ 38), with specific questions being raised about the
performance of the people at Xerox's corporate
headquarters; that in February 2001, Bingham's
allegations that Xerox's accounting irregularities were
not limited to XMEX, together with his allegations as
to specific accounting irregularities, were widely
publicized, as were statements from XMEX executives
that supported certain of Bingham's allegations and
Bingham's claim that "[m]any [Xerox] executives . . .
had developed a troubling attitude: 'There is no
accounting standard we can't beat'" (Compl. ¶ 63); that
a February 8, 2001 analyst's report stated that "We
believe that when considered within the timeline of
events and other known facts, the allegations of

financial and accounting [irregularities] warrant investor scrutiny and further analysis . . . . We believe the specter of these allegations enhances the already high-risk profile of Xerox . . ." (Compl. ¶ 67); that in March 2001, Safran was subpoenaed to appear before the SEC and was confronted with evidence of "numerous accounting irregularities engaged in by Xerox" (Compl. ¶ 314); that in March 2001, KPMG and its attorneys confronted Xerox officials with some of the documents shown to KPMG by the SEC, including an anonymous note to Romeril and Allaire alleging "fake transactions" and "illegal revenue recognition," and KPMG interpreted Romeril's response as a signal that Xerox had "a culture that didn't recognize that it was not a good thing to be getting anonymous letters about fraud" (Compl. ¶ 317); that KPMG knew prior to the First Restatement "that the SEC already suspected the massive overstatement of profit from 1997 to 2000 that it detailed in its consent decree with Xerox" (Compl. ¶ 315);  and that it was in the context of all of the foregoing that KPMG required the First Restatement, which represented "only minor restatements of [Xerox's] past financials" (Compl. ¶ 315), and "[i]n fact . . . Romeril intimidated KPMG into signing off on the Xerox audit despite the improper accounting devices by

48

threatening KPMG that any refusal to sign could trigger debt default and throw [Xerox] into bankruptcy" (FSB Compl. ¶ 60).

Thus, the factual allegations in the Complaint do, in fact, portray KPMG as a "virtual pushover" (Compl. ¶ 315) in its dealings with the Xerox Defendants, which at a minimum went along with accounting practices it knew to be clear violations of GAAP, and which, even after it was clear early in 2001 that there were very serious concerns about Xerox's accounting practices and it was apparent that it was questionable--at best--whether Xerox took seriously its obligation to comply with applicable accounting rules, was intimidated into signing off on a minimal restatement of Xerox's financial statements that accounted for only a small portion of Xerox's overstatements of revenues and pre-tax earnings.  The court concludes that the allegations of the Complaint describe conduct on the part of a non-fiduciary accountant that is highly unreasonable and represents an extreme departure from the standards of ordinary care.[3]  Compare In re Ikon Office Solutions, Inc. Sec. Litig., 66 F. Supp. 2d 622, 629-30 (E.D. Pa. 1999)(plaintiff adequately pled scienter by alleging defendant accountant violated auditing principles and had notes

---

[3] In its reply memorandum, KPMG includes a separate section with respect to its audit report on Xerox's 2000 financial statements.  There is no such separate argument made in KPMG's moving papers, so the court does not address that audit report separately.  However, the court's analysis as to scienter on the part of KPMG covers that audit report.

in its file regarding an audit committee meeting which specifically referred to one employee "cooking the books"); In re Oxford Health Plans, Inc. Sec. Litig., 51 F. Supp. 2d 290, 295-96 (S.D.N.Y. 1999)(plaintiff adequately pled scienter by alleging GAAP/GAAS violations coupled with "red flags" of which auditor must have been aware, including the facts that the client's accounting software could not keep track of accounts receivable, state officials had repeatedly investigated the client, and the company had misstated revenues by "hundreds of millions of dollars").

### 2. Statute of Limitations

KPMG seeks dismissal of claims asserted by class members who purchased Xerox securities after February 6, 2002, arguing that the applicable statute of limitations bars any claims brought later than one year after February 6, 2001. Although it makes reference to additional issues in its reply memorandum, KPMG presents a very narrow argument in its moving papers. It contends that the front-page story in The Wall Street Journal on February 6, 2001, which set forth Bingham's allegations, gave the plaintiffs actual notice of their claims. The court limits its analysis to that argument only.

