# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RUSSELL CARLSON, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) ) | 3:00-CV-1621 (AWT) **ALL CASES** |
| Plaintiff, | ) ) | |
| v. | ) ) | December 2, 2005 |
| XEROX CORPORATION, KPMG LLP, PAUL A. ALLAIRE, G. RICHARD THOMAN, ANNE MULCAHY BARRY D. ROMERIL, GREGORY TAYLER and PHILIP FISHBACH | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPENDIUM OF UNREPORTED AUTHORITY CITED IN XEROX DEFENDANTS' POSITION STATEMENT REGARDING THE RULE 26(f) REPORT AND THE CONFIDENTIALITY ORDER**

## <u>UNREPORTED CASES</u>

**<u>CASES</u>**                                                               **<u>TAB</u>**

<u>ACE Ltd. v. Cigna Corp.</u>, No. 00 Civ. 9423 (WK), 2001 U.S. Dist. LEXIS
    19090 (S.D.N.Y. Nov. 20, 2001) ................................................................1

<u>Carpenter Tech. Corp. v. Armco, Inc.</u>, CIV. A. No. 90-0740, 1990 WL 61180
    (E.D. Pa. May 8, 1990) ..........................................................................2

<u>Gramm v. Horsehead Indus., Inc.</u>, No. 87 Civ. 5122 (MJL), 1990 WL 142404
    (S.D.N.Y. Jan. 25, 1990).......................................................................3

<u>Masters v. Wilhelmina Model Agency, Inc.</u>, No. 02 Civ. 4911(HB)(HBP),
    2003 WL 21089073 (S.D.N.Y. May 13, 2003) ............................................4

<u>Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hicks, Muse,
Tate & Furst, Inc.</u>, No. 02 Civ. 1334 (SAS), 2002 WL 1822738
    (S.D.N.Y. Aug. 8, 2002) ........................................................................5

<u>New Colt Holding Corp. v. RJG Holdings of Fla.,Inc.</u>,
    No. Civ. 302CV173PCD, 2003 WL 22326978 (D. Conn. Mar. 27, 2003) ..................6

1

3 of 8 DOCUMENTS

**ACE Limited, Plaintiff, - against - CIGNA Corporation and CIGNA Holdings, Inc.,
Defendants.**

**00 Civ. 9423 (WK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2001 U.S. Dist. LEXIS 19090*

**November 20, 2001, Decided**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Plaintiff: H. Lee Godfrey, Vineet
Bhatia, Susman Godfrey L.L.P., Houston, Texas.

For Defendants: Jay B. Kasner, Joseph M. Asher, Skad-
den, Arps, Slate, Meagher & Flom LLP, New York, NY.

**JUDGES:** WHITMAN KNAPP, SENIOR U.S.D.J.

**OPINIONBY:** WHITMAN KNAPP

**OPINION:**

**ORDER**

**WHITMAN KNAPP, SENIOR DISTRICT JUDGE**

On May 23, 2001, counsel for both Plaintiff ACE
Ltd. ("ACE") and Defendants CIGNA Corp. and CIGNA
Holdings, Inc. ("Defendants" or "CIGNA") filed a writ-
ten report in compliance with *Federal Rule of Civil Pro-
cedure 26(f)* memorializing their agreed-upon schedule
for pre-trial proceedings. That report provided, among
other things, that the parties would conduct "document
discovery" between May 1 and August 1, 2001. Once
document discovery was substantially completed, "fact
discovery" (i.e. discovery primarily involving deposi-
tions and interrogatories) was to commence on August 1
and continue until January 18, 2002. Both parties have
since treated that report as a Scheduling Order issued
pursuant to *Federal Rule of Civil Procedure 16*, and we
now formally adopt their report as our Scheduling Order.

Although ACE produced various documents during
the document discovery period, [*2] CIGNA contends
that ACE failed to produce numerous documents respon-
sive to its production requests. Now that ACE has begun
noticing depositions, CIGNA moves this court to modify

the deadlines set forth in the Scheduling Order. In es-
sence, CIGNA asks this Court to modify its scheduling
order by (1) extending the fact discovery deadline by, at
the very least, ninety days from the date upon which
ACE completes its production of documents in response
to CIGNA's request; (2) preventing ACE from conduct-
ing depositions prior to ACE's production of such docu-
ments and CIGNA's review of such documents; and (3)
extending all other deadlines, including the trial date, by
at least ninety days. ACE strenuously opposes such a
modification (particularly any extension with respect to
the trial date currently set for November 4, 2002).

While both parties acerbically snipe at each other
regarding who is to blame for any outstanding document
production delay, we need not address that issue as their
discovery dispute over document production is not be-
fore this Court. On October 8, 2001, in a letter to this
Court, ACE's counsel indicated that it was making ap-
proximately sixty-three boxes of documents available
[*3] for CIGNA's review. According to the figures listed
by ACE, those boxes may contain nearly 84,000 pages of
documents. In addition, in an October 16, 2001 letter to
CIGNA's counsel, ACE also indicated that it would be
producing additional documents to CIGNA. Regardless
of why the completion of document production has been
delayed, it is eminently clear from these two letters that
document discovery was not completed on August 1,
2001 and that, after some delay, CIGNA may soon be
receiving a substantial amount of additional documenta-
tion.

Rule 16(b) provides that a schedule established in a
scheduling order "shall not be modified except upon a
showing of good cause and by leave of the district
judge." *FED.R.CIV.P. 16(b)*. "In determining whether
good cause exists, courts will consider 'factors such as
diligence *vel non* of the party requesting an extension,
bad faith *vel non* of the party opposing such extension,
the phase of the litigation and prior knowledge of and

notice of the parties" *Elliot Associates, L.P. v. The Republic of Peru (S.D.N.Y. Aug. 1, 1997) 1997 WL 436493, *3.* "District courts generally have considerable discretion to extend deadlines contained [*4] in pretrial orders." *Id.*

The circumstances in *Elliot Associates, L.P.* are analogous to those present in the instant case. In *Elliot Associates, L.P.*, the court found that delays in document production had resulted in the possibility that depositions would not be completed by the discovery deadline. *Id.* at *3. As such, the court found good cause to extend the discovery deadline imposed by the Rule 16 scheduling order. *Id.*

Here, the Scheduling Order provided that document discovery was to have concluded by August 1, 2001. Once document discovery had been completed, fact discovery would begin and continue into January 2002. Although the Scheduling Order did provide for some ongoing document production beyond August 1, it is clear that CIGNA would be prejudiced if the current fact discovery deadline were not modified. Since ACE is not still awaiting any production of a substantial number of documents it has yet to review, it might reasonably conclude its fact discovery by January 18, 2001. On the other hand, CIGNA is awaiting the production of a substantial number of documents, and it may well have difficulties in discovering whom it needs to depose, what questions [*5] or issues need to be explored through deposition or interrogatories, and facts relevant to defending various depositions without first reviewing such materials. As such, as in *Elliot Associates, L.P.*, the delay in document production in this case has resulted in the very real possibility that CIGNA will be unable to meaningfully complete its fact discovery by the current fact discovery cut-off date. Good cause therefore exists to extend the current discovery deadlines.

