~8917751.txt

12  executives, and then to talk to the senior executives about
13  what disclosure decisions they made. That's why I think
14  it's a more logical approach.
15       THE COURT: Let me ask you this. Is it possible
16  that that might be more logical and more appealing to a
17  neutral party and maybe defense counsel, but not most
18  logical to plaintiffs' counsel? That's what I'm trying to
19  probe.
20       MR. VOLLMER: We understand the plaintiffs have
21  asked for these five depositions early. My point is I'm
22  not sure they've explained why that's going to shortcut the
23  work in this case to prepare properly. So they've
24  identified it. I'm suggesting that we should have a more
25  orderly, systematic approach to the case. Because it's not

                                                          17

1   just their interest at stake; it's our interest at stake.
2        THE COURT: That's why I'm pressing you. You're
3   saying it's a more logical and orderly way to proceed, but
4   it's really striking me that it might be what we're really
5   talking about is one side or the other has a tactical
6   advantage.
7        MR. VOLLMER: I can't speak for them, Your Honor.
8        THE COURT: That's what we're really -- I'm
9   trying to figure out if that's what we're really talking
10  about, or we really are talking about a more logical and
11  orderly --
12       MR. VOLLMER: I've tried to be plain about my
13  interests. I have interests not being deposed twice. I
14  have interest in deferring at least my clients' depositions

Page 15

~8917751.txt

15  a bit longer to allow the criminal inquiry to proceed.
16  That is a genuine issue for us. I think it's a serious
17  point in our favor. And I don't think there's prejudice to
18  the plaintiffs in deferring these top-level executives for
19  a bit. Those are my interests. Those are my reasons.
20        THE COURT: Okay. Let's get to the plaintiffs.
21        MR. WEISS: Thank you, Your Honor.
22        Let me start by making some general observations.
23  All of us have been in complex litigation over the years.
24  And I think it's no surprise for any of us that there are
25  cases that require the same witness to be deposed a number

18

1   of times during the course of a complex case. It happens
2   all the time. This is not unique. What we try to do is
3   cut down the time, make it more efficient, reduce the
4   transaction costs, and get to the point where we can really
5   evaluate settlement potential sooner than later before we
6   spend a fortune getting to the same place.
7         It's somewhat like the difference between the
8   litigator and the trial lawyer going fishing. And they
9   don't have bait to start off with and they're going fishing
10  in an embanked river. So they have to go get the bait.
11  And the litigator starts turning over every pebble walking
12  down a hill to find bait, and the trial lawyer goes right
13  to the moist riverbed and is fishing long before the
14  litigator even gets to the stream. It's basically that
15  kind of an analysis.
16        So the idea of putting a witness through more
17  than one deposition is not a unique situation. But we're

~8917751.txt

18  not arguing that we want to do that. We're arguing really
19  something a little differently.
20       We're saying it's four years into the litigation.
21  This is a complex case. There's government investigations.
22  The parties aren't surprised by the kinds of documents that
23  we've been asking for because they've had our requests for
24  a long time and they're saying the government is looking at
25  similar activities or at least the same time frames. It is

                                                          19

1   true there's been a change in counsel, for Xerox, at least.
2   That's why we've been more accommodating in the time frame
3   that it takes for them to get all the documents. But we
4   can't put this off forever. And when we got the first
5   production, the people who were looking at those documents,
6   are now aside, came to the conclusion that the documents
7   were far more informative than they expected them to be.
8   Ands they decided to take a litigation risk and to come to
9   Evan Chesler on behalf of Xerox and suggest what is a
10  little different approach. And that is instead of doing
11  the litigator turning over every pebble, let's go for the
12  moist riverbed and see if we can't efficiently get to a
13  place where we can in good faith evaluate the litigation
14  value of this case from both sides.
15       And what Evan said a few minutes ago, which I
16  found very interesting and he repeated it twice, he said,
17  if we just look for the documents for the core group,
18  meaning the five plus certain number around them, we will
19  probably come up with most of what is really necessary. At
20  least that's what I thought I heard him say. So there's

Page 17

~8917751.txt

21    not much risk in not going after the balance. That's
22    pretty much what we're saying. We're saying if the balance
23    of the documents are produced later on, and we want them,
24    are merely duplicative, cumulative, and have no real
25    surprises, then we have gotten to the finish line a lot

