## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Russell Carlson, et al. | ) | 3:00-CV-1621 (AWT) |
| v. | ) | |
| Xerox Corp., et al. | ) | |
| | ) | |
| MASTER CASE | ) | |
| | ) | |
| Florida State Board of Admin., et al. | ) | 3:02-CV-1303 (AWT) |
| v. | ) | |
| Xerox Corp., et al. | ) | |
| | ) | December 9, 2005 |
| | ) | |
| MEMBER CASE. | ) | |

### <u>MEMORANDUM IN SUPPORT OF XEROX DEFENDANTS' PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT</u>

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000

*Attorneys for Defendant Xerox Corporation*

Of counsel:
Ivy Thomas McKinney (ct 09351)
Xerox Corporation
800 Long Ridge Road
Stamford, CT 06904
(203) 968-3000

*Attorney for Xerox Corporation*

DAY, BERRY & HOWARD LLP
One Canterbury Green
Stamford, CT 06901
Telephone: (203) 977-7300

*Attorneys for Defendants Philip Fishbach,
   G. Richard Thoman and Anne Mulcahy*

WILMER CUTLER PICKERING HALE
   and DORR LLP
2445 M Street, NW
Washington, DC 20037
(202) 663-6000

DALY & PAVLIS, LLC
107 John Street
Southport, CT 06490
(203) 255-6700

*Attorneys for Defendants Paul A. Allaire,
   Barry D. Romeril and Gregory Tayler*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF ALLEGED FACTS ................................................................... 2

ARGUMENT ........................................................................................................ 5

I.    PPM'S FEDERAL CLAIMS ARE BARRED BY THE ONE-YEAR
      STATUTES OF LIMITATION ..................................................................... 7

      A.    The Applicable Statutes Of Limitation. ........................................... 7

      B.    As PPM Acknowledges, It Was On Inquiry Notice On February 6,
            2001 ................................................................................................ 9

      C.    In The Alternative, PPM Was On Inquiry Notice By No Later
            Than June 28, 2001. ..................................................................... 12

      D.    PPM Has Not Alleged That It Exercised "Reasonable Diligence" ........... 17

      E.    PPM's Section 18 Claim Must Be Dismissed Because PPM Has
            Failed Adequately To Plead Adherence To The One-Year Statute
            of Limitations. .............................................................................. 19

II.   SECTION 10(b) AND SECTION 18 CLAIMS FOR PURCHASES
      BEFORE JANUARY 4, 1999, (FOR FSBA, TRSL AND FRANKLIN)
      AND BEFORE OCTOBER 3, 1999, (FOR PPM) ARE BARRED BY
      THE THREE-YEAR STATUTES OF REPOSE ........................................... 20

      A.    Section 10(b) Claims For Violations Before January 4, 1999, (For
            FSBA, TRSL And Franklin) And Before October 3, 1999, (For
            PPM) Fall Outside Of The Period Of Repose And Must Be
            Dismissed. ..................................................................................... 21

      B.    Section 18 Claims For Purchases Before January 4, 1999, (For
            FSBA, TRSL And Franklin) And Before October 3, 1999, (For
            PPM) Fall Outside Of The Period Of Repose And Must Be
            Dismissed. ..................................................................................... 22

      C.    The Plaintiffs' Section 18 Claims Must Be Dismissed Because
            They Have Failed Adequately To Plead Adherence To The Three-
            Year Statute Of Repose. ................................................................ 23

III.    THE PLAINTIFFS' CLAIMS ARE NOT SAVED BY <u>AMERICAN PIPE</u> TOLLING, RELATION BACK PURSUANT TO RULE 15(c), OR THE EXTENDED PERIODS OF LIMITATION AND REPOSE OF SARBANES-OXLEY ........................................................................................24

    A.    <u>American Pipe</u> Tolling Does Not Save Plaintiffs' Time-Barred Claims. ..........................................................................................24

    B.    PPM's Claims Do Not Relate Back To The Original Complaint. .............27

    C.    Sarbanes-Oxley's Limited Extension Of The Statutes Of Limitation And Repose Does Not Apply To PPM's Time-Barred Claims. ..........................................................................................28

IV.    THE PLAINTIFFS' SECTION 20(a) CLAIMS ALSO MUST BE DISMISSED ........................................................................................30

CONCLUSION........................................................................................32

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Addeo v. Braver, 956 F. Supp. 443 (S.D.N.Y. 1997) ........................................... 9

Aetna Life Ins. Co. v. Enter. Mortgage Acceptance Co. (In re Enter.
    Mortgage Acceptance Co. Sec. Litig.), 391 F.3d 401 (2d Cir. 2005) .......................... 29

Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974) .............................................. 16, 25

Arduini/Messina P'ship v. Natl. Med. Fin. Servs. Corp., 74 F. Supp. 2d
    352 (S.D.N.Y. 1999) ...................................................................... 8

Autin v. Martin, 576 So. 2d 72 (La. Ct. App. 1991) ............................................. 24

Calvello v. Elec. Data Sys., No. 00CV800, 2004 WL 941809 (W.D.N.Y.
    Apr. 15, 2004) ............................................................................ 25

Ceres Partners v. GEL Assocs., 918 F.2d 349 (2d Cir. 1990) .......................................... 21

Cullen v. Margiotta, 811 F.2d 698 (2d Cir. 1987) .............................................. 15

Dabit v. Merrill Lynch, 395 F.3d 25 (2d Cir. 2005) ............................................. 24

Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp.,
    No. 91 Civ. 2050 (LLS), 1992 WL 204374 (S.D.N.Y. Aug. 11, 1992)...................... 27

De La Fuente v. DCI Telecomm., Inc., 206 F.R.D. 369 (S.D.N.Y. 2002) .............. 7, 9, 17

Dodds v. Cigna Sec., Inc., 12 F.3d 346 (2d Cir. 1993)............................ 7, 8, 9, 17, 19, 31

Epstein v. Haas Sec. Corp., 731 F. Supp. 1166 (S.D.N.Y. 1990)................................ 19, 20

Ezra Charitable Trust v. Frontier Ins. Group, Inc., No. 00 Civ. 5361
    (LMM), 2002 WL 87723 (S.D.N.Y. Jan. 23, 2002) ...................................... 14

Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618 (S.D.N.Y. 2004)............... 22, 25, 26

Gerber v. MTC Elec. Techs. Co., 329 F.3d 297 (2d Cir. 2003) ....................................... 30

Giant Group, Ltd. v. Sands, 142 F. Supp. 2d 503 (S.D.N.Y. 2001) .................................. 18

Great S. Life Ins. Co. v. Enter. Mortgage Acceptance Co. (In re Enter.
    Mortgage Acceptance Co. Sec. Litig.), 295 F. Supp. 2d 307 (S.D.N.Y.
    2003) ................................................................................................ 10

In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., No. 03 MD
    1529 (LMM), 2005 WL 1278544 (S.D.N.Y. May 31, 2005) .................. 14, 23, 24, 29

In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., No. 03 MD
    1529 (LMM), 2005 WL 1679540 (S.D.N.Y. July 18, 2005) ........................... 17, 18, 21

In re Chaus Sec. Litig., 801 F. Supp. 1257 (S.D.N.Y. 1992) ................................ 19, 20, 24

In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188
    (E.D.N.Y. 2003) ................................................................................ 15

In re Deutsche Telekom AG Sec. Litig., No. 00 CIV 9475 SHS, 2002 WL
    244597 (S.D.N.Y. Feb. 20, 2002) .......................................................... 31

Isanaka v. Spectrum Techs. USA Inc., 131 F. Supp. 2d 353 (N.D.N.Y.
    2001) ................................................................................................ 21

Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518 (S.D.N.Y.
    1977) ................................................................................ 19, 20, 22, 23

Kahn v. Chase Manhattan Bank, No. 90 Civ. 2824 (LMM), 1995 WL
    491067 (S.D.N.Y. Aug. 17, 1995) .......................................................... 27

Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350
    (1991) .......................................................................................... 7, 21

LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148 (2d Cir.
    2003) ............................................................................................ 8, 9

Levitt v. Bear Stearns & Co., 340 F.3d 94 (2d Cir. 2003) ................................. 17

Levy v. U. S. Gen. Accounting Office, No. 97 Civ 4016 (MBM), 1998
    WL 193191 (S.D.N.Y. Apr. 22, 1998) ................................................ 27, 28

Linder Dividend Fund, Inc. v. Ernst & Young, 880 F. Supp. 49 (D. Mass.
    1995) ................................................................................................ 22

Menowitz v. Brown, 991 F.2d 36 (2d Cir. 1993) ............................................... 7

Morin v. Trupin, 778 F. Supp. 711 (S.D.N.Y. 1991) ......................................... 27

Newby v. Enron Corp. (In re Enron Corp. Sec. Derivative & "ERISA"
    Litig.), No. MDL-1446, Civ. A. H-01-3624, 2004 WL 405886
    (S.D. Tex. Feb. 25, 2004) ........................................................................ 29

Pilarczyk v. Morrison Knudsen Corp., 965 F. Supp. 311 (N.D.N.Y. 1997) .............. 15, 18

