## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RUSSELL CARLSON, Individually<br>And On Behalf Of All Others Similarly<br>Situated,<br><br>　　　　Plaintiff,<br><br>v.<br><br>XEROX CORPORATION, KPMG, LLP,<br>PAUL A. ALLAIRE, G. RICHARD<br>THOMAN, ANN MULCAHY<br>BARRY D. ROMERIL,<br>GREGORY TAYLER and<br>PHILIP FISHBACH,<br><br>　　　　Defendants. | 3:00-CV-1621 (AWT)<br><br>**ALL CASES**<br><br>January 19, 2006 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR CLASS CERTIFICATION

Dennis J. Johnson (CT 22090)
Jacob B. Perkinson (CT 22091)
James F. Conway, III (phv0744)
JOHNSON & PERKINSON
1690 Williston Road
P.O. Box 2305
S. Burlington, Vermont 05403
**Co-Lead Counsel for Plaintiffs**

Melvyn I. Weiss (CT 04080)
Brad N. Friedman (CT 24910)
Beth Kaswan (CT 21415)
MILBERG WEISS BERSHAD
　& SCHULMAN LLP
One Pennsylvania Plaza  49th Floor
New York, New York  10119-0165
**Co-Lead Counsel for Plaintiffs**

Glen DeValerio (CT 22582)
Leslie R. Stern (phv0743)
Bryan A. Wood (phv0742)
BERMAN DeVALERIO PEASE
　TABACCO BURT & PUCILLO
One Liberty Square
Boston, Massachusetts 02109
**Co-Lead Counsel for Plaintiffs**

Andrew M. Schatz (CT 00603)
SCHATZ & NOBEL, P.C.
One Corporate Center
20 Church Street
Hartford, CT 06103
**Co-Liaison Counsel for Plaintiffs**

J. Daniel Sagarin (CT 00603)
HURTWITZ & SAGARIN, LLC
147 N. Broad Street
Milford, Connecticut 06460
**Co-Liaison Counsel for Plaintiffs**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

ARGUMENT.......................................................................................................... 10

    A.    LEGAL STANDARD FOR A MOTION FOR CLASS CERTIFICATION ............................ 10

    B.    THIS ACTION SATISFIES THE REQUIREMENTS OF RULE 23(A) AND 23(G).............. 13

            1.    The Class Is So Numerous That Joinder
                Of All Members Is Impracticable ............................................................. 13

            2.    There Are Common Issues Of Law And Fact ........................................... 15

            3.    The Proposed Class Representatives' Claims
                Are Typical Of The Class ....................................................................... 16

            4.    The Proposed Class Representatives Will Fairly And Adequately
                Protect The Interests Of The Class ........................................................... 19

            5.    The Proposed Class Counsel Will Fairly And Adequately Represent
                The Interests Of The Class...................................................................... 21

    C.    THE REQUIREMENTS OF RULE 23(B)(3) HAVE BEEN MET..................................... 22

            1.    Questions Of Law And Fact Common To The Class Predominate.......... 23

            2.    A Class Action Is Superior To Other Available Methods For
                The Fair And Efficient Adjudication Of The Controversy....................... 25

CONCLUSION........................................................................................................ 28

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods. Inc. v. Windsor,*
521 U.S. 591 (1997)..................................................................................................... 23

*Avagliano v. Sumitomo Shoji Am., Inc.,*
103 F.R.D. 562 (S.D.N.Y. 1984) .................................................................................. 14

*Baby Neal v. Casey,*
43 F.3d 48 (3d Cir. 1994) ............................................................................................. 12

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
222 F.3d 52 (2d Cir. 2000) ........................................................................................... 12

*Basic, Inc. v. Levinson,*
485 U.S. 224 (1988)................................................................................................. 2, 24

*Blackie v. Barrack,*
524 F.2d 891 (9th Cir. 1975) .................................................................................. 20, 25

*Carlson v. Xerox Corp., et al.,*
392 F. Supp. 2d 267 (D. Conn. 2005)................................................................. 4, 8, 12

*Ceres Partners v. GEL Assocs.,*
918 F.2d 349 (2d Cir. 1990) ......................................................................................... 24

*Civic Ass'n of the Deaf v. Giuliani,*
915 F. Supp. 622 (S.D.N.Y. 1996) ............................................................................... 13

*Cross v. 21st Century Holding Co.,*
No. 00-4333, 2004 WL 307306, (S.D.N.Y. Feb. 18, 2004) ......................................... 14

*Cutler v. Perales,*
128 F.R.D. 39 (S.D.N.Y. 1989) .................................................................................... 15

*Daniels v. City of N.Y.,*
198 F.R.D. 409 (S.D.N.Y. 2001) ...................................................................... 18, 19, 21

*Dietrich v. Bauer,*
192 F.R.D. 119 (S.D.N.Y. 2000) ............................................................................ 11, 14

*Dolgow v. Anderson,*
43 F.R.D. 472 (E.D.N.Y. 1968)..................................................................................... 24

*Dunnigan v. Metropolitan Life Ins. Co.,*
214 F.R.D. 125 (S.D.N.Y. 2003) ............................................................................ 12, 16

*Dura-Bilt Corp. v. Chase Manhattan Corp.,*
89 F.R.D. 87 (S.D.N.Y. 1981) .................................................................. 17, 18, 19, 23

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156 (1974)................................................................................................. 12, 19

*Eisenberg v. Gagnon,*
766 F.2d 770 (3d Cir. 1985) ............................................................................. 2, 10, 11

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
903 F.2d 176 (2d Cir. 1990) ......................................................................................... 11

*Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
114 F.R.D. 48 (S.D.N.Y. 1987) .................................................................................... 27

*Green v. Wolf Corp.,*
406 F.2d 291 (2d Cir. 1968) .................................................................................. passim

*In re Arakis Energy Corp. Sec. Litig.,*

No. 95-3431, 1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ............................................ 24, 26
*In re Avon Sec. Litig.*,
  No. 91-2287, 1998 WL 834366 (S.D.N.Y. Nov. 30, 1998)................................................. 15, 20
*In re Baldwin-United Corp. Litig.*,
  122 F.R.D. 424 (S.D.N.Y. 1986) .................................................................................. 18, 19, 24
*In re Blech Sec. Litig.*,
  187 F.R.D. 97 (S.D.N.Y. 1999) .................................................................................... passim
*In re Data Access Sys. Sec. Litig.*,
  103 F.R.D. 130 (D.N.J. 1984).............................................................................................. 17
*In re Deutsche Telekom*,
  229 F. Supp. 2d 277 (S.D.N.Y. 2002) ................................................................................. 19
*In re Drexel Burnham Lambert Group*,
  960 F.2d 285 (2d Cir. 1992) ........................................................................................ passim
*In re Energy Sys. Equip. Leasing Sec. Litig.*,
  642 F. Supp. 718 (E.D.N.Y. 1986) ............................................................................ 18, 24, 27
*In re Frontier Ins. Group, Inc. Sec. Litig.*,
  172 F.R.D. 31 (E.D.N.Y. 1997)..................................................................................... 14, 19
*In re Indep. Energy Holdings, PLC Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) .................................................................................. passim
*In re LILCO Sec. Litig.*,
  111 F.R.D. 663 (E.D.N.Y. 1986)................................................................................. 23, 24, 27
*In re Lloyd's Am. Trust Fund Litig.*,
  No. 96 Civ. 1262 (RWS), 1998 WL 50211 (S.D.N.Y. Feb. 6, 1998)...................................... 11
*In re NASDAQ Market-Makers Antitrust Litig.*,
  172 F.R.D. 119 (S.D.N.Y. 1997) ........................................................................ 14, 17, 19, 25
*In re Oxford Health Plans, Inc. Sec. Litig.*,
  191 F.R.D. 369 (S.D.N.Y. 2000) .................................................................................. passim
*In re Prudential Ins. Co. of Am. Sales Prac. Litig.*,
  148 F.3d 283 (3d Cir. 1998) ........................................................................................ 13, 24
*In re Saxon Sec. Litig.*,
  No. 82 Civ. 3103 (MJL), 1984 WL 2399 (S.D.N.Y. Feb. 23, 1984)...................................... 25
*In re Sumitomo Copper Litig.*,
  194 F.R.D. 480 (S.D.N.Y. 2000) .................................................................................. 14, 17
*In re TCW/DWN Am. Gov't Income Trust Sec. Litig.*,
  941 F. Supp. 326 (S.D.N.Y. 1996) ...................................................................................... 21
*In re VISA Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ........................................................................................ 12, 23
*In re VMS Sec. Litig.*,
  136 F.R.D. 466 (N.D. Ill. 1991)........................................................................................... 15
*Jackson v. Foley*,
  156 F.R.D. 538 (E.D.N.Y. 1994)........................................................................................ 14
*Jones v. Ford Motor Credit Co.*,
  No. 00-8330, 2005 WL 743213 (S.D.N.Y. March 31, 2005)............................................ 13, 21
*Kennedy v. Tallant*,
  710 F.2d 711 (11th Cir. 1983) ............................................................................................ 11
*Korn v. Franchard Corp.*,