"Litigation instituted pursuant to § 10(b) and Rule 10b-5 . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after

such violation." <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v.
Gilbertson</u>, 501 U.S. 350, 364 (1991).  In <u>Rothman v. Gregor</u>, 220
F.3d 81 (2d Cir. 2000), the Second Circuit applied a two-part
test to determine whether a § 10(b) claim is barred by the
statute of limitations.  <u>Id.</u> at 97.  ("[W]e conclude that whether
the Appellants' claim against Andersen is time-barred turns on
<u>when</u>, after obtaining inquiry notice in December 1997, the
Appellants, in the exercise of reasonable diligence, should have
discovered the facts underlying the alleged fraud by Andersen."
(footnote omitted)).  In reaching this conclusion, the court
cited with approval the reasoning of the Tenth Circuit that "the
applicable statute of limitations should not precipitate
groundless or premature suits by requiring plaintiffs to file
suit before they can discover with the exercise of reasonable
diligence the necessary facts to support their claims." <u>Id.</u> at 97
(quoting <u>Sterlin v. Biomune Sys.</u>, 154 F.3d 1191, 1201 (10th Cir.
1998)).

The opinion in <u>In re Complete Management Inc. Securities
Litigation</u>, 153 F. Supp. 2d 314 (S.D.N.Y. 2001), explains the
two-part test applied in <u>Rothman</u> as follows:

> Establishing the reasonable discovery date of a
> securities fraud is a two-step process. First, a court
> must determine when a reasonable investor could learn of
> facts sufficient to indicate the probability that he has
> been defrauded, a circumstance known as "inquiry notice."
> Assuming a duty to inquire develops, then a court must
> take the second step of assessing when, "in the exercise
> of reasonable diligence, [a plaintiff] should have
> discovered the facts underlying the alleged fraud . . .

         ."  The statute of limitations then begins to run from
         that moment of constructive notice.

Id. at 336-37 (citations omitted).  Also, it should be noted that

when the court in Rothman referred to discovery of "the facts

underlying the alleged fraud," it was making reference to facts

sufficient to allege scienter, i.e., facts stated with

particularity and giving rise to a strong inference that the

defendant acted with the required state of mind.  See Rothman,

220 F.3d at 96 ("Without these alleged facts, we would not have

found that the appellants alleged sufficient facts to plead GT's

scienter, let alone Andersen's scienter.").

         The court is not determining at this time the date on which

the plaintiffs had "inquiry notice" because it was not directly

addressed in the briefing.  However, taking as true the factual

allegations in the Complaint and drawing all reasonable

inferences therefrom in favor of the plaintiffs, one could

conclude that February 6, 2001 is a date on which the plaintiffs

only had "inquiry notice" under the two-step process followed in

Rothman because the requirement is that the reasonable investor

learn of facts sufficient to indicate the probability that the

investor has been defrauded, and the Complaint alleges that a

February 8, 2001 analyst's report concluded that the allegations

of accounting irregularities warranted investor scrutiny and

further analysis, and it further alleges that investors were

relieved following the First Restatement and statements by the

Xerox Defendants about how it effectively rebutted Bingham's allegations and about how Xerox was continuing to cooperate with the SEC.

The foregoing analysis as to "inquiry notice" leads the court to conclude that KPMG has not demonstrated at this stage of the case that the plaintiffs had "constructive" notice as of February 6, 2001, and thus KPMG's motion to dismiss claims by class members who purchased Xerox securities after February 6, 2002 on the grounds that <u>The Wall Street Journal</u> story on February 6, 2001 gave "constructive notice" to the plaintiffs should be denied.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, Xerox Defendants' Motion to Dismiss Plaintiffs' Third Consolidated Amended Complaint (Doc. No. 161) is hereby DENIED, and Motion of Defendant KPMG LLP to Dismiss the Third Consolidated Amended Complaint (Doc. No. 166) is also hereby DENIED.

It is so ordered.

Dated this 13th day of July 2005, at Hartford, Connecticut.

/s/AWT

_____
Alvin W. Thompson
United States District Court