ACE, however, raises a legitimate issue with respect to the scope of such an extension. ACE asks this Court to, at the very least, extend the fact discovery deadline by 90 days from the date upon which ACE completes its production of documents in response to CIGNA's requests for production and to delay ACE's depositions until at least that same date. Such a discovery schedule would be too open-ended. This Court will not allow the discovery schedule to be held hostage to CIGNA's subjective satisfaction with ACE's document production. We thus set forth the following less flexible schedule to account for ACE's legitimate concerns.

As CIGNA is still in the process of receiving various documents from ACE, document discovery [*6] has not yet concluded. This Court now holds that document discovery must be completed by February 25, 2002. To the extent that CIGNA continues to dispute whether ACE

has satisfied its requests for production of documents, CIGNA should timely litigate those issues within this time frame. If any party intends to file a motion to compel the production of any documents, such a motion to compel must be filed no later than January 24, 2002.

Fact discovery (i.e. depositions and interrogatories), which was previously scheduled to proceed for approximately five and a half months from the day upon which document discovery was completed, will now officially commence on February 26, 2002, and continue until August 13, 2001. Unless the parties both agree, no depositions should be taken prior to February 26, 2002. To the extent that this Court resolves a motion to compel the production of documents by May 13, 2001, the Court shall not further modify the discovery schedule due to document production delays as the parties will still have approximately ninety days to conclude fact discovery.

Given these extensions, the Court must realistically extend the other deadlines set forth [*7] in the Scheduling Order, including the trial date. Requests for admissions shall now be served by September 13, 2002, and responses to such requests shall be due by October 14, 2002.

Expert discovery will now commence on October 16, 2002 and will be concluded by January 3, 2003. On the dates noted below, the parties shall identify their experts by providing the other parties with a copy of each expert's written report as described in *Federal Rule of Civil Procedure 26(a)(2)(B)*. On October 16, 2002, both sides shall identify their respective experts and provide expert reports. On November 18, 2002, the parties will identify their respective rebuttal experts and provide expert reports. Both sides shall complete their expert depositions by January 3, 2003.

Dispositive motions must be filed, served, and briefed on the following schedule. Opening briefs must be filed by February 3, 2003. Opposition briefs must be filed by March 3, 2003. Reply briefs must be filed by March 18, 2003.

Trial in this case is now set for June 2, 2003. A final pre-trial conference should be held on or before May 19, 2003. The parties will exchange (a) [*8] witness and exhibit lists, (b) motions *in limine*, (c) proposed *voire dire* questions and proposed jury instructions, (d) and a joint statement of the relevant facts on which both parties agree by April 18, 2003. Objections to proposed *voire dire* questions, proposed jury instructions, and witness and exhibit lists shall be exchanged on April 28, 2003. Opposition briefs to motions *in limine* will be due by May 5, 2003, and reply briefs in further support of motions *in limine* shall be filed by May 12, 2003. This schedule of pre-trial proceedings assumes no dispositive motion is pending. In the event that a dispositive motion

2001 U.S. Dist. LEXIS 19090, *

is pending, the parties will confer regarding the appropri-
ate scheduling of these matters (including an appropriate
extension with respect to the trial date).

**SO ORDERED.**

November 20, 2001
New York, New York

WHITMAN KNAPP, SENIOR U.S.D.J.

2

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1990 WL 61180 (E.D.Pa.)

**(Cite as: 1990 WL 61180 (E.D.Pa.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
CARPENTER TECHNOLOGY CORP., Plaintiff,
v.
ARMCO, INC., Defendant.
**CIV. A. No. 90-0740.**

May 8, 1990.

Richard C. Rizzo, Dechert Price & Rhoads, Robert
A. Limbacher, Philadelphia, Pa., for plaintiff.

Robert A. Nicholas, Reed Smith Shawl & McClay,
Arland T. Stein, Philadelphia, Pa., for defendant.

*MEMORANDUM AND ORDER*

HUYETT, District Judge.

*1 Pursuant to Rule 30(b)(6) of the Federal Rules
of Civil Procedure, defendant Armco, Inc.
("Armco") has noticed the deposition of a corporate
designee of plaintiff Carpenter Technology
Corporation ("Carpenter"). [FN1] In the instant
motion for a protective order, Carpenter argues that
certain portions of the deposition notice are
irrelevant to the issue raised by its complaint. In
addition, Carpenter objects to other portions of the
deposition notice because it fails to identify the
matters upon which testimony is sought with
reasonable particularity. Finally, Carpenter asks
this Court to postpone the taking of depositions
until after document production is complete to
avoid the need for costly, piecemeal depositions.
For the reasons stated below, I will grant
Carpenter's motion for a protective order, and order
the parties to establish a comprehensive deposition
schedule which shall commence after the initial
exchange of documents.

I.

Resolution of this discovery dispute requires a
detailed discussion of the factual background of this
suit. In 1973, Carpenter entered into a patent
license agreement with Armco regarding United
States Patent No. 3,556,776 ("the '776 patent").
The agreement required Carpenter to pay a royalty
of 5% of the net selling price of the products
covered by the '776 patent. Carpenter has complied
with this obligation.

A third party, Cyclops Corporation ("Cyclops"),
began selling products covered by the '776 patent
without a license in the early 1980's. As a result,
Armco filed an infringement action against Cyclops
in the Western District of Pennsylvania ("the
*Cyclops* action"). As a defense, Cyclops
maintained that the '776 patent was invalid because
the invention was in public use and on sale for more
than one year prior to the date of the patent
application.

Subsequently, in October 1982, Carpenter initiated
a declaratory judgment action in the Eastern District
of Pennsylvania which alleged that the '776 patent
was invalid and unenforceable. Carpenter and
Armco settled this action on October 23, 1983.