0

20

1     faster, we've saved the Court a lot of time, we've saved
2     the parties a lot of transaction costs. And it's only if
3     we come up with something that is really, you know,
4     exceptional that we will come to Your Honor and ask
5     Your Honor: Is this something that's worthy of bringing
6     one of those witnesses back for a short second trip? And
7     given that --
8             THE COURT: As I understand it, though, you're
9     asking the defense to take the risk in proceeding with the
10    deposition that something that's really surprising may turn
11    up later. And they'll have to live with the consequences
12    of that surprising thing turning up later. But you're
13    reserving for yourself the opportunity to come back and ask
14    the court to take another deposition.
15            MR. WEISS: They have the same opportunity. They
16    can come up with a document that undermines something that
17    we've been developing previously and they can ask
18    Your Honor for the same right to come forward and say,
19    "Mr. Weiss thought he got X from Mr. Jones and that X isn't
20    correct. Y is correct. I have a new document that nobody
21    knew about and I just want to take his deposition for an
22    hour or two, or whatever, and establish that."
23            But we are really taking the risk because

Page 18

~8917751.txt

24     Your Honor controls us. And you know that --
25          THE COURT: Well, that remains to be seen.

0

                                             21

1           MR. WEISS: We're putting ourselves in your hands
2     with respect to that issue.
3           When we went back and looked at the record, which
4     is quoted against us when Mr. Karam and I said we need all
5     the documents before we can start discovery, it was in the
6     context of not knowing when the documents were going to be
7     produced. And we were asking those questions and, you
8     know, at that point in time we thought they would be
9     produced within a reasonable period of time and we would be
10    able to get to that task sooner than later.
11          Now, we have clients to represent here, people
12    who lost a lot of money. Whether they have a right to
13    collect it or not is still something to be determined, but
14    we have an obligation to try to get them whatever justice
15    they're entitled to sooner than later. And the fact that
16    some of the issues on discovery hadn't been resolved up
17    until let's say February, as Mr. Chesler points out, didn't
18    stop them from accumulating those documents. The fact that
19    they had to go through a redaction process didn't mean that
20    they couldn't start accumulating the documents that were
21    being produced long before that date.
22          Now, you know, if he gives us a deadline for
23    producing everything so we can start the depositions, you
24    know, without having all the documents reviewed, if he can
25    give us a reasonable date that he's going to produce those

Page 19

~8917751.txt

22

```
 1   documents, we would like to second-think this.  But if he
 2   tells us he can't get all of those outlying documents until
 3   mid-next year sometime and we can't start these depositions
 4   until then, I just think that's not an efficient or right
 5   way to proceed.
 6           MR. FLEISCHMAN:  Your Honor, may I make one
 7   observation?
 8           THE COURT:  First help me understand -- if I'm
 9   remembering what I read in the papers, we have North
10   American documents and then documents in other places.
11   What percentage of the documents have been produced, do you
12   know, even?
13           MR. CHESLER:  We know that most of the -- well,
14   all of the hard copy documents from the two principal
15   facilities in the United States, Rochester and Stamford,
16   have been produced.  Some electronic documents have been
17   produced from those facilities.  There is a lot of
18   electronic discovery left, Your Honor; I don't know what
19   the percentages are.  And there's Europe.  Because of the
20   road we were walking down until this recent development,
21   Europe, although we've been making telephone calls to try
22   to understand who has what files, we've not had people in
23   Europe, we've had people here finding documents and
24   locating them.  The understanding was we were going to
25   finish North America and then go to Europe.
```

23

```
 1           MR. FLEISCHMAN:  Your Honor, I just want to ask
```

~8917751.txt

2  Mr. Chesler a question.
3      You say principal facilities. Can you just sort
4  of discover for us and for the Court how many non-principal
5  facilities are there that --
6      MR. SHAPIRO: Outside of Stamford and Rochester,
7  there are about 30 employees we identified with other North
8  American facilities. And I think there are about four or
9  five locations. Three to five locations.
10     MR. CHESLER: Where those 30 people are located.
11     MR. FLEISCHMAN: The observation I would make,
12 based on the conversation I heard, is that in many, many
13 complex cases like this, civil securities class actions, it
14 is not -- it has been my experience and I think Mr. Weiss's
15 and Mr. Chesler's as well, it is not unusual to depose the
16 CEO and the CFO and the COO for, say, a couple of days in a
17 large case. And then, because of regular scheduling
18 situations, you then finish your deposition or you take the
19 other two days or other day four or five months later.
20 It's not an unusual situation, and I've never seen any
21 defense counsel say that they were prejudiced because they
22 had that break. And in that case clearly you have a
23 situation where you have their whole deposition and
24 obviously you can't go back on questions you've asked, but
25 you have the ability to look at what they've said before