Rahr v. Grant Thornton LLP, 142 F. Supp. 2d 793 (N.D. Tex. 2000) .............................. 25

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ............................................................ 10

Rousseff v. E.F. Hutton Co., 867 F.2d 1281 (11th Cir. 1989) ......................................... 24

Shah v. Morgan Stanley, No. 03 Civ. 8761 (RJH), 2004 WL 2346716
    (S.D.N.Y. Oct. 19, 2004) ...................................................................... 8, 14

Sharpe v. Am. Express Co., 689 F. Supp. 294 (S.D.N.Y. 1988) ...................................... 16

Stamm v. Corp. of Lloyd's, No. 96 CIV. 5158 (SAS), 1997 WL 438773
    (S.D.N.Y. Aug. 4, 1997) ......................................................................... 22

State of Alaska Dept. of Revenue v. Ebbers (In re WorldCom, Inc. Sec.
    Litig.), 294 F. Supp. 2d 431 (S.D.N.Y. 2003) ................................................ 25, 26

White v. H & R Block, No. 02 Civ. 8965 (MBM), 2004 WL 1698628
    (S.D.N.Y. July 28, 2004) ................................................................... 8, 12, 17

WM High Yield Fund v. O'Hanlon, No. Civ. A. 04-3423, 2005 WL
    1017811 (E.D. Pa. Apr. 29, 2005) .............................................................. 22

Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553 (6th Cir. 2005) .................. 25, 26

**Statutes and Rules**

15 U.S.C. § 78r(c) ................................................................................... 8, 22

15 U.S.C. § 78t(a) ....................................................................................... 31

28 U.S.C. § 1658(b) ....................................................................................... 28

Fed. R. Civ. P. 15(c) ......................................................................... 6, 24, 27, 28

Pub. L. No. 107-204, 116 Stat. 745 (2002) .......................................................... 28, 29

**Other Authorities**

Fed. R. Civ. P. 15(c) advisory committee's note ............................................................... 28

## PRELIMINARY STATEMENT[1]

This action, <u>Florida State Board of Admin., et al. v. Xerox Corp., et al.</u>,

3:02-CV-1303 (AWT), is brought by four large institutional plaintiffs, three of which

filed claims in January 2002, within one year after press reports and other "storm

warnings" related to alleged accounting improprieties at Xerox Corporation ("Xerox").

The fourth, PPM America, Inc. ("PPM"), failed to file suit at that time.  In fact, PPM did

not sue the Xerox Defendants until nine months later, when it purported to join this action

as a new plaintiff in an amended complaint filed on October 3, 2002.  By that time,

however, the one-year statute of limitations governing PPM's federal claims, which had

been triggered by the same press reports and other "storm warnings" that initially

prompted the other three plaintiffs to bring suit, had expired.  Accordingly, all of PPM's

federal claims are time-barred and should be dismissed.

In addition, all of the plaintiffs assert federal claims related to securities

purchases that took place more than three years before they filed suit.  Claims related to

those purchases are now stale because they were asserted for the first time after the

---

[1] On December 2, 2002, defendants Xerox Corporation, Paul Allaire, G. Richard Thoman, Anne M. Mulcahy, Barry Romeril, Gregory Tayler and Philip Fishbach (collectively, the "Xerox Defendants") moved, pursuant to a Stipulation and Order dated November 20, 2002, to dismiss the Third Consolidated Amended Complaint in <u>Carlson, et al. v. Xerox Corp, et al.</u>, No. 3:00-CV-1621 (AWT), as augmented by certain specified allegations set forth in the Amended Complaint in this action.  That motion was made solely on the basis that the facts alleged failed adequately to plead that the Xerox Defendants acted with the requisite scienter, and was denied on July 13, 2005.  The instant motion is filed pursuant to and in accordance with the Stipulation and Order dated October 28, 2005, so ordered on November 2, 2005, permitting the Xerox Defendants to move to dismiss the Amended Complaint in this action based on issues unique to this action.  For the Court's convenience, a copy of this Stipulation and Order is attached as Exhibit A to the accompanying Declaration of Kevin J. Orsini ("Orsini Decl.").

expiration of the applicable statutes of repose.  All federal claims related to such

purchases also must be dismissed with prejudice.

Finally, all of the plaintiffs have failed to satisfy the requisite pleading

standards for their claims under Section 18 of the Securities Exchange Act of 1934 (the

"1934 Act").  The Court should dismiss these claims as well.