456 F.2d 1206 (2d Cir. 1972) ............................................................................. 11, 26
Maywalt v. Parker & Parsley Petroleum Co.,
    147 F.R.D. 51 (S.D.N.Y. 1993) ..................................................................... 10, 11, 13
Moskowitz v. Loop,
    128 F.R.D. 624 (E.D. Pa. 1989)................................................................................. 19
Oscar Gruss & Son v. Geon Indus.,
    75 F,R.D. 531 (S.D.N.Y. 1977) ............................................................................... 18
RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,
    No. 94 Civ. 5587 (PKL), 1996 WL 134757 (S.D.N.Y. Mar. 25, 1996) .................................. 24
Robbins v. Moore Med. Corp.,
    788 F. Supp. 179 (S.D.N.Y. 1992) .......................................................................... 20
Shelter Realty Corp. v. Allied Maint. Corp.,
    574 F.2d 656 (2d Cir. 1978) .................................................................................. 12
Simon v. Westinghouse Elec. Corp.,
    73 F.R.D. 480 (E.D. Pa. 1977)................................................................................. 27
Stevelman v. Alias Research, Inc.,
    No. 5:91-cv-682, 2000 WL 888385 (D. Conn. June 22, 2000) ................................................ 10
Tedesco v. Mishkin,
    689 F. Supp. 1327 (S.D.N.Y. 1988) .................................................................... 15, 16
Trief v. Dun & Bradstreet Corp.,
    144 F.R.D. 193 (S.D.N.Y. 1992) .......................................................................... 15, 17
Zeidman v. J. Ray McDermott & Co.,
    651 F.2d 1030 (5th Cir. 1981) ................................................................................ 15

OTHER AUTHORITIES

1 H. Newberg, *Newberg on Class Actions* § 3.13 (3d ed. 1992) ............................................ 18, 26

*Advisory Committee Note to the 1966 Revision of Rule 23*, 39 F.R.D. 69, 104 (1966)................ 23

RULES

Federal Rule of Civil Procedure 23 ...................................................................... passim

Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Lead Plaintiffs Dr. Paul Dantzig, Thomas Zambito, and the Louisiana State Employees' Retirement System ("Lead Plaintiffs") submit this Memorandum of Law in support of their Motion for an Order: (1) certifying this action as a class action; (2) certifying a class consisting of all persons and/or entities who purchased Xerox common stock and/or bonds during the period from February 17, 1998 through June 28, 2002 ("the Class Period") and who were damaged thereby ("the Class"); (3) appointing the Lead Plaintiffs, as well as Joseph DiNardo, Fernan Cepero, Leonard Nelson, John Stutsman, and Sol Sachs (collectively, the "Proposed Class Representatives") as Class Representatives of the defined class; and (4) appointing Johnson & Perkinson, Berman DeValerio Pease Tabacco Burt & Pucillo, and Milberg Weiss Bershad & Schulman LLP as Class Counsel for the Class.

## INTRODUCTION

This securities fraud action is perfectly suited for class treatment. The Third Consolidated Amended Complaint (hereinafter "Complaint" or "CAC") alleges that Defendants, Xerox Corporation ("Xerox") and six of its senior officers and/or directors (the "Individual Defendants",[1] who collectively with Xerox, are referred to as the "Xerox Defendants"), materially misrepresented Xerox's publicly reported financial results throughout the Class Period. CAC ¶¶ 16, 512. By utilizing a wide variety of "accounting opportunities" and "accounting tricks,"[2] the Xerox Defendants overstated Xerox's revenues by $6.4 billion and its

---

[1]     The Individual Defendants are Philip Fishbach, G. Richard Thoman, Anne Mulcahy, Paul A. Allaire, Barry D. Romeril and Gregory Tayler.

[2]     These methods included, *inter alia,* using artificially low interest rate assumptions to inflate the recognized "present value" of long-term leases ("ROE"); arbitrarily changing the allocation of equipment versus supply and maintenance revenue in long-term leases to prematurely recognize lease revenue ("margin normalization"); using reserves as "cushions" to close the gap between forecasted and actual performance; improperly recognizing revenues as sales of revenue streams to banks where Xerox assured payment on the agreements (so that the arrangement was in effect a loan; the risk of loss not passing); misclassifying long-term leases as "sales type" rather

1

pre-tax earnings by $1.411 billion during the Class Period.  Additionally, the Xerox Defendants

issued numerous false or misleading statements to the market regarding Xerox's operations and

misrepresented or concealed its accounting practices and problems.  Defendant KPMG, LLP

("KPMG") gave credence to Xerox's false financial statements by its knowing or reckless

issuance of false audit opinions certifying those financial statements.  CAC ¶ 279.  As a result,

Defendants caused Xerox's stock to trade at artificially high prices, enabling the Individual

Defendants to personally profit by selling more than $55 million dollars of Xerox stock at the

height of the fraud.  CAC ¶ 13.

As discussed in detail below, all of the requirements for class certification under Rule 23

of the Federal Rules of Civil Procedure are satisfied here.  Moreover, the alternatives to class

treatment would effectively deny class members access to the courts, thereby barring them from

establishing their right to recovery.  Courts have long recognized that violations of the federal

securities laws by public companies and their management generally inflict economic injury on

large numbers of geographically dispersed persons with relatively small individual losses,

rendering the cost of pursuing individual litigation – under complex statutes and against well-

financed defendants – impractical.  *See, e.g., Basic, Inc. v. Levinson,* 485 U.S. 224 (1988);

*Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir. 1985).  Accordingly, Lead Plaintiffs

respectfully submit that the proposed class should be certified and the Proposed Class

Representatives should be approved as class representatives.

---

than "operating" leases to improperly recognize revenues up-front; recognizing revenues prior to execution of
enforceable lease agreements and/or prior to shipments of equipment to customers; retroactively inflating the
residual value of equipment being leased and improperly deferring expenses associated with supply, maintenance
and labor portions of long-term leases; and shipping to outside warehouses to conceal inventory levels. CAC ¶¶ 14,
42, 43, 47, 48, 50, 51, 53, 54, 62 and 72.