Pursuant to the settlement agreement ("the 1983
Agreement"), Carpenter continued paying royalties
to Armco pending the resolution of the *Cyclops*
action. In the event the '776 patent was declared
invalid in the *Cyclops* action, Armco agreed to
reimburse Carpenter for all royalties paid from the
date of the 1983 Agreement plus interest. The
1983 Agreement dealt with the possibility of
settlement of the *Cyclops* action as follows:

6. In the event the *Armco v. Cyclops* case is
terminated by settlement which has the effect of
according Cyclops an effective royalty rate less than
or more favorable to Cyclops than the royalty rate
provided for in the Armco/Carpenter License

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 2

Not Reported in F.Supp., 1990 WL 61180 (E.D.Pa.)

**(Cite as: 1990 WL 61180 (E.D.Pa.))**

Agreement of December 31, 1973, Armco shall promptly notify Carpenter of such lower or more favorable royalty rate (by furnishing Carpenter with a true copy of all portions of the Settlement Agreement bearing on the effective royalty rate, including all portions dealing with royalties and/or other payments), and Carpenter shall be entitled to recalculate royalties theretofore paid to Armco covering the period for which Cyclops is paying royalties as to have the benefit of such lower or more favorable royalty rate; Carpenter shall also have the benefit of such lower or more favorable royalty rate for royalty payments thereafter accruing under the December 31, 1973 agreement; in the event that such recalculation by Carpenter shall result in a sum due and owing to Carpenter, Armco shall pay the same to Carpenter within 15 days after written notice from Carpenter to Armco. In the event Carpenter shall be required to institute litigation to collect any such sum, Carpenter shall be entitled to recover in such litigation its reasonable attorney's fees for conducting the same.

*2 *See* Carpenter's Exhibit A, pp. 3-4.

In July 1985, the '776 patent was declared invalid in the *Cyclops* action on Cyclop's motion for summary judgment. The Federal Circuit reversed and remanded the case for resolution of certain factual disputes regarding the validity of the '776 patent. [FN2] *See Armco, Inc. v. Cyclops Corp.,* 791 F.2d 147 (Fed.Cir.1986).

Nearly three years later, the *Cyclops* action was settled ("the *Cyclops* settlement agreement"). The *Cyclops* settlement agreement provided for a cash payment by Cyclops in the amount of $225,000 over the period of a year [FN3] and an exchange of services. Pertinent portions of the *Cyclops* settlement agreement provide for an exchange of services as follows:

4.1 CYCLOPS' Cytemp Division (hereinafter "CYTEMP"), shall make available to BALTIMORE the following conversion work at the prices per pound to BALTIMORE and maximum volume (tons/mo.) listed below, for a period of thirty (30) consecutive months from the date of

execution of this Agreement:

\* \* \*

5.1 CYCLOPS' CYTEMP Division or any successor to substantially all of the assets of the CYTEMP Division shall purchase conversion work from BALTIMORE an BALTIMORE's rotary forge for an aggregate 3,000 tons of material during a period of seven (7) years from the date of execution of this Agreement.

\* \* \*

*See* Carpenter's Exhibit B, pp. 2-3, 7. Subsequent to the *Cyclops* settlement agreement, Armco, through its subsidiary, advised Carpenter that "[t]he royalty to Carpenter is 5% of sales, and the settlement with Cyclops is equivalent to an effective royalty of 5% of sales." *See* Carpenter's Exhibit C.

Carpenter disputed Armco's calculation of the effective royalty rate provided to Cyclops by virtue of the *Cyclops* settlement agreement at 5%, and has filed suit to recover under paragraph 6 of the 1983 settlement agreement. [FN4] The sole issue presented by this action is whether the *Cyclops* settlement agreement has the effect of according Cyclops an effective royalty rate more favorable than the 5% royalty rate paid by Carpenter pursuant to the 1973 patent license agreement with Armco. This is complicated by the fact that the *Cyclops* settlement agreement involves an exchange of services.

II.

The scope of permissible discovery is set forth in the Federal Rules of Civil Procedure. Rule 26(b)(1) states:

parties may obtain discovery regarding any matter, not privileged, which is *relevant* to the subject matter involved in the pending action, whether it relates to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 3

Not Reported in F.Supp., 1990 WL 61180 (E.D.Pa.)

**(Cite as: 1990 WL 61180 (E.D.Pa.))**

the trial if the information sought appears *reasonably calculated to lead to the discovery of admissible evidence.*

**\*3** [emphasis supplied]. While the scope of discovery is generally broad, it is not without its bounds. *See McCalin v. Mack Trucks, Inc.,* 85 F.R.D. 53, 57 (E.D.Pa.1979). In defining the permissible scope of discovery, I may issue an order limiting discovery to certain matters.

Carpenter objects to the following areas of examination identified in Armco's notice of corporate deposition as irrelevant:

7. The making, using and selling by Carpenter of 13-8 Mo and other alloys in accordance with United States Patent No. 3,556,77[6], including but not limited to the amount of sales and usages of each alloy.

8. The costs and the profits to Carpenter with regard to sales and usages of 13-8 Mo and other alloys made in accordance with United States Patent 3,556,776, including but not limited to an identification of the items of costs and their amounts and the items of profit and their amounts.

                              * * *

10. The capacity of Carpenter to make 13-8 Mo and other alloys in accordance with United States Patent 3,556,776.

11. The services performed by Carpenter for Armco or Cyclops Corporation, including but not limited to the identification of each service, the capacity to perform each such service, sales price with regard to the performance of each such service, the cost to carpenter for performance of each such service, and the profits to Carpenter for performance of each such service.

12. The products sold by Carpenter to Armco or Cyclops Corporation, including but not limited to the identification of each such product, the sales price with regard to each such product, the costs to Carpenter for each such product, and the profits to Carpenter with regard to each such product.

13. The performance of annealing of billets by Carpenter for another company and by another company for Carpenter since January 1, 1981, including but not limited to the capacity to perform such annealing of billets, the identity of each such other company involved in each such annealing of billets, the costs of performing each such annealing of billets and the profits to Carpenter and to the other company in performing each such annealing of billets.

*See* Carpenter's Exhibit F, pp. 3-5. Carpenter claims that paragraphs 14 through 16, which are substantially similar to paragraph 13 except that they deal with pickling (¶ 14), VIM melting (¶ 15) and rotary forge conversion (¶ 16), also seek the production of irrelevant information.

Carpenter argues that "none of these subjects are remotely relevant to the fundamental issue of what is the effective royalty rate being paid by *Cyclops* to *Armco* under their 1989 Agreement." *See* Plaintiff's Brief in Support of Motion for a Protective Order, p. 14 (emphasis in original). In response, Armco argues that these matters relate directly "to valuation of the benefits received by Plaintiff under the terms of the 1973 License Agreement," and that it is necessary "to compare the relative value of the two effective royalty rates." *See* Defendant's Brief in Response to Plaintiff's Motion for a Protective Order, pp. 4-5. Armco incorrectly srgues that this case involves a comparison of the benefits accorded to Carpenter under the 1973 license agreement with the benefits accorded to Cyclops under the *Cyclops* settlement agreement.