24

1  and use that as institutional knowledge in your
2  questioning.
3      The other part is, I've been in a number of cases
4  in very large corporations like Xerox where we have gone

Page 21

~8917751.txt

5  back to the Court, and I've never -- I don't think there's
6  ever been a problem and really not a lot of resistance
7  ultimately from defendants when new documentation or
8  lower-level employee says things that somehow implicates a
9  CEO or CFO.
10      So I guess it's the notion that this is --
11  there's such great prejudice here and it's an unusual
12  situation. I guess it's been my experience that that is
13  more of the usual situation, and the reason being because
14  most of the time those COEs and CFOs are presently employed
15  by the corporation and their schedules are so tight.
16      In this situation you have X employees who are
17  getting paid a substantial amount of money from Xerox that
18  may not be relevant to this inquiry, but they no longer
19  work, they're retired and their schedules are quite a bit
20  more open than in the normal situation.
21      I'm not quite understanding why it is such a, you
22  know, an offense to take their deposition one time and then
23  some months later -- and I think Mr. Weiss said this on an
24  earlier conference call with the Court -- and take it
25  another time. I don't think there's anything wrong with

25

1  that and I don't think it prejudices them in any way. If a
2  document is discovered later on that somehow changes their
3  testimony, that happens all the time. Witnesses say, "I'd
4  like to go back and amend my -- in light of this document
5  and it refreshes my recollection, I'd like to go back and
6  fully, you know, fully describe exactly what it is." I
7  don't see that it's prejudice.

Page 22

~8917751.txt

8       MR. CHESLER: Your Honor, may I?
9       THE COURT: Yes.
10      MR. CHESLER: Just a few things.
11          First, I was following Mr. Weiss's fishing story
12  I think pretty carefully. I've got the analogy. The
13  problem is we've got two different rivers here: A document
14  river and a deposition river. The approach to documents
15  has been the every-pebble approach, where on depositions
16  they want to go a different way. My proposal was simply to
17  rationalize those two processes. We're paying greatly for
18  this and we're the ones doing all the work. All we're
19  saying, You want to be a trial lawyer and not a litigator?
20  Fine. Let's deal with the documents the same way as the
21  witnesses and let's streamline this, get it done in an
22  orderly fashion.
23          Which leads me to respond to Mr. Fleischman's
24  comment. I've been in a lot of cases where depositions
25  have been bifurcated or split. But it's not because of the

0

26

1   document discovery hasn't been done; it's because there are
2   busy people with busy schedules and you accommodate them.
3   But you had the documents in hand when the witness was
4   prepared and you accommodate the witness and comes back and
5   finish. That's not what we're talking about.
6           Nor are we talking about the exceptional case
7   which happens from time to time where some document nobody
8   anticipated or somebody's file that nobody anticipated is
9   found after the fact. It happens. We're doing our jobs
10  and some secretary somewhere says, "You know, I opened a

Page 23

~8917751.txt

11    closet yesterday and I found a file box that nobody knew
12    about." You look at them. If they're responsive, you
13    produce them to your adversaries and it may require
14    resuming a deposition.
15          That's not this case. We've been saying now for
16    weeks to the plaintiffs with certainty, "There have got to
17    be a lot of documents we will not have seen under this new
18    procedure," and that doesn't make any sense to us. Get the
19    discovery done on the document side and defer the
20    depositions, or streamline the document process and move
21    the depositions a much smaller period of time, but do it in
22    a sensible way.
23          MR. FRIEDMAN: Your Honor, Brad Friedman for the
24    plaintiffs.
25          The practical way this is going to play out on