## STATEMENT OF ALLEGED FACTS

On February 6, 2001, the Wall Street Journal published the first in a series

of news articles stemming from allegations by a former Xerox employee, James

Bingham, that accounting irregularities Xerox had experienced in Mexico were found in

other Xerox operations around the world.  (See AC ¶¶ 212-13.)[2]  The February 6 article

reported Bingham's contention that there was a "high likelihood" that Xerox had issued

"misleading financial statements and public disclosures" in recent years.  (See id.)  The

article also reported that Xerox allegedly improperly boosted its pre-tax income by as

much as $1.2 billion from 1995-1999, as opposed to prior statements that it had

improperly recognized $78 million in revenues related to Xerox's operations in Mexico.

(AC ¶ 55.)  The February 6 article was followed by a series of additional articles that

appeared in the Wall Street Journal from February through June of 2001.  (See AC,

introductory paragraph.)  These articles further detailed alleged accounting improprieties

at Xerox.  (See infra Point I.C.)

---

[2] "AC" refers to the Amended Complaint in this action, dated October 3, 2002.
"OC" refers to the original Complaint in Florida State Bd. of Admin., et al. v. Xerox
Corp., et al., originally filed in the Northern District of Florida under Civil Action No.
02CV00008 SPM on January 4, 2002.  Copies of these complaints are attached as
Exhibits B and C, respectively, to the Orsini Declaration.

On May 31, 2001, Xerox announced a restatement of its previously
reported results for fiscal years 1998, 1999 and 2000.  (AC ¶¶ 7, 122.)  According to the
plaintiffs, this restatement reported that Xerox's pre-tax income for 1998 and 1999 was
overstated by some $312 million, due to problems with its Mexico operation, the "misuse
of a reserve established in connection with its acquisition of Rank PLC", and "improper
accounting for long-term leases".  (Id.)  The plaintiffs allege that this restatement
"confirmed Mr. Bingham's main claim that the Company had used aggressive accounting
to secretly bolster results in the late 1990's".  (AC ¶ 229 (internal quotation marks
omitted).)

On January 4, 2002, plaintiffs Florida State Board of Administration
("FSBA"), Teachers' Retirement System of Louisiana ("TRSL") and Franklin Mutual
Advisers, LLC ("Franklin") filed a complaint (the "Original Complaint") against the
Xerox Defendants and KPMG, LLP.  In the Original Complaint, these plaintiffs alleged
violations of, inter alia, Sections 10(b) and 18 of the 1934 Act, and sought damages
related to their purchases of Xerox Corporation common stock from February 15, 1998,
through February 6, 2001.  (See, e.g., OC ¶¶ 3, 11, 14, 17.)

On June 28, 2002, in its Annual Report for 2001, Xerox announced a
second restatement.  (AC ¶ 9.)  In this second restatement, Xerox announced that it had
overstated revenues and profits for the years 1997 through 1999, in amounts greater than
those that had been reported in the May 2001 restatement.  (Id.)  Like the May 2001
restatement, the June 2002 restatement addressed the accounting practices that Bingham
alleged were improper.  (See AC ¶ 203.)

3

On October 3, 2002--nine months after the Original Complaint was filed--
FSBA, TRSL and Franklin, joined by new plaintiff PPM asserting its claims for the very
first time, filed an amended complaint (the "Amended Complaint").  The Amended
Complaint seeks damages related to purchases of Xerox Corporation common stock that
took place from 1997 through 2000 (for FSBA, TRSL and Franklin) and 1998 through
2000 (for PPM), and, like the Original Complaint, alleges violations of, inter alia,
Sections 10(b) and 18 of the 1934 Act.  (See, e.g., AC ¶¶ 5, 12, 15, 18, 21, 23.)

The Original Complaint and the Amended Complaint both allege that
Xerox used "misleading accounting practices" to "artificially inflate" its financial results.
(E.g., OC ¶ 39; AC ¶ 44.)  Both complaints identify the same core allegedly improper
accounting practices:

- "improperly recognizing revenues on long term leases";

- "improperly recognizing revenue on the sale of income streams from long
  term rentals";

- "establishing fraudulent reserves for the purpose of inflating revenue figures
  in subsequent periods"; and

- failing to account properly for bad debt, and using artificially low discount
  rates in calculating the present value of assets based in often volatile foreign
  currencies".

(OC ¶ 40, AC ¶ 45; see also OC ¶ 50, AC ¶ 56.)[3]

---

[3] The Amended Complaint also identifies an additional allegedly misleading accounting
practice:  the improper consolidation into Xerox's financial results of "foreign
corporations in which Xerox had an interest".  (AC ¶¶ 45, 56(h).)  In addition, it contains
supplemental allegations regarding the purported Xerox wrongdoing first charged in the
Original Complaint.  (See AC ¶ 71 & p. 21 (additional alleged "technique" Xerox used to
"improperly" account for revenues from supply, maintenance and finance portions of
long-term leases); AC ¶¶ 104-05 (additional allegedly improper reserves).)