## STATEMENT OF FACTS

Throughout the "Class Period", the Xerox Defendants announced fraudulent financial results for the Company, *e.g.,* CAC ¶¶ 111, 325-326, 328, 334-340, 348-349, 355, 358-359, 368-370, 377-378, 383-384, 394-395, 398-401, 409-412, 416, 449, and misrepresented that Xerox's financial statements had been compiled in conformance with GAAP.  CAC ¶¶ 81, 106, 112, 120, 254, 256, 327, 339, 350, 360, 371, 379, 385, 402, 417, 448, 465, 467, 468, 471, 481.  At the same time, Defendant KPMG falsely assured Xerox investors that Xerox's statements of earnings and financial condition were fairly stated in compliance with Generally Accepted Accounting Principles ("GAAP") and that KPMG had complied with Generally Accepted Auditing Standards ("GAAS") during its year-end audits of Xerox.  CAC ¶¶ 31, 279, 297, 500.

In addition, the Xerox Defendants issued public statements containing misrepresentations, asserting, *inter alia,* that Xerox's allegations of accounting improprieties by Xerox's assistant treasurer, James Bingham, ("Bingham") were baseless; that its accounting irregularities were confined to Xerox's Mexican subsidiary ("XMEX"); and that there would be no material variance between the method of revenue recognition utilized by Xerox and that which the SEC required. CAC ¶¶ 463, 430, 107.  The Xerox Defendants also issued materially misleading statements regarding the Company's business, touting, *inter alia*, the Company's "excellent growth in Mexico" and strong performance in Latin America, *see*, *e.g.*, CAC ¶¶ 328, 334, 340, 345, 351, 359, 386, 403; past and expected delivery of double-digit earnings growth, *see*, *e.g.*, CAC ¶¶ 335-338, 342, 343, 347, 348, 353, 355-358, 375 and ¶ 394; and adequate hedging, CAC ¶¶ 354, 366-367.

As a result of the public dissemination of Xerox's false and misleading financial statements and the Xerox Defendants' other statements, and misleading omissions, regarding

Xerox's business, Xerox stock traded at artificially inflated levels during the Class Period. *See,*
*e.g.,* CAC, Chart between pp. 125-126 (showing price increases tied to various announcements in
1998); CAC, Chart between pp. 140-141 (showing pre-split price increase of $10.93 in response
to January 26, 1999 announcement of 1998 earnings and expected growth); CAC, Chart between
pp. 162-163 (showing stock price response to Xerox April 25, 2000 announcement that the
Company beat analysts' earnings expectations by $.05 per share); CAC Chart between ¶¶ 171-
172 (showing various increases in stock price in response to misleading statements in 2001 and
2002).

From June 16, 2000 through April 2002, the Xerox Defendants' accounting machinations
"gradually came to light," *Carlson v. Xerox Corp., et al.,* 392 F. Supp. 2d 267, 274 (D. Conn.
2005). On June 16, 2000, Xerox announced that it would fail to meet its estimated second
quarter 2000 earnings in part because of the "unexpected" discovery of bad debts in XMEX,
which would lead to a $.05 to $.06 reduction in earnings per share. CAC ¶ 36. Xerox
downplayed the effect of this situation, claiming it was an isolated incident. Thus, Romeril
misled analysts about the breadth of Xerox' problems when, during a conference call, he stated
that "the company's troubles in Mexico appear to have been caused by problems with customer
receivables accounts," CAC ¶ 37a, and that "there was no reason to believe the Mexican problem
would spread to other countries." CAC ¶ 37b. In response to the Xerox Defendants' June 16,
2000 partial disclosure, Xerox's stock price declined $ 4.29 per share on June 16, 2000. CAC ¶
37.

On June 29, 2000, Xerox issued a press release announcing that the SEC had begun an
investigation into accounting issues at XMEX. In response to this disclosure, Xerox's stock
price declined another $1.44 per share. CAC ¶ 39. Although Xerox then stated that it intended

4

to fully cooperate with the SEC in the investigation, Xerox was subsequently fined by the SEC, in part, for a lack of full cooperation in the SEC investigation. CAC ¶¶ 4, 262.

On July 26, 2000, Xerox announced its second quarter 2000 results. Rather than a charge of $.05 per share as Xerox had previously estimated for the accounting problems at XMEX, Xerox disclosed that it actually took an $.11 per share charge associated with the problems at its Mexican subsidiary. CAC ¶ 40. While Defendant Allaire noted that the situation at XMEX was the subject of an ongoing investigation by Xerox and the SEC, he misled investors by attributing, and limiting, the accounting irregularities at XMEX to the fact that several senior managers at XMEX, who had purportedly collaborated, over a period of years, to circumvent Xerox's accounting policies and administrative procedures. *Id.* Allaire falsely stated, "We have no reason to believe that the special circumstances that existed in Mexico are replicated in any other country." *Id.* He reiterated that Xerox was cooperating fully with the SEC. Notwithstanding Defendants' efforts to mislead investors by downplaying the significance of Xerox's accounting problems, misrepresentations issued at that time, Xerox's stock price dropped from $18.19 to $15.25 per share on July 26, 2000, on eight times its volume on the prior day. CAC ¶ 41.

On October 24, 2000, Xerox issued a release announcing its results for its 2000 third quarter. Xerox was forced to establish a $55 million pre-tax provision for problems associated with XMEX. It took an after-tax charge of $41 million, or $.06 per share, for the accounting irregularities at XMEX. In an effort to limit the impact of the XMEX accounting disclosures, the Xerox Defendants falsely represented to investors that Xerox did not anticipate any further related charges and that Xerox's accounting problems were isolated to and affected only XMEX. CAC ¶ 50. Notwithstanding this assurance, Xerox's stock dropped $.32 per share on October 24, 2000. *Id.*

On February 1, 2001, Xerox announced the results of its commissioned investigation of XMEX. CAC ¶ 53g. Xerox once again misled investors my representing that the accounting irregularities at the Mexican subsidiary had resulted from the collusion of a small group of senior XMEX and Latin American executives acting to circumvent Xerox's policies and practices. *Id.* In its press release, Xerox assured investors that it had launched a worldwide review of its internal audit controls to ensure that the problems that had been discovered at XMEX were not present elsewhere. *Id.;* CAC ¶ 54. Xerox further represented that this worldwide review had recently been completed and that the issues identified at XMEX were not found in any other major unit operated by Xerox. CAC ¶ 54.

On February 6, 2001, mere days after Xerox's false assurances, *The Wall Street Journal* reported allegations by Xerox's assistant treasurer, James Bingham, that Xerox's accounting problems were world-wide and were not limited to Mexico. CAC ¶ 55. The article described an August 28, 2000 meeting at which Bingham detailed various accounting irregularities to Xerox senior executives, including Defendant Romeril, as well as a memorandum Bingham sent to Xerox treasurer, Eunice Filter in July 2000, warning that Xerox's accounting irregularities extended beyond Mexico. CAC ¶¶ 56-60. As reported by the *Journal*, Filter had instructed Bingham not to distribute the memorandum, questioned whether Bingham wanted people to go to jail, and instructed him to recall the memorandum and destroy it. *Id.* The Xerox Defendants' response was to allege that Bingham was a disgruntled ex-employee who had been dismissed "for cause" and that Bingham's allegations had no merit. CAC ¶ 61.