**\*4** The language of the 1983 Agreement demonstrates that a valuation of the benefits received by Carpenter under the 1973 license agreement are not relevant to this suit. Paragraph 6 of the 1983 Agreement provides that in the event that the *Cyclops* action "is terminated by a settlement which has the effect of according to Cyclops an effective royalty rate less than or more favorable to Cyclops than the royalty rate provided for in the Armco-Carpenter License Agreement of 1973 ..." The only question to be resolved by this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 61180 (E.D.Pa.)

**(Cite as: 1990 WL 61180 (E.D.Pa.))**

Page 4

suit is whether the *Cyclops* settlement agreement had the effect of according to Cyclops a royalty rate less than or more favorable than 5%--the rate negotiated by Armco and Carpenter as a part of the 1973 license agreement. The fact that Carpenter may have realized large sales or profits, by virtue of a high volume of sales of the subject matter of the '776 patent and 1973 license agreement, does not affect the ultimate issue to be resolved by this litigation. Therefore, the subject matter of paragraphs 7 and 8 are not relevant or reasonably calculated to lead to admissible evidence. Similarly, Carpenter's performance of annealing of billets, pickling, VIM melting, and rotary forge conversion for other companies or another companies' performance of same for Carpenter is *not* relevant to the narrow issue raised by Carpenter's complaint. Thus, the subject matter of the deposition notice contained in paragraphs 10 through 16 is also improper. Therefore, I will grant Carpenter's motion for a protective order, and strike these portions of Armco's notice of deposition.

### III.

I will also grant Carpenter's request that I issue an order postponing the taking of depositions on the remaining areas of the deposition notice. I have "broad discretion" in controlling the timing of discovery. *Salter v. Upjohn Co.,* 593 F.2d 649, 651 (5th Cir.1979); *see also Marroquin-Manriquez v. Immigration and Naturalization Service,* 699 F.2d 129, 134 (3d Cir.1983), *cert. denied,* 467 U.S. 1259 (1984).

In addition to the deposition notice referred to above, Armco has filed a request for production of documents which duplicates all 16 subject areas contained in the deposition notice. Carpenter has not responded to this request. However, Armco proposes to conduct the depositions of various Carpenter corporate designees without the benefit of prior document production. This could lead to the need to reconvene the depositions of certain corporate officers for the purpose of a separate examination regarding the documents. I conclude that requiring Carpenter to produce the same witnesses on two separate occasions would result in undesirable, piecemeal discovery. This is both an inefficient and costly means of pursuing discovery. For this reason, I shall grant Carpenter's request.

Armco shall be prohibited from conducting any depositions of Carpenter's corporate designees until after all document production from its request for production of documents is completed and counsel have had an opportunity to negotiate a mutually convenient deposition schedule. During these negotiations, Armco may designate specific persons to be produced for deposition based upon its examination of the records produced or simply notice the deposition of an unspecified corporate designee with a description of the matters upon which examination will be taken. Fed.R.Civ.Proc. 30(b)(6); *see also GTE Products Corp. v. Gee,* 115 F.R.D. 67, 68 (D.Mass.1987).

### IV.

**\*5** For the reasons stated above, Carpenter's motion for a protective order is granted and paragraphs 7, 8, and 10 through 16 of Armco's notice of deposition of Carpenter's corporate designee are stricken. In addition, all depositions of Carpenter's corporate designees are stayed pending production and review of all relevant corporate documents pursuant to outstanding requests for production of documents, and the negotiation by counsel of a mutually convenient and efficient deposition schedule for these corporate officers.

Counsel are reminded that the Court expects counsel to cooperate as much as possible in an effort to resolve discovery disputes without seeking judicial intervention. Counsel are further expected to proceed with discovery in an efficient and expeditious manner.

An appropriate order follows.

### ORDER
Upon consideration of plaintiff's Motion for a Protective Order Regarding the Rule 30(b)(6) Deposition Notice of defendant and supporting memorandum of law, the response of defendant, the reply of plaintiff, and for the reasons stated in the attached memorandum, it is ordered as follows:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 5

Not Reported in F.Supp., 1990 WL 61180 (E.D.Pa.)

**(Cite as: 1990 WL 61180 (E.D.Pa.))**

(a) Plaintiff's motion is GRANTED;

(b) The subject matter of paragraphs 7, 8, and 10 through 16 of defendant's Rule 30(b)(6) deposition notice is not permissible discovery, and these paragraphs are hereby STRICKEN;

(c) The taking of the deposition of Carpenter's corporate officers or designees shall be STAYED until after: (1) the production and review of all documents produced by Carpenter pursuant to defendant's presently outstanding Request for Production of Documents, and (2) counsel for both parties agree upon a mutually convenient and efficient deposition schedule.

IT IS SO ORDERED.

> FN1. The deposition was scheduled to take place on April 17, 1990. However, by agreement of counsel, it was postponed pending order of this Court on Carpenter's motion for a protective order.

> FN2. The '776 patent disclosed stainless steel alloys of the general type of PH 13-8 MO fabricated by the air melt or double vacuum melt process. *Id.* at 148.

> FN3. This amount was to be paid to Baltimore Specialty Steels Corporation ("Baltimore"), a subsidiary of Armco.

> FN4. Carpenter seeks to recalculate royalties paid to Armco to obtain the benefit of the allegedly more favorable royalty rate accorded to Cyclops by virtue of the *Cyclops* settlement agreement. In addition, Carpenter seeks costs and attorney's fees.

Not Reported in F.Supp., 1990 WL 61180 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:90cv00740 (Docket) (Feb. 01, 1990)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3



## Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

**(Cite as: 1990 WL 142404 (S.D.N.Y.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Robert GRAMM, Susan Skakel Rand and Mark
Skakel, on behalf of themselves and
all other former shareholders of Great Lakes
Carbon Corporation similarly
situated, Plaintiffs,
v.
HORSEHEAD INDUSTRIES, INC. and Mellon
Bank, N.A., Defendants.
**No. 87 CIV. 5122 (MJL).**

Jan. 25, 1990.
Robert L. Sills, Reboul, MacMurray, Hewitt,
Maynard & Kristol, New York City, for plaintiffs.

Helene M. Freeman, Shea & Gould, New York
City, for defendants.