27

1    the ground is that we already have enough documents to
2    spend a productive full day with each of these witnesses,
3    or more, or more.
4          Now, Mr. Vollmer makes the point, he says, well,
5    you should go and depose all the people, the information
6    flow is from the underlings to the top people, and I
7    suppose one thing you could do is take the set of documents
8    we already have and go depose each of the ten people, let's
9    say, who wrote a document and ask as to each of them: "Did
10    you give the document to the CFO?" Or you can do what we
11    want to do, which is to take all ten documents, go directly
12    to the CFO, as to each document say: "Did you get that
13    document?" And as to each one the CFO says, "Yes, I got

Page 24

~8917751.txt

14  that document," you ask questions about that. We have, we
15  think, a good set of documents now to do that. If the CFO
16  says, "Yeah, I received that document," then I don't need
17  to take the deposition of the person who gave them the
18  document and I've got more than enough to spend a good
19  productive amount of time.
20       THE COURT: I understand that's the approach you
21  want to take. It seems to me that we're talking about
22  shifting from one basic or fundamentally different approach
23  to another. And what I hear -- well, it's not what
24  everybody is talking about. We're discussing two different
25  approaches. And you can call them litigator approach and

28

1   the trial lawyer approach -- since you've used those terms,
2   I'll adopt your terminology without making any findings.
3   But what I was trying to suggest was that if we want to
4   make the transition from one approach to another, that's
5   fine. But I don't think it's appropriate to continue on
6   with one approach for one part of the discovery and another
7   approach for the other part of discovery.
8        MR. FLEISCHMAN: Your Honor, may I ask for
9   clarification?
10       THE COURT: Yes.
11       MR. FLEISCHMAN: So initially this whole thing
12  really started because I think Mr. Weiss and Mr. Chesler
13  were talking about streamlining and producing relevant
14  discovery for these witnesses so that we could go forward
15  with these witnesses. Are you saying that that approach
16  cannot work, the approach whereby the production still

Page 25

~8917751.txt

17  takes place? As Mr. Weiss pointed out, probably 95 percent
18  of the relevant -- and Mr. Chesler -- would happen with the
19  streamlined approach and then we get those other documents
20  later on.
21          THE COURT: One thing that I'm trying not to lose
22  sight of here is that both sides have to be prepared for
23  the deposition. And if both sides are going to agree this
24  is going to be it and this is all anybody will have,
25  neither side will have all the documents that may exist in

0

29

1   the world but we'll know each will have what's going to be
2   in the case. And then it's fair.
3           MR. GOLDBERG: Your Honor, you raised the issue
4   earlier with Mr. Vollmer about tactical issues, the extent
5   to which part this might be tactically motivated. As you
6   may see from our papers, that is a principal concern of
7   ours. The plaintiffs' motivation is tactical to get second
8   bites and to be able to take a deposition and take the
9   deposition a second time. And it has given us the comfort
10  only that they might be subject to a motion to quash or
11  motion for protective order if they went that route.
12          All the comments of plaintiffs' counsel reinforce
13  that we should have concerns about the tactical advantages
14  that they would get. They're saying it's routine to depose
15  people twice. It's routine to get one set of documents,
16  we'll ask whether the witness has seen these. Then we'll
17  get production of the Europe documents and we'll go back
18  and ask these. Then we'll get some other deposition
19  testimony and go back and ask about that. We don't feel

Page 26

~8917751.txt

20  comfortable that our sole recourse, which is to come in and
21  move for protective order regardless of whatever
22  admonitions you may give, is sufficient.
23        To turn that a little bit further, we talked
24  about risk. And as Your Honor absolutely correctly pointed
25  out, if this deposition goes forward, as we've said we

30

1  would be willing to do, we recognize that we are taking a
2  risk. We are not going to be fully prepared. We haven't
3  seen the documents. Everything has been so tied up with
4  people trying to do the discovery process, find the
5  documents, get them produced. We're relying on the company
6  to feed us the documents, and then we've got to go through
7  and figure out which ones are relevant. We're not going to
8  be fully prepared. What we've said is: If both sides are
9  equally at risk, we're willing to take that. If plaintiffs
10 want to go forward in September, October, whatever, and
11 recognize, my goodness, we're not going to be fully
12 prepared, they're not going to be, we think we may have an
13 edge, we at least -- and I know this is different from what
14 some of the other parties have said -- if that's what's
15 ordered, we'll do it. But what we're not willing to do is
16 have us suffer all the risk and have them say, okay, we'll
17 do this, it's fine, it's routine for former CEOs, and then
18 come back for a second and third and fourth bite.
19       We agree the most sensible approach is let's
20 become trial lawyers rather than litigators. Let's become
21 trial lawyers. We'll all follow the same approach. And at
22 that point at appropriate time our depositions will go