### ARGUMENT

The plaintiffs' federal claims in this action are governed by a one-year statute of limitations and a three-year period of repose. The one-year statute of limitations is triggered either by the discovery of the facts constituting the violation or by "inquiry notice", meaning the emergence of "storm warnings" that would suggest to an ordinary investor the probability that it has been defrauded. Once placed on inquiry notice, an investor must exercise reasonable diligence to investigate potential claims, or its claims will be time-barred in one year. (See Point I.A.)

Here, there were sufficient press reports and other "storm warnings" to place the plaintiffs on inquiry notice by February, and certainly no later than June, 2001. (See Points I.B and I.C.) Yet, PPM failed to assert its federal claims until the Amended Complaint was filed in October 2002, more than one year later. Because PPM has not alleged that it exercised reasonable diligence to investigate its claims once it was on inquiry notice, the one-year statute of limitations had expired by the time it asserted its claims. (See Point I.D.) For that reason, and because PPM has failed to allege properly when it discovered the facts underlying its Section 18 claim (see Point I.E), PPM's federal claims must be dismissed.

In addition, each of the plaintiffs appears to assert federal claims related to purchases that fall outside of the three-year period of repose. Such claims must be dismissed with prejudice. (See Points II.A and II.B.) Also, because the plaintiffs have failed to meet their pleading obligation to identify which purchases occurred within the three-year repose period, their Section 18 claims must be dismissed entirely. (See Point II.C.)

5

Moreover, the plaintiffs' time-barred claims are not saved by any of (a) the doctrine of class action (or "American Pipe") tolling, (b) relation back pursuant to Fed. R. Civ. P. 15(c), or (c) the extended periods of limitation and repose enacted by the Sarbanes-Oxley Act. First, because the plaintiffs filed their claims before class certification was decided in the Carlson action, they cannot benefit from American Pipe tolling, and the statutes of limitation and repose governing their claims were not tolled by the filing of the Carlson consolidated class action complaint in April 2001. (See Point III.A.) Second, because PPM has not alleged that it was not a party to the Original Complaint because of some "mistake" of identity, its claims do not relate back for statute of limitations purposes to the date the Original Complaint was filed. (See Point III.B.) Third, although the Sarbanes-Oxley Act extended the applicable statutes of limitation and repose to two and five years, respectively, it did so only for claims that were not yet stale as of July 30, 2002, and only for "proceedings" that were "commenced" after that date. Sarbanes-Oxley does not salvage PPM's time-barred claims because (a) PPM was on inquiry notice by February, and no later than June, 2001, thus its claims were stale under the one-year statute of limitations on July 30, 2002, and (b) the filing of an amended complaint is not the "commencement" of a new "proceeding" for purposes of Sarbanes-Oxley. (See Point III.C.)

Finally, because the plaintiffs' control person liability claims pursuant to Section 20(a) of the 1934 Act are derivative in nature, they are untimely and must be dismissed to the same extent as the underlying Section 10(b) and Section 18 claims. Further, because the Amended Complaint contains no allegations that Xerox was a

6

"control person" of any primary violator, the plaintiffs' Section 20(a) claims must be dismissed entirely as to Xerox.  (See Point IV.)

## I.    PPM'S FEDERAL CLAIMS ARE BARRED BY THE ONE-YEAR STATUTES OF LIMITATION

PPM's Section 10(b) and Section 18 claims should be dismissed because they were not asserted until October 3, 2002, more than one year after February 6, 2001, (or June 28, 2001, at the very latest), when PPM is charged with knowledge of the alleged fraud.  Thus, those claims are time-barred.

### A.    The Applicable Statutes Of Limitation.

PPM's claims brought pursuant to Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder (collectively, the "Section 10(b) claims") are governed by a one-year statute of limitations.  See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).  To be timely, such claims must be "commenced within one year after the discovery of the facts constituting the violation".  Id.  The Second Circuit has recognized that "discovery" of the facts constituting the violation "includes constructive or inquiry notice, as well as actual notice".  Menowitz v. Brown, 991 F.2d 36, 41 (2d Cir. 1993); see also Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993).  The one-year statute of limitations is not subject to equitable tolling.  See Lampf, 501 U.S. at 363 (holding that "the 1-year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary"); De La Fuente v. DCI Telecomm., Inc., 206 F.R.D. 369, 386 (S.D.N.Y. 2002) ("The doctrine of equitable tolling does not apply to the statute of limitations in securities fraud cases.").  Claims brought pursuant to Section 18 of the 1934 Act also are governed by a

7

one-year statute of limitations, as set forth in Section 18(c), and also must be brought "within one year after the discovery of the facts constituting the cause of action". See 15 U.S.C. § 78r(c).