On April 3, 2001, Xerox disclosed that it would be delaying the filing of its annual report due to a disagreement with KPMG over accounting issues. CAC ¶ 69. Xerox also revealed that it was facing a widening probe by the SEC into its accounting practices. *Id.* Standard & Poors

noted that, if Xerox's financial statements needed to be revised downward, that could have significant negative implications in terms of the Company's stock price and its bond rating. CAC ¶ 71. In response to this disclosure, Xerox's stock price declined $1.05 per share on April 3, 2001. An analyst's report dated April 20, 2001 explained that, unless Xerox delivered its audited financial statements to lenders by May 31, 2001, Xerox could be in violation of its debt covenants and forced to immediately repay $220 million to its lenders. Xerox's stock price declined $.30 per share on April 20, 2001 in response.

On May 22, 2001, Xerox reported that the SEC had broadened its investigation into Xerox's accounting practices and was examining unusual transactions between Xerox and Citibank. CAC ¶ 80. The *Wall Street Journal,* on that date, reported that Bingham had told SEC investigators that the Citibank deals had the effect of accelerating into just two quarters much of the revenue and profit earned from renting copiers to customers in Brazil over the next several years. *Id.* Notwithstanding Xerox's public assurances that it had looked carefully into the issues raised by Bingham and found them to be untrue and without merit, CAC ¶63, and its false assertion that its accounting for the type of transaction described by Bingham fully complied with GAAP, CAC ¶ 81, Xerox's stock price declined $.60 per share on May 22, 2001. CAC ¶ 83.

On May 31, 2001, Xerox issued restated financial statements for 1998 and 1999 and revised results for 2000 (the "First Restatement"). CAC ¶ 84. The First Restatement reflected that Xerox's 1998 pre-tax income had been overstated by $184 million, or $.19 per share, and 1999 pre-tax income had been overstated by approximately $128 million, or $.13 per share. Xerox's reported pre-tax loss for 2000 was reduced by $172 million, or $.19 per share, because certain revenue that had been prematurely reported as earned in 1998 and 1999 was reported as

earned in 2000. Thus, for the three-year period, the aggregate pre-tax income was reduced by a total of $140 million. *Id*. Given the Xerox Defendants' simultaneously issued false and misleading assurances to investors that the problems identified in Mexico had been fully accounted for and were not found elsewhere; that no fictitious transactions were found; and that the First Restatement did not impact the Company's liquidity, CAC ¶¶ 85, 99, Xerox's stock rose $.88 per share on May 31, 2001. As this Court noted in denying Defendants' Motion to Dismiss, "the First Restatement and the statements by Xerox left investors relieved and thus negated any negative effect which may have accompanied the disclosure of limited violations of GAAP by Xerox." *Carlson*, 392 F. Supp. 2d at 278.

On October 5, 2001, Xerox announced that PriceWaterhouse Coopers, LLP ("PwC") was replacing KPMG as the Company's new auditor for the 2001 fiscal year. CAC, Chart between ¶¶ 171-72. Although Xerox proclaimed that there were no accounting disagreements with KPMG, the market questioned whether this event was a harbinger for further bad news, and Xerox's stock price responded negatively, declining $.84 per share on October 6, 2001.

On January 7, 2002, Xerox disclosed that the SEC had advised Xerox that the SEC believed that Xerox's accounting methodology for sales-type leases did not comply with the requirements of SFAS 13. CAC ¶ 106. Although Xerox misrepresented that the SEC's methodology would not materially change the Company's results, *id.,* Xerox's stock price declined $.17 per share in response to this announcement.[3]

On April 10, 2002, the *Wall Street Journal* reported that the SEC had widened its probe and that KPMG and Defendants Allaire and Romeril had received Wells Notices. CAC ¶ 122.

---

[3]       Similarly, on January 28, 2002, during a conference call with analysts, Mulcahy stated that Xerox continued to believe that its methodology produced financial results that were fairly represented in accordance with GAAP and that Xerox had done substantial work to demonstrate that there was no material difference between its methodology and the SEC's methodology. CAC ¶ 112.

In response, Xerox's stock dropped $.34 per share that day. *Id.*

On April 11, 2002, the SEC issued a press release disclosing that it filed a complaint (the "SEC Complaint") against Xerox in federal court and announced a settlement with Xerox. CAC ¶ 123. Among other things, Xerox agreed to restate its financial statements for the years 1997 to 2001 and pay a $10 million dollar fine, which, at the time, was the largest fine the SEC had levied against a public company. CAC ¶¶ 116, 118. The SEC's Complaint alleged that, from 1997 to 1999, Xerox's accounting machinations enabled the Company to overstate its revenue by $3 billion and overstated income by $1.5 billion. CAC ¶ 131. These amounts were in addition to the overstatements addressed by Xerox's prior restatement. *Id.* In response to this news, on April 11, 2002 Xerox's already battered stock price declined $.24 per share, to $9.94. CAC ¶ 122.

Even then, the full extent of Xerox's accounting fraud had yet to be been revealed. On June 28, 2002, Xerox release its Second Restatement, CAC ¶ 137, which disclosed that, as a result of the use of the numerous accounting machinations identified in the Complaint, (the extent of which went beyond even those identified by the SEC in its previously filed Complaint), it would be forced to reduce its revenues and pretax income figures well beyond those reported in Xerox's prior restatement and identified by the SEC. *Id;* CAC ¶ 138. Again, Xerox's stock price declined in response to the Xerox Defendants' further explication of the magnitude of Xerox's accounting fraud, dropping from $8.00 to $6.00 on volume of 48 million shares, almost 10 times the prior day's volumn. CAC Chart, between ¶¶ 171-72.

In short, all class members suffered the same wrong: the overpayment for their Xerox securities, and a loss of their investment as the truth was revealed. *See, e.g.,* CAC ¶ 16 (Xerox stock price was inflated throughout the Class Period). Though the amount of their overpayment

9

and losses may differ throughout the Class Period, as the amount of artificial inflation in the

stock price undoubtedly varied depending on the misrepresentations and partial disclosures that

were reflected in Xerox's stock price, all of Defendants' misstatements and misleading

omissions occurred as part of a single course of conduct, and, until the final day of the Class

Period, Xerox's stock continued to be artificially inflated, at least in part, as a result of the Xerox

Defendants' failure to fully reveal the extent of Xerox's financial accounting fraud.

## ARGUMENT

### A.    Legal Standard For A Motion For Class Certification

Courts in the Second Circuit have consistently held that class actions are appropriate for

cases raising claims under the federal securities law. *See, e.g., In re Indep. Energy Holdings,*

*PLC Sec. Litig.,* 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (The Second Circuit has stated a

"preference for the use of class actions in securities laws claims."); *Green v. Wolf Corp.*, 406

F.2d 291, 296 (2d Cir. 1968) (A class action may be the only viable method by which

shareholders may obtain recovery.); *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999)

("Class action treatment of related claims is particularly appropriate when plaintiffs seek redress

for violations of the securities laws. It is well recognized that private enforcement of these laws

is a necessary supplement to government regulation."); *Stevelman v. Alias Research, Inc.*, No.

5:91-cv-682, 2000 WL 888385, at *1-5 (D. Conn. June 22, 2000) (certifying class in case

brought under the federal securities laws); *Maywalt v. Parker & Parsley Petroleum Co.*, 147

F.R.D. 51, 54 (S.D.N.Y. 1993) (noting that there is a "preference for class certification in

securities cases" as certification is important "for small securities holders located throughout the

country"); *see also Eisenberg*, 766 F.2d at 785 ("the effectiveness of the securities laws may

depend in large measure on the application of the class action device").

In determining whether certification is appropriate, the Second Circuit has "directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation." *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 1998 WL 50211, at *5 (S.D.N.Y. Feb. 6, 1998); *Maywalt*, 147 F.R.D. at 54 (internal citations omitted).[4] By providing a single forum in which to litigate the same or similar claims, a class action affords an indispensable mechanism for the conservation of judicial resources. *See Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983) ("Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts.").