MEMORANDUM AND ORDER

MICHAEL    H.    DOLINGER,    United    States
Magistrate:

**\*1** Defendant Horsehead Industries has moved for
an order requiring plaintiffs' counsel to return three
documents that are assertedly protected by the
attorney-client privilege or work-product rule and
that were supposedly inadvertently disclosed by a
non-party witness when he produced them at his
deposition in September 1987. The motion is
granted in part and denied in part.

The first of the three documents is a memorandum
that was prepared by Jane Kober, Esq., an attorney
for Horsehead. The other two documents consist
of sets of notes prepared by a Michael Stanton,
when he was employed either by Horsehead or by

an affiliated company. The two sets of notes are
dated May 6 and July 21, 1987 respectively and
were prepared at the request of Ms. Kober to assist
her in connection with the current litigation.

All of these documents were contained in a file of
papers that were in the possession of Mr. Stanton at
the time of his deposition in September 1988.
Although Mr. Stanton had left the employ of
Horsehead or its affiliated company at some earlier
time, he had retained these documents, and the
record reflects no information suggesting that
Horsehead had made any attempt to retrieve them
or that its counsel sought to screen Mr. Stanton's
documents prior to or at the deposition.

When deposed, Mr. Stanton produced the folder of
documents, but volunteered that one--the so-called
Kober    memorandum--was    privileged.    When
Horsehead's counsel reviewed the memorandum,
she agreed, and Stanton withheld that item while
turning over the rest of his documents. The folder
was marked as an exhibit at the deposition, and
handed    over    to    plaintiff's    counsel.    At    the
conclusion of the deposition, Horsehead's counsel
reviewed what had been produced and then stated
that the folder contained a second copy of the
Kober memorandum and requested its removal from
the    exhibit.    Plaintiffs'    counsel    declined,    but
ultimately agreed not to copy or review it until the
issue was resolved.

Defendant's counsel never mentioned the Stanton
notes at the deposition. Finally, in January 1989,
when she wrote to plaintiffs' counsel about the
dispute, she advised that Horsehead believed that
those notes, which were also part of the Stanton
folder, were work-product and should also be
returned. [FN1]

The parties attempted without success to resolve
their dispute. Horsehead finally filed a motion for
a protective order on June 2, 1989.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 2

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

**(Cite as: 1990 WL 142404 (S.D.N.Y.))**

*ANALYSIS*

At the outset I note that the events leading to this dispute, as well as Horsehead's presentation of the facts in its motion papers, are characterized by continuing confusion and reflect an extraordinary degree of sloppiness on the part of defendants' counsel. Indeed, upon *in camera* review of each side's copies of the documents assertedly at issue, the Court discovered that two of the disputed documents in plaintiffs' possession--the Kober memorandum and the July 21 Stanton notes--are in whole or in part different from the versions that Horsehead had presented to the Court, although they bear some similarities. Since Horsehead's motion seeks the return of documents held by plaintiffs, necessarily the following discussion addresses the documents that plaintiffs have proffered. [FN2]

*2 I address the Stanton notes first, and then turn to the Kober memorandum.

A. *The Stanton Notes*

Defendants claim that the Stanton notes are work-product and also protected by the attorney-client privilege. [FN3] They further argue that production of these documents by Stanton at his deposition was inadvertent and should therefore not be viewed as a waiver of protection.

We start by noting that it is the burden of Horsehead to establish the facts that would demonstrate the existence of a privilege or the applicability of the work-product rule. *See, e.g., von Bulow v. von Bulow,* 811 F.2d 136, 144 (2d Cir.), *cert. denied,* 481 U.S. 1015 (1987) (quoting In re *Grand Jury Subpoena Dated Jan. 4, 1984,* 750 F.2d 223, 224 (2d Cir.1984)). *Accord, e.g., United States v. Stern,* 511 F.2d 1364, 1367 (2d Cir.), *cert. denied,* 423 U.S. 829 (1975); In re *Horowitz,* 482 F.2d 72, 82 (2d Cir.), *cert. denied,* 414 U.S. 867 (1973). This burden requires an evidentiary showing by competent evidence, *see, e.g., von Bulow v. von Bulow, supra,* 811 F.2d at 144, and cannot be " 'discharged by mere conclusory or ipse dixit assertions.' " In re *Grand*

*Jury Subpoena Dated Jan. 4, 1984, supra,* 750 F.2d at 225 (quoting In re *Bonanno,* 344 F.2d 830, 833 (2d Cir.1965)). *Accord, von Bulow v. von Bulow, supra,* 811 F.2d at 146. If such a privilege is established, it then becomes the burden of plaintiffs to demonstrate the facts establishing a waiver. *See, e.g.,* In re *Horowitz, supra,* 482 F.2d at 80.

Insofar as the Stanton notes are concerned, we may assume for present purposes that Horsehead has established that they constitute work-product. Although the affidavit of Ms. Kober in support of that claim is skeletal, to say the least, she does represent without contradiction by plaintiffs that Mr. Stanton "prepared the notes ... at my request and for my use in connection with settlement discussions and anticipated litigation." (*See* Affidavit of Jane Kober, Esq., sworn to Oct. 11, 1988.) She further states that the notes "were intended by me and by Horsehead Industries, Inc. to be privileged," a statement apparently intended to suggest that the documents were maintained with the requisite degree of confidentiality. Liberally construed, these statements suffice to justify the conclusion that the notes meet the basic requirements of Fed.R.Civ.P. 26(b)(3), which provides presumptive protection for documents "prepared in anticipation of litigation or for trial...." [FN4] Although the most stringent protection of the rule governs the attorney's own mental impressions, *see, e.g., Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989), the rule plainly offers some protection as well to documents authored by others, whether or not, as in this case, at the request of the attorney.

Nonetheless, wholly apart from the assertedly inadvertent production by Mr. Stanton, defendants have obviously waived any protection for the Stanton notes. Waiver of work-product immunity is found whenever a party has disclosed the work-product in such a manner that it is likely to be revealed to his adversary. *See generally Shields v. Sturm Ruger & Co.,* 864 F.2d 379, 381-82 (5th Cir.1989);₅₄In re *Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982); *GAF Corp. v. Eastman Kodak Co.,* 85 F.R.D. 46, 52 (S.D.N.Y.1979); *Stix*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

**(Cite as: 1990 WL 142404 (S.D.N.Y.))**

*Products v. United Merchants & Mfrs.*, 47 F.R.D. 334, 338 (S.D.N.Y.1969). In this case, Horsehead itself provided to plaintiffs a copy of the March 6, 1987 notes and the relevant pages of the July 21, 1987 notes, and furthermore permitted plaintiffs' counsel to question witnesses at several depositions concerning the contents of these documents. Necessarily, then, Horsehead cannot belatedly invoke a claim of work-product protection for these documents and seek to compel their return.