Page 27

~8917751.txt

23  forward, we'll be prepared, and that will be that.
24      MR. WEISS: The only comment I would like to make
25  to that is we didn't put the burden on them to come and

                                                        31

1   make a motion for a protective order. We put the burden on
2   ourselves, if we want a second bite, to make a motion to
3   Your Honor for leave to do it. I think there's a big
4   difference.
5       And if Mr. Chesler is right, that 95 percent of
6   the real relevant documents are going to be in this first
7   production and the stuff that's going to be coming from
8   overseas is really not going to be that relevant, then
9   there is a real efficiency to doing it our way and we're
10  going to get this case over with a lot more quickly.
11      MR. KARAM: Your Honor, I'm somewhat familiar
12  with the document production and the way it's going. I
13  think one of the triggers that caused us to talk about this
14  strategy is we were told by Xerox that they had
15  substantially produced all of the Stamford and Rochester
16  hard copy documents where the offices of these people were.
17  So we figured we had their hard copy documents.
18      Then we had discussions with Mr. Chesler and he
19  said we'll prioritize the electronic documents of these
20  five people and maybe the ten people who reported to them.
21  And our thinking was that is the bulk of the North American
22  documents.
23      The next step that caused us to consider this
24  strategy was that Mr. Chesler told us that they had really
25  not begun the hard work of producing the European

Page 28

~8917751.txt

32

```
 1  documents.  So we thought if we're going to wait to get the
 2  European documents, they're really not going to be finished
 3  until sometime in the spring of next year.  And we thought
 4  let's focus on the North American case, that's the real
 5  heart of the case, and move forward on that.
 6          So perhaps to suggest a compromise where we get
 7  all of the North American documents, take a deposition on
 8  the North American documents, and then if there's going to
 9  be a second deposition on the European documents, which I
10  guess are a lesser subset, maybe we can take that
11  deposition separately.
12          MR. FLEISCHMAN:  Your Honor, I would just ask a
13  question.  This conversation, I guess, part of what it's
14  missing is some type of framework for the actual timing.
15  If we were -- and I know we're still in this discussion
16  phase of this -- what would be the timing?  And I guess I
17  direct it to Xerox.  What would be the timing of
18  production?  Assuming that we agreed to prioritize, which
19  obviously we have not, but assuming we agreed to
20  prioritize, what is a realistic date where you would have
21  all the electronic documentation and other North American
22  documentation as to these six people and the European
23  documentation, realistically?
24          THE COURT:  Before he answers your question, can
25  I make sure I understand it?  You said assuming we agree to
```

Page 29

33

~8917751.txt

1 prioritize --
2        MR. FLEISCHMAN: The streamlined approach, excuse
3 me.
4        MR. CHESLER: So, in other words, if we redefine
5 the universe that we're actually going to gather and
6 produce, not what do we give you now and then we're going
7 to give you more later.
8        MR. FLEISCHMAN: Well --
9        MR. CHESLER: Excuse me. If what we're talking
10 about is --
11       THE COURT: That's the question I want you to
12 answer.
13       MR. CHESLER: Thank you, Your Honor. That's the
14 one I'm able to answer. I can't answer the other one.
15       Our best estimate is if we produce the universe
16 of documents from the files we've identified -- which is
17 not just these five people. We've tried to say five plus
18 who are the other people we should go out and get so that
19 we have the reasonable universe of documents we think need
20 needs to be produced, we will, in fact, finish this we
21 believe this fall. I can't say September versus October.
22 But we're talking about doing it between now and sometime
23 this fall. Done. Europe, United States, hard copy,
24 electronic documents we believe we can finish.
25       My partner Sandra Goldstein is saying to be sure

0

34

1 we can finish in Europe -- because we are talking about
2 somewhat of a black box in Europe, we haven't been there

Page 30