Because "discovery" of facts sufficient to trigger the one-year statute of limitations includes inquiry notice, a duty of inquiry arises "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded". Dodds, 12 F.3d at 350. Those circumstances "are often analogized to 'storm warnings'". LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003) (citation omitted). "Storm warnings" triggering a duty of inquiry can be found in "any financial, legal, or other data, including public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants". Shah v. Morgan Stanley, No. 03 Civ. 8761 (RJH), 2004 WL 2346716, at *9 (S.D.N.Y. Oct. 19, 2004) (citation omitted).

"Storm warnings" do not have to disclose the entire alleged fraud in order for an investor to be on inquiry notice. See Dodds, 12 F.3d at 352 ("An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice."). Rather, investors "need only 'be capable of perceiving the general fraudulent scheme based on the information available to them'". White v. H & R Block, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *5 (S.D.N.Y. July 28, 2004) (citation omitted); Shah, 2004 WL 2346716, at *9 (same). Put differently, the issue "is not whether the disclosed facts alerted plaintiffs to the existence of the entire fraudulent scheme they allege occurred, but rather whether plaintiffs had notice of facts sufficient to impose upon them a duty to inquire further into the matter". Arduini/Messina P'ship v. Natl. Med. Fin.

8

Servs. Corp., 74 F. Supp. 2d 352, 359 (S.D.N.Y. 1999); see also, e.g., De La Fuente,

206 F.R.D. at 381 (noting that "plaintiffs have a duty to inquire into the reliability of a

defendant's representations where there is information that suggests that there are any

material misrepresentations"); Addeo v. Braver, 956 F. Supp. 443, 450 (S.D.N.Y. 1997)

("It is sufficient that plaintiffs had knowledge of . . . aspects of the fraud.") (citation

omitted).

   Once an investor is on inquiry notice, it has a duty to exercise reasonable

diligence to investigate and seek "to learn the facts which would disclose fraud". Dodds,

12 F.3d at 350. If an investor fails to conduct such an investigation when placed on

inquiry notice, "knowledge will be imputed as of the date the duty arose". LC Capital

Partners, 318 F.3d at 154.

   B.  As PPM Acknowledges, It Was On Inquiry Notice On February 6, 2001.

   In the Amended Complaint, the plaintiffs--including PPM--allege that they

"did not know, and had no reason to know, of the Company's fraudulent accounting

methods set forth [in the Amended Complaint], until, at the earliest, February [6], 2001,

when The Wall Street Journal published the first of its series of articles disclosing the

allegations of Mr. Bingham". (AC ¶ 272.)[4] Similarly, the plaintiffs allege that they "did

not know, and had no reason to know, that Defendants' statements, in public filings, to

the press, and to the investing public, as set forth in [the Amended Complaint], were false

---

   [4] In paragraphs 272 and 273 of the Amended Complaint, the plaintiffs mistakenly
refer to the date of the Wall Street Journal article as February 1, rather than February 6,
2001. Elsewhere, the Amended Complaint acknowledges that the article is dated
February 6 (see AC introductory paragraph & ¶ 55), and the February 6 article itself
makes clear that it is the one referred to in the Amended Complaint (see Orsini Decl. Ex.
D).

and materially misleading until February [6], 2001, at the earliest", when the same <u>Wall Street Journal</u> article was first published.  (AC ¶ 273.)  The plaintiffs (including PPM) thus admit that they had "reason to know" of the alleged fraud on February 6, 2001, thereby putting them on inquiry notice.[5]

Even beyond PPM's admission, the conclusion that February 6, 2001, is the date on which PPM's duty to inquire arose is confirmed by PPM's own allegations regarding the <u>Wall Street Journal</u> article of that date, and by the substance of the article itself.  According to the article, which PPM describes as an "exposé" (AC ¶ 212), Bingham "concluded that there was a 'high likelihood' that Xerox in recent years had issued 'misleading financial statements and public disclosures'" (<u>see</u> AC ¶ 213).[6]  The