Accordingly, Rule 23 is broadly interpreted so as to *facilitate* certification of class actions. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990) ("[i]n light of the importance of the class action device in securities fraud suits, these factors are to be construed liberally."). "[W]hen a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *Indep. Energy*, 210 F.R.D. at 479 (citation omitted); *see also Eisenberg*, 766 F.2d at 785; ("The interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action."); *Blech*, 187 F.R.D. at 102 ("Class action treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws. . . . Accordingly, in an alleged securities fraud case, when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward.").

---

[4]     *See also Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir. 1972) (noting that when deciding an issue of class certification, courts must be "mindful of the admonition of liberality toward demands for class suit status in securities litigation"); *Dietrich v. Bauer*, 192 F.R.D. 119, 122 (S.D.N.Y. 2000) (holding that Rule 23 is to be applied in a liberal fashion when considering claims brought under the federal securities laws); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 373 (S.D.N.Y. 2000) ("our Court of Appeals has directed district courts to avoid applying Rule 23 under a restrictive interpretation").

11

In deciding Plaintiffs' motion, "[t]he district court must accept all of the allegations in the pleadings as true . . . and avoid conducting a preliminary inquiry into the merits." *Dunnigan v. Metropolitan Life Ins. Co.,* 214 F.R.D. 125, 133 (S.D.N.Y. 2003); *see also Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir. 1978). In *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974), the Supreme Court specifically stated that there is "nothing in either the language or the history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule . . . ." *Id.* at 177.

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re VISA Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 133 (2d Cir. 2001); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 58 (2d Cir. 2000).

Moreover, "[w]here an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." *See Baby Neal v. Casey,* 43 F.3d 48, 58 (3d Cir. 1994) (citing *Falcon,* 475 U.S. at 157-59). Here, this Court has already noted that "the factual allegations in the Complaint make it clear that the accounting fraud at [XMEX] was not an isolated fraud, but rather was simply one aspect of a corporate-wide accounting fraud directed by Xerox senior management at corporate headquarters" and has denied Defendant KPMG's Motion to Dismiss based on its assertion that the February 6, 2001 disclosures put investors on constructive notice of the full extent of Xerox's accounting machinations. *Carlson,* 392 F. Supp. 2d at 292. Since the proposed class representatives are all members of the class they

seek to represent, and all were the subject of the same illegal common course of conduct by the Defendants, class treatment is appropriate. *See In re Prudential Ins. Co. of Am. Sales Prac. Litig.,* 148 F.3d 283, 312 (3d Cir. 1998).

**B.    This Action Satisfies The Requirements Of Rule 23(a) and 23(g)**

Federal Rule of Civil Procedure 23 ("Rule 23") requires a two-step analysis to determine whether class certification is appropriate. First, the action must satisfy the four prerequisites of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequate representatives).[5] *See In re Drexel Burnham Lambert Group*, 960 F.2d 285, 290 (2d Cir. 1992). Second, the action must satisfy one of the requirements of Rule 23(b) (with 23(b)(3) relating to predominance and superiority). *Id.* This action satisfies each of these requirements.

**1.    The Class Is So Numerous That Joinder Of All Members Is Impracticable**

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. *See Maywalt*, 147 F.R.D. at 54. The "numerosity" requirement does not mandate impossibility, but only difficulty or inconvenience of joining all members of a class. *See Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 632 (S.D.N.Y. 1996). Precise quantification of class members is not a prerequisite to satisfying the numerosity requirement for class certification, as the Court may make common sense assumptions to support a finding of

---

[5]    Recent amendments to Rule 23 require that the adequacy of counsel determination, originally analyzed under Rule 23(a)(4), be made under Rule 23(g), which became effective December 1, 2003. *See Jones v. Ford Motor Credit Co.*, No. 00-8330, 2005 WL 743213 at *26 (S.D.N.Y. March 31, 2005) "although Rule 23(g) replaces the adequacy test as originally developed under Rule 23(a)(4), it largely incorporates the adequacy standards developed thereunder").

13

numerosity. *See Dietrich*, 192 F.R.D. at 123; *see also Cross v. 21st Century Holding Co.,* No. 00-4333, 2004 WL 307306, at \*1 (S.D.N.Y. Feb. 18, 2004) ("Plaintiffs are not obligated to prove the exact class size to satisfy numerosity.").

The Court may also consider other factors bearing on the impracticability of joinder of all class members, such as judicial economy concerns, geographic dispersion of the proposed class, and the inability of class members to bring suit on an individual basis. *See Jackson v. Foley*, 156 F.R.D. 538, 542 (E.D.N.Y. 1994); *see also Avagliano v. Sumitomo Shoji Am., Inc.*, 103 F.R.D. 562, 580 (S.D.N.Y. 1984) (holding that geographical spread of class members is to be given considerable weight in determining whether joinder is impracticable).

In this case, although the exact size of the Class is not yet known, the facts alleged in the Complaint clearly establish the numerosity requirement. Indeed, the Proposed Class Representatives seek to represent a class that undoubtedly consists of thousands of individuals or entities who purchased Xerox securities during a six year period. CAC ¶ 503. Moreover, during the Class Period, there were at least 719,988,021 shares of Xerox common stock outstanding. *Id.* The Complaint also alleges that, during the Class Period, Xerox common stock was traded on the New York Stock Exchange and held by shareholders in geographically dispersed locations throughout the United States and abroad. *Id.* ¶ 27(a), 47. These facts satisfy the numerosity requirement of Rule 23. *See Dietrich*, 192 F.R.D. at 123 (holding that allegations in a securities action that the defendant company was traded on NASDAQ, and had 22.5 million shares outstanding held by approximately 522 record holders, were facts reasonable to "infer that the class is sufficiently large to meet Rule 23(a)'s numerosity requirement"); *In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 40 (E.D.N.Y. 1997) ("[i]n securities fraud actions brought against publicly owned and national corporations, the numerosity requirement may be satisfied

14

by a showing that a large number of shares were outstanding and traded during the relevant

period."); *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1039 (5th Cir. 1981) (finding

that numerosity is generally presumed when a claim involves a nationally traded security); *see*

*also Oxford,* 191 F.R.D. at 374 ("Here, because Oxford stock was traded in high volume during

the class period, the precise number of class members could be, and very likely is, numbered in

the thousands . . . [t]he [n]umerosity requirement is satisfied.").

### 2.    There Are Common Issues Of Law And Fact

The "commonality" requirement under Federal Rule of Civil Procedure 23(a)(2) has also

been satisfied. This requirement is generally considered a low hurdle that "has been applied

permissively by courts in the context of securities fraud litigation." *Blech,* 187 F.R.D. at 104.

Indeed, courts have liberally construed the commonality requirement to mandate only a

minimum of one issue common to all class members. *See Trief v. Dun & Bradstreet Corp.,* 144

F.R.D. 193, 198 (S.D.N.Y. 1992*); see also Cutler v. Perales,* 128 F.R.D. 39, 44 (S.D.N.Y. 1989)

(commonality "does not mean that all issues must be identical as to each [class] member, but it

does require that plaintiffs identify some unifying thread among the members' claims that

warrants class treatment" (internal citations omitted)); *Tedesco v. Mishkin,* 689 F. Supp. 1327,

1334 (S.D.N.Y. 1988) ("not every question of fact or law raised need be common to every

member of the class"). Even factual variations among class members' grievances will not defeat

the commonality requirement so long as the claims arise from a "common nucleus of operative

facts." *In re VMS Sec. Litig.,* 136 F.R.D. 466, 473 (N.D. Ill. 1991); *Green,* 406 F.2d at 298-99;

*see also In re Avon Sec. Litig.,* No. 91-2287, 1998 WL 834366, *5 (S.D.N.Y. Nov. 30, 1998)

("Commonality does not mandate that all class members make identical claims and arguments")

15

(internal citation omitted); *Tedesco,* 689 F. Supp. at 1334 ("not every question of fact or law raised need be common to every member of the class").