**\*3** Horsehead alternatively argues that the Stanton notes are protected by the attorney-client privilege. The relevant privilege is defined by C.P.L.R. § 4503 , which protects any "confidential communication made between the attorney ... and the client in the course of professional employment...." Again, however, even if we assume that Ms. Kober's affidavit sufficiently establishes the basis for a claim of privilege, [FN5] that protection has obviously been waived by Horsehead's disclosure of most or all of the documents in question and their acquiescence in deposition testimony concerning the substance of those documents. *See, e.g., Jakobleff v. Cerrato, Sweeney & Cohn*, 97 A.D.2d 834, 835, 468 N.Y.S.2d 895, 897 (2d Dept.1983); *Matter of Estate of Baker*, 139 Misc.2d 573, 576, 528 N.Y.S.2d 470, 473 (Surr.Ct.1988); *cf. People v. O'Connor*, 85 A.D.2d 92, 96-97, 447 N.Y.S.2d 553, 557 (4th Dept.1982).

In sum, even if the disclosure by Stanton at his deposition is ignored, the Stanton notes are discoverable. Accordingly, there is no basis for ordering plaintiffs to return them.

**B.** *The Kober Memorandum*

There is some confusion in the record concerning the dating and provenance of the memorandum prepared by Ms. Kober, but it appears that it was prepared in March 1987. (*See* Stanton Deposition at 5-6.) [FN6] The memorandum refers to a meeting with several Horsehead employees and discusses each of the claims asserted by Horsehead with respect to the escrow fund that is at issue in this lawsuit. (*See id.* at 6.)

Horsehead argues that the memorandum is subject to both the attorney-client privilege and the work-product rule. Fairly construed, the record reflects that the attorney-client privilege if it ever applied, has been waived. As for the work-product rule, despite the deficiencies in defendants' motion, I conclude that it does apply to protect the document.

Defendants' initial hurdle is to establish that the attorney-client privilege applies to the Kober memorandum. The record is singularly sparse on this matter despite ample opportunity for Horsehead to establish the necessary facts. Indeed, defendants do not appear to have met their burden of showing that the document ever was privileged.

It is not disputed that Ms. Kober served as counsel to Horsehead in connection with litigation. Indeed, this is implicit in her affidavit. *See also* Plaintiffs' Memorandum dated June 22, 1989 at pp. 2, 16; Stanton Dep. at 5- 6. An *in camera* review of the document also suffices to demonstrate that it contains what is unmistakably an analysis of the claims at issue in this lawsuit and that it was communicated to the client. Horsehead fails, however, to demonstrate that the communication was made in confidence, as is its burden under New York law. *See, e.g., People v. Mitchell*, 58 N.Y.2d 368, 373, 461 N.Y.S.2d 267, 269-70 (1983); *Poteralski v. Colombe*, 84 A.D.2d 887, 888, 444 N.Y.S.2d 765, 766 (3d Dep't 1981). Since copies of this document ended up in the possession not only of Mr. Stanton--who was not an addressee of the cover sheet--but also of Horsehead's accountants, Ernst & Whinney, the absence of any evidence on this point can be viewed as fatal to Horsehead's privilege claim. In any event, even if subsequent distribution of the memorandum were viewed simply as a matter of waiver, and therefore subject to proof by plaintiffs as part of their burden, the result would not differ.

**\*4** The attorney-client privilege does not ordinarily extend to attorney-client communications that are disclosed to others. *See, e.g., People v. Osorio*, 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 614, 549 N.E.2d 1183, 1185 (1989); *People v. O'Connor, supra*, 85

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 4

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

**(Cite as: 1990 WL 142404 (S.D.N.Y.))**

A.D.2d at 96-97, 447 N.Y.S.2d at 557; *Reisch v. J & L Holding Corp.,* 111 Misc.2d 72, 74, 443 N.Y.S.2d 638 (Sup.Ct.1981); *Nelson v. Greenspoon,* 103 F.R.D. 118, 123-24 (S.D.N.Y.1984). There are, of course, limited exceptions to this principle. For example, if the communication is made through a third party, the privilege will be honored if "the client had a reasonable expectation of confidentiality under the circumstances." People v. Osorio, supra, *75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 615, 549 N.E.2d 1183, 1186. Furthermore, there may be circumstances in which a communication is disclosed or made to a non-attorney third-party in order to facilitate the rendition of legal services by the attorney; in such a case, the privilege will not be vitiated.* See, e.g., People v. Osorio, supra, *75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 614-615, 549 N.E.2d 1183, 1185-1186; In re* Grand Jury Subpoena, *599 F.2d 504, 513 (2d Cir.1979);* United States v. Kovel, *296 F.2d 918, 921-22 (2d Cir.1961). If, however, the communication is disclosed or made for purposes other than to facilitate the rendition of legal services by an attorney, the communication is not privileged.* See, e.g., In re John Doe Corp., *675 F.2d 482, 488 (2d Cir.1982); In re* Horowitz, supra, *482 F.2d at 81.*

In this case the record reflects that the Kober memorandum, although addressed to the president of Horsehead, was also sent by unknown channels and for unstated purposes to Mr. Stanton and to Ernst & Whinney. Since the current record contains no specific indication why the memorandum was sent to Stanton, plaintiffs cannot meet their burden to demonstrate waiver based on this fact. Indeed, since Stanton was apparently providing information to the attorney to facilitate her rendering of legal services, we may at least speculate that he was sent the memorandum as part of a process by which he was kept abreast of pertinent developments so that he could assist Ms. Kober in performing her function as counsel on this matter.

The disclosure to Ernst & Whinney is a different matter. The courts recognize a waiver of the attorney-client privilege if the privileged communication is disclosed to accountants of the client, unless the transmission was for the purpose of enabling the accountants to assist the attorney in rendering legal services. *See, e.g.,* In re *Horowitz, supra,* 482 F.2d at 81. *See also* In re *John Doe Corp., supra,* 675 F.2d at 488; In re *Grand Jury Subpoena, supra,* 599 F.2d at 513; *United States v. Kovel, supra,* 296 F.2d at 922. [FN7] In this case plaintiffs contend that the firm was merely performing accounting services directly for Horsehead, and could not be viewed as the attorney's agent for purposes of sustaining the privilege. Although the record is not crystal-clear, the principal relevant evidence on this point--the deposition testimony of Mr. Jerry Lee of Ernst & Whinney--indicates that the firm was not working on matters related to the case. *See* Lee Dep. at 246-47.