_____

[5] Plaintiffs' acknowledgement that they were on inquiry notice as of February 6, 2001, is further illustrated by several facts.  <u>First</u>, FSBA, TRSL and Franklin were careful to file the Original Complaint by January 2002, just within one year of February 6, 2001.  <u>Second</u>, the "relevant period" defined by FSBA, TRSL and Franklin in the Original Complaint terminated on February 6, 2001, the very date the <u>Wall Street Journal</u> article was published.  (<u>See</u> OC ¶ 3.)  <u>Third</u>, in the Original Complaint, FSBA, TRSL and Franklin made clear that they were suing for purchases of Xerox common stock that took place from February 15, 1998, through February 6, 2001, but <u>not</u> for any purchases that may have occurred <u>after</u> February 6, 2001.  (<u>See</u> OC ¶¶ 11, 14, 17.)  <u>Fourth</u>, none of the plaintiffs now sues for any purchases of Xerox common stock that took place after that date.  (<u>See</u> AC ¶¶ 15, 18, 21, 23 (indicating that each plaintiff is suing only for purchases "through 2000").)

[6] All of the news articles discussed in this Memorandum were referred to, quoted from or relied upon by the plaintiffs in drafting the Amended Complaint and bringing suit.  Therefore, the Court may consider them in evaluating the Xerox Defendants' motion to dismiss.  <u>See, e.g.</u>, <u>Great S. Life Ins. Co. v. Enter. Mortgage Acceptance Co.</u> <u>(In re Enter. Mortgage Acceptance Co. Sec. Litig.)</u>, 295 F. Supp. 2d 307, 310 (S.D.N.Y. 2003) ("On a Rule 12(b)(6) motion, the Court may consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have, been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.'") (quoting <u>Rothman v. Gregor</u>, 220 F.3d 81, 88-89 (2d Cir. 2000)), <u>aff'd</u>, 391 F.3d 401 (2d Cir. 2005).  The Xerox Defendants do not concede, of course, that the substance of these articles (or any other "fact" alleged by the plaintiffs) was or is true, but there can be no question that the

February 6 article also reported Bingham's claim that Xerox's "accounting violations were not limited to Xerox Mexico" and that his allegations purportedly were supported by other former Xerox employees.  (See AC ¶¶ 214-16.)  In addition, the article described Bingham's claims that, in 2000, he wrote a memo in which he concluded that Xerox's "'win at any cost' financial strategy overcame appropriate accounting policies" and that Xerox's then-Treasurer instructed him not to distribute that memo, "asking if he 'wanted people to go to jail'".  (2/6/01 WSJ article, at 4, Orsini Decl. Ex. D.)  Moreover, the article discussed several of Bingham's specific allegations about Xerox's accounting.  According to the article, Bingham alleged that Xerox:

- prematurely booked revenue for service and supplies on "sales-type" leases (id. at 3);

- used an "artificially low [discount] rate to boost short term results" in Brazil and other countries (id.);

- established a $100 million Rank Xerox reserve "without any basis" (id. at 5); and

- improperly recognized revenue on its sale of future income streams to banks and other financial institutions and "'inadequate[ly]'"disclosed those transactions (id.).

These allegations are central to the claims that PPM eventually brought against Xerox.  (See, e.g., AC ¶¶ 45, 56(a), 56(c), 56(d), 56(f), 100-03.)

In addition, the February 6 article noted that Bingham had filed a wrongful-termination suit against Xerox (to which PPM refers in the introductory paragraph of the Amended Complaint) in late 2000 in Connecticut Superior Court in

_____

substance of the allegations reported in each article was publicly available as of the date each article was published.

11

Stamford.  (See 2/6/01 WSJ article, at 2, Orsini Decl. Ex. D.)  In his November 3, 2000,

complaint, Bingham alleged that, among other things, Xerox engaged in "fraudulent

accounting and financial reporting practices".  (Bingham Compl. Introduction, Orsini

Decl. Ex. E; see also, e.g., id. ¶ 12 (Xerox allegedly engaged in "ongoing misconduct and

fraud"); ¶ 18 (Bingham allegedly "explained again his concerns over the accounting and

financial irregularities and the illegality and fraud that was ongoing as a result thereof");

¶ 24 (Bingham allegedly attempted to "remedy defendant Xerox's ongoing misconduct

and fraud").)  Bingham's November 2000 complaint also contained his allegations

(discussed above) regarding the purported response of Xerox's then-Treasurer to his 2000

memo about Xerox's accounting.  (See id. ¶¶ 8-11.)

Accordingly, even aside from PPM's admission, it is clear that the

February 6, 2001, Wall Street Journal article contained sufficient "storm warnings" to

alert a reasonable investor to the "general fraudulent scheme" alleged in the Amended

Complaint.  See White, 2004 WL 1698628, at *5.