Here, there are numerous common legal and factual issues, as the same facts giving rise to the claims of the Proposed Class Representatives also give rise to absent Class Members' claims. The common legal and factual issues include, among others, whether:

   a)   the federal securities laws were violated by Defendants' acts as alleged in the CAC;

   b)   the statements issued by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and financial statements or condition of Xerox; and

   c)   the members of the Class have sustained damages and the proper measure of such damages.

CAC ¶ 506. Additional common questions include whether Defendants acted knowingly or recklessly in issuing false and misleading statements and whether the market prices of Xerox's securities during the Class Period were artificially inflated because of Defendants' conduct. Virtually identical common questions have been found sufficient in numerous securities law class actions. *See, e.g., Drexel Burnham,* 960 F.2d at 290-91; *Indep. Energy,* 210 F.R.D. at 480, *Oxford,* 191 F.R.D. at 374-75. Indeed, where "issues are 'central' to [Plaintiffs'] cause[s] of action under [the federal securities laws,] the commonality requirement is satisfied." *See Dunnigan,* 214 F.R.D. at 137.

### 3.    The Proposed Class Representatives' Claims Are Typical Of The Class

Rule 23(a)(3) requires that the claims asserted by the Proposed Class Representatives be typical of the claims of each member of the Class. In this Circuit, a representative's claims are

16

typical if they are based on the same legal theory and arise from the same event or practice -- or

same course of conduct -- that gives rise to the claims of other Class Members. *See Drexel*

*Burnham*, 960 F.2d at 291. "Typicality under Rule 23 requires that a class representative have

the incentive to prove all the elements of the cause of action which would be presented by the

individual members of the class were they initiating individualized actions." *In re NASDAQ*

*Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 126 (S.D.N.Y. 1997) (internal citations and

quotations omitted). The typicality requirement of Rule 23(a)(3) is also liberally construed and

"typical" is not read to mean "identical." *Trief*, 144 F.R.D. at 200.

Courts have recognized that this requirement "can be met with surprising ease in most

cases, because the majority of class action decisions support the view that when it is alleged that

the same unlawful conduct was directed at or affected both the named plaintiff and the class

sought to be represented, the typicality requirement is met." *In re Data Access Sys. Sec. Litig.*,

103 F.R.D. 130, 139 (D.N.J. 1984), *rev'd and remanded on other grounds*, 843 F.2d 1537 (3d

Cir. 1988) (citation omitted). A plaintiff's claims satisfy the typicality requirement if -- as here -

- they arise "from the same course of events, and each class member makes similar legal

arguments to prove the defendant's liability." *Drexel Burnham*, 960 F.2d at 291; *Indep. Energy*,

210 F.R.D. at 480 (quoting *NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. at 126-27).

Thus, inevitable differences among the proposed class representatives and other members

of the class do not defeat typicality, because "when inquiring into the typicality requirement

under Rule 23(a)(3), the focus must be on the defendants' behavior and not that of plaintiffs." *In*

*re Sumitomo Copper Litig.*, 194 F.R.D. 480, 482 (S.D.N.Y. 2000). As the court in *Dura-Bilt*

explained:

> Typicality refers to the nature of the claim of the class representatives, and
> not to the specific facts from which the claim arose or relief is sought.

> The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct. Factual differences will not defeat class certification where the various claims arise from the same legal theory. Thus, a difference in the amount of damages, date, size or manner of the purchase, the type of purchaser, and even the specific document influencing the purchase will not render the claim atypical in most securities actions.

*Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y. 1981) (citations omitted); *see also Daniels v. City of N.Y.,* 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ("it is well settled that the mere existence of individualized fact questions with respect to the named plaintiff's claims will not bar class certification"); 1 H. Newberg, *Newberg on Class Actions* § 3.13, at 167 (3d ed. 1992). Because this inquiry focuses on the nature of the claims, any factual difference involving the date, type and manner of the purchase, the investor's perception of the transaction, or even the information furnished to him or her at the time of the purchase will not destroy typicality if each class member was the victim of the same material omissions and the same course of conduct. *See In re Baldwin-United Corp. Litig.,* 122 F.R.D. 424, 428 (S.D.N.Y. 1986); *Dura-Bilt,* 89 F.R.D. at 99; *Oscar Gruss & Son v. Geon Indus.,* 75 F.R.D. 531, 534-35 (S.D.N.Y. 1977).

Here, the Proposed Class Representatives, like the absent Class members, purchased Xerox stock during the Class Period at prices that were artificially inflated due to Defendants' material misrepresentations and misleading omissions, and suffered losses as the truth was revealed. "The commonality provided by the alleged misstatements and omissions and defendants' purportedly fraudulent scheme far outweighs any particular distinctions in the fact patterns surrounding the investments made by given class members." *In re Energy Sys. Equip. Leasing Sec. Litig.,* 642 F. Supp. 718, 751-52 (E.D.N.Y. 1986). Since "the mere existence of

18

individualized factual questions' as to the claims of class representatives does not bar class

certification," *Frontier,* 172 F.R.D. at 41, "the possible availability of a unique defense does not

foreclose class certification." *Moskowitz v. Loop,* 128 F.R.D. 624, 631 (E.D. Pa. 1989)

(construing *Basic, Inc. v. Levinson,* 485 U.S. 224 (1988)).  In sum, "the class certification stage

of the litigation is an inappropriate time to inquire into the merits of the plaintiffs' claims and, by

extension, defendants' affirmative defenses." *In re Deutsche Telekom,* 229 F. Supp. 2d 277, 284

(S.D.N.Y. 2002) (citing *In re VISA,* 280 F.3d at 135).[6]

     As the Proposed Class Representatives' claims are based upon the same facts and legal

theories as the rest of the Class, the Proposed Class Representatives satisfy the typicality

requirement.

### 4.    The Proposed Class Representatives Will Fairly And Adequately Protect The Interests Of The Class

     The Proposed Class Representatives also satisfy Rule 23(a)(4), which provides that:  (i)

the representative party's attorney must be qualified, experienced and generally able to conduct

the litigation; and (ii) the plaintiff's interests must not be antagonistic to those of others in the

class. *See Oxford,* 191 F.R.D. at 376; *Daniels,* 198 F.R.D. at 414; *Drexel Burnham,* 960 F.2d at

291.  In order to deny class certification, the court must find a "fundamental conflict or

inconsistency between the claims of the proposed class members" that is "so palpable as to

outweigh the substantial interest of every class member in proceeding with the litigation."

*NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. at 514-15.  Courts reject "efforts to defeat

certification by raising the possibility of hypothetical conflicts or antagonisms among class

---

[6]    *See also Dura-Bilt,* 89 F.R.D at 96 ("This court will not speculate, in deciding this motion, whether defendants can maintain any affirmative defenses.  Rule 23 was not intended to encourage such conjecture."); *In re Baldwin-United Corp. Litig.,* 122 F.R.D., 424, 427 (S.D.N.Y. 1986) ("Camouflaged as an attack on commonality, this argument in fact invites the Court to examine and accept in the course of these class certification motions an affirmative defense that is potentially dispositive of several claims in this litigation.  Such inquiry is outside the scope of Rule 23 and indeed defies the principle enunciated in *Eisen* . . . ").

members, especially regarding damages." *Id.* at 513 (citations omitted); *see also Blackie v.*

*Barrack,* 524 F.2d 891, 909 (9th Cir. 1975). For instance, the timing of Plaintiffs' purchases of

the subject securities during the class periods is irrelevant as long as the representatives' claims

arise from the same practice and course of conduct that forms the basis of the class claims. *See*

*e.g., Robbins v. Moore Med. Corp.,* 788 F. Supp. 179 (S.D.N.Y. 1992) ("whether plaintiff and

other class members bought early in the Class Period or late, they are all alleged to have been

injured by the inter-related misstatements and omissions . . ."). As the Second Circuit stated in

rejecting various alleged hypothetical conflicts within a class:

> The record unequivocally indicates that all members of [the class]
> (including appellants) share a common interest in showing that Drexel
> violated federal and state securities laws. All members of [the class]
> similarly wish to obtain the highest possible recovery for that [class]. In
> the absence of a showing of a genuine conflict between appellants and [the
> class], we reject appellants' argument that Rule 23(a)(4) has not been
> satisfied.

*Drexel Burnham,* 960 F.2d at 291.

Here, each proposed class representative, like all other members of the proposed class,

possesses claims under the federal securities laws against the Defendants in connection with the

purchase of Xerox's shares. Each proposed class representative has the same interest in

recovering damages caused as a result of the Defendants' alleged unlawful conduct. No

cognizable conflicts or antagonisms exist between Plaintiffs and the other members of the

classes.

As to the former second prong of Rule 23(a)(4), which is now the inquiry addressed

under Rule 23(g), as discussed *infra* at Section 5.B., "the qualifications of class counsel are

generally more important in determining adequacy than those of class representatives." *Avon,*

1998 WL 834366, at *9; *see also In re TCW/DWN Am. Gov't Income Trust Sec. Litig.,* 941 F.

Supp. 326, 341 (S.D.N.Y. 1996) ("[I]n complex securities fraud cases, this Court is in agreement

with 'the recent trend in this district to assess the adequacy of the representative's attorney rather

than the personal qualifications of the named plaintiff.'") (quoting *Klein v. A.G. Becker Paribas,*

*Inc.,* 109 F.R.D. 646, 651 (S.D.N.Y. 1986)); *see also Drexel Burnham,* 960 F.2d at 291; *Oxford,*

191 F.R.D. at 376 ("the qualifications of class counsel are generally more important in

determining adequacy than those of class representatives."). Therefore, the particular

educational or professional background or experiences of the proposed class representatives are

not determinative of their adequacy as class representatives. *See Daniels,* 198 F.R.D. at 419

("the inquiry, then, into the representatives' personal qualities is not an examination into their

moral righteousness, but rather an inquiry directed at improper or questionable conduct arising

out of or touching upon the very prosecution of the lawsuit.") (quoting *Jane B. v. Dep't of Social*

*Servs.,* 117 F.R.D. 64, 71 (S.D.N.Y. 1987)).

　　　The qualifications and expertise of Plaintiffs' Lead Counsel assure vigorous

representation of the class, as discussed in Section 5.B. regarding Rule 23(g). Accordingly, there

can be no doubt that the proposed representatives, through their capable counsel, will vigorously

represent the interests of each of the classes and that the prerequisites of Rule 23(a)(4) are

satisfied.

　　　**5.　　The Proposed Class Counsel Will Fairly And Adequately**
　　　　　　**Represent The Interests Of The Class**

　　　Rule 23(g), providing for the appointment of class counsel, complements Rule 23(a)(4)'s

requirement that class counsel be adequate. *Jones v. Ford Motor Credit Co.,* No. 00-8330, 2005

WL 743213, at *26 (S.D.N.Y. March 31, 2005) (noting that 23(g) incorporates the adequacy of

counsel analysis formerly performed under Rule 23(a)(4)). Rule 23(g) requires a court to

appoint "class counsel" when a class is certified. Fed.R.Civ.P. 23(g)(1)(A). Consistent with

21

Rule 23(a)(4), class counsel "must fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(1)(B). In appointing class counsel, the Court must consider:

- the work counsel has done in identifying or investigation potential claims in the action,
- counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action,
- counsel's knowledge of the applicable law, and
- the resources counsel will commit to representing the class.

Fed.R.Civ.P. 23(g)(1)(C)(i). The Court may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class. Fed.R.Civ.P. 23(g)(1)(C)(ii).

The law firms of Johnson & Perkinson, Berman DeValerio Pease Tabacco Burt & Pucillo, and Milberg Weiss Bershad & Schulman, LLP were previously appointed by this Court as Lead Counsel for the Lead Plaintiffs and the putative class. These firms have done extensive work in investigating and identifying the claims brought in this action, have vigorously represented their clients in this action, have extensive experience and expertise in the securities class action field, and have successfully prosecuted literally hundreds of class cases throughout the country. As the Court is familiar with the work done by Lead Counsel in this action, and is familiar with the credentials of Lead Counsel as a result of the Lead Plaintiff/Lead Counsel appointment process, it is respectfully submitted that Lead Counsel are appropriate Class Counsel, and the Court should appoint these three firms as Class Counsel pursuant to Rule 23(g)(1)(A).

## C.   The Requirements Of Rule 23(b)(3) Have Been Met

The requirement of Rule 23(b)(3) has two prongs: (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members,

22

and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The issues of predominance and superiority are not amenable to a bright line test. Rather, the key inquiry turns on whether class certification will ensure economies of time and money by allowing a few representatives to proceed on behalf of a larger whole, such that a class action is the most efficient method of proceeding. *In re LILCO Sec. Litig.,* 111 F.R.D. 663, 668 (E.D.N.Y. 1986); *see also Advisory Committee Note to the 1966 Revision of Rule 23*, 39 F.R.D. 69, 104 (1966). The facts of this case satisfy both prongs of Rule 23(b)(3).

### 1.    Questions Of Law And Fact Common To The Class Predominate

The Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud . . . ." *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 625 (1997). It is well-established that "[i]n determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." *Indep. Energy,* 210 F.R.D. at 486. Further, "Rule 23(b)(3) does not require that all questions of law or fact be common; it only requires that the common questions predominate over individual questions." *Dura-Bilt,* 89 F.R.D. at 93; *see also In re VISA,* 280 F.3d at 140 ("predominance requirement calls only for predominance, not exclusivity, of common questions"). As the court explained in *Oxford*, "[c]ommon questions may predominate where there exists a common course of conduct even though there is not a complete identity of facts. Where, as here, there exists a common nucleus of operative facts affecting all members, common questions unquestionably prevail." *Oxford,* 191 F.R.D. at 374 (citation omitted). Indeed, the Second Circuit has held that "to deny a class action simply because all of the allegations of the class do not fit together like pieces in a jigsaw puzzle, would destroy much of the utility of Rule 23." *Green,* 406 F.2d at 300.

Securities fraud cases are typically found to satisfy the predominance requirement, since defendants' liability to the entire class will be based on a common course of conduct. *See LILCO*, 111 F.R.D. at 668; *See In re Arakis Energy Corp. Sec. Litig.,* No. 95-3431, 1999 WL 1021819, at *10 (E.D.N.Y. Apr. 27, 1999) ("In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues."); *Dolgow v. Anderson*, 43 F.R.D. 472, 491 (E.D.N.Y. 1968); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* No. 94 Civ. 5587 (PKL), 1996 WL 134757, at *7 (S.D.N.Y. Mar. 25, 1996) (The issue of "whether defendants failed to disclose material non-public information . . . thereby committing a fraud on the market . . . is the same for all class members, and therefore predominates over the class.")