**\*5** In arguing to the contrary, Horsehead relies principally on a footnote in a letter sent by trial counsel to the Court in which she states that the accountants "were providing advice at that time to Horsehead regarding the escrow issues and possible settlement of those issues and as such were agents of Horsehead." (June 27, 1989 Letter from Laurel A. Bedig, Esq. to the Court.) This statement is not competent evidence and is inconsistent with the testimony of Mr. Lee. The argument is also partly unresponsive to plaintiffs' argument, which is that the accountants were not acting as an agent of Horsehead's attorneys.

An alternative argument could be made on behalf of Horsehead, to the effect that New York state law, as reflected in the recent decision by the New York Court of Appeals in *People v. Osorio,* differs from *Horowitz et al.* by requiring the Court to look solely to the client's reasonable expectations of confidentiality. Thus, in *Osorio,* after noting that communications by the client to his counsel are protected even if made through an agent of either the attorney or the client, the Court went on to observe:

The scope of the privilege is not defined by the third parties' employment or function, however; it depends on whether the client had a reasonable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

**(Cite as: 1990 WL 142404 (S.D.N.Y.))**

expectation of confidentiality under the circumstances.

*People v. Osorio, supra,* 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 615, 549 N.E.2d 1183, 1186. Since Ernst & Whinney was acting as Horsehead's accountants, there was no reason for Horsehead to suspect that the firm would not respect the confidentiality of the Kober memorandum. *See, e.g.,* AICPA, Code of Professional Conduct Rule 301 (1988) (prohibiting disclosure of "confidential client information" without client consent).

The difficulty with this argument, however, is that *Osorio* involved the use of a third party as a conduit for a communication between client and counsel--in that case a fellow inmate of defendant served as his English-language interpreter--and the quoted passage is fairly read as being limited to communications made through a third party, not to privileged communications that are subsequently disclosed to a third party. Moreover, the Court's citation in *Osorio* of *United States v. Kovel* indicates its agreement with the reasoning of that decision, which makes the same distinction as later found in *Horowitz* and its progeny. Finally, I note that prior relevant caselaw in New York is also premised on the principle that a privileged attorney-client communication is vitiated if subsequently disclosed for any purpose other than to facilitate the attorney's performance of legal services, and the Court in *Ocasio* offers no indication that it intended to overrule that body of law.

Horsehead's alternative basis for seeking return of the Kober memorandum is that it is protected as attorney work-product. If so, the document would presumably be protected notwithstanding its transmittal to Ernst & Whinney, since waiver of work-product protection will be implied only if the document is disclosed in circumstances that make it substantially more likely that the document will be revealed to the party's adversary. Thus, disclosure to another person who has an interest in the information but who is not reasonably viewed as a conduit to a potential adversary will not be deemed a waiver of protection of the rule. *See, e.g., GAF*

*Corp. v. Eastman Kodak Co., supra,* 85 F.R.D. at 52; *Stix Products v. United Merchants & Mfrs., supra,* 47 F.R.D. at 338. Disclosure by Horsehead to Stanton or to its own accountants cannot be said to have posed a substantial danger at the time that the document would be disclosed to plaintiffs. [FN8]

*6 It remains to be seen, however, whether Horsehead has adequately demonstrated that the document held by plaintiffs is covered by the work-product rule, and, if so, whether its disclosure to plaintiffs at the Stanton deposition amounts to a waiver. I conclude, despite the deficiency of the record, that the document is work product. Moreover, under all of the circumstances here, I conclude that defendants' handling, or mishandling, of this document in connection with the deposition is not tantamount to a waiver of the work-product protection.

The work-product rule covers documents "prepared in anticipation of litigation or for trial...." Accordingly, "[i]f the primary motivating purpose behind the creation of the document is not to assist in pending or impending litigation, then a finding that the document enjoys work product immunity is not mandated." *United States v. Gulf Oil Corp.,* 760 F.2d 292, 296 (T.E.C.A.1985).

In this case the submitted affidavits do not disclose why the memorandum was prepared. Some guidance is found, however, from an *in camera* review of the memorandum and its cover sheet. It appears that counsel for Horsehead was holding meetings with a "shareholder committee"--presumably former shareholders of Great Lakes Carbon Corporation--and that the meetings involved, either in whole or in part, a discussion of the claims that Horsehead was asserting against the escrow fund. Based on the conceded chronology of events, [FN9] it becomes apparent that the discussions referred to in the memorandum and covering note were in fact settlement discussions between Horsehead and plaintiffs which were designed to resolve Horsehead's claim against the escrow fund and thus obviate the need for this lawsuit.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 6

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

(Cite as: 1990 WL 142404 (S.D.N.Y.))

It is apparent from the cover sheet that the enclosed memorandum was in the nature of a draft or working paper and not a final product. Indeed, the memorandum itself notes in various places the need for further analysis, investigation or consultation on specific issues. Thus, although it is unclear whether the final product was intended for disclosure to the shareholder committee, it is evident that this version was not, and in fact it is labelled as "PRIVILEGED AND CONFIDENTIAL, ATTORNEY WORK PRODUCT." Under these circumstances, the document was certainly intended to be confidential.

Given the known facts, it is reasonable to infer that the document was prepared principally to assist in either anticipated future litigation or the avoidance of such litigation through settlement. This suffices to establish the applicability of Rule 26(b)(3) absent some form of waiver. *See, e.g., Reavis v. Metropolitan Property & Liability Ins. Co.,* 117 F.R.D. 160, 163 (S.D.Cal.1987).

As noted, the distribution of the document to Stanton and Ernst & Whinney does not constitute a waiver of the work-product rule. The final question, therefore, is whether the disclosure of the memorandum at the Stanton deposition constitutes such a waiver. I conclude that it does not.

*7 The so-called "inadvertent disclosure" question has received little attention by the New York courts, but the one recent reported decision suggests general adherence to the developing caselaw in the federal courts. *See Manufacturers & Traders Trust Co. v. Servotronics, Inc.,* 132 A.D.2d 392, 398-401, 522 N.Y.S.2d 999, 1003-05 (4th Dep't 1987) (citing cases). Accordingly I rely upon that body of law.