C.    In The Alternative, PPM Was On Inquiry Notice By No Later Than
       June 28, 2001.

Even if the Wall Street Journal's February 6, 2001, "exposé" reporting

Bingham's allegations against Xerox somehow was not sufficient to put PPM on inquiry

notice--and, as PPM admits, it was--there can be no doubt that PPM was put on inquiry

notice by the numerous additional "storm warnings" between February and June 28,

2001.  Accordingly, PPM was on inquiry notice by June 28, 2001, at the very latest.

First, between February 22 and June 28, 2001, as set forth in the Amended

Complaint, the Wall Street Journal published several additional articles about Xerox.

(See AC introductory paragraph; Orsini Decl. Exs. F - I.)  In addition to reiterating many
of the detailed charges of alleged accounting improprieties first reported on February 6,
those articles publicized additional alleged Xerox wrongdoing about which PPM
ultimately complained.  (See, e.g., 2/22/01 WSJ article, at 2 (reporting that Bingham
advised Xerox to hedge more of its Brazil currency exposure), Orsini Decl. Ex. F; AC
¶ 107).)  The Wall Street Journal also reported other facts and allegations that constituted
further "storm warnings".  For example, the Wall Street Journal reported that Xerox
"delayed filing its [2000] annual report due to a disagreement with its outside auditor
over accounting issues" and that Xerox was "facing a widening probe of its accounting
practices by the Securities and Exchange Commission".  (4/3/01 WSJ article, at 1, Orsini
Decl. Ex. G.)  Moreover, a June 28, 2001, article reported Bingham's allegation that
"concern spread at Xerox that the [SEC] investigation [of alleged wrongdoing in Mexico]
would find out about other undisclosed accounting issues".  (6/28/01 WSJ article, at 3,
Orsini Decl. Ex. I.)  That article also reported that Bingham had testified before the SEC
that he and other Xerox accounting employees "discussed more than $500 million in
special accounting actions in 1998 and 1999 and Xerox's need to do 'everything' it could
'to keep the investigation in Mexico'".  (Id.)

Second, on April 16, 2001, a Consolidated Class Action Complaint
alleging accounting improprieties at Xerox, captioned Carlson, et al. v. Xerox Corp., et
al., No. 03:00-CV-1621 (AWT) (the "2001 Carlson Complaint"), was filed in the United
States District Court for the District of Connecticut.  The 2001 Carlson Complaint
contained many of the same allegations of accounting fraud that PPM eventually pleaded

more than 17 months later.  (See Orsini Decl. Ex. J.)  For example, like the Amended

Complaint, the 2001 Carlson Complaint alleged that Xerox:

- prematurely recognized supplies and service revenue on long-term leases
  (compare AC ¶¶ 67-68 with 2001 Carlson Compl. ¶ 44);

- entered into long-term leases with bad credit risk customers (compare AC
  ¶ 74 with 2001 Carlson Compl. ¶ 46);

- improperly booked revenue associated with its sales of revenue streams from
  long-term rentals to financial institutions (compare AC ¶¶ 82 with 2001 Carlson
  Compl. ¶¶ 58-59);

- artificially inflated residual values in order to book more revenue (compare
  AC ¶¶ 95-99 with 2001 Carlson Compl. ¶ 71); and

- used artificially low discount rates in valuing long-term leases in foreign
  countries (compare AC ¶¶ 89, 92-94 with 2001 Carlson Compl. ¶¶ 66, 69-
  70).

The 2001 Carlson Complaint thus constituted yet another significant "storm warning"

that triggered PPM's duty to investigate.  See, e.g., In re Adelphia Commc'ns Corp. Sec.

& Derivative Litig., No. 03 MD 1529 (LMM), 2005 WL 1278544, at *8-9 (S.D.N.Y.

May 31, 2005) (finding that earlier complaint triggered inquiry notice because there were

"no significant differences" between earlier complaint and complaint at issue); Shah,

2004 WL 2346716, at *10 (ruling that prior complaint regarding the same subject matter

and containing "markedly similar" allegations, "confirmed" that plaintiff was on notice

inquiry by Fortune magazine article published shortly before prior complaint); Ezra

Charitable Trust v. Frontier Ins. Group, Inc., No. 00 Civ. 5361 (LMM), 2002 WL 87723,

at *5 (S.D.N.Y. Jan. 23, 2002) (finding that "the mere existence" of prior litigation

against defendant "involving similar allegations" should have "alerted plaintiffs to

possible fraud"), aff'd sub. nom., LC Capital Partners, LP v. Frontier Ins. Group, Inc.,