The possibility of individualized proof of reliance is not an impediment to certification. *See Green*, 406 F.2d at 301; *Energy Sys.,* 642 F. Supp. at 752. Here, the Proposed Class Representatives enjoy the benefit of the "fraud on the market" presumption, which presumes that: (a) the alleged misrepresentations, so long as they are material, will inflate the value of the Company's shares, and (b) plaintiff and all members of the Class relied upon the integrity of the market for those shares. *See Basic*, 485 U.S. at 241; *Ceres Partners v. GEL Assocs.,* 918 F.2d 349, 360 (2d Cir. 1990). As such, this litigation will focus on Defendants' dissemination of materially false and misleading financial statements and their other misrepresentations. The uniform applicability of such liability issues is "readily susceptible to class-wide proof." *Baldwin-United*, 122 F.R.D. at 427; *Prudential*, 163 F.R.D. at 207 ("'[I]t would be folly to force each [investor] to prove the nucleus of the alleged fraud again and again.'") (quoting *In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,* 140 F.R.D. 425, 431 (D. Ariz. 1992).

24

Finally, individual damage issues do not prevent class certification, where, as here, a common nucleus of law and facts is shared by all class members, since such common questions of law and fact predominate over individual questions. *See Green,* 406 F.2d at 301; *Blackie,* 524 F.2d at 902-03, 905; *Indep. Energy,* 210 F.R.D. at 486 ("while damage amounts may vary, the claims are based on a common legal theory of material misrepresentations and omissions such that common questions clearly predominate."). *In re Saxon Sec. Litig.,* No. 82 Civ. 3103 (MJL), 1984 WL 2399, at *6, (S.D.N.Y. Feb. 23, 1984) (certifying a six year class period while noting that although "a number of different artifices and devices are alleged, they are all in furtherance of a 'single inflammatory scheme,' the artificial overvaluing of Saxon's stock.") (citation omitted.). This is because "[t]he amount of damages is invariably an individual question and does not defeat class action treatment . . . should the class prevail, the amount of the price inflation during the period can be charted and the process of computing individual damages will be virtually a mechanical task." *Blackie,* 524 F.2d at 905 (citations omitted). Moreover, even if it develops that each class member's damages must be separately determined, class certification would still be appropriate. *NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. at 523-24.

Thus, common questions plainly predominate in this action. The Complaint's allegations regarding the Defendants' false statements and omissions constitute the type of "common course of conduct" claim that fits well within the Second Circuit standards for class certification under Rule 23(b)(3). *See Green*, 406 F.2d at 300-301.

### 2.    A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of The Controversy

Among the issues to be considered in determining whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy are: (1) the interests of individual members in controlling the action; (2) the extent and nature of any

litigation concerning the controversy already commenced by or against members of the class; (3)

the desirability or undesirability of concentrating the litigation of the claims in the particular

forum; and (4) the difficulties likely to be encountered in the management of a class action. *See*

*Blech,* 187 F.R.D. at 107.

First, individual members do not have an overriding interest in controlling the action. A

consideration of paramount importance here is that the amount of damages suffered by the vast

majority of Class members is too small -- compared to the cost of the litigation -- to justify the

expense of individual litigation. Indeed, as has been noted:

> In general, securities suits such as this easily satisfy the superiority
> requirement of Rule 23. Most violations of the federal securities laws,
> such as those alleged in the Complaint, inflict economic injury on large
> numbers of geographically dispersed persons such that the cost of
> pursuing individual litigation to seek recovery is often not feasible.
> Multiple lawsuits would be costly and inefficient, and the exclusion of
> class members who cannot afford separate representation would neither be
> 'fair' nor an adjudication of their claims.

*Blech*, 187 F.R.D. at 107; *see also Korn*, 456 F.2d at 1214. Although some Class members may

have suffered damages substantial enough that it might be economically viable for them to bring

their own suits, this fact does not support a finding that Class members have an interest in

individually "controlling" the litigation under Rule 23(b)(3). The reference in Rule 23(b)(3) to

the interest of individual class members in controlling the litigation relates to the interests of

most or all of the Class members -- rather than the interests of only a few -- since if only a small

fraction of the Class has an interest in controlling the litigation, they may serve their interest by

opting out of the suit. 1 H. Newberg, *Newberg on Class Actions* § 4.29 at 332 (3d ed. 1992).

Class certification of this action will also promote judicial economy and uniformity of

decisions. *See, e.g., Arakis,* 1999 WL 1021819 at *11 ("In addition, were plaintiffs required to

bring individual actions, the potential for duplicative litigation and consequent waste of judicial and party resources would be significant.").

Finally, there is no reason to expect any difficulties in the management of these actions as class actions so as to render any one of the proposed classes unsuitable for class certification. *See, e.g., LILCO,* 111 at 671; *Energy Sys.,* 642 F. Supp. at 752. Without a factual basis for such a determination, speculation as to the possible unmanageability of this class action would be an inadequate basis for refusing certification. *Simon v. Westinghouse Elec. Corp.,* 73 F.R.D. 480, 487 (E.D. Pa. 1977).

Thus, it is clear that securities suits such as this one satisfy the superiority requirement of Rule 23. Most violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons to such an extent that the cost of pursuing individual litigation to seek recovery is not feasible. Under such circumstances, the alternatives to a class action are either no recourse for thousands of investors or a multiplicity of scattered suits resulting in the inefficient administration of litigation that follows. *See Blech,* 187 F.R.D. at 107 (holding the superiority requirement satisfied as "[m]ultiple lawsuits would be costly and inefficient" and "although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf"); *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 114 F.R.D. 48, 53 (S.D.N.Y. 1987) (noting that in "an action such as this one where the claims are numerous and relatively small, individual claimants are unlikely to take on the burden and cost of litigation. The superiority of the class action in such cases is beyond dispute.").

In the present case, as with the cases cited above, there are a large number of injured individuals, many with damage claims too small to justify the expense of individual actions, and each of whom possesses effectively identical claims against Defendants. Because the requirements of Federal Rule of Civil Procedure 23 are fully satisfied, the proposed Class should be certified.

## CONCLUSION

For the foregoing reasons, the Proposed Class Representatives respectfully request that the Court grant their motion for class certification.

PLAINTIFFS,
By their attorneys,

DATED:  January 19, 2006.

/s/ Dennis J. Johnson
Dennis J. Johnson (CT 22090)
Jacob B. Perkinson (CT 22091)
James F. Conway, III (phv0744)
**Johnson & Perkinson**
1690 Williston Road
P.O. Box 2305
South Burlington, Vermont 05403
Phone: (802) 862-0030
Fax: (802) 862-0060
E-mail: djohnson@jpclasslaw.com


Glen DeValerio (CT 22582)
Leslie R. Stern (phv0743)
Bryan A. Wood (phv0742)
**Berman DeValerio Pease Tabacco**
  **Burt & Pucillo**
One Liberty Square
Boston, Massachusetts 02109
(617) 542-8300


Melvyn I. Weiss (CT 04080)
Brad N. Friedman (CT 24910)
Beth Kaswan (CT 21415)

28

**Milberg Weiss Bershad & Schulman LLP**
One Pennsylvania Plaza  49th Floor
New York, New York  10119-0165
(212) 594-5300

.

**Co-Lead Counsel**

Andrew M. Schatz (CT 00603)
**Schatz & Nobel, P.C.**
One Corporate Center
20 Church Street
Hartford, CT 06103
(860) 493-6292

J. Daniel Sagrain (CT 00603)
**Hurtwitz & Sagarin, LLC**
147 N. Broad Street
Milford, Connecticut 06460
(203) 877-8000

**Co-Liaison Counsel**