Although the courts are not unanimous in their formulation of the governing standards for addressing claims of "inadvertent disclosure," *compare, e.g., Hartford Fire Ins. Co. v. Garvey,* 109 F.R.D. 323, 328-32 (N.D.Cal.1986), *with Mendenhall v. Barber-Greene Co.,* 531 F.Supp. 951, 954-55 (N.D.Ill.1983), it is generally accepted that the unintended and erroneous disclosure of a document containing a privileged communication

does not constitute a waiver of the privilege if the attorney and client have taken "reasonable precautions to ensure confidentiality." In re *Grand Jury Proceedings Involving Berkley & Co.,* 466 F.Supp. 863, 869 (D.Minn.1979), *aff'd as qualified,* 629 F.3d 548 (8th Cir.1980). *See, e.g., Standard Chartered Bank v. Ayala Int'l Holdings,* 111 F.R.D. 76, 85-86 (S.D.N.Y.1986); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105-06 (S.D.N.Y.1985) (citing cases); *Dunn Chemical Co. v. Sybron Corp.,* 1975-2 Trade Cases (CCH) ¶ 60, 561 at p. 67, 463 (S.D.N.Y.1975). *See also Hartford Fire Ins. Co. v. Garvey, supra,* 109 F.R.D. at 331 ("complete failure to take reasonable precautions").

In this case the question is whether the procedures utilized by Horsehead were " 'so lax, careless, inadequate or indifferent to consequences' as to constitute a waiver." *Data Systems of New Jersey v. Philips Business Systems,* 78 Civ. 6015 (CSH), Memorandum Opinion and Order at 15 (S.D.N.Y. Jan. 8, 1981) (available on LEXIS) (quoting *National Helium Corp. v. United States,* No. 158-75, slip op. at 3-4 (U.S.Ct.Cl. Feb. 2, 1979).) I conclude that they were not.

The initial failing by Horsehead was its failure to retrieve from Stanton all confidential documents when he left the company. This error was compounded when counsel for Horsehead did not seek to review with Stanton prior to his deposition whether he had any privileged documents in his possession. Nonetheless, these errors were not the direct cause of the erroneous disclosure of the Kober memorandum.

As noted at the deposition, Stanton himself noted the confidential status of a memorandum from Ms. Kober and declined to produce it to plaintiffs. The production to plaintiffs' counsel occurred only because, unknown to Stanton or counsel, there was a second such draft memorandum in the folder that he turned over at the deposition.

This set of circumstances reflects obvious carelessness both by Horsehead and by its counsel. Nonetheless, in context it does not reflect so

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 7

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

**(Cite as: 1990 WL 142404 (S.D.N.Y.))**

egregious a pattern of nonfeasance as to suggest an intent or willingness to waive the protections of the work-product rule, which is the central concern. *See, e.g., Manufacturers & Traders Trust Co. v. Servotronics, supra,* 132 A.D.2d at 399-400, 522 N.Y.S.2d at 1004-1005; *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co., supra,* 104 F.R.D. at 105-06 (citing cases).

**\*8** First, the fact that Horsehead did not retrieve the document from Stanton when he left the company is not tantamount to waiver. *See, e.g., Dunn Chemical Co. v. Sybron Corp., supra,* 1975-2 Trade cases at p. 67,463. Indeed, in *Dunn* Judge Lasker so held despite the fact that the former employee in that case had offered to return the privileged document to the client and it had failed to accept his proffer. *Id.* at p. 67,462. Second, in any event Stanton himself was sufficiently aware of the need for confidentiality that he declined to produce at his deposition what he obviously believed was the only such document in his possession. Third, prior to the deposition Horsehead's counsel had conducted an adequate review of the company's files, and, after locating the company's copy of the document, withheld it from production by the company. *Compare, e.g., Eigenhein Bank v. Halpern,* 598 F.Supp. 988, 991 (S.D.N.Y.1984) (company twice produced privileged document as part of small volume of documents produced to its adversary, the second time after having belatedly invoked a claim of privilege).

In short, the only reason that the memorandum was turned over was the fortuity that Stanton unknowingly had copies of two somewhat similar attorney memoranda in his folder. Under all the circumstances, I conclude that this was a truly inadvertent disclosure and not a waiver of work-product protection.

*CONCLUSION*

For the reasons stated, Horsehead's motion is denied with respect to the Stanton notes and granted with respect to the Kober memorandum.

SO ORDERED.

FN1. These documents and the Kober memorandum had been listed on a previously supplied privilege list prepared for Horsehead during the litigation.

FN2. Upon discovery of this anomaly, the Court held a conference with counsel, at which Horsehead's counsel agreed that the motion should be deemed to be directed at plaintiffs' version of the disputed documents. Strangely, counsel for defendants apparently never bothered to examine the documents held by plaintiffs' counsel before filing the motion, and obviously never compared their versions with plaintiffs', despite the fact that plaintiffs' answering papers annexed copies of two of the documents.

FN3. The differences between the parties' respective versions of this document are immaterial since, according to its counsel, Horsehead seeks to protect only the first two pages, which are identical in both versions. This limitation is not revealed in Horsehead's motion papers.

FN4. Federal law governs the applicability of the work-product rule, even in diversity suits such as the present case. *See, e.g., United Coal Companies v. Powell Const. Co.,* 839 F.2d 958, 966 (3d Cir.1988); *Railroad Salvage of Conn. v. Japan Freight Consolidators,* 97 F.R.D. 37, 39-41 (E.D.N.Y.1983), *aff'd mem.,* 779 F.2d 38 (2d Cir.1985); *Merrin Jewelry Co. v. St. Paul Fire & Marine Ins. Co.,* 49 F.R.D. 54, 56 (S.D.N.Y.1970).

FN5. That affidavit does not even specify that Ms. Kober was serving as counsel for Horsehead, although this fact is not contested.

FN6. The defendants' version of the memorandum is dated April 3, 1987. However, the lengthier version proffered by plaintiffs, although undated, is annexed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                   Page 8

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

**(Cite as: 1990 WL 142404 (S.D.N.Y.))**

> to a covering note dated March 5, 1987.
>
> FN7. The New York courts appear to follow this rule. *See, e.g., People v. Osorio, supra,* 550 N.Y.S.2d 612, 615, 549 N.E.2d 1183, 1186 (citing, *inter alia, United States v. Kovel, supra* ).
>
> FN8. As previously noted, accountants are normally required to maintain the confidentiality of their clients' confidential communications.
>
> FN9. Horsehead purchased Great Lakes' stock on February 28, 1985, asserted its claim against the escrow fund by letter dated February 21, 1986, and then attempted to negotiate a settlement with plaintiffs, who ultimately filed suit on July 17, 1987. (*See* Plaintiffs' Memorandum at 1- 2.)

Not Reported in F.Supp., 1990 WL 142404 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:87cv05122 (Docket) (Jul. 17, 1987)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.