## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Russell Carlson, et al. | ) | |
| v. | ) | |
| Xerox Corp., et al. | ) | 3:00-CV-1621 (AWT) |
| | ) | |
| MASTER CASE | ) | |
| | ) | 3:02-CV-1303 (AWT) |
| Florida State Board of Admin., et al. | ) | |
| v. | ) | |
| Xerox Corp., et al. | ) | August 17, 2007 |
| | ) | |
| MEMBER CASE. | ) | |

## COMPENDIUM OF UNREPORTED AUTHORITY CITED IN THE SUPPLEMENTAL MEMORANDUM REGARDING THE XEROX DEFENDANTS' PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT

**CASE NAME**                                                                    **TAB**

**Court of Appeals Decisions**

In re WorldCom, Inc. Sec. Litig., No. 05-6979, 2007 U.S. App. LEXIS 17797
    (2d Cir. July 26, 2007) ...................................................................................1

**District Court Decisions**

Chemco, Inc. v. Stone, McGuire & Benjamin, No. 91 C 5041, 1992 U.S. Dist. LEXIS
    11657 (N.D. Ill. July 29, 1992) ......................................................................2

In re Brand Name Prescription Drugs Antitrust Litig., No. 94 C 897, MDL 997,
    1998 U.S. Dist. LEXIS 12534 (N.D. Ill. Aug. 6, 1998) .................................3

Irrer v. Milacron, Inc., No. 04-72898, 2006 U.S. Dist. LEXIS 66473
    (E.D. Mich. Sept. 18, 2006) ...........................................................................4

Kozlowski v. Sheahan, No. Civ.A. 05 C 5593, 2005 U.S. Dist. LEXIS 32796
    (N.D. Ill. Dec. 12, 2005) ................................................................................5

Levine v. Bally Total Fitness Holding Corp., No. 06 C 1437, 2006 U.S. Dist. LEXIS
    95006 (N.D. Ill. Sept. 29, 2006) ....................................................................6

Shaffer v. Combined Ins. Co. of Am., No. 02 C 1774, 2003 U.S. Dist. LEXIS 20689
    (N.D. Ill. Nov. 18, 2003)................................................................................7

Teachers' Ret. Sys. of La. v. Qwest Communs. Int'l, Inc., No. 04-cv-0782-REB-CBS,
    2005 U.S. Dist. LEXIS 44756 (D. Colo. Sept. 23, 2005)..............................8

# TAB 1

LEXSEE 2007 U.S. APP. LEXIS 17797

**In Re: WORLDCOM SECURITIES LITIGATION; CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, THE LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION, BOARD OF TRUSTEES OF THE TEACHERS' RETIREMENT SYSTEM OF THE STATE OF ILLINOIS, STATE UNIVERSITIES RETIREMENT SYSTEM ON ILLINOIS, ILLINOIS STATE BOARD OF INVESTMENT, WEST VIRGINIA INVESTMENT MANAGEMENT BOARD, CONTRA COSTA COUNTY, EMPLOYEES' RETIREMENT SYSTEM, OAKLAND FIRE AND POLICE RETIREMENT SYSTEM, SACRAMENTO COUNTY EMPLOYEES' RETIREMENT SYSTEM, SACRAMENTO REGIONAL TRANSIT DISTRICT CONTRACT EMPLOYEES' RETIREMENT PLAN, SACRAMENTO REGIONAL TRANSIT DISTRICT SALARIED EMPLOYEES' RETIREMENT PLAN, SAN BERNADINO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, SONOMA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, TULARE COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, VENTURA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, WASHINGTON STATE INVESTMENT BOARD, MINNESOTA STATE BOARD OF INVESTMENT, LOS ANGELES BOARD OF FIRE & POLICE PENSION COMMISSIONERS, BOARD OF ADMINISTRATION OF THE LOS ANGELES CITY EMPLOYEES' RETIREMENT SYSTEM, THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION EMPLOYEES' RETIREMENT SYSTEM, HEAVY & GENERAL LABORERS' LOCALS 472 & 172 ANNUITY FUND, MILWAUKEE EMPLOYEES' RETIREMENT SYSTEM, MAINE STATE RETIREMENT SYSTEM, MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM OF MICHIGAN, MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM, STATE OF ALASKA DEPARTMENT OF REVENUE, ALASKA STATE PENSION INVESTMENT BOARD, and CARPENTERS PENSION TRUST FOR SOUTHERN CALIFORNIA, Plaintiff-Appellants, -v.- CABOTO-GRUPPO INTESA BCI and CABOTO HOLDINGS SIM S.p.A., Defendant-Appellees,**

**Docket No. 05-6979-cv**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*2007 U.S. App. LEXIS 17797*

**November 6, 2006, Argued**
**July 26, 2007, Decided**

**PRIOR HISTORY:** [*1]

Appeal from judgment of the United States District Court for the Southern District of New York (Cote, J.) dismissing plaintiffs' securities actions as time-barred. Held, that plaintiffs, who were members of a class designated in a class action complaint, were protected by the doctrine of *American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713*

*(1974),* by tolling of their limitations period during the time that the class action was pending on their behalf, notwithstanding their filing of individual actions prior to the court's ruling on class certification.
*In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 2003 U.S. Dist. LEXIS 20955 (S.D.N.Y., 2003)*

**DISPOSITION:** Vacated and remanded.

**COUNSEL:** ERIC ALAN ISAACSON (William S. Lerach, Darren J. Robbins, Michael J. Dowd, Spencer A. Burkholz, Thomas E. Egler, Joseph D. Daley, Tami Falkenstein Hennick, on the brief), Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; and Patrick J. Coughlin, Randi D. Bandman, Azra Z. Mehdi, on the brief, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA, for Plaintiff-Appellants.

ROBERT A. HOROWITZ (Toby S. Soli, on the brief), Greenberg Traurig, LLP, New York, NY, for Defendant-Appellees.

**JUDGES:** Before: FEINBERG, LEVAL, and CABRANES, Circuit Judges.

**OPINION BY:** LEVAL

**OPINION**

LEVAL, *Circuit Judge*:

This is an appeal from the **[*2]** judgment of the United States District Court for the Southern District of New York (Cote, *J.*), which dismissed the actions of certain bondholders ("Appellants") of WorldCom, Inc. as time-barred. The question presented is whether the filing of a complaint asserting a class action tolls the statute of limitations for putative class members who file individual suits (asserting the same claims) prior to the class certification decision.

The Appellants are public and private pension funds, which purchased bonds of WorldCom. In these suits brought against the underwriters of the bonds under *Section 11* of the Securities Act of 1933, the Appellants allege that the registration statements covering the bonds they purchased contained false and misleading information. The statute of limitations for such actions requires that claims be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." *15 U.S.C. § 77m*. These complaints initially named as defendants a number of underwriters--not including Caboto-Gruppo Intesa BCI and Caboto Holdings Sim S.p.A. (collectively, "Caboto") who are **[*3]** the Appellees. The complaints were later amended to add the Caboto defendants. The assertion of claims against Caboto in these actions did not occur until more than one year after the Appellants were put on inquiry notice of the misinformation in the registration statements. In the meantime, however, and prior to the expiration of the Appellants' one-year limitations period, other purchasers of the WorldCom bonds had filed timely class action suits under *Section 11* against Caboto purporting to represent Appellants as members of the class. In the district court, responding to Caboto's motion to dismiss the suits for untimeliness, the Appellants argued that the filing of these class actions had tolled the statute of limitations as to their claims under the doctrine announced in *American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974)*: "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class . . . ." *Id. at 554*. The district court rejected this argument because the Appellants had filed their individual suits before the class suits on their behalf had been certified. The district court held that tolling under *American* **[*4]** *Pipe* is unavailable to class members who, like the Appellants, file individual suits before the class certification decision. The court therefore found the Appellants' suits to be untimely and dismissed them. We disagree with the district court. As we understand the rule of *American Pipe*, it provides that the filing of a class action tolls the statute of limitations for all members of the asserted class, regardless of whether they file an individual action before resolution of the question whether the purported class will be certified.

**Background**

The district court summarized the origins of this complex litigation:

For many years, WorldCom grew by acquisitions. By 1998, it had acquired more than sixty companies in transactions valued at over $ 70 billion. . . . In early 2000, however, its attempt to acquire Sprint collapsed. During this period of acquisition-driven expansion, WorldCom had used accounting devices to inflate its reported earnings. Senior WorldCom management instructed personnel in the company's controller's office on a quarterly basis to falsify WorldCom's books to reduce WorldCom's reported costs and thereby to increase its reported earnings. When the pace of acquisitions **[*5]** slowed, it added new strategies to

disguise a decline in its revenues. In 2002, however, the scheme collapsed.

*In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 400 (S.D.N.Y. 2003).*

In February 2002, WorldCom reduced its revenue and earnings forecasts for the year, and reduced them again on April 22. Shortly thereafter, the first investor class action lawsuit against WorldCom was filed on April 30, 2002. On June 25, WorldCom admitted publicly that it had previously issued false and misleading financial statements. WorldCom admitted it had overstated earnings and had falsely reported ordinary costs as capital expenditures. Soon after this public disclosure, WorldCom filed for bankruptcy. Once WorldCom's admission became public, numerous class action lawsuits were filed in various federal courts around the country on behalf of purchasers of WorldCom securities. In August 2002 the Judicial Panel on Multi-District Litigation consolidated the federal court class actions before Judge Cote in the United States District Court for the Southern District of New York.

In the same period, numerous individual actions were filed by holders of WorldCom securities, primarily in state courts. After **[*6]** WorldCom's public disclosures, between July 2002 and October 2003, over 120 public and private pension funds, all represented by the law firm of Milberg Weiss Bershad Hynes & Lerach LLP, filed individual state-court actions asserting claims relating to their purchase of WorldCom bonds. These state-court suits alleged claims under the Securities Act of 1933, but not under the Exchange Act of 1934. This choice was apparently intended to prevent removal of the state-court actions to federal court. Federal courts have exclusive jurisdiction over Exchange Act claims, *see 15 U.S.C. § 78aa*, and any claim joined to an Exchange Act claim may also be removed under *28 U.S.C. § 1441*. By contrast, the Securities Act grants state and federal courts concurrent jurisdiction and generally bars the removal of state-court actions to federal court. *See 15 U.S.C. § 77v(a).*

Notwithstanding this strategy, the Appellants' state-court actions were removed to federal court under *28 U.S.C. § 1452(a)*, which permits removal from state courts of actions falling within the federal courts' bankruptcy jurisdiction. The Appellants challenged the removal, but the district court concluded that their cases

were removable **[*7]** because they were "related to" the WorldCom bankruptcy, *In re WorldCom, Inc. Sec. Litig., 293 B.R. 308 (S.D.N.Y. 2003)*--a decision later affirmed on appeal, *Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86 (2d Cir. 2004)*. The Appellants' actions were thus consolidated with the class actions in May 2003.

The first of these class action suits was filed by one group of Appellants, the State of Alaska Department of Revenue and the Alaska State Pension Investment Board (the "Alaska Appellants"), in state court in Alaska on April 21, 2003. Their complaint alleged that the Alaska Appellants suffered substantial losses arising out of their purchases of bonds from WorldCom's August 1998, May 2000, and May 2001 offerings. The complaint named as defendants a number of the underwriters of those bonds. [1] On September 24, 2003, a month after the removal of their suit to the U.S. District Court for the Southern District of New York, the Alaska Appellants amended their complaint, adding additional underwriters (the "Additional Underwriters")--including Caboto--as defendants. The Caboto defendants are the sole appellees in this appeal.

> 1    According to the district court, "[t]he allegations **[*8]** in the complaints filed in each of the Milberg Weiss Actions are similar, but not identical." The district court and the parties treat the Alaska Appellants' complaints as representative pleadings, as do we.

The amended complaint alleged that Caboto, as well as other underwriters, violated *Section 11* of the Securities Act, [2] which imposes liability on underwriters of securities when the registration statement contains an "untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." *15 U.S.C. § 77k(a)*. The Alaska Appellants alleged that the registration statements and prospectuses for the WorldCom bond offerings contained false and misleading statements. Though the amended complaint described at length the fraud committed by WorldCom and its affiliates, the Alaska Appellants expressly specified that their *Section 11* claims were not based on fraud, but rather on negligence and strict liability for registration statements containing untrue statements of material fact.

> 2    The amended complaint also contains allegations against J.P. Morgan Chase & Co. and

J.P. Morgan Securities Inc. **[*9]** under *Section 12(a)(2)* of the Securities Act arising out of a December 2000 bond private placement. Because these companies are not parties in the present appeal, this opinion omits discussion of *Section 12(a)(2)* and the December 2000 bonds.

On October 24, 2003, the district court certified a class action involving securities claims against WorldCom. The named class action plaintiffs included groups that had purchased bonds during the May 2000 and May 2001 bond offerings, but not the August 1998 bond offering. The class action complaint asserted Section 11 claims against underwriters of the bond offerings, including Caboto.

The underwriter defendants in the Alaska Appellants' action moved to dismiss based, *inter alia*, on statute of limitations grounds. The district court permitted all the other Appellants to oppose the motion through a joint amicus brief. The court noted that once it had decided the motion in the Alaska Appellants' case, the parties in the other actions would be allowed to argue whether the resolution of that motion should govern their cases.

The underwriter defendants based their statute-of-limitations argument on *Section 13* of the Securities Act, which provides:

No **[*10]** action shall be maintained to enforce any liability created under *section 77k* [Section 11] . . . of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . . In no event shall any such action be brought to enforce a liability created under *section 77k* [Section 11] . . . of this title more than three years after the security was bona fide offered to the public . . . .

*15 U.S.C. § 77m.* Thus, a suit alleging that a securities underwriter violated *Section 11* must be filed (a) within one year of the date that the plaintiff was on actual notice or inquiry notice of the violation, *and* (b) within three years of the date that the security was offered to the public. The underwriter defendants argued that the claims in the Alaska Appellants' original complaint, as well as

claims added in the amended complaint, were barred by the one-year time limit, the three-year time limit, or both.

In response, the Alaska Appellants (and the other Appellants, through their amicus brief) argued that their claims should be governed by the longer statutes of limitations provided **[*11]** for in the Sarbanes-Oxley Act, rather than the shorter ones described in *Section 13* of the Securities Act. The Sarbanes-Oxley Act provides for two-and five-year limitations periods for private securities cases "that involve[] a claim of fraud, deceit, manipulation, or contrivance . . . ." *28 U.S.C. § 1658(b)*. However, the district court held that the Alaska Appellants could not benefit from these longer limitations periods, because they had expressly disavowed relying on allegations of fraud or intentional misconduct, basing their Section 11 claims entirely on theories of negligence and strict liability. Moreover, the court found that the Sarbanes-Oxley Act's language and legislative history confirmed that its limitations periods were not available in Section 11 claims such as those asserted by the Alaska Appellants.

Having found that the Securities Act's one-and three-year statutes of limitations applied to the Alaska Appellants' claims, the district court held that any claims based on the August 1998 bond offering had expired in August 2001 and were time-barred. [3] The district court next turned to the Section 11 claims based on the May 2000 and May 2001 bond offerings. The Securities **[*12]** Act required that these claims be brought within one year after the Alaska Appellants were on inquiry notice of the inaccuracies in the bond-offering registration statements. The Alaska Appellants' initial complaint was brought on April 21, 2003. Upon examination of the public disclosures of WorldCom, the court ruled that the underwriters had failed to demonstrate as a matter of law that the Alaska Appellants were on inquiry notice as of April 20, 2002--a year and a day before the original complaint.

[3]  Because it held that the Sarbanes-Oxley Act's statutes of limitations did not apply to the Alaska Appellants' claims, the court declined to consider whether the Act could be applied retroactively to revive a claim that had expired before its passage. The Second Circuit later took up this question and concluded that Sarbanes-Oxley did not revive expired claims. *See In re Enterprise Mortgage Acceptance Co. Sec. Litig., 391 F.3d 401 (2d Cir.*

*2004)* (as amended Jan. 7, 2005). As a result, claims relating to the August 1998 bond offering, which expired a year before Sarbanes-Oxley's passage, cannot be revived and are not at issue in the present appeal, which the Appellants concede.

However, **[*13]** the court noted that claims against the *additional* underwriter defendants, including Caboto, were asserted for the first time in the amended complaint on September 24, 2003. WorldCom had revealed much of its financial misconduct on June 25, 2002, when it publicly restated its earnings and expenses. Therefore, the court held, the Alaska Appellants were on inquiry notice of their Section 11 claims as of that date at the latest, [4] and their claims against the Additional Underwriters were filed past the one-year deadline, which expired on June 25, 2003, one year after Appellants were first on inquiry notice regarding WorldCom's financial misconduct. Those claims would have to be dismissed unless the statute of limitations was tolled by virtue of the class actions asserted against the additional underwriter defendants.

    4   The Appellants do not contest this finding on appeal.

The Alaska Appellants argued that, under the doctrine of *American Pipe*, their claims were tolled by the filing of a WorldCom class action on April 30, 2002. In *American Pipe*, the Supreme Court held that the filing of a class suit tolled the statute of limitations for class members who sought to intervene after the class **[*14]** certification motion was denied for failure to demonstrate numerosity. *414 U.S. at 552-53*. In later cases, the Court extended its ruling to class members who opted out after the certification motion was granted, *see Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 176 n.13, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)*, and to class members who filed separate suits after class certification was denied, *see Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 353-54, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983)*. The Alaska Appellants argued that their suits should also benefit from *American Pipe* tolling, pointing to language in these opinions, which articulates the principle in broad terms. *See, e.g.*, *id. at 350* ("The filing of a class action tolls the statute of limitations 'as to all asserted members of the class . . . .'" (quoting *American Pipe, 414 U.S. at 554*)). The earliest federal WorldCom class actions were filed on April 30, 2002, and several others were filed soon thereafter. If the filing of these class action suits tolled

the Securities Act's statutes of limitations, then the claims against the Additional Underwriters by entities asserted to be class members would still be viable, notwithstanding the fact that they were filed more than a year after the plaintiffs **[*15]** were put on inquiry notice.

The district court ruled that the Alaska Appellants could not benefit from *American Pipe* tolling. The court reasoned that the justification for the doctrine was to avoid the filing of numerous suits by individual class members as a safeguard to preserve their option of proceeding by individual action. With the benefit of *American Pipe* tolling, class members could wait until after certification was resolved before deciding whether to file their individual suits. According to the district court's reasoning, class members (such the Alaska Appellants) who filed individual suits *before* the certification decision were not entitled to have their claims tolled, because such individual suits were precisely what the *American Pipe* tolling doctrine sought to avoid.

The Alaska Appellants argued that unless claims like theirs qualified for *American Pipe* tolling, parties who intend to file their own suits "will simply forbear doing so until it is time to opt out of the class." The district court responded that such a delay would have beneficial effects:

> The parties and courts will not be burdened by separate lawsuits which, in any event, may evaporate once a class has been **[*16]** certified. At the point in a litigation when a decision on class certification is made, investors usually are in a far better position to evaluate whether they wish to proceed with their own lawsuit, or to join a class, if one has been certified.

The court concluded that "Plaintiffs who choose, as is their right, to pursue separate litigation may not enjoy the benefits of that separate litigation without bearing its burdens," including the burden of filing suit within the applicable statute of limitations.

Because the district court held that the filing of the WorldCom class actions did not toll the statute of limitations as to the Alaska Appellants' claims, those claims expired a year after the Alaska Appellants were on

inquiry notice of the falsities in WorldCom's registration statements--at the latest, a year after WorldCom's public disclosures on June 25, 2002. The claims in the amended complaint against the Additional Underwriters, which was filed in September 2003, were untimely. The court dismissed with prejudice all the Alaska Appellants' claims against the Additional Underwriters.

After the district court issued its opinion on November 21, 2003, the underwriters in the other [*17] Appellant actions (as well as some additional suits not filed by Milberg Weiss) moved to dismiss based largely on the grounds of the district court's ruling. The Appellants opposed the motions to dismiss, and the Alaska Appellants moved the court to reconsider certain aspects of its opinion. The district court again rejected the argument that *American Pipe* tolling should apply to the Appellants' claims against the Additional Underwriters. After rejecting other arguments (which are not relevant for present purposes), the district court dismissed with prejudice the Appellants' claims against the additional underwriters under the Securities Act's statute of limitations.

The district court's opinion was issued on January 20, 2004. On July 22, 2004, the court ordered the dismissal with prejudice of most of the Appellants' Section 11 claims, including all Section 11 claims against the Additional Underwriters. In its orders of dismissal, the court noted:

> [I]f any plaintiff files a motion to dismiss its lawsuit voluntarily by the end of the opt out period for the WorldCom consolidated class action, the plaintiff shall be permitted to remain a member of the Class without prejudice as to its [*18] right to recover for any claims that are brought on behalf of the Class.

Most or all of the Appellants declined to voluntarily withdraw their suits and rejoin the class.

In November 2005, the Appellants settled with all of the underwriters except one--Caboto. Appellants' individual claims against Caboto appeared for the first time in their amended complaints, and those claims relate only to the May 2001 offering. Therefore, the only issues on appeal concern whether the district court was correct to dismiss with prejudice the amended complaints' claims against Caboto based on the May 2001 offering.

## Discussion

The question is whether a plaintiff, which is identified as a member of the plaintiff class in a class action suit, is deprived of the benefit of the tolling provided by the *American Pipe* doctrine if it filed its own individual action before the motion for class certification was resolved. We agree with the Appellants that their time to file should have been tolled upon the filing of a class action purporting to assert their claims, regardless of their having also filed individual actions asserting the same claims.

### A

In *American Pipe*, the Supreme Court considered a case in which the [*19] State of Utah brought an antitrust suit eleven days before the one-year statute of limitations was set to expire. The State purported to bring the suit as a class action, but the district court denied the State's motion to certify the class because it found that the requirement of numerosity of *Rule 23 of the Federal Rules of Civil Procedure* was not met. (The court agreed that the State's claims were typical of the class and that the State was an adequate representative.) After denial of the motion, and beyond the limitations period, parties that would have been class members had certification been granted moved to intervene. The district court denied the motion to intervene on the ground that the would-be intervenors' claims were barred by the statute of limitations. *See 414 U.S. at 541-44*.

The court of appeals reversed, and the Supreme Court agreed with the court of appeals that the intervenors were not time-barred. After considering the history of *Rule 23*, the Court noted that the present version of the Rule makes class actions "truly representative suit[s]" in which the claims of class members are pressed by the class representatives. *Id. at 550*. As a result, the class members [*20] should be considered parties to the suit "until and unless they received notice thereof and chose not to continue." *Id. at 551*. Thus, just as the filing of the class action satisfied the State of Utah's statute-of-limitations obligations, it also did so for class members, including the intervenors. To hold otherwise would "frustrate the principal function of a class suit, because then the sole means by which members of the class could assure their participation in the judgment if notice of the class suit did not reach them

until after the running of the limitation period would be to file earlier individual motions to join or intervene as parties--precisely the multiplicity of activity which *Rule 23* was designed to avoid . . . ." *Id.* In other words, unless class members' claims were tolled by the filing of the class suit, those class members would be forced to initiate their own actions in anticipation of the possibility that a motion for class certification would be denied.

The Court next explained that its ruling was not limited to class members who had deliberately relied on the class action to advance their claims. Just as class members need not actively participate in order to profit **[*21]** from the class action's eventual outcome, they may also benefit passively from the suit's tolling effect on the statute of limitations. Even class members who were unaware of the class action--indeed, even those who "demonstrably did not rely" on it--should benefit from the tolling. *Id. at 552.*

The Court noted that its ruling was not inconsistent with the purposes of a statute of limitations. Statutes of limitations are designed to prevent "'the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" *Id. at 554* (quoting *Order of R.R. Telegraphers v. Ry. Express Agency, 321 U.S. 342, 348-49, 64 S. Ct. 582, 88 L. Ed. 788 (1944)).* Statutes of limitations thus guard against unfair surprises that result from the resurrection of stale claims. The need to put an adversary on notice to defend against a claim is served when a class action is brought identifying both the nature of the claim and the plaintiffs who may participate in the judgment. "Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and the size of the prospective litigation . . . ." *Id. at 555.*

The **[*22]** Court announced the rule in general terms:

> We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.

*Id. at 554.*

The Supreme Court revisited the rule in *American Pipe* shortly after the decision was issued. *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974),* was an antitrust class action against brokerage firms and stock exchanges. One question presented was whether, under the particular circumstances of the case, individual notice to identifiable class members was required or was merely discretionary. In a footnote, the Court rejected the argument that class members (even if individually notified) would not opt out of a class action because the statute of limitations would have run on what would have been their individual causes of action. The Court explained that "[t]his contention is disposed of by our recent decision in *American Pipe* . . ., which established that commencement of a class action tolls the applicable statute of limitations as **[*23]** to all members of the class." *Id. at 176 n.13.* In other words, the claims of class members who opted out would not be time-barred, because the statute of limitations on those claims was tolled by the filing of the class action.

The third and final Supreme Court opinion to discuss the issue was *Crown, Cork & Seal.* The plaintiff, Theodore Parker, filed a race-discrimination charge with the Equal Employment Opportunity Commission ("EEOC") in October 1977. While his charge was pending before the EEOC, others filed a purported class action based on similar allegations. In September 1980, a motion for class certification was denied. Parker, who was within the asserted plaintiff class, filed suit in federal court in October 1980--within 90 days of the denial of class certification, but almost two years after the EEOC had issued him a Right to Sue letter. The district court dismissed his suit because he had not filed within 90 days of receiving his Right to Sue letter, as required by the applicable statute of limitations. *See 462 U.S. at 347-48.*

The court of appeals reversed, and the Supreme Court affirmed the court of appeals, ruling that Parker's suit was timely. The Court explained that its **[*24]** holding in *American Pipe* was not limited to intervenors, reiterating that "[t]he filing of a class action tolls the statue of limitations 'as to all asserted members of the class.'" *Id. at 350* (quoting *American Pipe, 414 U.S. at 554*). The Court again noted that a contrary rule would lead class members to file anticipatory suits for fear that certification would be denied, resulting in "a needless

multiplicity of actions." *Id. at 351*. Moreover, the district court's failure to apply *American Pipe* to a non-intervenor's separate action was inconsistent with *Eisen*, where the Court noted that class members' claims would be tolled until they opted out of the class action. *Id. at 351-52*. Finally, the Court noted that the purposes of statutes of limitations--"to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights"--are fulfilled "when a class action is commenced." *Id. at 352*. Class members are permitted--even encouraged--to rely on the class plaintiffs to advance their claims, and the initiation of a class suit gives defendants all the information they need to prepare their defense. Perhaps fewer suits in fewer jurisdictions would be filed if only **[*25]** intervenors received the benefits of *American Pipe* tolling after certification is denied, but "this is not an interest that statutes of limitations are designed to protect." [5] *Id. at 353*. The Court again reiterated the *American Pipe* principle in broad terms, quoting directly from that decision:

> "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." [*American Pipe, 414 U.S. at 554*]. Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.

*Id. at 353-54*.

[5] The Court emphasized that the *American Pipe* rule would reduce the number of protective filings by litigants who wish to stop the running of the statute of limitations. The Court also noted that "avenues exist by which the burdens of multiple lawsuits may be avoided . . . [such as] consolidation in appropriate cases and multidistrict proceedings." *Id. at 353* (citations omitted).

**B**

This court has not yet faced the question whether the tolling required by *American Pipe* for members of a class on whose **[*26]** behalf a class action is filed applies also to class members who file individual suits before class certification is resolved. [6] We now conclude that it does.

[6] At the start of *Crown, 462 U.S. at 348-49*, the Court noted that two courts of appeals--the Ninth and the Second Circuits--had held that *American Pipe* tolling applied only to putative class members who sought to intervene after certification was denied. *Crown* thus overruled those decisions. In one of those decisions, *Arneil v. Ramsey, 550 F.2d 774 (2d Cir. 1977)*, putative class members had filed an individual suit before a class certification motion was decided. The Appellants argue that because *Crown* overruled *Arneil*, and *Arneil* involved a fact pattern similar to the present case, *Crown* affirms that those who file suit before certification are entitled to tolling. However, *Crown* did not address the issue; the only part of *Arneil* it squarely addressed was whether non-intervenors may ever benefit from *American Pipe* tolling.

The theoretical basis on which *American Pipe* rests is the notion that class members are treated as parties to the class action "until and unless they received notice thereof and chose not to continue." *American Pipe, 414 U.S. at 551*. **[*27]** Because members of the asserted class are treated for limitations purposes as having instituted their own actions, at least so long as they continue to be members of the class, the limitations period does not run against them during that time. Once they cease to be members of the class--for instance, when they opt out or when the certification decision excludes them--the limitation period begins to run again on their claims.

Nothing in the Supreme Court decisions described above suggests that the rule should be otherwise for a plaintiff who files an individual action before certification is resolved. To the contrary, the Supreme Court has repeatedly stated that "'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.'" *Crown, 462 U.S. at 353-54* (quoting *American Pipe, 414 U.S. at 554*). We see no reason not to take this statement at face value.

It would not undermine the purposes of statutes of limitations to give the benefit of tolling to all those who are asserted to be members of the class for as long as the class action purports **[*28]** to assert their claims. As the

Supreme Court has repeatedly emphasized, the initiation of a class action puts the defendants on notice of the claims against them. *See, e.g., American Pipe, 414 U.S. at 554-55* (noting that the purposes of statues of limitations "are satisfied when . . . a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment"). A defendant is no less on notice when putative class members file individual suits before certification. The Supreme Court explained that "[c]lass members who do not file suit while the class action is pending cannot be accused of sleeping on their rights," *Crown, 462 U.S. at 352*; the same is certainly true of class members who file individual suits before the court decides certification.

In concluding that the Appellants could not benefit from *American Pipe* tolling, the district court stated that the goal of avoiding a "needless multiplicity of actions" is undermined when class members file individual suits before **[\*29]** a certification motion is decided. The district court reasoned that class members who wait to sue individually until after the class certification decision will be in a "better position to evaluate whether they wish to proceed with their own lawsuit." Moreover, class members' desire to sue separately may "evaporate" once they have a chance to assess the class representatives' performance.

The district court may be correct that its conception of the *American Pipe* rule would reduce the number of individual suits filed by class members. But this is beside the point. While reduction in the number of suits may be an incidental benefit of the *American Pipe* doctrine, it was not the purpose of *American Pipe* either to reduce the number of suits filed, or to force individual plaintiffs to make an early decision whether to proceed by individual suit or rely on a class representative. Nor was the purpose of *American Pipe* to protect the desire of a defendant "not to defend against multiple actions in multiple forums." *Crown, 462 U.S. at 353*. The *American Pipe* tolling doctrine was created to protect class members from being *forced* to file individual suits in order to preserve their claims. It was **[\*30]** not meant to induce class members to forgo their right to sue individually.

We hold that because Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class, notwithstanding that they also filed individual actions prior to the class certification decision. [7]

> 7     We need not consider the Appellants' alternative argument that their claims qualify for the longer statutes of limitations in the Sarbanes-Oxley Act.

## Conclusion

The judgment of the district court is VACATED, and the case is REMANDED for further proceedings.

TAB 2

LEXSEE 1992 U.S. DIST. LEXIS 11657

**CHEMCO, INC., et al., Plaintiffs, v. STONE, McGUIRE & Benjamin, et al., Defendants.**

**No. 91 C 5041**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1992 U.S. Dist. LEXIS 11657*

**July 28, 1992, Decided
July 29, 1992, Docketed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors filed a securities fraud action against defendant trading groups. One trading group filed a motion for summary judgment on the federal claim and for dismissal of the pendent state law claims.

**OVERVIEW:** Initially, a receiver was appointed to operate various trading groups. The receiver brought suit against the various trading groups for securities fraud on behalf of the purported class of investors. The judge disqualified the receiver from acting as putative class representative or as attorney for the class. Thereafter, the investors filed suit in their individual capacity against the trading groups. One trading group filed a motion for summary judgment, arguing that the securities fraud claim was barred by the statute of limitations. The investors claimed that the statute of limitations was tolled by the receiver's commencement of the class action. The court granted the trading group's motion for summary judgment, holding that the agreement between the investors and the trading group, under which the trading group agreed not to raised a statute of limitations defense for a specified period of time, had expired. The limitation period for the investors to filed suit in their individual capacity had run prior to the receiver's filing of the class action. Thus, there was no tolling of the statute of limitations.

**OUTCOME:** The court granted the trading group's motion for summary judgment on the investors' federal securities violations claims and dismissed the investors'

pendent state law claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Class Actions > Class Members > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Limitations on Remedies*
[HN1] Potential class members are allowed to file individual actions in whatever time remains in the statute of limitations period, given the tolling during the pendency of the class action case.

**JUDGES:** [*1] Zagel

**OPINION BY:** JAMES B. ZAGEL

**OPINION**

*MEMORANDUM OPINION AND ORDER*

The Rosenthal defendants move for summary judgment on the remaining federal claim and for dismissal of the pendent state law claims. The defendants argue that the section 10(b) claim is barred by the applicable statute of limitations. In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 111 S.Ct. 2773 (1991)*, the Supreme Court adopted the one year/three

year rule for section 10(b) claims; claims may be brought one year after the discovery of the violation, but not longer than three years after the sale. The plaintiffs do not dispute the applicability of this rule to 10(b) claims, but allege that the case is governed by a tolling agreement entered into by the defendants.

This case is related to a securities fraud action filed by the SEC in November of 1989 against Michael Douglas, D & S Trading Group, Ltd., Analytic Trading Systems, Inc., and Analytic Trading Service, Inc. In that case (No. 89 C 8407), Judge Alesia entered a permanent injunction against Douglas and his trading groups, and appointed Steven Scholes as receiver to operate the Douglas entities. The receiver brought a suit on behalf **[*2]** of the receivership estates and on behalf of a purported class of investors against Stone, McGuire & Benjamin on December 12, 1991 and added the Rosenthal defendants on April 25, 1991 (Case no. *90 C 7201*). That suit was also on behalf of John and Pamela LaVinka individually and on behalf of the purported investor class. The Chemco plaintiffs are members of the class as it is now described. Judge Alesia has not yet ruled on the motion for class certification in that case.

On July 26, 1991 Judge Alesia disqualified the receiver from acting as putative class representative or as attorney for the class. In response to Scholes' argument that the investor class would be unduly injured by his removal, Judge Alesia commented:

> The plaintiff account holders [i.e. investors] have three options: they may . . . continue pursuing this lawsuit as a class action; they may pursue their claims individually; or . . . they may join in [other pending class] actions.

The Chemco plaintiffs filed this action against the defendants on August 9, 1991.

The Rosenthal defendants had an agreement with Scholes that they would not raise a statute of limitations defense prior to April 26, 1991. **[*3]** Scholes filed within the deadline of the agreement and the Rosenthal defendants have not raised a statute of limitations defense in the *92 C 7201* case. The Rosenthal defendants had a separate agreement with the Chemco plaintiffs that they would toll any statute of limitations defense they might have as of December 19, 1990 until February 15, 1991,

without waiving any such defense they might have before or after those dates. Plaintiffs filed in August of 1991, well after the agreement with Scholes had expired and more importantly well after the agreement between the Chemco plaintiffs and the Rosenthal defendants had expired.

Plaintiffs contend that they should be able to avoid the statute of limitations and file this action because, under *American Pipe and Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756 (1974)*, the commencement of a class action by the receiver in the *Scholes* case tolled the statute of limitations as to all potential class members, including the Chemco plaintiffs. The plaintiffs' argument fails for two reasons. First, the statute of limitations had expired by the time the *Scholes* action was filed. Only the agreement **[*4]** between Scholes and the Rosenthal defendants prevents the issue from being raised in that case. *American Pipe* allows [HN1] potential class members to file individual actions in whatever time remains in the statute of limitations period, given the tolling during the pendency of the class action case. *Id. at 770*; *see also Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 103 S.Ct. 2392, 2394 (1983)*. In this case, there is no time remaining. The limitations period had run before Scholes filed his class action suit, but even if the agreed "tolling" period applies to the individual class members, the limitations period would run one day after the class certification was denied. Even by the Chemco plaintiffs' reading of the disqualification order as a denial of class certification, or at least a ruling which permits them to file new actions under *American Pipe*, the statute of limitations defense would bar this action, since they did not file within one day.

Second, *American Pipe* addressed situations where a class action was filed, potential class members waited to see if the class would be certified, class certification was denied, and **[*5]** the statute of limitations had run out during the pendency of the class action suit. That unfairly left plaintiffs without any cause of action and defeated a primary purpose of class actions, the efficiency and economy of litigation by avoiding duplicative suits. *Id. at 766*. In this case, Judge Alesia has not denied class certification in the *90 C 7201* case; the certification motion is under advisement. The Chemco plaintiffs are still putative class members in that case. Therefore, this case really falls within the problem of a needless multiplicity of suits that *American Pipe* and *Crown, Cork & Seal Co.* strove to avoid. *See, e.g. Crown, Cork & Seal*

*Co. at 2396*. The removal of Scholes as the class representative did not change the Chemco plaintiffs' status in that case. Despite the Chemco plaintiffs' characterization that they filed this case "pursuant to Judge Alesia's order," the disqualification order in *90 C 7201* did not create additional time for the plaintiffs to file individual suits that would otherwise be time-barred. Judge Alesia's order means that it did not leave the plaintiffs without any cause of action, as Scholes argued his disqualification **[*6]** would. Only if class certification is denied in *90 C 7201* would the putative class members be able to bring suits individually under *American Pipe*. The issue of the expired statute before the *Scholes* action was filed might or might not prevent a suit by an individual potential class member, but it does not prevent the grant of summary judgment in this case. [1]

1    There is no pending motion for class certification in this case. On July 9, 1992 the Court granted the plaintiff's motion to dismiss the class action.

The Rosenthal defendants' Motion for Summary Judgment is granted as to Count V. Counts I, II, and III are dismissed; the Court declines to exercise pendent jurisdiction over these common law claims.

Enter:

James B. Zagel

United States District Judge

Date: 28 July 1992

TAB 3

LEXSEE 1998 U.S. DIST. LEXIS 12534

**IN RE: BRAND NAME PRESCRIPTION DRUGS ANTITRUST LITIGATION;**
**This Document Relates To: ALL CASES FILED BY INDIVIDUAL PLAINTIFFS**

**94 C 897, MDL 997**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*1998 U.S. Dist. LEXIS 12534*

**August 4, 1998, Decided
August 6, 1998, Docketed**

**DISPOSITION:** [*1] Wholesaler Defendants' motion for partial summary judgment granted-in-part while Manufacturer Defendants' motion for partial summary judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, independent pharmacies, drug and grocery store chains, opted out of a nationwide class action against defendants, a drug manufacturer and a wholesaler. Plaintiffs pursued their own individual claims under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, alleging price fixing. Plaintiffs later amended their complaint to add the wholesalers as defendants. The wholesaler defendants moved for partial summary judgment.

**OVERVIEW:** Defendants sought to limit plaintiffs' potential claims to cover only those purchases of prescription drugs made within the statutory limitations period. The court held that plaintiffs were not entitled to the benefits of *Fed. R. Civ. P. 15(c)(3)* to allow relation back of their claims against the wholesaler defendants. Plaintiffs deliberately chose not to originally initiate suit against the wholesaler defendants. Thus, the amendment of the wholesaler defendants did not relate back to filing of the original complaint, and therefore any damages which depended on this amendment were to be defined by the date of the amendment. Furthermore, the court found it inappropriate to invoke the doctrine of equitable or class action tolling. Plaintiffs made a conscious decision to pursue their claims on an entirely separate track from that of the class case. Plaintiffs filed their own

lawsuits and disavowed class status. They also chose not to include the wholesalers as defendants in their original complaints. It would have been inequitable to allow them to reap the benefits of a doctrine designed for a group, which they disavowed being a part of from the beginning.

**OUTCOME:** The court granted in-part the wholesaler defendants' motion for partial summary judgment.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Evidence > Documentary Evidence > General Overview*
[HN1] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. Once a motion has been filed for summary judgment, the burden shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial. The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; the nonmovant must go beyond the pleadings and support its contentions with proper documentary evidence. The plain language of *Rule 56(c)* mandates the entry of summary judgment against a party

who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
[HN2] Damages resulting from an antitrust conspiracy can only be recovered for those acts which were committed within the limitations period.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
*Civil Procedure > Parties > Joinder > General Overview*
[HN3] When an amendment serves to add claims against additional parties, *Fed. R. Civ. P. 15(c)(3)* governs the relation back question. *Rule 15(c)(3)* provides that where an amendment changes the party or the naming of the party against whom a claim is asserted, the amended claims are allowed to relate back to the date of the original pleading only if, inter alia, the party knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. *Fed. R. Civ. P. 15(c)(3).*

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN4] *Fed. R. Civ. P. 15(c)(3)* to require a misnomer of defendant; in other words, claims against a new party relate back where there has been an error made concerning the identity of the proper party.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
*Insurance Law > Motor Vehicle Insurance > Coverage > No-Fault Coverage > Time Limitations*
[HN5] Equitable tolling permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before. The touchstone of this doctrine is "reasonable diligence" - the plaintiff must demonstrate that he exercised all reasonable diligence to sue the proper party within the

limitations period. If a plaintiff demonstrates such diligence, and could not have sued previously, tolling of the statute may be appropriate. In determining whether equitable tolling is appropriate, courts consider several factors which weigh in favor of applying the doctrine. One such factor that has been found to justify equitable tolling is when a court has led the plaintiff to believe that she had done everything required of her.

*Civil Procedure > Parties > Joinder > General Overview*
*Civil Procedure > Joinder of Claims & Remedies > Claims*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN6] The standard for equitable tolling clearly requires that the plaintiff be prevented in some way from proceeding with its claim.

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Opt-Out Provisions*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN7] After a statute has been tolled, the limitations clock then resumes ticking again only after the court makes a class certification decision and the class member "opts out" of the class.

*Civil Procedure > Class Actions > Class Members > General Overview*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN8] The commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class that would have been parties had the suit been permitted to continue as a class action. The Supreme Court explains that the class action tolling rule is a generous one, preserving for class members a range of options pending a decision on class certification. In addition, the doctrine has been made available to eventual class members and opt-out plaintiffs alike, and plaintiffs filing individual lawsuits are not necessarily precluded from having a statute tolled for their claims.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
*Antitrust & Trade Law > Private Actions > Purchasers > Direct Purchasers*

*Antitrust & Trade Law > Private Actions > Purchasers > Indirect Purchasers*

[HN9] An indirect purchaser -- a party that is at least one step removed on the distribution chain from the alleged conspirators -- cannot seek antitrust damages for illegal overcharges that are passed on to them through intermediaries in the distribution chain who purchased directly from the conspirators.

**COUNSEL:** For BRAND NAME PRESCRIPTION DRUGS ANTITRUST LITIGATION, plaintiff: Paul Ethan Slater, Greg Shinall, Sperling, Slater & Spitz, P.C., Chicago, IL.

For BRAND NAME PRESCRITION DRUGS ANTITRUST LITIGATION, RANDALLS FOOD & DRUG, MALLEY'S PHARMACY, RITE AID, DON'S PHAR INC, CONNEYS PHAR INC, TAYLOR DRUG STORES, INC., plaintiffs: Ann C. Tighe, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL.

For BRAND NAME PRESCRITION DRUGS ANTITRUST LITIGATION, plaintiff: Jeff Robert Branick, Provost & Umphrey, Beaumont, TX.

For BRAND NAME PRESCRITION DRUGS ANTITRUST LITIGATION, plaintiff: Junie Leroy Bradshaw, Wyatt B. Durrette, Jr., Durrette, Irvin, Lemons & Bradshaw, P.C., Richmond, VA.

For BRAND NAME PRESCRITION DRUGS ANTITRUST LITIGATION, plaintiff: Van C Ernest, Durrette Irvin & Bradshaw, Richmond, VA.

For BRAND NAME PRESCRITION DRUGS ANTITRUST LITIGATION, plaintiff: Richard Lyle Coffman, Attorney at Law, Beaumont, TX.

For RANDALLS FOOD & DRUG, plaintiff: James M. McGraw, Looper, Reed, Mark & McGraw, Inc., Houston, [*2] TX.

For DON'S PHAR INC, plaintiff: Steven Joseph Rotunno, Kubasiak, Cremieux, Fylstra, Reizen & Rotunno, P.C., Chicago, IL.

For DON'S PHAR INC, plaintiff: David A Melnick, Stephanie L Melnick, Melnick & Melnick, S.C., Milwaukee, WI.

For CONNEYS PHAR INC, plaintiff: Judi A. Lamble, Fay Clayton, Robinson, Curley & Clayton, P.C., Chicago, IL.

For TAYLOR DRUG STORES, INC., plaintiff: Wendi Sloane Weitman, Richard Allen Saldinger, Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg, Chicago, IL.

For TAYLOR DRUG STORES, INC., plaintiff: Thomas P. O'Brien, III, Charles G Middleton, III, James N Williams, Nancy J Schook, Middleton & Reutlinger, Louisville, KY.

For ABBOTT LABS, defendant: Jeffrey A. Leon, Winston & Strawn, Chicago, IL.

For ABBOTT LABS, defendant: Frank Cicero, Jr., James Andrew Langan, Anne J. McClain, Nader R. Boulos, Kirkland & Ellis, Chicago, IL.

For ABBOTT LABS, defendant: Jeffrey S. Cashdan, King & Spalding, Atlanta, GA.

For G D SEARLE & COMPANY, defendant: John W. Treece, David M. Schiffman, Marjorie Golis Wilde, Sidley & Austin, Chicago, IL.

For BINDLEY WESTERN INDUSTRIES, INC., defendant: Steven Joseph Rotunno, Kubasiak, [*3] Cremieux, Fylstra, Reizen & Rotunno, P.C., Chicago, IL.

For BINDLEY WESTERN INDUSTRIES, INC., defendant: Kael Behan Kennedy, James L. Komie, Schuyler, Roche & Zwirner, Chicago, IL.

For BINDLEY WESTERN INDUSTRIES, INC., defendant: Marguerite S. Boyd, John W. Nields, Jr., Howrey & Simon, Washington, DC.

For BINDLEY WESTERN INDUSTRIES, INC., defendant: Patricia A Gaegler, George R Kucik, Nada S Sulaiman, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC.

For BINDLEY WESTERN INDUSTRIES, INC., defendant: David A Melnick, Stephanie L Melnick, Melnick & Melnick, S.C., Milwaukee, WI.

For MARION MERRELL DOW INC., defendant: Jerome H. Torshen, Torshen, Spreyer & Garmisa, Ltd., Chicago, IL.

For MARION MERRELL DOW INC., defendant: Lee A.

Freeman, Freeman, Freeman & Salzman, P.C., Chicago, IL.

For MARION MERRELL DOW INC., defendant: Gregory D. Hanley, Honigman, Miller, Schwartz & Cohn, Detroit, MI.

For MARION MERRELL DOW INC., defendant: David E. Everson, Stinson, Mag & Fizzeli, P.C., Kansas City, MO.

For MARION MERRELL DOW INC., defendant: Richard Alan Arnold, Scott E Perwin, James J Kenny, William J Blechman, Kenny, Nachwalter, Seymour, Arnold, [*4] Critchlow & Spector, P.A., Miami, FL.

For MARION MERRELL DOW INC., defendant: Richard W Giauque, Stephen T Hard, Douglas H Patton, Giauque, Crockett, Bendinger & Peterson, Salt Lake City, UT.

For MARION MERRELL DOW INC., defendant: Peter J. Venaglia, Jeffrey M. Strank, Dornbush, Mensch, Mandelstam & Schaeffer, New York, NY.

For BURROUGHS WELLCOME COMPANY, defendant: Ruth F. Masters, Latham & Watkins, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: David Stewart Fleming, Ralph Joseph Gabric, Brinks, Hofer, Gilson & Lione, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Lee A. Freeman, Jr., John F. Kinney, James T. Malysiak, Freeman, Freeman & Salzman, P.C., Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Richard William Austin, Richard S. Wisner, Audrey A. Berish, Pretzel & Stouffer, Chtd., Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Nancy Schaefer, Schaefer, Rosenwein & Fleming, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Matthew Sean Elvin, Ross & Hardies, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Mark G. Arnold, Husch, Eppenberger,

Donohue, Elson & Cornfeld, St. Louis, MO.

For [*5] BURROUGHS WELLCOME COMPANY, defendant: Daniel S. Hefter, Martin B. Carroll, Hefter & Radke, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: George L. Saunders, Jr., Saunders & Monroe, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: William F. Cavanaugh, Jr., Patterson, Belknap, Webb & Tyler, New York, NY.

For BURROUGHS WELLCOME COMPANY, defendant: Thomas F Curnin, Laura Mezey, Cahill, Gordon & Reindel, New York, NY.

For BURROUGHS WELLCOME COMPANY, defendant: Donald L Flexner, Crowell & Moring, Washington, DC.

For BURROUGHS WELLCOME COMPANY, defendant: Jennifer A Albert, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC.

For BURROUGHS WELLCOME COMPANY, defendant: Richard J. Holwell, White & Case, New York, NY.

For BURROUGHS WELLCOME COMPANY, defendant: Arthur Makadon, Mark S. Stewart, Leslie E. John, Daniel Schoor-Rube, Stephen J. Kastenberg, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA.

For BURROUGHS WELLCOME COMPANY, defendant: Heather A. Libbey, Wilson & McIlvaine, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Herbert Dym, David L Meyer, Jonathan R Galst, Covington & Burling, Washington, DC.

For [*6] BURROUGHS WELLCOME COMPANY, defendant: Frederick P. Furth, Furth, Fahrner & Mason, San Francisco, CA.

For BURROUGHS WELLCOME COMPANY, defendant: Joseph L. Alioto, Joseph L. Alioto Law Offices, San Francisco, CA.

For BURROUGHS WELLCOME COMPANY,

defendant: Barbara Reeves, Morrison & Foerster, Los Angeles, CA.

For BURROUGHS WELLCOME COMPANY, defendant: John Alexander Cochrane, Cochrane & Bresnahan, St. Paul, MN.

For BURROUGHS WELLCOME COMPANY, defendant: Charles Harley Johnson, Johnson Law Office, St. Paul, MN.

For BURROUGHS WELLCOME COMPANY, defendant: Joseph Andrew Kowalcik, Kowalcik Law Office, St. Paul, MN.

For BURROUGHS WELLCOME COMPANY, defendant: Lawrence B Clark, Lange, Simpson, Robinson & Somerville, Birmingham, AL.

For BURROUGHS WELLCOME COMPANY, defendant: James L Schwartz, Schwartz & Spalding, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: John Kenneth Kallman, Law Offices of John Kenneth Kallman, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Robert A Milne, Dewey Ballantine, New York, NY.

For BURROUGHS WELLCOME COMPANY, defendant: Ronald W. Davis, Attorney, New York, NY.

For BURROUGHS WELLCOME COMPANY, [*7] defendant: Robert E. Davy, Robert E. Davy, Jr. & Associates, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Henry F. Field, Attorney at Law, Chicago, IL.

For BURROUGHS WELLCOME COMPANY, defendant: Thomas D. Rosenwein, Rosenwein & Oberholtzer, Chicago, IL.

For FOXMEYER DRUG COMPANY, defendant: Alan J Weinschel, Bruce A Colbath, Weil, Gotshal & Manges, New York, NY.

For FOXMEYER DRUG COMPANY, defendant: Steven P. Mandell, Davidson, Goldstein, Mandell & Menkes, Chicago, IL.

For FOXMEYER DRUG COMPANY, defendant: Craig Allen Varga, Varga, Berger, Ledsky & Hayes, Chicago, IL.

For MCKESSON CORPORATION, defendant: William J. Gibbons, Latham & Watkins, Chicago, IL.

For MCKESSON CORPORATION, defendant: J Thomas Rosch, McCutchen, Doyle, Brown & Enersen, San Francisco, CA.

For MCKESSON CORPORATION, defendant: J. Thomas Rosch, Trevor J Chaplick, Peter K Huston, Latham & Watkins, San Francisco, CA.

For RHONE-POULENC RORER INTERNATIONAL, INC., defendant: Nathan P. Eimer, Sidley & Austin, Chicago, IL.

For RHONE-POULENC RORER INTERNATIONAL, INC., defendant: Mary B. Cranston, Jeffrey S. Ross, Terrence A. Callan, Attorney at Law, San Francisco, [*8] CA.

For RHONE-POULENC RORER INTERNATIONAL, INC., defendant: Gary H Anderson, Melanie A Sherk, Patrick S Thompson, Pillsbury, Madison & Sutro, San Francisco, CA.

For ALCO HEALTH SERVICES CORPORATION, NATIONAL WHOLESALE DRUGGISTS' ASSOCIATION, WHITMIRE DISTRIBUTION CORPORATION, MCKESSON CORPORATION, CARDINAL HEALTH, INC., BINDLEY WESTERN INDUSTRIES, INC., defendants: Jacqueline A. Criswell, Tressler, Soderstrom, Maloney & Priess, Chicago, IL.

For ALCO HEALTH SERVICES CORPORATION, defendant: Howard D Scher, Stephen J Levy, Steven E Bizar, Montgomery, McCracken, Walker and Rhoads, Philadelphia, PA.

For UPJOHN COMPANY, THE, defendant: Larry J Saylor, Catherine M Patterson, Miller, Canfield, Paddock & Stone, Detroit, MI.

For UPJOHN COMPANY, THE, defendant: Martin J Dubowsky, Martin J. Dubowsky, Ltd., Chicago, Il.

For UPJOHN COMPANY, THE, defendant: James G. Vantine, Jr., B Jay Yelton, III, Charles E Ritter, Attorney, Kalamazoo, MI.

For JOHNSON AND JOHNSON VISION PRODUCTS, INC., defendant: William F. Cavanaugh, Jr., Thomas W Pippert, Roosevelt N Nesmith, Patterson, Belknap, Webb & Tyler, New York, NY.

For FOREST LAB INC, defendant: Peter J. Venaglia, **[*9]** Herschel Weinstein, Dornbush, Mensch, Mandelstam & Schaeffer, New York, NY.

For CIBA-GEIGY CORP, SANDOZ PHARMACEUTICALS CORPORATION, defendants: John E. Frey, Wildman, Harrold, Allen & Dixon, Chicago, Il.

For CIBA-GEIGY CORP, SANDOZ PHARMACEUTICALS CORPORATION, NOVARTIS PHARMACEUTICALS CORPORATION, defendants: Harvey Kurzweil, Dewey Ballantine, New York, NY.

For RX USA, INC., defendant: Richard Lewis Reinish, D'Ancona & Pflaum, Chicago, IL.

For RX USA, INC., defendant: Arlin M. Adams, Schnader, Harrison, Segal & Lewis, Philadelphia, PA.

For RX USA, INC., defendant: Steve D Shadowen, Schnader, Harrison, Segal & Lewis, Harrisburg, PA.

For RX USA, INC., defendant: Ira P. Tiger, Attorney, Philadelphia, PA.

For EXPRESS SCRIPTS, defendant: David Barry Kahn, David B. Kahn & Associates, Ltd., Northfield, IL.

For AMERICAN CYANAMID COMPANY, defendant: Joel Gerald Chefitz, Stephen David Libowsky, Katten, Muchin & Zavis, Chicago, Il.

For AMERICAN CYANAMID COMPANY, defendant: Kenneth R. Logan, Joseph F Tringali, Simpson, Thacher & Bartlett, New York, NY.

For GIANT EAGLE INC, defendant: John L. Huff, Attorney at Law, Chicago, IL.

For GIANT **[*10]** EAGLE INC, defendant: Scott D Livingston, Robert M Barnes, Bernard D Marcus, Marcus & Shapira, L.L.P., Pittsburgh, PA.

For WHITMIRE DISTRIBUTION CORPORATION, CARDINAL HEALTH, INC., defendants: Thomas L Long, Baker & Hostetler, Columbus, OH.

For MCKESSON CORPORATION, defendant: J Thomas Rosch, Peter K Huston, Latham & Watkins, San Francisco, CA.

For BINDLEY WESTERN INDUSTRIES, INC., defendant: Ernest A. Tuckett, III, George R Kucik, Nada S Sulaiman, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC.

For BERGEN BRUNSWIG CORP, defendant: Melvin R. Goldman, Lynn M Humphreys, Morrison and Foerster, San Francisco, CA.

For BERGEN BRUNSWIG CORP, defendant: Steven Kaufman, Ropes & Gray, Boston, MA.

**JUDGES:** Charles P. Kocoras, United States District Judge.

**OPINION BY:** Charles P. Kocoras

**OPINION**

**MEMORANDUM OPINION AND ORDER**

CHARLES P. KOCORAS, District Judge:

This matter is before the Court on the Manufacturer Defendants' and Wholesaler Defendants' motions for partial summary judgment on the Individual Plaintiffs' Sherman Act claims. For the following reasons, the Wholesaler Defendants' motion is granted-in-part, while the Manufacturer Defendants' **[*11]** motion is denied.

**BACKGROUND**

The Individual Plaintiffs consist of thousands of independent pharmacies, drug store chains, and grocery store chains who have chosen to opt out of the nationwide class action ("the Class case") to pursue their own individual claims under *Section 1* of the Sherman Act, *15 U.S.C. § 1*. The Individual and Class Plaintiffs each assert a conspiracy among brand name prescription drug manufacturers to fix the prices for such drugs through their use of a "two-tiered" pricing system. Though both the Class Plaintiffs and the Individual Plaintiffs originally named the Manufacturer Defendants as defendants in their Sherman Act claims, these plaintiff groups diverged in their treatment of the Wholesalers. The Class Plaintiffs named the Wholesalers as defendants in their original complaint; conversely, the Individual Plaintiffs merely

1998 U.S. Dist. LEXIS 12534, *11

identified the Wholesalers as co-conspirators but did not name them as defendants in their complaints.

On October 2, 1997, certain Individual Plaintiffs filed a Motion for Leave to Amend to Add Wholesaler Defendants to assert their Sherman Act claims against six wholesalers ("the Wholesaler Defendants"): AmeriSource **[*12]** Corporation; Bergen Brunswig Corporation; Bindley Western Industries, Inc.; Cardinal Health, Inc.; McKesson Corporation; and Whitmire Distribution Corporation. The Individual Plaintiffs did not seek to join another Wholesaler, FoxMeyer, because FoxMeyer had filed for bankruptcy in August 1996. Since that time, however, Wholesaler Defendant McKesson has executed an Asset Purchase Agreement in which FoxMeyer sold substantially all of its assets to McKesson. In an opinion dated November 20, 1997, this Court granted the Individual Plaintiffs' motion for leave to join the Wholesaler Defendants.

In their amended complaints, the Individual Plaintiffs seek damages against the Wholesaler Defendants for the time period from October 1989 through the present (or the time of trial). The Individual Plaintiffs also seek damages for the same time period for purchases of brand name drugs from Wholesalers other than the Wholesaler Defendants. These damage claims now sought by the Individual Plaintiffs are essentially identical to the claims asserted by the class action complaint originally filed by the Class Plaintiffs on November 4, 1993. All of the cases were consolidated in this Court by the Multidistrict **[*13]** Panel on February 4, 1994. The class was ultimately certified by this Court, though all of the Individual Plaintiffs opted out of the class by the opt-out deadline of March 10, 1995.

The Wholesaler and Manufacturer Defendants have now filed the present motions for partial summary judgment, seeking a limitation on certain damage claims asserted by the Individual Plaintiffs. Specifically, the Defendants seek summary judgment on the following claims: (1) damages accruing from purchases through the Wholesaler Defendants that were consummated prior to October 2, 1993; and (2) damages for purchases made from non-Defendant Wholesalers. Before addressing the merits of these motions, it is first necessary to set forth the appropriate standard of review.

**LEGAL STANDARD**

[HN1] Summary judgment is appropriate when the

record, viewed in a light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. Once a motion has been filed for summary judgment, the burden shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains **[*14]** on issues on which the nonmovant bears the burden of proof at trial. See *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; the nonmovant must go beyond the pleadings and support its contentions with proper documentary evidence. See *Id.*

The plain language of *Rule 56(c)* mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See *Id at 322*. "In such a situation there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See *Id at 323*. Applying these principles, we turn to the merits of the motions presently before us.

**DISCUSSION**

The Wholesaler and Manufacturer Defendants have each filed motions seeking partial summary judgment on the Individual Plaintiffs' Sherman Act claims. Primarily, the **[*15]** Defendants ask the Court to limit the Individual Plaintiffs' potential claims to cover only those purchases of brand name prescription drugs made within the 4-year statutory limitations period. The genesis of these motions is found in this Court's recent decision, dated November 20, 1997, to allow the Individual Plaintiffs leave to amend their complaints to add the Wholesalers as defendants in this action. See *In re Brand Name Prescription Drugs Antitrust Litig., 177 F.R.D. 414 (N.D. Ill. 1997)*. In this opinion, the Court expressly reserved judgment on the issue of whether this amendment would "relate back" for purposes of delineating the time period for which damages would be recoverable. *Id. at 423*. Accepting our invitation to revisit this issue in appropriate detail, the Wholesaler and Manufacturer Defendants have now filed the instant motions.

The effective filing date of these claims is critical to

the determination of the period for which the Individual Plaintiffs can recover damages. The Supreme Court has recently reaffirmed that [HN2] damages resulting from an antitrust conspiracy can only be recovered for those acts which were committed within [*16] the limitations period. See *Klehr v. A. O. Smith Corp., 521 U.S. 179, 138 L. Ed. 2d 373, 117 S. Ct. 1984, 1990-91 (1997)* (explaining that in a continuing price fixing conspiracy, a plaintiff cannot recover for sales which were made to it outside the limitations period). Applying this rule to the instant case, the Individual Plaintiffs can only recover overcharge damages for those sales which were consummated within the four years preceding the filing of their lawsuits. For the direct purchaser claims against the Manufacturer Defendants, the relevant cut-off date for these purchases is four years before the filing of the original complaints in 1993 and 1994. However, for the indirect purchaser claims against the Manufacturer Defendants, and for the claims against the newly-added Wholesaler Defendants, it is necessary to consider the effective date of the Wholesalers' joinder and the legal effect that this joinder should have on the scope of the Individual Plaintiffs' potential recovery. That, in a nutshell, is the impetus for the present motions.

To answer these questions, however, several legal issues must be considered. The first is whether the amended complaint, [*17] and its joinder of the Wholesaler Defendants, "relates back" to the filing of the original complaint. If it does not relate back, we must next consider whether the limitations period was tolled during the pendency of the class action complaint for purposes of establishing an earlier filing date. Depending on how these issues play out, the question of whether the various indirect purchaser claims can be maintained against the Manufacturer Defendants must finally be considered. The Court will address each of these issues in turn.

I. Relation Back

The first question raised in the Defendants' motions is whether the joinder of the Wholesaler Defendants should relate back to the filing of the original complaints in 1993 and 1994. [HN3] When an amendment serves to add claims against additional parties, *Federal Rule of Civil Procedure 15(c)(3)* governs the relation back question. *Rule 15(c)(3)* provides that where an amendment "changes the party or the naming of the party against whom a claim is asserted," the amended claims

are allowed to relate back to the date of the original pleading only if, inter alia, the party "knew or should have known that, but for a mistake concerning the identity [*18] of the proper party, the action would have been brought against the party." *Fed.R.Civ.P. 15(c)(3).*

There is no real dispute over whether the Wholesaler Defendants had knowledge of the pendency of this action from the beginning - clearly they did. Nor is there any question that the Individual Plaintiffs knew full well who the Wholesalers were and deliberately chose not to name them as defendants in their original complaints. What is hotly contested, however, is whether the initial omission of the Wholesaler Defendants from the Individual Plaintiffs' cases must have been the product of some sort of mistake in order to qualify for relation back under *Rule 15(c)(3)*. The Defendants assert that, in the absence of any such mistake, relation back is not proper.

The Seventh Circuit has strictly read the language of [HN4] *Rule 15(c)(3)* to require "a misnomer of defendant"; in other words, claims against a new party relate back only "where there has been an error made concerning the identity of the proper party." *Wood v. Worachek, 618 F.2d 1225, 1230 (7th Cir. 1980)*; see also *Worthington v. Wilson, 8 F.3d 1253, 1256 (7th Cir. 1993)* (relation back not allowed where [*19] failure to name the putative defendants was not due to a mistake about their proper names); *Hill v. Shelander, 924 F.2d 1370, 1374 n.2 (7th Cir. 1991)* (*Rule 15(c)* "comprehends a situation where the original complaint sues the correct party but identifies him by a technically incorrect name"). Thus, where the plaintiff has knowledge of, but initially fails to join, an omitted defendant, the amended complaint does not relate back when that defendant is later joined. See *Norton v. International Harvester Co., 627 F.2d 18, 22-23 (7th Cir. 1980)*; *Vakharia v. Swedish Covenant Hosp., 824 F. Supp. 769, 773-74 (N.D. Ill. 1993)*. In fact, this rule has been applied to deny relation back in a case, remarkably similar to the instant situation, where the later-joined defendant had been identified in the original complaint, but only as a co-conspirator. *Havoco of America, Ltd. v. Hilco, Inc., 750 F. Supp. 946 (N.D. Ill. 1990)*, aff'd, *971 F.2d 1332 (7th Cir. 1992)*. The Defendants assert, therefore, that the Individual Plaintiffs prior identification of the Wholesalers as co-conspirators conclusively establishes [*20] that no mistake was ever made and that relation back is not appropriate.

The Individual Plaintiffs, in response, dispute

whether *Rule 15(c)(3)* has been so strictly construed by the Seventh Circuit. In support of a more liberal interpretation of the rule, Plaintiffs cite the case of *Woods v. Indiana University-Purdue University at Indianapolis, 996 F.2d 880 (7th Cir. 1993)*, which held that *Rule 15(c)*

> *expressly* contemplates the prospect of the retrospective application of an amended complaint to a defendant who was *not* named originally but who was added only later, when the plaintiff or plaintiff's attorney realized that the defendant should have been named at the outset. And that of course includes (indeed it would far more commonly involve) a defendant who was not named at all to begin with ... rather than a defendant who was named at the beginning but was originally sued in the wrong capacity.

*Id. at 888*. Likewise, in *Donald v. Cook County Sheriff's Dept., 95 F.3d 548 (7th Cir. 1996)*, the Seventh Circuit indicated that joinder of completely new parties - not simply those that were originally misnamed - **[*21]** could be related back under the federal rules. *Id. at 561* (court would allow relation back where the plaintiff mistakenly sued the Sheriff's Department rather than the individual officers against whom his claims could only be brought). Thus, the Individual Plaintiffs argue that *Rule 15(c)* applies beyond the context of mere misnomer to situations involving legal mistakes such as is present in the instant case.

Defendants contend that Woods and Donald, rather than overruling the general rule requiring a misnomer, have merely carved out an exception for cases involving governmental entities. In these cases, the plaintiffs had made mistakes in determining the proper defendants in their suits against the government. The Seventh Circuit found that such mistakes were within the purview of *Rule 15(c)(3)*, and thus permitted relation back of the claims against defendants who were only properly named after the statute of limitations had run. See *Donald, 95 F.3d at 561*; *Woods, 996 F.2d at 888*. The Defendants assert that, because there are clearly no governmental defendants implicated in this case, the exception exemplified by the **[*22]** Donald and Woods cases is inapplicable.

Though it is somewhat difficult to reconcile this prior precedent, a very recent decision from the Seventh Circuit sheds some needed light on this issue. In *Baskin v. City of Des Plaines, 138 F.3d 701 (7th Cir. 1998)*, the court reaffirmed the rule of Wood and Worthington requiring a "'mistake in the identification of the proper party.'" *Id. at 704* (quoting *Wood, 618 F.2d at 1230*). Rejecting the plaintiff's argument for a broader construction of *Rule 15(c)(3)*, the court distinguished Donald on the basis that it involved a pro se plaintiff who had mistakenly sued the Sheriff's Department when his only cause of action was against the individual jail personnel. *Id. at 704 fn. 1*. Without a similar mistake to excuse his belated amendment of the proper defendant, the Baskin plaintiff was not allowed to take advantage of the relation back rules. *Id. at 704*.

This Seventh Circuit precedent makes clear that the Individual Plaintiffs cannot enjoy the benefits of *Rule 15(c)(3)* to allow relation back of their claims against the Wholesaler Defendants. Though there has been **[*23]** some conflicting dicta on this point over the years, a common theme has emerged from this Circuit's analysis of *Rule 15(c)(3)* - the need for some sort of "mistake" as to the proper defendant's identity. This mistake may involve a simple factual misnomer, e.g. *Diaz v. Shallbetter, 984 F.2d 850, 854 (7th Cir. 1993)* (amendment which seeks to change name of defendant from "John Shullbetter" to "Dennis Shallbetter" is covered by *Rule 15(c)*), or it may consist of a plaintiff's legal misconception as whether to sue an individual or institutional governmental defendant, e.g. *Donald, 95 F.3d at 560*; *Woods, 996 F.2d at 886-87*. In all of these cases where the Seventh Circuit has permitted relation back under *Rule 15(c)(3)*, however, the plaintiff has always made some type of mistake in suing the proper defendants.

The Individual Plaintiffs made no such mistake in this case. Represented by sophisticated, able and learned counsel, the Individual Plaintiffs *deliberately chose* not to originally sue the Wholesaler Defendants for whatever reason. They did not misname the Wholesalers in their original complaints, nor did they mistakenly sue **[*24]** the wrong party by virtue of some legal misconception. Any miscalculation the Individual Plaintiffs may have made with regard to *Illinois Brick Co. v. Illinois, 431 U.S. 720, 52 L. Ed. 2d 707, 97 S. Ct. 2061 (1977)*, and its effect on their indirect purchaser claims, simply cannot be shoehorned into *Rule 15(c)(3)*'s "mistake" requirement. Thus, the amendment of the Wholesaler Defendants does not relate back to filing of the original

complaint, and therefore any damages which depend on this amendment are to be defined by the date of this amendment.

II Tolling of Limitations Period

The Individual Plaintiffs alternatively argue that the statute of limitations period should be tolled to permit damages from before the four years leading up to the 1997 amendment. The Individual Plaintiffs advance two theories for tolling the limitations period in this case: (1) equitable tolling, and (2) class action tolling. The Defendants dispute that these tolling doctrines apply to the facts of this case.

[HN5] Equitable tolling "permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before." [*25] *Singletary v. Continental Illinois Nat'l Bank and Trust Co. of Chicago, 9 F.3d 1236, 1241 (7th Cir. 1993)*; *Donald, 95 F.3d at 561*. The touchstone of this doctrine is "reasonable diligence" - the plaintiff must demonstrate that he exercised all reasonable diligence to sue the proper party within the limitations period. *Singletary, 9 F.3d at 1241-43*. If a plaintiff demonstrates such diligence, and could not have sued previously, tolling of the statute may be appropriate. In determining whether equitable tolling is appropriate, courts have considered several factors which weigh in favor of applying the doctrine. See *Donald, 95 F.3d at 562*.

One such factor that has been found to justify equitable tolling is when a "'court has led the plaintiff to believe that she had done everything required of her.'" *Donald, 95 F.3d at 562* (quoting *Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151, 80 L. Ed. 2d 196, 104 S. Ct. 1723 (1984))*. Citing this factor, the Individual Plaintiffs contend that they have relied on the Seventh Circuit's decision in *Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478, 481 (7th Cir. 1980)*, [*26] and this Court's prior rulings in 1994 and 1996, in previously deciding not to name the Wholesalers as defendants in their cases. Arguing that these opinions led them to believe that the Wholesalers need not be joined, the Individual Plaintiffs assert that they have been reasonably diligent in pursuing their claims and thus should receive the benefits of the equitable tolling doctrine.

The Defendants disagree, arguing that the Individual Plaintiffs have not satisfied the requirements for equitable

tolling. Though agreeing that this doctrine focuses on the diligence of the plaintiff, the Defendants point out that, regardless of any diligence, a plaintiff must also show he was "*unable* to sue [the proper defendants] before." *Singletary, 9 F.3d at 1241* (emphasis added). Though the Individual Plaintiffs may have had a reasonable reason for not suing the Wholesalers in the first instance, the Defendants contend that nothing affected the Individual Plaintiffs' *ability* to include the Wholesalers as defendants. Since the omission of the Wholesalers Defendants from the original complaint was merely the product of a strategic choice by the Individual Plaintiffs, the [*27] Defendants argue that they cannot avoid the consequences of this choice by invoking the doctrine of equitable tolling.

The Court agrees. [HN6] The standard for equitable tolling clearly requires that the plaintiff be prevented in some way from proceeding with its claim, and the Individual Plaintiffs have offered no excuse for their failure to join the Wholesaler Defendants sooner. The Individual Plaintiffs have always (or at least should have) understood that their indirect purchaser claims, without the joinder of the Wholesalers as defendants, stood on arguably tenuous footing because of Illinois Brick and its progeny. Cf. *In re Beef Industry Antitrust Litigation, 600 F.2d 1148, 1163 (5th Cir. 1979)* (holding that direct sellers must be joined as defendants in order to avoid an Illinois Brick bar); and *Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478 (7th Cir. 1980)* (arguably holding that Illinois Brick does not bar recovery when an intermediary is alleged to be a co-conspirator). Though they ultimately placed their reliance on Fontana, and this Court validated this reliance in our prior opinions, the Individual Plaintiffs [*28] proceeded down this path at their own potential peril. This Court allowed the recent joinder of the Wholesaler Defendants to the Individual cases, but we are not amenable to employing an equitable doctrine to bail the Individual Plaintiffs out of the consequences of their prior strategic decision. Thus, the Court finds it inappropriate to invoke the doctrine of equitable tolling in this case.

In a final attempt to salvage as much of their damage claims as possible, the Individual Plaintiffs alternatively seek to invoke the doctrine of class action tolling. This doctrine works to suspend the limitations clock for putative class members upon the filing of a class action complaint, preserving for each that portion of the limitations period that remained at the time the class

action was filed. See *Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 76 L. Ed. 2d 628, 103 S. Ct. 2392 (1983); American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 38 L. Ed. 2d 713, 94 S. Ct. 756 (1974).* [HN7] After a statute has been tolled, the limitations clock then resumes ticking again only after the court makes a class certification decision and the class member "opts out" [*29] of the class. *Tosti v. City of Los Angeles, 754 F.2d 1485, 1488-89 (9th Cir. 1985).* The Individual Plaintiffs thus contend that the filing of the initial class action on November 4, 1993, which included the same claims now asserted against the Wholesalers in this case, served to toll the statute of limitations for these claims until the opt-out deadline of March 10, 1995. Assuming that class action tolling is appropriate, the potential period of damage recovery against the Wholesaler Defendants (and other related claims) would be expanded by 488 days - back to June 2, 1992 from October 2, 1993 (based on the amendment date of October 2, 1997).

The Defendants, however, argue that class action tolling cannot be invoked in this case. The purpose of the class action tolling doctrine, the Defendants assert, is to preserve the claims of putative class members while class action status is pending. See *Crown, Cork & Seal, 462 U.S. at 350-51.* Tolling the statute of limitations avoids the necessity of each individual class member having to file his own claim in order to avoid the risk of being shut out if a class is not certified. In this case, however, [*30] many of the Individual Plaintiffs filed their actions *prior to* any determination of class action status and prior to opting out of the class. The Defendants contend that these Plaintiffs, who filed the type of duplicative claims which the tolling rule seeks to avoid, cannot now turn around and enjoy the benefits of class action tolling. In fact, many courts have refused to apply the class action tolling rule for plaintiffs who choose to opt out of a putative class. See, e.g., *Pulley v. Burlington Northern, Inc., 568 F. Supp. 1177, 1179 (D. Minn. 1983)* ("while a class action tolls the statute of limitations for all claims within the class action, it does not toll the limitations period for individual actions brought by members of the class while the class still exists"); *Chemco, Inc. v. Stone, McGuire & Benjamin, 1992 U.S. Dist. LEXIS 11657, 1992 WL 188417,* at *2 (N.D. Ill. July 29, 1992) (where class certification has not been denied, applying tolling doctrine would create "the problem of a needless multiplicity of suits that American Pipe and Crown, Cork & Seal Co. strove to avoid").

If nothing else, this case certainly presents a novel [*31] circumstance for application of the class action tolling rule. Many of the Individual Plaintiffs did file their own individual lawsuits prior to the certification of the class, and thus arguably burdened the court system with needless duplicative paper. Furthermore, this is not the typical case in which the plaintiffs are reliant on a tolling of the limitations period in order to preserve their claims; instead, the Individual Plaintiffs seek to employ the tolling doctrine merely to preserve a longer period of time for purposes of calculating damages. To our knowledge, no court has been previously presented with such an application of the class action tolling doctrine.

From one perspective, several considerations augur in favor of allowing class action tolling in this case. For one, the Supreme Court has painted with a broad brush in defining the class action tolling doctrine: [HN8] "The commencement of a class action suspends the applicable statute of limitations as to *all asserted members of the class* that would have been parties had the suit been permitted to continue as a class action." *Crown, Cork & Seal, 462 U.S. at 353* (quoting *American Pipe, 414 U.S. at 554)* [*32] (emphasis added). The Supreme Court has explained that the class action tolling rule "is a generous one ... preserving for class members a range of options pending a decision on class certification." *Crown, Cork & Seal, 462 U.S. at 354* (concurring opinion). In addition, the doctrine has been made available to eventual class members and opt-out plaintiffs alike, see *id at 352,* and no Supreme Court case has held that plaintiffs filing individual lawsuits should be necessarily precluded from having a statute tolled for their claims.

However, though class action tolling is a broad rule, and could arguably apply in a case such as this, the Court feels strongly that it should not be invoked in this case. The Individual Plaintiffs made a conscious decision early on to pursue their claims on an entirely separate, though essentially parallel, track from that of the Class case. These Plaintiffs filed their own lawsuits and disavowed class status. They also chose, in contrast to the Class Plaintiffs, not to include the Wholesalers as defendants in their original complaints. In this Court's mind, it would be inequitable to now allow the Individual Plaintiffs [*33] to reap the benefits of a doctrine which is designed for a group -- the Class and its putative members -- which they have disavowed being a part of from the beginning. In fact, class action tolling has been denied in such situations where a plaintiff "wants his cake and to eat it,

too." *Stutz v. Minnesota Mining Mfg. Co., 947 F. Supp. 399, 403 (S.D. Ind. 1996)* (further explaining that the class action tolling rule should not be applied "when a plaintiff attempts to manipulate the rule in a way that frustrates its underlying purpose"). Thus, the Court finds that the class action tolling rule should not be extended to apply to the facts of this case.

The Court holds that neither equitable nor class action tolling is appropriate in this case. Therefore, for those claims against the Wholesaler Defendants (and any others which depend on the Wholesaler Defendants being joined), the relevant damages period only dates back to October 2, 1993.

III Illinois Brick and Co-conspirator Intermediaries

The final issue on this motion, one that has proven to be a recurring point of contention in this case, deals with the effect of the Illinois Brick indirect purchaser [*34] bar on the Individual Plaintiffs' claims against the Manufacturer Defendants. The Supreme Court in Illinois Brick held that [HN9] an indirect purchaser -- a party that is at least one step removed on the distribution chain from the alleged conspirators -- cannot seek antitrust damages for illegal overcharges that are passed on to them through intermediaries in the distribution chain who purchased directly from the conspirators. *Illinois Brick Co. v. Illinois, 431 U.S. 720, 746, 52 L. Ed. 2d 707, 97 S. Ct. 2061 (1977)*. Thus, in order for the Plaintiffs to avoid an Illinois Brick bar with regards to their indirect purchaser claims against the Manufacturer Defendants, the Wholesalers must have been part of the alleged conspiracy. The big question, however, is whether the Wholesalers must be formally named as defendants, or if merely identifying the Wholesalers as co-conspirators is enough to overcome the rule of Illinois Brick.

In granting the Individual Plaintiffs leave to amend their complaints to join some of the Wholesalers as defendants, this issue has already been rendered moot in large part. However, since the Court has now held that this amendment does [*35] not relate back to the filing date of the initial complaints, those damage claims accruing before October 2, 1993 are still governed by the original pleadings. In their original complaints, the Individual Plaintiffs did *not* name the Wholesalers as defendants, but did identify them as co-conspirators in the alleged price-fixing conspiracy. In addition, those indirect purchaser claims which are predicated on purchases from non-Defendant Wholesalers are also dependent on the resolution of this issue. The issue, as we have stated, is whether identifying these intermediaries as co-conspirators is enough in light of Illinois Brick's bar on indirect purchaser claims.

This Court has answered this question before. The Court previously agreed with the Individual Plaintiffs that, in order to avoid the Illinois Brick bar, it was sufficient that the intermediaries in the distribution chain -- the Wholesalers -- be identified in the complaint as co-conspirators. See *In re Brand Name Prescription Drugs Antitrust Litigation, 867 F. Supp. 1338, 1344-45 (N.D. Ill. 1994)*. Since this prior holding, however, the Seventh Circuit has weighed in with its opinion as to the effect [*36] of Illinois Brick on the antitrust claims in this MDL proceeding. Unfortunately, the Seventh Circuit's analysis was written from the perspective of the Class case, in which the Wholesalers have been defendants from the outset, and did not directly address the question of whether the Wholesalers need be named as defendants. Nevertheless, Judge Posner's opinion did shed some new light on this issue, and thus it is necessary to reconsider our prior holdings on this point.

With regards to Illinois Brick and the indirect purchaser claims, the Court of Appeals had the following to say:

The indirect-purchaser issue (with which we begin) is separate from the issue of the wholesalers' participation in the manufacturers' alleged conspiracy. It is true that if we reversed the judge's ruling on the latter issue and so reinstated the wholesalers as defendants, and if the plaintiffs went on to obtain a judgment against the wholesalers and manufacturers, any indirect-purchaser defense would go by the board, since the pharmacies would then be direct purchasers from the conspirators. *Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478, 481 (7th Cir. 1980)*; [*37] *Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1212-13 (9th Cir. 1984)*; see also *In re Beef Industry Antitrust Litigation, 600 F.2d 1148, 1163 (5th Cir. 1979)* (requiring that the direct sellers, here the wholesalers, be joined as defendants -- but that requirement is satisfied).

*In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599, 604-05 (7th Cir. 1997)*. The Seventh Circuit decided to reinstate the Wholesalers as defendants in the Class case, though making clear that their complicity in the conspiracy was necessary in order for the Plaintiffs to recover from the Manufacturer Defendants for purchases made through the Wholesalers. With respect to the Class case, it was unnecessary for the court to decide whether the Wholesalers' involvement must be as named defendants, or merely as co-conspirators not joined to the case.

Predictably, the Individual Plaintiffs and the Defendants read the Seventh Circuit's opinion to support their polar-opposite positions in this case. Relying on the Seventh Circuit's tangential discussion of the issue, the parties now argue how they believe the court would rule if directly **[*38]** presented with the question of whether it recognizes a co-conspirator exception to Illinois Brick. The parties' respective interpretations as to how the tea leaves read are as follows.

The Manufacturer Defendants assert that the Seventh Circuit's opinion conclusively establishes that the Plaintiffs' indirect purchaser overcharge claims are barred by Illinois Brick unless two prerequisites are satisfied: (1) the direct sellers (the Wholesalers) must be joined as defendants, and (2) the Plaintiffs must obtain a judgment against the Wholesalers and Manufacturers. The Manufacturer Defendants place great reliance on the Seventh Circuit's citation with approval to the Fifth Circuit's decision in In re Beef and its requirement that co-conspirator intermediaries be joined as defendants in order to avoid an Illinois Brick bar to indirect purchaser claims. See *In re Beef, 600 F.2d at 1163*. This citation to In re Beef confirms, according to the Defendants, that the Seventh Circuit has always subscribed to the rule requiring direct purchaser intermediaries be formally joined as defendants.

The Manufacturer Defendants detect no inconsistency in the Court **[*39]** of Appeals' preceding citation to *Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478 (7th Cir. 1980)*. In Fontana, the Seventh Circuit opined that they were "not satisfied that the Illinois Brick rule directly applies in circumstances where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise resulting in intended injury to the buyer." *Id. at 481*. The

Defendants argue, however, that the Fontana court did not rely on this reason for finding the Illinois Brick bar inapplicable to the indirect purchaser claims in that case. Instead, the Defendants claim the Fontana court based its decision on the fact that the plaintiff was seeking damages as "a competitor, not a customer," and because the plaintiff's claim was not for an overcharge passed through the chain of distribution but was rather for a combination of anticompetitive acts which destroyed the plaintiff's business. See *id at 481*. In fact, other courts have subscribed to this interpretation of Fontana, refusing to read Fontana to create a co-conspirator exception to Illinois Brick's rule **[*40]** prohibiting indirect purchaser recovery. See *Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 931 n. 11 (3d Cir. 1986)*.

The Individual Plaintiffs, on the other hand, place a much different spin on the Seventh Circuit's citation to Fontana. The direct citation to Fontana, Plaintiffs explain, indicates this Circuit's continuing adherence to the rule allowing indirect purchaser claims where the intermediaries are merely identified as co-conspirators but not joined as defendants. This interpretation is bolstered by the Seventh Circuit's subsequent citation to *Arizona v. Shamrock Foods Co., 729 F.2d 1208 (9th Cir. 1984)*, which similarly held that Illinois Brick was inapplicable in a case where the plaintiffs alleged that the intermediaries were co-conspirators but did not name them as defendants. *Id. at 1212-13*. Thus, the Individual Plaintiffs read the Seventh Circuit's string of citations as affirming the co-conspirator exception created by Fontana and Shamrock Foods.

The Individual Plaintiffs interpret the Seventh Circuit's subsequent direction to "see also" In re Beef as merely identifying an **[*41]** inter-circuit conflict and to note that, with respect to the Class case, this more rigorous requirement was nevertheless satisfied. At worst, the Plaintiffs contend, it was not clear what Judge Posner meant to imply with his citation to In re Beef; in such a situation involving ambiguous dictum, a lower court should not interpret that dictum as overruling prior Circuit precedent. See, e.g., *United States v. Crawley, 837 F.2d 291, 292-93 (7th Cir. 1988)* (providing several reasons why dictum in prior cases should be given little or no weight). If Judge Posner wanted to dispel any notion that Fontana recognized a co-conspirator exception to Illinois Brick, the Plaintiffs argue, he certainly would not have done it by attaching a direction to "see also" In re Beef at the end of a string cite. Thus,

the Individual Plaintiffs contend that the Seventh Circuit's opinion changes nothing, and that this Court should stand by our prior pronouncements recognizing the inapplicability of Illinois Brick as long as the Wholesalers are identified as co-conspirators.

Before solving this riddle, the Court must first note that this analysis is relevant to two separate [*42] subsets of damage claims against the Manufacturer Defendants in this case. First, the Individual Plaintiffs seek damages for pre-October 2, 1993 purchases made through the Wholesaler Defendants. As previously explained, the recent joinder of the Wholesaler Defendants does not relate back to the original complaints, and this leaves the pre-1993 claims with the Wholesalers only implicated as co-conspirators and not named defendants. Second, the Individual Plaintiffs have also asserted indirect purchaser claims for purchases made through non-Defendant Wholesalers. These Wholesalers were originally identified as co-conspirators, but were not joined as defendants by the amended complaints. Thus, the entirety of these non-Defendant Wholesaler indirect purchaser claims also rest on the Court's resolution of the co-conspirator exception issue. Since the Court finds the considerations attendant to each of these subsets of indirect purchaser claims to be somewhat different, we will analyze them separately.

A. Pre-1993 purchases from Defendant Wholesalers

The first group of claims which are affected by this co-conspirator exception question are the Individual Plaintiffs' purchases made through [*43] the Wholesaler Defendants before October 2, 1993. These claims are unique in that the intermediary Wholesalers, though not officially defendants for the relevant time period, have since been joined to this action. It is this unique aspect of these claims which, the Court believes, conclusively dictates that Illinois Brick should not bar their recovery.

In refusing to recognize a co-conspirator exception to Illinois Brick, the In re Beef court based its decision on a consideration of the policies underlying the Illinois Brick bar on indirect purchaser claims. See *In re Beef, 600 F.2d at 1163*. Absent joinder of the intermediaries, the court feared, there could be "inconsistent adjudications on the issue of the existence of a vertical conspiracy [which would] leave[] the defendants subject to the risk of multiple liability that the Illinois Brick Court found unacceptable." Id. Since non-defendant intermediaries would not be bound by any judgment as to the

conspiracy, the In re Beef court rejected any exception to Illinois Brick where "the alleged co-conspirator middlemen are not named as parties defendant." Id.

In this case, [*44] of course, the Wholesaler Defendants have now been joined as defendants, albeit for a later time period than the claims that are at issue. As a result, the Wholesaler Defendants will be bound by and unable to relitigate the facts found by the jury in the present case. If the Wholesaler Defendants are found to have been members of a vertical conspiracy with the Manufacturers, they will be collaterally estopped from later pressing their own antitrust claims against the Manufacturers in a subsequent proceeding. Conversely, if the Wholesaler Defendants are exonerated at trial, they will not have to face any other Sherman Act claims deriving from the same conduct. Thus, because the Wholesaler Defendants are now parties to this litigation, the considerations underlying the decision in In re Beef are no longer germane to this subset of indirect purchaser claims.

Therefore, even if this Circuit were to adopt the In re Beef rule, the Court believes that this rule would not bar recovery for those pre-1993 claims which involved purchases from the Wholesaler Defendants. The sum and substance of the In re Beef rule is to require that co-conspirator middlemen be parties to the proceeding [*45] that will adjudge the existence of any conspiracy. For the pre-1993 claims, this requirement is satisfied. The Wholesaler Defendants will have a full and fair opportunity to litigate their involvement in the alleged price-fixing conspiracy, and will be bound by any judgment reached in this case. The fact that the Manufacturer Defendants may be forced to pay damages for a longer period time than the Wholesaler Defendants is, in this Court's opinion, irrelevant to the application of the In re Beef rule.

In summary, the Court believes that the joinder of the Wholesaler Defendants conclusively eliminates any of the risks or concerns which underlie the rule of In re Beef, and therefore we find this rule inapplicable for those claims which implicate intermediaries which are parties to this case. Thus, the Court holds that Illinois Brick does not bar those claims against the Manufacturer Defendants which derive from purchases made from Defendant Wholesalers prior to October 2, 1993 (but within the original limitations period).

B. All purchases from non-Defendant Wholesalers

The second subset of claims -- those involving purchases from non-Defendant Wholesalers -- presents a [*46] much tougher case. These Wholesalers have never been parties, nor has their joinder been sought, at any time during this case. Thus, the rule of In re Beef would squarely dictate that these claims are barred by Illinois Brick. It is necessary to determine, therefore, whether the Seventh Circuit now subscribes to the holding of In re Beef, or whether it continues to recognize a co-conspirator exception as seemingly set forth in Fontana.

Though the precedent lacks consistent clarity, this Court continues to read the relevant Seventh Circuit precedent to recognize a co-conspirator exception to the general rule prohibiting indirect purchaser claims. This exception allows an antitrust plaintiff to avoid the strictures of Illinois Brick by identifying an intermediary as a co-conspirator, though it does not further require that the intermediary also be formally named as a defendant. As applied to this case, this exception would permit the Individual Plaintiffs to recover damages for purchases made through any of the Wholesalers (who were all identified as co-conspirators), whether or not these Wholesalers were named as defendants. This was our holding prior to the Seventh [*47] Circuit's recent opinion in this case, and this is still our holding today.

Though Judge Posner's oblique references to this issue are not definitive either way, this Court reads the language of his opinion to recognize a co-conspirator exception to Illinois Brick. Upon dissecting the relevant passage of the Seventh Circuit's opinion, several clues suggest this interpretation. First of all, Judge Posner explained that if the Wholesalers were brought back in to the Class case, and judgment was rendered finding the Wholesalers and Manufacturers to have participated in the alleged conspiracy, "any indirect-purchaser defense would go by the board, since the pharmacies would then be direct purchasers from the *conspirators*." *In re Brand Name, 123 F.3d at 604* (emphasis added). Though this choice of words may have been inadvertent, the court's decision to use the word "conspirators" rather than "defendants" could be construed as tacitly endorsing a co-conspirator exception to Illinois Brick. Since the Wholesalers have always been identified as co-conspirators by the Individual Plaintiffs, these Plaintiffs were "direct purchasers from the conspirators" if their [*48] claims are proven out at trial.

Even more indicative of this interpretation, however, are those cases that the court chose to cite in support of this statement. As direct support for the proposition, Judge Posner cited to *Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478 (7th Cir. 1980)*, and to *Arizona v. Shamrock Foods Co., 729 F.2d 1208 (9th Cir. 1984)*. Among the several appellate decisions involving Illinois Brick and a possible co-conspirator exception, these two cases are recognized (though there is admittedly some disagreement as to the validity of this recognition) as being the leading Circuit authority in support of a co-conspirator exception to Illinois Brick. See *Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 931 fn. 11 (3d Cir. 1986)* (recognizing that Fontana and Shamrock Foods have been cited in support of a co-conspirator exception, though finding that each could be distinguished on separate grounds). The citation to Fontana, the only prior precedent on the issue from this Circuit, is to be expected. However, the court's decision to also cite Shamrock Foods, as opposed [*49] to other decisions that have squarely rejected any co-conspirator exception to Illinois Brick and have required that co-conspirator intermediaries be named as defendants, see *Link, 788 F.2d 918*; *Austin v. Blue Cross & Blue Shield of Alabama, 903 F.2d 1385, 1392 (11th Cir. 1990)*; *In re Midwest Milk Monopolization Litigation, 730 F.2d 528, 532 (8th Cir. 1984)*, is a telling indicator of the Seventh Circuit's position on this issue. The decision to cite the two cases on this far end of continuum, rather than the many others which clearly stand against this proposition, persuades this Court that our prior recognition of a co-conspirator exception is still viable.

The Seventh Circuit's final citation to In re Beef, a case which is clearly in the camp with Link and the others in rejecting such an exception, seems to be best explained as a recognition of conflicting authority. The court could have cited In re Beef as direct support for the court's statement, but instead chose to isolate this citation with a "see also" introductory signal. The isolation of In re Beef from Fontana and Shamrock Foods would seem [*50] to imply that the Seventh Circuit reads these cases to stand for something different than In re Beef. Taking this inference a step further, this grouping of the citations insinuates that the court agrees with the Individual Plaintiffs' view that Fontana and Shamrock Foods allow a plaintiff to proceed with indirect purchaser claims where the intermediary in the distribution chain is identified as a co-conspirator. In subsequently citing In re Beef, the Seventh Circuit noted that, with regard to the Class case,

the more stringent requirement of naming the intermediaries as defendants was also satisfied.

Admittedly, the Seventh Circuit's opinion does not provide much to go on with respect to resolving this issue which is unique to the Individual cases. But, based on the direction that has been given to us, this Court believes that the Seventh Circuit has endorsed, and continues to recognize, a co-conspirator exception to Illinois Brick. The effect of this ruling is to allow the indirect purchaser claims against the Manufacturer Defendants to go forward, without regard to whether a specific purchase was made from a Wholesaler who is a defendant or not. Nothing the **[*51]** Court of Appeals has said would indicate that this position is in error, and thus summary judgment for these claims is denied.

IV Summary

The Wholesaler Defendants' motion for partial summary judgment is granted-in-part, while the Manufacturer Defendants' motion is denied. The Individual Plaintiffs' damage claims will be limited as follows. The Court finds that the recent amendment joining the Wholesaler Defendants does not relate back to the date of the original complaints, and the Individual Plaintiffs cannot take advantage of any tolling rules to preserve more of their claims in this case. The result of these conclusions is that the claims against the Wholesaler Defendants will cover a period back to October 2, 1993. The Manufacturer Defendants, as a result of our recognition of a co-conspirator exception to Illinois Brick, still face damage claims dating back to four years preceding the filing of the original complaints.

**CONCLUSION**

For the foregoing reasons, the Wholesaler Defendants' motion is granted-in-part, while the Manufacturer Defendants' motion is denied.

Charles P. Kocoras

United States District Judge

Dated: August 4, 1998

TAB 4

LEXSEE 2006 U.S. DIST. LEXIS 66473

**ARNOLD IRRER, ET AL, Plaintiffs, v. MILACRON, INC., Defendant.**

**Case No. 04-72898**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2006 U.S. Dist. LEXIS 66473*

**September 18, 2006, Decided**
**September 18, 2006, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Irrer v. Milacron, Inc., 2006 U.S. Dist. LEXIS 74907 ( E.D. Mich., Oct. 16, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, 256 employees claiming to have been injured by exposure to metalworking fluids made by defendant manufacturer while working in an automobile plant, filed a product liability suit. The manufacturer filed a motion for summary judgment as to the claims asserted by two employees (employees one and two), alleging that their claims were barred by the three-year statute of limitations set forth in *Mich. Comp. Laws § 600.5805(15)*.

**OVERVIEW:** As to employee one, it was clear that by June of 1995, she knew she had a lung problem and believed that it was caused by chemicals she was exposed to at work but failed to file suit until nine years later. Thus, her claims were barred by the three-year statute of limitations. As to employee two, by 1996 he believed that the metalworking fluids he was exposed to at work were dangerous and that he had suffered pulmonary injuries as a result of exposure to chemicals in the plant where he worked. That was enough to start the statute of limitations running on his claims. In addition, employees one and two were not entitled to the benefits of tolling under *Mich. Comp. Laws § 600.5855* based on a pending class action suit because putative class members who chose to file individual actions before a decision on class certification were not entitled to the benefit of the class action tolling rule. They also were not entitled to tolling based on fraudulent concealment as the employees'

proffered evidence on the manufacturer's failure to warn could not be considered affirmative acts designed to prevent the employees from discovering their cause of action.

**OUTCOME:** The court granted the motion for summary judgment.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The central inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim*
[HN2] *Fed. R. Civ. P. 56(c)* mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of*

2006 U.S. Dist. LEXIS 66473, *

*Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN3] The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN4] In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
[HN5] A party opposing summary judgment may not rest upon its mere allegations but rather must set forth specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*. The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > General Overview*
*Torts > Products Liability > General Overview*
[HN6] Under Michigan law, a claim for personal injury from a product must be brought within three years of when the claim first accrues. *Mich. Comp. Laws § 600.5805(13)*.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > Accrual of Actions > Discovery Rule*
*Torts > Products Liability > General Overview*
[HN7] The Michigan courts apply a discovery rule to

product liability claims, thus affecting the date they accrue for statute of limitations purposes. The discovery rule measures the accrual date of latent occupational diseases in products liability cases.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > Accrual of Actions > Discovery Rule*
[HN8] The Michigan Supreme Court adopted the "possible cause of action" standard for determining when the discovery rule period begins to run. It reasoned that this standard advances a court's concern regarding preservation of a plaintiff's claim when the plaintiff is unaware of an injury or its cause, yet also protects the Legislature's concern for finality and encouraging a plaintiff to diligently pursue a cause of action. Thus, once a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action. The statute of limitations begins to run at that point, giving the plaintiff three years to investigate and file his complaint. Once a plaintiff is aware of an injury and its possible cause, the plaintiff is equipped with the necessary knowledge to preserve and diligently pursue his claim.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > Accrual of Actions > Discovery Rule*
[HN9] The discovery rule applies to the discovery of an injury, not to the discovery of a later realized consequence of the injury. Moreover, a plaintiff need not know the details of the evidence by which to establish his cause of action.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > Accrual of Actions > Discovery Rule*
[HN10] Under the discovery rule, it is not necessary for a plaintiff to know of a definitive cause of his injury; rather, it is sufficient that he is aware of a possible cause thus triggering his duty to diligently pursue that possible causal connection and file his product liability lawsuit within the three-year statute of limitations set forth in *Mich. Comp. Laws § 600.5805(15)*. Michigan courts strictly adhere to the general rule that subsequent

2006 U.S. Dist. LEXIS 66473, *

damages do not give rise to a new cause of action.

**Governments > Legislation > Statutes of Limitations > Time Limitations**
**Torts > Procedure > Statutes of Limitations > Accrual of Actions > General Overview**
[HN11] Michigan's appellate courts have rejected the argument that the statute of limitations on work-related claims does not begin to run until the plaintiff receives a definitive diagnosis.

**Civil Procedure > Class Actions > Class Members > General Overview**
**Governments > Legislation > Statutes of Limitations > Tolling**
[HN12] Putative class members who choose to file individual actions before there is a decision on class certification, are not entitled to the benefit of the class action tolling rule.

**Governments > Legislation > Statutes of Limitations > Tolling**
[HN13] See *Mich. Comp. Laws § 600.5855.*

**Governments > Legislation > Statutes of Limitations > Tolling**
[HN14] For purposes of tolling a statute of limitations, only actions after the alleged injury could have concealed plaintiff's cause of action against defendant because actions taken before the alleged injury would not have been capable of concealing causes of action that did not yet exist.

**Governments > Legislation > Statutes of Limitations > Tolling**
[HN15] For purposes of tolling a statute of limitations, fraudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent. Thus, a plaintiff must show that a defendant engaged in some arrangement or contrivance of an affirmative character designed to prevent subsequent discovery.

**Governments > Legislation > Statutes of Limitations >**

*Equitable Estoppel*
[HN16] The doctrine of equitable estoppel is a judicially created exception to the general rule that statutes of limitation run without interruption. It is essentially a doctrine of waiver that extends the applicable period for filing a lawsuit by precluding the defendant from raising the statute of limitations as a bar. Michigan courts have been reluctant to recognize an estoppel in the absence of conduct clearly designed to induce the plaintiff to refrain from bringing action within the period fixed by statute. The doctrine is generally invoked only when it can be fairly said that the defendant is responsible for deceiving the plaintiff, and inducing plaintiff to postpone action upon some reasonably well grounded belief that plaintiff's claim will be adjusted if he does not sue. For example, the usual sort of conduct which may work an estoppel in the statute of limitations context includes an offer to compromise or settle plaintiff's claim, a representation that the limitations period was of much greater duration than it actually was, or part payment of plaintiff's claim.

**COUNSEL:** For Milacron, Incorporated, Defendant: Sean S. Cleland, LEAD ATTORNEY, Martin, Bacon, (Mount Clemens), Mount Clemens, MI; Robert A. Miller, Lee D. Thames, Butler, Snow, LEAD ATTORNEYS, Jackson, MS; John G. Mitchell, LEAD ATTORNEY, Secrest, Wardle, (Farmington Hills), Farmington Hills, MI.

For Arnold Irrer, Donald Allen, Kent Barton, Arnold Davis, Felix Rubio, Melvard Newhouse, Samuel Florida, Eula Mae Newhouse, Ila Davis, Karen Florida, Ramona Rubio, Adelaide Ball, Sally A. Hanson, Plaintiffs: Roy A. Jacobson, Jr., Gerald L. Spence, LEAD ATTORNEYS, Spence Law Firm, Jackson, WY.

For Arnold Davis, Felix Rubio, Melvard Newhouse, Samuel Florida, Arnold Irrer, Donald Allen, Kent Barton, Plaintiffs: Gary L. Shockey, LEAD ATTORNEY, Spence Law Firm, Jackson, WY.

For Estate of Bruce Eldridge, Estate of Buford Alexander, Estate of Jerry Holt, Estate of John Ross, Estate of Roosevelt Mizell, Estate of Steve Klarich, Abraham Felix, Albert Dudley, Albert Hawkins, Allen Gates, Allen Jerke, Andrew Wendling, Arnold Grace, Arnold Irrer, Arnold Kipfer, Barbara McCraney, Beatrice Shumpert, Benigno Cortez, Berley Cavness, Bernard Kahn, Bertha Simmons, Bethany Gordon, Betty Jackson,

Bob Casault, Bobby Roberts, Bobby Slaughter, Calvin Stewart, Cassandra Cambell, Ceasar Littles, Cesley Barnes, Chad Oakley, Charles Cross, Charles DeCaire, Charles Hilliker, Charles Ursery, Chris Green, Chris Wagner, Clifton Arbuckle, Clifton Bey, Clovis Davis, Craig Steele, Dale Fox, Dan Price, Daniel Anderson, Daniel Chrenka, Daniel Lesko, Daniel Rosinski, Darlene Novak, Dave Henderson, David Bodnar, David Croteau, David Terrian, David Wilson, Dawn Hagemeister, Deborah Dantzler-Harris, Dennis Boykins, Dennis Harry, Dolores Matta, Don Morey, Donald Allen, Donald Fremd, Donald Hamady, Donald Valley, Douglas Beebe, Douglas Koch, Earlene Elliott, Ed McFadden, Edward McMahon, Elaine Willingham, Elizabeth Bell, Ernest Yaklin, Evelyn Dobbins, Everett Cragg, Fred McDaniel, Garwood Reimer, Gary Hicks, Gary Stillwagon, George Colter, George Harris, George Howard, Georgia Ford, Gerald Austin, Gerald Koryciak, Gerald Moore, Gerald Mosher, Glen Byers, Gordon Gragg, Gordon Harmon, Gregory Cook, Grover Hurley, Harold Miller, Harvey Taylor, Henry Heal, Hermilo Moreno, Hertis Gant, Homer Taylor, Horace Blair, Howard Loree, Howard Stuart, Hugh Smith, Ire Gillespie, J. C. McDaniel, Jack Sweeney, James Anderson, James Cook, James Goza, James Graham, James Halford, James Hill, James Martin, James Pouillon, Janene LaPratt, Jerry Ward, Jodie Nicholson, Joe Johnson, John Govitz, John Hobson, John McCallum, John McCraney, John Shannon, John Shields, Johnny Thornton, Joseph Willey, Joyel Cole, Keith Calkins, Keith Swayze, Kenneth Franklin, Kenneth Johnstone, Kenneth Randt, Kenneth Scott, Kent Barton, Larry Binkley, Larry Brown, Larry Clear, Larry Fluty, Larry Hoffman, Lawrence Tremble, Lee Roy Wells, Leo Dolehanty, Leon Bryant, Leroy Smith, Leroy Wing, Linda Cohoon, Linda Hill, Lloyd Bentley, Lloyd Moore, Louis Koryciak, Lula Lewis, Martha Edwards, Martin Gall, Mary Randle, Mary Anna Turner, Matthew Sproul, Maud Barton, Maurice O'Suna, Maxine Rivers, Melvin Austin, Merwin Geraghty, Michael Fuller, Michael Rogers, Michael Roos, Mike Prell, Milton Whiren, Mitch Garrett, Morris Branch, Morris Massey, Myrtin Calhoun, Nathanial Wyatt, Neil Huiskens, Pat Dolan, Patricia Crim, Paul Matney, Percy Morris, Phillip Harris, Phillip Kimble, Phyllis Radd, Ralph Niedecken, Randy Johnson, Ray Gatica, Regina King, Richard Cherry, Richard Corcoran, Richard Ferguson, Richard Pakosz, Richard Pidcock, Richard Shock, Robert Arnot, Robert Boza, Robert Holt, Robert Ladd, Robert Morris, Robert Muschiana, Robert Oginsky, Robert Williams, Rocky Spencer, Roger Bouchard, Ronald Dodge, Roy Guidry,

Rufus Endicott, Russell Brown, Sandra Gamble, Sandra Garrison, Sandra Hart, Sandra Henry, Sandra Stiven, Sharlene Woodward, Shirley Knox, Stanley Lessiter, Stanley Ziecina, Stephany Stephen, Steven Baroski, Steven Smith, Teddy Morris, Terry Turner, Thomas Frye, Timothy Calhoun, Timothy Jones, Timothy Wilson, Tom Sabin, Tomm McLean, Ulysses Blake, Virgie Turner, Walter Rosinski, William Balcer, William Murphy, Willie Hopkins, Willie Jones, Willie Wiggins, Willie Woodward, Yvonne Harris, Arnold Davis, Felix Rubio, Melvard Newhouse, Samuel Florida, Dave Riopelle, Enrico Guerrieri, Richard Slater, Dennis McGowan, James Walters, Judith Oginsky, Robert Neumann, Stanley Hodges, Valerie Lyles, William Wilson, Estate of George Brown, James Popular, Jerry Taylor, Taylor Hill, Ted Sweeney, Regional Garland, Valerie Green, Harriet Betts, Eula Mae Newhouse, Ila Davis, Karen Florida, Ramona Rubio, Adelaide Ball, Sally A. Hanson, Estate of Richard Slater, Estate of David Riopelle, Estate of Enrico Guerrieri, Estate of William Slater, Plaintiffs: Neal J. Wilensky, LEAD ATTORNEY, Kaechele & Wilensky (Grand Blanc), Grand Blanc, MI.

**JUDGES:** [*1] Nancy G. Edmunds, United States District Judge.

**OPINION BY:** Nancy G. Edmunds

**OPINION**

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS GREEN AND GARLAND [70]**

This product liability case comes before the Court on Defendant's motion for summary judgment as to Plaintiffs Green and Garland [1] arguing that their product liability claims against Milacron are time-barred. Defendant's motion is GRANTED. Plaintiffs' tolling and equitable estoppel arguments are rejected.

> 1  Defendant's motion addressed another Plaintiff, Harriett Betts, but her claims were dismissed with prejudice immediately before the hearing on this matter by a stipulation and order.

**I. Facts**

This Court has diversity jurisdiction over Plaintiffs'

product liability action [2] brought by 256 current or former General Motors employees claiming to have been injured by exposure to Defendant Milacron, Inc.'s metalworking fluids used in fabricating metal parts at GM's Buick plant. Plaintiffs' complaint was filed on [*2] June 21, 2004.

> 2 Although Plaintiffs assert three theories of recovery (negligence, strict liability and intentional tort), all three arise out of Defendant Milacron's alleged negligence and allege personal injury from Defendant's product.

This matter is currently before the Court on Milacron's motion for summary judgment arguing that Plaintiffs Valerie Green and Regional Garland knew or should have known of their alleged injury and possible cause of action more than three years before this suit was filed. Accordingly, Milacron argues, their claims are time-barred under the applicable statute of limitations.

## II. Standard for Summary Judgment

[HN1] Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided [*3] that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* [HN2] *Rule 56(c)* mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

[HN3] The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex, 477 U.S. at 323.* Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* [HN4] In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).* [HN5] The non-moving party may not rest upon its mere allegations, however, but rather "must set

forth specific facts showing that there is a genuine issue for [*4] trial." *Fed. R. Civ. P. 56(e)*. The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).*

## III. Analysis

### A. General Principles

[HN6] Under Michigan law, a claim for personal injury from a product must be brought within three years of when the claim first accrues. *Mich. Comp. Laws § 600.5805(13).* [HN7] The Michigan courts apply a discovery rule to product liability claims, thus affecting the date they accrue for statute of limitations purposes. *See Moll v. Abbott Lab., 444 Mich. 1, 506 N.W.2d 816, 823 (Mich. 1993); Mascarenas v. Union Carbide Corp., 196 Mich. App. 240, 492 N.W.2d 512, 514 (Mich. Ct. App. 1992)* (observing that "[t]he 'discovery rule' measures the accrual date of latent occupational diseases in products liability cases"); *Stinnett v. Tool Chem. Co., 161 Mich. App. 467, 411 N.W.2d 740, 743 (Mich. Ct. App. 1987).* [*5]

[HN8] The Michigan Supreme Court adopted "the 'possible cause of action' standard for determining when the discovery rule period begins to run in *Moll*." *Solowy v. Oakwood Hosp. Corp., 454 Mich. 214, 561 N.W.2d 843, 846 (Mich. 1997).* It reasoned that "[t]his standard advances the Court's concern regarding preservation of a plaintiff's claim when the plaintiff is unaware of an injury or its cause, yet . . . also protects the Legislature's concern for finality and encouraging a plaintiff to diligently pursue a cause of action." *Moll, 506 N.W.2d at 827.* Thus, "[o]nce a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action." *Id. at 828.* The statute of limitations begins to run at that point, giving the plaintiff three years to investigate and file his complaint. "Once a plaintiff is aware of an injury and its possible cause, the plaintiff is equipped with the necessary knowledge to preserve and diligently pursue his claim." *Solowy, 561 N.W.2d at 847.*

Additional general principles apply to Michigan's discovery rule. [HN9] It "applies to the discovery of an injury, not to the discovery [*6] of a later realized consequence of the injury." *Moll, 506 N.W.2d at 825.* Moreover, a plaintiff need not know "the details of the

evidence by which to establish his cause of action." *Id. at 828* (internal quotations and citation omitted).

**B. Application to Undisputed Facts as to Plaintiff Green's and Garland's Causes of Action Against Defendant Milacron, Inc.**

Defendant Milacron argues that the undisputed facts presented here show that Plaintiffs Green and Garland each knew or should have known of their injury and its possible cause for more than three years before this lawsuit was filed because: (1) each had a documented lung-related condition no later than 1995 and 1996, respectively; and (2) each believed that exposure to metalworking fluids or mists was a possible cause of that condition more than three years before filing this suit.

**1. Valerie Green**

Valerie Green claims that she was exposed to metalworking fluids from 1985 through 1995. (Def.'s Ex. B, Green Fact Sheet at 2.) She last worked at GM's Buick Plant on February 10, 1995. (Green Dep. at 78.) On that last day of work, Ms. Green had pneumonia. (Green Dep. at 43.) She was told by her physician, **[*7]** Dr. Filos, that her pneumonia was triggered by the air in the GM plant where she worked. (Green Dep. at 44.) In 1995, she understood that, based on comments from Dr. Filos, that something at work was causing her breathing problems and that it could have been triggered by some unknown chemicals in the work environment. (Green Dep. at 45-46.) [3]

> 3  She was diagnosed with "probable hyperactive airways disease" by Dr. Filos on May 11, 1995. (Def.'s Ex. K.)

On February 10, 1995, Ms. Green submitted an application for disability benefits. (Def.'s Ex. D.) In that application, she identified one of her disabling conditions as asthma, a condition she believed was a work-related condition. (Green Dep. at 107.) Her physician, Dr. Musson, submitted a Statement of Disability on April 14, 1995, declaring that Ms. Green was totally disabled and listing shortness of breath, asthmatic type, pneumonia, and obstructive air diseases, among other things, as her present condition. (Def.'s Ex. E.)

Ms. Green subsequently applied for **[*8]** workers' compensation benefits. In her June 15, 1995 application, she stated that her employment had caused and

significantly aggravated her breathing condition. (Def.'s Ex. F.) She also testified that, as of that date, that was her opinion. (Green Dep. at 105.) She further testified that, on June 19, 1995, another of her physicians, Dr. Musson, had told her that whatever was in the environment at her work was not good for her lungs. (Green Dep. at 108.) On that date, Dr. Musson put Ms. Green on work restrictions that included avoiding smoke, vapors, or fumes because of her lung disease. (Def.'s Ex. H, 6/19/95 work restriction note.)

In light of the above, Defendant argues that, no later than June 1995, Ms. Green knew that (1) she was injured, and (2) a possible cause was the vapors or fumes in her work environment. Thus, as of June 19, 1995, Ms. Green had discovered sufficient information about her injury and a possible cause to trigger the three-year statute of limitations on her product liability claims. This Court agrees with Defendant.

By June 1995, Plaintiff Green knew that: (1) she had lung problems, (2) she was exposed to chemical fumes and mists at the GM plant where she **[*9]** worked (Green Dep. at 49), and (3) her physician had told her exposure to "different elements in the air" at the GM Plant where she worked was causing her breathing problems. (Green Dep. at 44-46.) Thus, similar to the plaintiff in *Stinnett*, she knew she had a lung problem and believed that "the problem was caused by chemicals she had been exposed to at work" and yet failed to bring this action until nine years later, on June 21, 2004. *Stinnett, 411 N.W.2d at 743*. *Accord*, *Mascarenas, 492 N.W.2d at 515* (affirming the trial court's decision that the plaintiff's product liability claim was time-barred because "[p]laintiff himself had associated his neurological symptoms with exposure to toxic fumes as early as 1982 or 1983. . . . [and thus] knew no later than 1983 that he was suffering damages associated with defendants' products.")

**2. Regional Garland**

Mr. Garland has a long work history at General Motors, most of it marked by respiratory and sinus problems that he attributes to products used at the plant. These begin in 1966-67 when Mr. Garland was diagnosed with sinusitis and severe chronic sinus headaches and was advised by physicians **[*10]** to avoid contact at work with paint, primer or thinner spray and other paint fumes. (Garland Dep. at 136-40.) He also suffered a pneumothorax (collapsed lung) in 1975. Its cause was not diagnosed, but Mr. Garland told another doctor in March

of 1986 that he believed it might have been caused by his workplace exposure to methylene chloride because that product's label stated that it "causes lung damage and can cause death." (Garland Dep. at 65-66, 115-18; Def.'s Ex. Q, 3/18/96 medical record of Dr. Rotblatt.)

Mr. Garland claims here that he was exposed to metalworking fluids beginning in 1984 or 1985 and ending on August 13, 1997, and that this exposure caused chronic sinusitis, reoccurring pneumonia, and in part a collapsed lung. (Def.'s Ex. O, Factual Information Sheet at 4; Garland Dep. at 75-76, 104-112.) Mr. Garland testified that, while working at the GM Plant, he saw "Milacron" on product barrels and saw Milacron representatives wearing Milacron hats. (Garland Dep. at 94-102.)

Mr. Garland also testified that he was exposed to a product called "Chemkleen 338," which he believes to be a Milacron product. There was a specific incident, in either 1984 or 1985, where his exposure [*11] to that product took his breath away and left him with a lingering cough. (Garland Dep. at 104-112.) Mr. Garland claims that he was washing cars with other workers and then this chemical product "came in on us, and everybody just lost their breath. And I wanted to know what it was . . . ." (Garland Dep. at 108.) Mr. Garland was very upset and let others at the Plant know about it. He eventually got the label off a barrel of Chemkleen 338 because he believed that was the product being used when "we almost -- all of us guys in there, we almost suffocated. They put too much of it into the system that they were washing the cars and stuff with." (Garland Dep. at 107-108.)

In July 1986, Mr. Garland was given a work restriction related to his lungs, calling for no exposure to fumes, vapors, or smoke. [4] (Garland Dep. at 152-54; Def.'s Ex. R, 7/2/86 entry Buick Medical Treatment Record.)

> 4 In fact, Mr. Garland testified that virtually the entire time he worked at GM, he was under work restrictions precluding exposure to fumes, vapors and mists. (Garland Dep. at 159.)

[*12] In March 1987, Mr. Garland had a chest x-ray in response to complaints of chest pain and in light of his history of pneumothorax. The report indicates that his lungs were "negative for active disease" but "emphysematous configuration of the chest noted.

Blunting along both lateral costo phrenic sulci most likely related to old pleural fibrosis." (Def.'s Ex. S, 3/30/87 report from B-O-C Flint Medical Department.)

About a decade later, Mr. Garland applied for worker's compensation benefits, listing three injury dates in 1996: February 1, March 13, and October 25, 1996, and claiming that he "has suffered disabling pulmonary injuries as a result of exposure to various chemicals, dusts, fumes and other pollutants in the plant." (Def.'s Ex. T, Bureau of Workers' Disability Compensation, Application for Mediation or Hearing - Form A.) [5]

> 5 Mr. Garland also claimed a March 1993 wrist injury and a 1996 hernia injury. (Def.'s Ex. T.)

Mr. Garland testified that, throughout 1994, 1995, and 1996, he had heard coworkers [*13] talk about lawsuits similar to this action, and it was his belief that the metalworking fluids he was exposed to were "dangerous stuff." (Garland Dep. at 30-35.)

> Q: Have you ever been made aware of other lawsuits involving metal working fluid exposure?
>
> A: I've heard different guys in the shop talk about stuff like that.
>
> Q: What did you hear?
>
> A: That this is some dangerous stuff we're working here. And it was like what are we working here. And it was, I don't know, I just go to work.

(Garland Dep. at 30.)

> Q: Well, tell me when you first started to have these conversations with these people.
>
> A: I'd say '94, '95, '96, all the way through there. Because, see, I left out of the shop in '97.
>
> Q: So sometime between '94 and '97 you would have had these conversations?
>
> A: Yes.

(Garland Dep. at 35.)

Mr. Garland last worked at the GM Plant on August 13, 1997, when he went out on compensable sick leave. (Garland Dep. at 47-48, 158.)

Defendant argues that, based on Mr. Garland's own testimony and the dates he claimed he was disabled from lung-related injuries as a result of exposure to chemicals at the GM Plant, Mr. Garland knew or [*14] should have known, by October 25, 1996 at the latest, that (1) he was injured, and (2) a possible cause was his exposure to metalworking fluids in his work environment. Thus, as of October 25, 1996, Mr. Garland had discovered sufficient information about his injury and a possible cause to trigger the three-year statute of limitations on his product liability claims. This Court agrees with Defendant.

Despite Plaintiffs' claims to the contrary, [HN10] it is not necessary for Plaintiff to "know of a definitive cause" of his injury; rather, it is "sufficient" that he is "aware of a possible cause" thus triggering his duty to diligently pursue that possible causal connection and file his product liability lawsuit within the three-year statute of limitations. *CIBOROWSKI v. PELLA WINDOW & DOOR CO., 2005 Mich. App. LEXIS 3208, No. 257091, 2005 WL 3478159 (Mich. Ct. App. Dec. 20, 2005).* Michigan courts strictly adhere "to the general rule that subsequent damages do not give rise to a new cause of action." *Moll, 506 N.W.2d at 825* (internal quote and citation omitted).

[HN11] Michigan's appellate courts have likewise rejected the argument that the statute of limitations on such claims does not begin [*15] to run until the plaintiff receives a definitive diagnosis. *Kullman v. Owens-Corning Fiberglas Corp., 943 F.2d 613, 616 (6th Cir. 1991)* (citing *Stinnett, 411 N.W.2d at 742-43).* For example, in *Stinnett,* the trial court denied the defendants' motion for summary judgment on statute of limitation grounds. It held that, for an action to accrue, the plaintiff "has to be informed by a physician that there is a diagnosis of a work-related injury and not something speculative." *Stinnett, 411 N.W.2d at 472.* The Michigan Court of Appeals reversed. It reasoned that, "given plaintiff's own unequivocal deposition testimony, plaintiff knew that he had a lung problem and he believed that the problem was caused by the chemicals he had been exposed to at work." *Id. at 473* (citing cases). This was enough to trigger the statute of limitations. *Id.*

The same reasoning and result apply here. Mr. Garland knew of his respiratory problems and, like the plaintiff in *Stinnett,* believed, since at least 1984 or 1985, that these problems were caused by the chemicals in the air that he had been exposed to at work. Moreover, by 1996 [*16] he believed that the metalworking fluids he was exposed to at work were "dangerous stuff" and he had suffered pulmonary injuries as a result of exposure to chemicals in the GM plant where he worked. This was enough to start the statute of limitations running on his claims. That statute gave him three years to investigate and pursue his product liability claims and to file his lawsuit. He failed to do so, and thus those claims are time-barred.

Accordingly, unless other tolling rules apply, these Plaintiffs' product liability claims against Defendant are time-barred. The Court now addresses Plaintiffs' tolling arguments.

### 4. Plaintiffs' Tolling and Equitable Estoppel Arguments

Plaintiffs argue that tolling is required because (1) class certification issues were pending in a separate Michigan state court action filed in November 1999; (2) Defendant actively and fraudulently concealed the existence of these Plaintiffs' product liability claims and thus the three-year statute of limitations period is tolled for an additional two years under *Mich. Comp. Laws § 600.5855*; and (3) Defendant Milacron allegedly made false representations to General Motors [*17] about the safety of its products and thus the doctrine of equitable estoppel should be invoked to preclude Milacron from arguing the statute of limitations bars Plaintiffs' lawsuit. The Court considers and rejects each of these arguments.

### a. Pending Michigan State Court Action With Class Allegations

Plaintiffs first argue, without supporting authority, that the statute of limitations on their product liability claims were tolled while class certification issues were pending in a separate Michigan state action, *Gibson v. General Motors Corporation, et. al.,* Genesee County Circuit Court, Case No. 99-66596-NO. Plaintiffs are mistaken.

The three-year statute of limitations period for these Plaintiffs' product liability claims expired before the November 5, 1999 filing date of the putative class action *Gibson* lawsuit in state court: Ms. Green's expired, at the latest, on June 19, 1998, and Mr. Garland's expired, at the

latest, on October 25, 1999. Moreover, Plaintiffs' tolling argument ignores the fact that, while the *Gibson* action was pending, they filed a separate action against Defendant Milacron. *Irrer, et al. v. Milacron, Inc. ("Irrer I")*, Genesee County **[*18]** Circuit Court, Case No. 02-75196-NO, was filed in state court on December 10, 2002. *Irrer I* was subsequently removed to this Court and voluntarily dismissed without prejudice on June 6, 2003. (*Irrer, et. al. v. Milacron, Inc.*, United States District Court, Eastern District of Michigan, Case No. 02-75092, Docket Nos. 15-16.) Thus, for about six months, these Plaintiffs had their own separate product liability action pending against Defendant Milacron despite the fact that the *Gibson* action was still pending in state court and that court had not yet denied the *Gibson* plaintiffs' motion for class certification. Moreover, this action (*Irrer II*) was not filed until June 21, 2004, even though the motion for class certification was denied on April 23, 2004. Defendant argued at the hearing on this matter that, at the very least, the statute of limitations on Plaintiffs' claims ran during the six months that the separate *Irrer I* lawsuit was pending and for the two months between the *Gibson* court's denial of the plaintiffs' motion for class certification and the filing of the *Irrer II* lawsuit. Defendant's argument is persuasive.

[HN12] Putative class members like Plaintiffs, **[*19]** who choose to file individual actions before there is a decision on class certification, are not entitled to the benefit of the class action tolling rule. *Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 632-33 (S.D. N.Y. 2004)* (citing decisions reaching the same conclusion). To allow tolling under these circumstances "'would create the very inefficiency'" that the rule announced in *American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974)*, was created to prevent. *Id. at 633* (quoting *In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 450-51 (S.D. N.Y. 2003)*). Accordingly, even if the three-year statute of limitations period on Ms. Green's and Mr. Garland's product liability claims had not expired, they would not be entitled to the benefit of the class action tolling rule for the time periods discussed above.

### b. Fraudulent Concealment

Plaintiffs next argue that under *Mich. Comp. Laws § 600.5855*, [6] the three-year statute of limitations on their product liability claims is tolled because Defendant Milacron fraudulently concealed the existence of their

**[*20]** cause of action against it. In support, Plaintiffs proffer:

(1) an affidavit from John Truchan, health and safety representative for UAW Local 599 in early 1987, averring that during that time period Milacron representatives told the committee members that its metal working fluids were "safe enough to drink" and did not "mention that breathing the mist from metal working fluids could cause any type of breathing problems" (Pls.' Ex. 1, 1/17/05 Aff.);

(2) on May 31, 1996, an industry group known as the Independent Lubricant Manufacturers Association ("ILMA") published comments regarding the National Institute for Occupational Safety and Health's ("NIOSHA") February 23, 1996 draft "Criteria for a Recommended Standard: Occupational Exposures to Metalworking Fluids" expressing its opinion that "NIOSHA has not adequately supported its Recommended Exposure Limit ("REL") for occupational exposures to metal removal fluids -- either on a technical or a legal basis" (Pls.' Ex. 2 at 4);

(3) deposition testimony showing that Milacron employee, John Steigerwald, was an officer of ILMA and supported that industry group's positions (Pls.' Resp. at 5);

(4) Milacron's Toxicity **[*21]** Advisory Committee minutes from an October 23, 1980 meeting stating the "belief that the area of inhalation toxicology and its far-reaching potentially long-term effects is probably the major area in metalworking fluid occupational health to be concerned about" (Pls.' Ex. 7);

(5) an October 17, 1998 internal memo detailing a number of workers "reportedly out on sick leave due to coolant related illness ranging from breathing problems to loss of speech", observing that "all related records from

May 98 to date" have been summoned", that "[t]he V8 scare has taken over V6", and there is a "need to take actions to keep it from getting out of hand" (Pls.' Ex. 8);

(6) a November 14, 2000 letter from Milacron to an Environmental Engineer at GM's V6 Flint - Plant # 36 enclosing confidential documents concerning the OSHA MSDS for certain Milacron metalworking fluid concentrate (Pls.' Ex. 9);

(7) deposition testimony from Ann Ball, a Milacron technical services representative, that she went out to GM's V6 Plant in response to its concerns about dermatitis and respiratory issues (Ball Dep. at 35-36);

(8) Ball's November 2, 1998 Trip Report revealing that "Many V6 employees [*22] have developed a lack of trust surrounding the use of metal removal fluids (MRF's) in the workplace" because "[i]nformation surrounding concerns in the V8 plant have filtered into the V6 plant" and observing that "V6 employees are in need of awareness training so that they have a better understanding of MRF's and their safe use" and further observing, among other things, that "Caution signs found hanging out of reach in various areas through the plant . . . need updating" (Pls.' Ex. 11);

(9) a December 8, 1999 internal Milacron memo discussing a December 2, 1999 request from the GMPTG Flint Components facility "for Milacron to bring in an expert to discuss the possible health affects [sic] of metal working fluids", observing that "in a recent e-mail response from Greg Foltz, Milacron has been advised not to discuss any health and safety issues concerning our products at any GM facility", objecting that the advice is unwise and contrary to prior practice and suggesting that Milacron "conduct the meeting with guidelines" that Milacron not reference the pending lawsuit (presumably

the November 1999 Michigan state action) and "will only provide information on the health and safety [*23] of metal working fluids that is publicly available" (Pls.' Ex. 12);

(10) deposition testimony from a GM worker, Robert Holt, who worked at Buick, in Plant 10, that at a 2000 meeting plant employees were told that dermatitis complaints were caused by overwashing and not Milacron's coolants and that he was led to believe these Milacron products were perfectly safe (Holt Dep. at 20);

(11) an undated section from an internal Milacron handbook entitled "Questions and Answers: Health & Safety of Metalworking Fluids" with a "Tech Response" for eye, nose, throat and/or bronchial irritation recommending that (in addition to evaluating operating conditions, ventilation, checking out concentration, filling out required forms, eliminating other causes, notifying Regulatory Affairs for a letter, citing OSHA General Duty Clause, not promising to solve the problem, and issuing closure letter) that tech "Listen to complaint -- deny ownership of the problem -- ventilation or shielding are solutions" (Pls.' Ex. 20); and

(12) deposition testimony from another GM employee, Deborah Dantzler-Harris, that she had a conversation in April of 1998 with an unnamed chemical management person about [*24] the safety of chemicals used in her department and was told that "system 7 was safe" and she did not ask him to elaborate (Dantzler-Harris Dep. at 228-230).

The evidence Plaintiffs proffer does not support application of the tolling statute.

6    Michigan's tolling statute for fraudulent concealment provides that:

[HN13] If a person who is or

may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

*Mich. Comp. Laws § 600.5855.*

First, Michigan courts make the common sense observation that [HN14] "only actions after the alleged injury [*25] could have concealed plaintiff's cause of action against defendant because actions taken before the alleged injury would not have been capable of concealing causes of action that did not yet exist." *Doe v. Roman Catholic Archbishop of the Archdiocese of Detroit, 264 Mich. App. 632, 692 N.W.2d 398, 404 (Mich. Ct. App. 2004)* (emphasis added). Because Ms. Green and Mr. Garland allege that they suffered work-related lung injuries in 1995 and 1996 respectively, the Court does not consider items 1 and 4 listed above.

Second, Michigan courts have further observed that [HN15] "[f]raudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent." *Id. at 405* (internal quotes and citations omitted). "Thus, the plaintiff must show that the defendant engaged in some arrangement or contrivance of an affirmative character designed to prevent subsequent discovery." *Id.* (internal quotes and citation omitted).

Even when viewed in a light most favorable to Plaintiffs, items 2, 3, 5-12 and Plaintiffs' [*26] proffered evidence on its failure to warn claims cannot be considered affirmative acts by Milacron designed to prevent these Plaintiffs from discovering the cause of action they allege here. Similar to the plaintiff in *Doe v.*

*Roman Catholic Archbishop of the Archdiocese of Detroit*, Plaintiffs here fail to distinguish between "plaintiff's knowledge of the evidence that could prove [his or her] claims and plaintiff's knowledge of the possible causes of action against defendant." *692 N.W.2d at 407.*

Finally, much of the evidence Plaintiffs proffer refutes the argument that they could not, with reasonable diligence, have known that they had a possible cause of action thus requiring them to investigate and file their action within three years of that date. For example, items 5, 7, and 8 acknowledge that by 1998 GM employees from both the V8 and V6 plants had health concerns about working around Milacron's metalworking fluids. In fact, a lawsuit had been filed in Michigan state court in March 1996 by a group of plaintiff employees at GM's V8 engine plant against General Motors and Cincinnati Milacron alleging respiratory injuries from exposure to metalworking fluids. [*27] *Brock v. General Motors, et. al.*, Genesee County Circuit Court, Case No. 96-46048-NO. (Def.'s Ex. V.) Moreover, as Defendant points out, Plaintiffs' complaint alleges that "metal working fluids have been the focus of extensive scientific studies over the past fifteen to twenty years." (Compl. P 6.) Defendant also submits evidence that Plaintiffs' union informed its members of the possible health risks associated with working around metalworking fluids since 1984. (Def.'s Ex. U at M9, M10, M15.) Thus, despite Plaintiffs' arguments to the contrary, this Court concludes that Plaintiffs are not entitled to the benefit of Michigan's two-year tolling statute for fraudulent concealment.

### c. Equitable Estoppel

Plaintiffs' final argument is that Defendant Milacron should be estopped from raising the three-year statute of limitations as a bar to this action because it allegedly made false misrepresentations to its customer, General Motors, about the safety of its metalworking products. (Pls.' Resp. at 11-12.) This Court rejects Plaintiffs' argument that the facts presented here warrant application of the doctrine of equitable estoppel to preclude Defendant from raising the statute [*28] of limitations as a bar to Plaintiffs' action.

[HN16] "[T]he doctrine of equitable estoppel" is a "judicially created exception to the general rule that statutes of limitation run without interruption. It is essentially a doctrine of waiver that extends the

applicable period for filing a lawsuit by precluding the defendant from raising the statute of limitations as a bar." *Cincinnati Ins. Co. v. Citizens Ins. Co., 454 Mich. 263, 562 N.W.2d 648, 651 (Mich. 1997)* (citing *Lothian v. Detroit, 414 Mich. 160, 324 N.W.2d 9 (Mich. 1982)).* Michigan courts have been "reluctant to recognize an estoppel in the absence of conduct clearly designed to induce the plaintiff to refrain from bringing action within the period fixed by statute." *Lothian, 324 N.W.2d at 18* (internal quotation and citation omitted). The doctrine is generally invoked only when "it can be fairly said that [the defendant] is responsible for deceiving the plaintiff, and inducing [plaintiff] to postpone action upon some reasonably well grounded belief that [plaintiff's] claim will be adjusted if he does not sue." *Id.* (internal quotation and citation omitted). For example, **[*29]** "the usual sort of conduct which may work an estoppel in the statute of limitations context" includes "an offer to compromise or settle plaintiff's claim, a representation that the limitations period was of much greater duration than it actually was, or part payment of plaintiff's claim." *Id.* There is no evidence of this sort of conduct here.

**IV. Conclusion**

For the above-stated reasons, Defendant's motion for summary judgment as to Plaintiffs Green and Garland is GRANTED.

s/ Nancy G. Edmunds

United States District Judge

Dated: September 18, 2006

TAB 5

LEXSEE 2005 U.S. DIST. LEXIS 32796

**ALICE KOZLOWSKI and RENEE WALKER, individually and on behalf of a class, Plaintiffs, v. MICHAEL SHEAHAN, Sheriff of Cook County in his official capacity, and COOK COUNTY Defendants.**

**Civil Action No.: 05 C 5593**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 32796*

**December 12, 2005, Decided
December 12, 2005, Filed**

**PRIOR HISTORY:** *Hart v. Sheahan, 396 F.3d 887, 2005 U.S. App. LEXIS 1549 (7th Cir. Ill., 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, two former pretrial detainees at a county jail, brought a putative class action against defendants, the county and its sheriff in his official capacity, pursuant to *42 U.S.C.S. § 1983.* Defendants jointly moved to dismiss on the ground that the case was time-barred and the detainees failed to state a claim.

**OVERVIEW:** The detainees' *§ 1983* claim was subject to Illinois' two-year limitations period for personal injury actions. Defendants argued that the limitations period had run as the detainees filed their action more than three years after suffering the alleged injuries. In response, the detainees argued the limitations period was tolled by the timely commencement of another putative class action filed by pretrial detainees. The detainees acknowledged that they were putative class members in the other case and that the judge in that case had not ruled on class certification. By filing the present case, they attempted to revive the protracted detention claim dismissed in the other case. The court held that the weight of authorities militated against applying the tolling doctrine to the present case because class certification in the other case was pending. The court rejected the detainees' alternative argument that the judge's dismissal of the other case's protracted detention claim constituted denial of class certification. Because the two-year limitations period had

expired and the detainees were not entitled to tolling, the instant case had to be dismissed.

**OUTCOME:** The court granted defendants' motion to dismiss.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN1] A motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* challenges the sufficiency of the complaint, and dismissal of an action under the rule is warranted only if no relief could be granted under any set of facts that could be proved consistent with the allegations. In ruling on a motion to dismiss, the court must accept the well-pleaded allegations as true and draw all reasonable inferences in favor of the nonmoving party. To survive a motion to dismiss, a complaint need not plead particular legal theories or particular facts. All that is required is a short and plain statement that will give the defendant fair notice of the nature and basis of the claim, but a complaint must be dismissed if it reveals that the plaintiff's claim is barred by a statute of limitations.

*Civil Rights Law > Section 1983 Actions > General Overview*

2005 U.S. Dist. LEXIS 32796, *

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN2] Plaintiffs' *42 U.S.C.S. § 1983* claim brought in a federal district court in Illinois is subject to Illinois' two-year limitations period for personal injury actions.

*Civil Procedure > Class Actions*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN3] The tolling doctrine provides that if a class action is timely filed, the limitations period stops running for all putative class members. This doctrine serves to avoid multiplication of intervention motions by putative class members before class certification is decided. The doctrine protects the principal purposes of the class action procedure, promotion of efficiency and economy of litigation. To achieve this purpose, the doctrine should not be applied to a putative class member who multiplies proceedings by filing a new action while class certification is pending.

*Civil Procedure > Class Actions*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN4] Putative class members forfeit the benefit of the tolling doctrine if they file individual actions during the pendency of class certification.

**COUNSEL:** **[*1]** For Alice Kozlowski, Renee Walker, Plaintiffs: Thomas Gerard Morrissey, Thomas G. Morrissey, Chicago, IL; Robert Hugh Farley, Jr., Robert H. Farley, Jr., Ltd., Naperville, IL.

For Michael Sheahan Sheriff of Cook County in his official capacity, Defendant: Steven M. Puiszis, Frank Joseph Marsico, James Constantine Vlahakis, Hinshaw & Culbertson, Chicago, IL.

For Cook County, Defendant: Patrick T. Driscoll, Jr., Cook County State's Attorney, Chicago, IL.

**JUDGES:** Suzanne B. Conlon, Judge.

**OPINION BY:** Suzanne B. Conlon

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Alice Kozlowski and Renee Walker, two former pretrial detainees at the Cook County Department of Corrections ("the county jail"), brings a putative class action against Cook County and its sheriff, Michael Sheahan, in his official capacity, pursuant to *42 U.S.C. § 1983*. Defendants jointly move to dismiss. For the reasons set forth below, the motion is granted.

**BACKGROUND**

The following facts are derived from the amended complaint. This case arises from the pretrial detention of Kozlowski and Walker in Division III of the county jail. They were held for several months in 2002; Kozlowski was released **[*2]** on July 24, 2002, and Walker, on September 19, 2002. Am. Compl. at P 3. They were assigned to Division III because it was designated to house inmates who needed medical treatment; Kozlowski received treatment for drug addiction, and Walker, for asthma. *Id.* at P 7.

Division III, which occupied three floors, was divided into six tiers. *Id.* at P 8. An interlocking area separated each floor into two tiers. *Id.* This area served as the only passageway to the tiers and a monitoring station for guards. *Id.* Inside each tier were cells, a common holding area, and shower stalls. *Id.* at P 9. Each cell housed two inmates. *Id.* at P 10. Secured by a steel door with a small opening, each cell had two bunk beds, a toilet, and a sink. *Id.* The common holding area, known as "the day room," had pay phones and a television. *Id.* at P 9. If allowed in the day room, inmates could socialize with each other, use the pay phones, and shower. *Id.* From the monitoring station, guards could observe the day room, but not the cells. *Id.* at PP 9-10. The monitoring station was supposed to be staffed by guards. *Id.* at P 8. As a result, it was impossible for inmates to pass weapons **[*3]** or contraband from one tier to another. *Id.*

The lockdowns, which usually lasted from Friday afternoon to Sunday afternoon, were conducted to seize weapons and contraband from inmates. *Id.* at P 11. Between March 11, 2001 and March 11, 2003 ("the class period"), lockdowns took place at least once a month. *Id.* at PP 2(c), 11. During each lockdown, teams of guards searched the tiers for weapons and contraband. *Id.* at P 11. The searches of each tier took less than 40 minutes. *Id.* Because inmates could not pass weapons or

contraband between the tiers without going through the monitoring stations, inmates would not burden the search effort by using the day room and shower stalls after their tiers were searched. *Id.* at P 8. But inmates were confined in their cells during the entire lockdown. *Id.* at P 11. As a result, they could not exercise, shower, use the pay phones, or watch television. *Id.* at P 12.

While they do not allege denial of food, medical care, or protection during the lockdowns, Kozlowski and Walker claim the lockdowns violated the *Fourteenth Amendment* by subjecting them to protracted detention in their cells. They seek to represent all female **[*4]** pretrial detainees held in Divisions III and IV during the class period. Defendants move to dismiss on two grounds: (1) this case is time-barred; and (2) plaintiffs fail to state a claim.

**DISCUSSION**

**I. Motion to Dismiss Standard**

[HN1] "A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, and dismissal of an action under the rule is warranted only if no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Cler v. Ill. Educ. Ass'n, 423 F.3d 726, 729 (7th Cir. 2005)* (quoting *DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000))*. In ruling on a motion to dismiss, the court must accept the well-pleaded allegations as true and draw all reasonable inferences in favor of the nonmoving party. *Cler, 423 F.3d at 729.* To survive a motion to dismiss, a complaint "need not plead particular legal theories or particular facts." *DeWalt, 224 F.3d at 612.* All that is required is "a short and plain statement . . . that will give the defendant fair notice" of the nature and basis of the claim. *Id.* But a complaint must be dismissed if it "reveals **[*5]** that the plaintiff's claim is barred by a statute of limitations." *Tregenza v. Great Am. Commc'ns Co., 12 F.3d 717, 719 (7th Cir. 1993).*

**II. Statute of Limitations**

[HN2] Plaintiffs' *§ 1983* claim is subject to Illinois' two-year limitations period for personal injury actions. *Mitchell v. Donchin, 286 F.3d 447, 450 (7th Cir. 2002).* Defendants argue the limitations period has run: Plaintiffs were released before September 19, 2002, but did not file this case until September 28, 2005 -- more than three years after suffering the alleged injuries. In response,

plaintiffs argue the limitations period is tolled by the timely commencement of *Genise v. Sheahan, 2003 U.S. Dist. LEXIS 22867, 03 C 1768 (N.D. Ill. 2003)*, another putative class action filed by pretrial detainees.

**A.** *Hart v. Sheahan*

Genise Hart and five other pretrial detainees filed a putative class action against Sheriff Sheahan and Cook County on March 11, 2003. Defs. Exs. C (docket printout), F (second amended complaint). Hart claimed protracted detention identical to Kozlowski and Walker's allegations: "During the weekend lock down, the detainee is neither released from her cell nor permitted to shower, exercise **[*6]** or have access to a phone to communicate with their [*sic*] lawyer or family." Defs. Ex. F at P 20. In addition, Hart alleged that because they were confined in their cells during the lockdowns, inmates could not communicate with guards if they needed protection against cellmates or medical attention. *See, e.g., id.* at PP 19, 39-41, 52(D)-(E).

Judge Zagel initially dismissed Hart's second amended complaint. *Hart,* Dkt. No. 35 (Dec. 18, 2003). On appeal, the Seventh Circuit held that Hart sufficiently stated a claim based on the alleged lack of access to medical attention and guard protection:

> The heart of the plaintiffs' claim, with enough merit to withstand a motion to dismiss, is that the jail is subjecting them *to a risk of serious harm by an unreasonably protracted detention of them out of sight and hearing of guards.*

*Hart v. Sheahan, 396 F.3d 887, 894 (7th Cir. 2005)* (emphasis added). The Seventh Circuit instructed that on remand, Judge Zagel should "prune the overlong complaint of untenable charges." *Id.* One of the untenable charges was Hart's claim based on protracted detention alone. Had the Seventh Circuit intended to allow **[*7]** the protracted detention claim to go forward, its holding would not have included the restricting language about the inmates' being "out of sight and hearing of guards." *Id.* Accordingly, Judge Zagel dismissed the protracted detention claim on remand. *Hart,* Dkt. No. 100, at *1 (Oct. 25, 2005) (striking two allegations from Hart's fourth amended complaint (Defs. Ex. B at PP 9(d)(iv)-(v)) "because they seem relevant only to a theory that an unreasonably prolonged detention (even without

risk of serious harm) is unconstitutional").

Kozlowski and Walker acknowledge they are putative class members in *Hart* and that Judge Zagel has not ruled on class certification. Pls. Mem. at 8. By filing the present case, they attempt to revive the protracted detention claim dismissed in *Hart. See id.* Whether *Hart* provides a basis for tolling the limitations period depends on whether the tolling doctrine applies to their claims.

## B. Applicability of the Tolling Doctrine

First established in *American Pipe & Construction Co. v. Utah,* [HN3] the tolling doctrine provides that if a class action is timely filed, the limitations period stops running for all putative class members. *414 U.S. 538, 554, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974).* [*8] This doctrine serves to avoid multiplication of intervention motions by putative class members before class certification is decided. *See id. at 551.* The doctrine protects "the principal purposes of the class action procedure-promotion of efficiency and economy of litigation." *Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 349, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983).* To achieve this purpose, the doctrine should not be applied to a putative class member who multiplies proceedings by filing a new action while class certification is pending.

A clear majority of federal courts has followed this approach. In *Glater v. Eli Lilly & Co.,* the First Circuit refused to toll the limitations period for a plaintiff who filed her individual suit while class certification was pending. *712 F.2d 735, 739 (1st Cir. 1983).* The First Circuit reasoned that judicial economy "would not be served, and in fact would be disserved, by guaranteeing a separate suit at the same time that a class action [was] ongoing." *Id.* Applying the same rationale in *Wyser-Pratte Management Co. v. Telxon Corp.,* the Sixth Circuit held that [HN4] putative class members forfeited the benefit of the tolling [*9] doctrine if they filed individual actions during the pendency of class certification. *413 F.3d 553, 569 (6th Cir. 2005).* The weight of authorities militates against applying the tolling doctrine to the present case because class certification in *Hart* is pending. [1]

  1  *See, e.g., In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 452 (S.D.N.Y. 2003); In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 221 (E.D.N.Y. 2003); Chinn v. Giant Food, Inc., 100 F. Supp. 2d 331, 335 (D.*

*Md. 2000); Rahr v. Grant Thornton LLP, 142 F. Supp. 2d 793, 800 (N.D. Tex. 2000); In re Brand Name Prescription Drugs Antitrust Litig., 1998 U.S. Dist. LEXIS 12534, Nos. 94C897, MDL997, 1998 WL 474146, at *8 (N.D. Ill. Aug. 6, 1998); Stutz v. Minn. Mining & Mfg. Co., 947 F. Supp. 399, 404 (S.D. Ind. 1996); Chemco, Inc. v. Stone, McGuire & Benjamin, 1992 U.S. Dist. LEXIS 11657, No. 91 C 5041, 1992 WL 188417, at *2 (N.D. Ill. July 29, 1992); Pulley v. Burlington N., Inc., 568 F. Supp. 1177, 1179-80 (D. Minn. 1983); Wachovia Bank & Trust Co. v. Nat'l Student Mktg. Corp., 461 F. Supp. 999, 1012 (D.D.C. 1978); but see Rochford v. Joyce, 755 F. Supp. 1423, 1428 (N.D.Ill. 1990)* (limitations period tolled for individual plaintiffs because defendants could move to consolidate putative class actions).

[*10] Arguing the contrary, plaintiffs rely on *Yang v. Odom, 392 F.3d 97 (3d Cir. 2004),* and *Catholic Social Services, Inc. v. Immigration and Naturalization Service, 232 F.3d 1139 (9th Cir. 2000) (en banc). Yang* and *Catholic* are distinguishable because class certification in both cases had been decided. *Yang* applied the tolling doctrine to plaintiffs after class certification in a previous action was denied. *Yang, 392 F.3d at 112.* Similarly, *Catholic* dealt with a situation where individual plaintiffs from a previously-dismissed class action sought to file a new class action. *Catholic, 232 F.3d at 1147* ("strickly speaking, this is not a statute of limitations question at all"). Neither case sheds any light on the situation here because class certification in *Hart* is still pending. Thus, plaintiffs' argument on the applicability of the tolling doctrine must fail.

Plaintiffs advance an alternative argument that Judge Zagel's dismissal of Hart's protracted detention claim constitutes denial of class certification. Because plaintiffs assert only the protracted detention claim, they conclude tolling is applicable. [*11] This argument not only lacks a legal basis, but also incorrectly assumes their case may proceed under the protracted detention theory.

As discussed above, *Hart* forecloses claims based on protracted detention alone. Plaintiffs point to one sentence in *Hart:* "Unless inmates can go between tiers, once a tier has been searched there is no apparent reason why the inmates in that tier can't be let out of their cells." Pls. Memo. at 3 (quoting *Hart, 396 F.3d at 893*). This

sentence, they assert, subjects their protracted detention to constitutional scrutiny. Pls. Mem. at 3. But the quoted sentence must be read in the context: *"These consequences* [resulting from the lack of access to medical care and guard protection] might . . . condemn the administration of the jail if there. . . [exists an]other way to conduct the lockdown." *Hart, 396 F.3d at 893* (emphasis added). The sentence quoted by plaintiffs addresses only the claims based on lack of access to guards, and does not validate claims based on protracted detention alone. Plaintiffs' argument has no merit.

Under *Hart,* plaintiffs may not sue for protracted detention. *Id. at 894.* **[*12]** The court need not address the parties' arguments based on other issues. The present case may proceed, if at all, only under the theory that defendants subjected the inmates "to a risk of serious harm by an unreasonably protracted detention of them out of sight and hearing of the guards." *Id.* The present case parallels *Hart,* the tolling doctrine does not apply when class certification in *Hart* is pending. Because the two-year limitations period has expired, the present case must be dismissed.

## CONCLUSION

For the reasons set forth above, the motion to dismiss is granted.

ENTER:

Suzanne B. Conlon

United States District Judge

December 12, 2005

## JUDGMENT IN A CIVIL CASE

Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that this case is dismissed without prejudice.

Date: 12/12/2005

TAB 6

LEXSEE 2006 U.S. DIST. LEXIS 95006

**DOUGLAS LEVINE, Plaintiff, v. BALLY TOTAL FITNESS HOLDING CORPORATION, PAUL A. TOBACK, JOHN W. DWYER, LEE S. HILLMAN, and ERNST & YOUNG, LLP, Defendants.**

**No. 06 C 1437**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 95006*

**September 29, 2006, Decided**

**PRIOR HISTORY:** *In re Bally Total Fitness Sec. Litig., 2006 U.S. Dist. LEXIS 93986 (N.D. Ill., July 12, 2006)*

**COUNSEL:** **[*1]** For Douglas Levine, Plaintiff: Christopher B Sanchez, Cafferty Faucher LLP, Chicago, IL; Deborah R. Gross, Law Offices of Bernard M. Gross, P.C., Philadelphia, PA; Marvin Alan Miller, Miller Law LLC, Chicago, IL; Robert P. Frutkin, Law Offices of Bernard M. Gross, Philadelphia, PA.

For Bally Total Fitness Holding Corporation, Paul A Toback, Defendants: Janet Malloy Link, Michael James Faris, Robert Walter Tarun, LEAD ATTORNEYS, Latham & Watkins LLP (IL), Chicago, IL; Laurie B Smilan, Latham & Watkins LLP, Reston, VA.

For John W. Dwyer, Defendant: Howard Steven Suskin, LEAD ATTORNEY, Shyni R Varghese, William Denby Heinz, Jenner & Block LLP, Chicago, IL.

For Lee S. Hillman, Defendant: Dawn Marie Canty, Heather J Kuhn O'Toole, Mary Ellen Hennessy, Steven L. Bashwiner, Katten Muchin Rosenman LLP, Chicago, IL.

For Ernst & Young, LLP, Defendant: Bradley Joseph Andreozzi, Brian J. Massengill, Dana S Douglas, David William Fuller, Jeffrey Alan Berger, Stanley J. Parzen, Mayer, Brown, Rowe & Maw LLP, Chicago, IL.

**JUDGES:** John F. Grady, United States District Judge.

**OPINION BY:** John F. Grady

**OPINION**

*MEMORANDUM OPINION*

Before the court are defendants' motions to dismiss the complaint. **[*2]** For reasons of judicial economy, at this juncture, the court is addressing only defendants' arguments that plaintiff's claims are time-barred. For the following reasons, the motions of Lee S. Hillman, John W. Dwyer, and Bally Total Fitness Holding Corporation and Paul A. Toback are granted in part and denied in part, and the motion of Ernst & Young, LLP is granted.

*BACKGROUND*

This case is part of a group of consolidated cases referred to as *In re Bally Total Fitness Securities Litigation.* [1] Plaintiffs have filed several related securities fraud putative class actions against Bally Total Fitness Holding Corporation ("Bally"); three of its former officers and directors, Lee S. Hillman, John W. Dwyer, and Paul A. Toback; and Bally's former auditor, Ernst & Young, LLP. It is alleged that defendants violated federal securities laws by publicly disseminating false and misleading corporate reports, financial statements, and press releases.

> 1    The lead case is *Petkun v. Bally,* 04 C 3530, which was filed on May 20, 2004. We previously granted the parties' motions for consolidation of the cases for all purposes and directed that the consolidated cases be referred to as "In re Bally [Total] Fitness Securities Litigation." (Minute

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 55 of 82

Page 2
2006 U.S. Dist. LEXIS 95006, *2

Order of Sept. 8, 2004.) We also appointed Cosmos Investment Company, LLC ("Cosmos") as lead plaintiff (Memorandum Opinion of March 15, 2005), and appointed lead and local counsel (Minute Order of May 23, 2005). On January 3, 2006, Cosmos filed a consolidated class action complaint on behalf of a class consisting of those who purchased or acquired Bally securities during the period of August 3, 1999 through and including April 28, 2004.

The complaint in the instant case was filed on March 15, 2006; the case was initially assigned to Judge Der-Yeghiayan. It was reassigned to us and consolidated with the others on April 18, 2006.

[*3] The complaint alleges the following facts, which are taken as true for purposes of the instant motions.

Defendant Bally is a corporation that operates many fitness centers throughout North America. Bally's securities are publicly traded on the New York Stock Exchange. Plaintiff Douglas Levine acquired 2.6 million shares of Bally common stock in connection with Bally's acquisition of Crunch Fitness International, Inc. ("Crunch") pursuant to an October 31, 2001 Agreement and Plan of Merger (the "Crunch Acquisition Agreement"). Plaintiff was a stockholder of Crunch at the time of the acquisition. He alleges that the shares of Bally stock sold to him in connection with the acquisition were valued at an artificially inflated price due to defendants' wrongful conduct.

Prior to and at the time of the acquisition, defendant Dwyer was Bally's Chief Financial Officer and Executive Vice President; defendant Toback was Bally's Chief Operating Officer; and defendant Hillman was Chief Executive Officer ("CEO"), President, and Chairman of Bally's Board of Directors (the "Board"). Hillman retired in December 2002. Dwyer resigned from his positions on April 28, 2004. Toback subsequently became President [*4] and CEO. (In August 2006, Toback resigned from his positions.) We will refer to Hillman, Dwyer, and Toback collectively, where appropriate, as the "Individual Defendants," and to Bally and the Individual Defendants, where appropriate, as the "Bally Defendants." The accounting firm Ernst & Young, LLP ("E & Y") served as Bally's outside auditor prior to and at the time of the acquisition and thereafter, until it resigned the engagement on March 31, 2004.

The thrust of the complaint is that prior to the Crunch acquisition, defendants caused Bally to issue numerous press releases and to file reports and statements with the Securities and Exchange Commission (the "SEC") that touted the company's financial performance, when in truth Bally was prematurely recognizing revenue and thus materially inflating its reported revenues and income, in violation of Generally Accepted Accounting Principles (GAAP) and Bally's own revenue-recognition policy.

From early 2000 through late 2001, Bally issued press releases and filed 8-K, 10-K and 10-Q forms with the SEC stating its financial results for various time periods. Some of the SEC filings contained certifications by the Individual Defendants pursuant [*5] to the Sarbanes-Oxley Act of 2002. In the Sarbanes-Oxley certifications, the Individual Defendants attested that they had reviewed the contents of the particular report to confirm that it did not contain any untrue statement of material fact or omit a material fact necessary to make the statements not misleading.

Plaintiff alleges that Bally's financial statements were materially false and misleading because, contrary to defendants' representations, they had not been prepared in conformity with Generally Accepted Accounting Principles (GAAP). Bally is alleged to have violated GAAP in accounting for the following: membership revenue; membership acquisition expenses; recoveries of unpaid dues; acquired payment obligations; prepaid personal training services; multiple-element arrangements; self-insurance liabilities and insurance expense; costs incurred to develop internal-use computer software; escheatment obligations; advertising expense; maintenance expense; start-up ("presale") costs; inventory; accruals; foreign exchange gains and losses; leases; sales of future receivables; the valuation of goodwill and separately identifiable intangible assets apart from goodwill; the amortization [*6] of goodwill; and fixed asset impairment. (Complaint PP 74-110, 113-121.)

Plaintiff also alleges that E & Y, in its capacity as Bally's outside auditor during most of the relevant time period, played a role in the fraud. E & Y issued unqualified audit opinions on Bally's financial statements for the years 1999-2001. (Only the statements for the years 1999 and 2000, however, were issued before plaintiff acquired his Bally stock.) Plaintiff maintains that

2006 U.S. Dist. LEXIS 95006, *6

E & Y diverged from Generally Accepted Auditing Standards (GAAS) when auditing Bally in that it either identified and ignored flagrant multiple violations of GAAP or recklessly failed to identify these violations.

The complaint alleges that "defendants' fraudulent misrepresentations beg[a]n to unravel" on March 11, 2004, when Bally issued a press release indicating that it was changing its accounting practices and that the change would result in non-cash charges of $ 675 million. (Complaint PP 50-51.) On March 30, 2004 and April 2, 2004, Bally filed its 2003 annual report with the SEC on Forms 10-K and 10-K/A, stating that its previous accounting methodology had resulted in errors in calculating deferred revenue related to prepaid [*7] dues and that it was restating several prior periods. Plaintiff alleges that the March 11 press release and the March 30 and April 2 filings were materially false and misleading "in that they covered up the true accounting manipulations" that occurred. (Id. P 55.)

It is further alleged that "[t]he truth concerning [Bally's] accounting improprieties was not known to the market and Plaintiff until April 28, 2004." (Id. P 56.) On that day, Bally issued a press release announcing that its CFO, Dwyer, had resigned "pursuant to the terms of a separation agreement" and that "[s]eparately, the Company announced" that the SEC had commenced an investigation connected to Bally's recent restatement regarding the timing of recognition of prepaid dues. (Id. P 56 (quoting from press release).) Plaintiff asserts that in response to this announcement, the price of Bally common stock fell from $ 5.40 per share on April 28 to $ 4.50 per share on April 29, a 16.6% drop. In the period of ninety trading days following the disclosure, the stock reached a mean trading price of $ 4.56 per share.

On November 15, 2004, Bally announced that its Audit Committee had concluded, based on its internal [*8] investigation, that Bally's financial statements for the years 2000 through 2003 and for the first quarter of 2004 could no longer be relied upon and should be restated. Bally also announced that it would be unable to issue any financial statements for the remainder of 2004 or for 2005 until it had completed the restatements, which were expected to be issued in July 2005 (but were not actually issued until November 2005).

On February 8, 2005, Bally announced the Audit Committee's findings that multiple accounting errors had occurred. Bally also announced that it was suspending the severance pay of Hillman and Dwyer (the former CEO and CFO, respectively), who, in the Audit Committee's view, were responsible "for multiple accounting errors and creating a culture within the accounting and finance groups that encouraged aggressive accounting." (Id. P 60.) Bally also stated that it had identified deficiencies in its internal controls over financial reporting. On February 16, 2005, Bally announced that it had received a request for information from the United States Attorney for the District of Columbia in connection with a criminal investigation.

On November 30, 2005, Bally filed [*9] a restatement that comprehensively restated its financial results for 2000, 2001, 2002, and 2003, and first reported results for 2004 and the first three quarters of 2005 (the "Restatement"). [2] The adjustments in the Restatement resulted in a $ 96.4 million increase in previously-reported net loss for the year 2002 and a $ 540 million decrease in net loss for the year 2003. The decrease in 2003 reported net loss includes the reversal of the cumulative effect of the change in accounting previously reported in 2003 of $ 583 million. Bally also increased the January 1, 2002 opening accumulated stockholders' deficit by $ 1.7 billion to recognize the effects of corrections in financial statements prior to 2002.

   2   In connection with the review and restatement, Bally retained KPMG as auditor.

Plaintiff filed this action on March 15, 2006. The complaint contains five counts. In Count I, plaintiff alleges that all defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j [*10] (b), and Rule 10b-5, 17 C.F.R. 240.10b-5. Count II is a "control person" claim in which plaintiff alleges that the Individual Defendants violated § 20(a) of the Act, 15 U.S.C. § 78t(a). In Count III, plaintiff alleges that the Bally Defendants violated § 18 of the Act, 15 U.S.C. § 78r. Counts IV and V are for, respectively, common-law fraud and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and are asserted against all defendants. Plaintiff seeks compensatory damages, punitive damages on the common-law fraud claim, attorney's fees, costs, and expenses.

Four separate motions to dismiss the complaint have been filed by (1) Bally and Toback; (2) Hillman; (3) Dwyer; and (4) E & Y. Those motions are now fully

briefed.

Defendants contend that plaintiff's claims are time-barred. Defendants also argue that plaintiff's claims fail for the same reasons set forth in defendants' motions to dismiss the consolidated class action complaint. We granted those motions for failure to adequately allege scienter. After we issued our memorandum opinion dismissing the consolidated class action complaint, plaintiff moved to amend [*11] his complaint to supplement his scienter allegations. At a hearing on plaintiff's motion to amend, we determined that an amendment could potentially cure the scienter problem, but would not cure any limitations problems. Accordingly, we instructed the parties to brief only the arguments that plaintiff's claims are time-barred, and indicated that were we to hold that any of the federal claims are not time-barred, we would vacate our earlier order denying plaintiff leave to amend his complaint.

We will first address the motions of the Bally Defendants and then address the motion of E & Y.

## DISCUSSION

### A. *The Motions of the Bally Defendants*

The Bally Defendants contend that (1) plaintiff's § 10(b) and § 20(a) claims in Counts I and II are barred by the applicable statute of limitations; (2) plaintiff's § 18 claim is barred by the applicable statute of limitations; and (3) all of plaintiff's claims are barred by the limitations provision contained in the Crunch Acquisition Agreement.

#### 1. *Section 10(b) and 20(a) Claims*

Section 10(b) of the Securities Exchange Act makes it unlawful for a person "[t]o use or employ, in connection with the purchase [*12] or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *15 U.S.C. § 78j(b)*. Among those rules is *Rule 10b-5*, which "prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security." *In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996)*. Section 20(a) of the Act, the "control person" provision, "creates vicarious liability for a person who actually or potentially

controlled the primary violator's acts." *Foss v. Bear, Stearns & Co., 394 F.3d 540, 543 (7th Cir. 2005)*.

Under the Sarbanes-Oxley Act, plaintiffs must bring § 10(b) and 20(a) claims--"private right[s] of action that involve[] a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws"--by no later than "the earlier of 2 years after the discovery of the facts constituting the violation or 5 years after such violation." *28 U.S.C. § 1658* [*13] *(b)*. "Discovery" of the facts occurs when a potential plaintiff has inquiry notice or actual notice of a violation. *See Tregenza v. Great Am. Communications Co., 12 F.3d 717 (7th Cir. 1993)*. Inquiry notice is "the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." *LaSalle v. Medco Research, Inc., 54 F.3d 443, 446 (7th Cir. 1995)*. This "reasonable person" is viewed as an investor of ordinary intelligence. *See Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006); In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig., 391 F.3d 401, 411 (2d Cir. 2004)*.

"The statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint. Of course if he pleads facts that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court." *Tregenza, 12 F.3d at 718* (citation omitted). Defendants argue that plaintiff has pleaded facts in his complaint that show that his [*14] §§ 10(b) and 20(a) claims are time-barred--in particular, that Bally issued a press release on March 11, 2004 stating in part:

> Importantly, effective with the 2003 period, the Company has elected to change from its prior method of estimation based deferral accounting to a preferable, modified cash basis of accounting for its membership revenues. Under the modified cash basis of accounting, revenue is recognized upon the later of when collected or earned and costs associated with the sale of memberships are no longer deferred but are recognized when incurred. This change, which is an extension of the guidance in EITF00-21 Revenue Arrangements with Multiple

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 58 of 82

Page 5
2006 U.S. Dist. LEXIS 95006, *14

Deliverables pertaining to revenues from products and services embedded in membership contracts, is fully supported by the Company's independent auditors. The Company's independent auditors will be providing the Company with a preferability letter supporting the changes. In related actions, the Company also reduced the balance sheet carrying value of its deferred tax assets and corrected an error in the recognition of prepaid dues. The accounting change and these actions resulted in total non-cash charges of $ 675 million. **[*15]**

. . .

The accounting change and these actions results in total non-cash charges of $ 675 million consisting of:

. . .

$ 43 million as of December 31, 2002 resulting from the correction of an error related to the prior calculation of prepaid dues. This change is reflected as a restatement of prior periods and represents less than 2% of the reported revenues during each annual restatement period.

(Complaint PP 51-52.) In defendants' view, this allegation demonstrates that plaintiff had knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed, and because plaintiff filed suit later than March 11, 2006 (two years after he had inquiry notice), his claims are time-barred.

We disagree. The question of whether plaintiff had sufficient facts to put him on inquiry notice of a securities fraud claim or claims is a fact question normally inappropriate for resolution on a motion to dismiss. *Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 669 (7th Cir. 1998).* The exception to this rule is where the facts pled in the complaint indicate without a doubt that plaintiff's suit is time-barred, **[*16]** see *id. at 670,* but this is not such a case. For inquiry notice to arise, "more than 'merely suspicious circumstances' must exist; instead, the plaintiff must learn of a circumstance that places him 'in possession of, or with ready access to, the

essential facts that he needs in order to be able to sue.'" *Id.* (quoting *Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1337 (7th Cir. 1997)).* "The facts constituting such notice must be sufficiently probative of fraud--sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated--not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit." *Fujisawa, 115 F.3d at 1335.*

We cannot say that the March 11 press release constituted even the "suspicious circumstances" element of inquiry notice that would trigger a duty to investigate. Defendants have not cited one case in which a single restatement of results was sufficient to provide inquiry notice. Rather, the cases cited by defendants involved more extensive warning signs--for example, widespread media coverage **[*17]** of accounting problems coupled with a sharp drop in price. Plaintiff has pled facts concerning a single press release by Bally itself that only obliquely informed the public of an accounting error and related charge. These allegations do not establish as a matter of law that plaintiff was on inquiry notice of his claims on March 11, 2004. Accordingly, the Bally Defendants' motions to dismiss will be denied as to Counts I and II. [3]

> 3    Because of this ruling, we need not address plaintiff's argument that the doctrine of tolling applies to these claims (the argument would be rejected in any event for the reasons stated *infra*).

**2. *Section 18 Claim***

*Section 18* of the Securities Exchange Act creates a private right of action for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement in a report or document required to be filed under the Act. *See 15 U.S.C. § 78r(a).* In Count III of the complaint, plaintiff alleges that he relied **[*18]** on misstatements that the Bally Defendants made in Bally's Form 10-K disclosures for fiscal years 1999, 2000, and 2001. (Complaint P 159.)

The first question is which statute of limitations applies to this claim. *Section 18* itself states: "No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." *15*

U.S.C. § 78r(c). Plaintiff contends, though, that the Sarbanes-Oxley Act increased the time periods to two years and five years, respectively. (As noted *supra,* under the Sarbanes-Oxley Act, plaintiffs must bring "private right[s] of action that involve[] a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws" by no later than "the earlier of 2 years after the discovery of the facts constituting the violation or 5 years after such violation." *28 U.S.C. § 1658(b).*

The authorities are divided. *Compare, e.g., In re Hollinger Int'l, Inc. Sec. Litig., No. 04 C 834, 2006 U.S. Dist. LEXIS 47173, 2006 WL 1806382,* **[*19]** *at *15 (N.D. Ill. June 28, 2006)* (Coar, J.) (rejecting the argument that Sarbanes-Oxley extends the limitations period for § 18 treatments) *with Shriners Hosps. for Children v. Qwest Communs. Int'l, Inc., No. 04-CV-0781-REB-CBS, 2005 U.S. Dist. LEXIS 40044, 2005 WL 2350569, at *3 (D. Colo. Sept. 23, 2005)* (determining that § 18 claims fall within the parameters of Sarbanes-Oxley). We find instructive one of the cases cited by defendants in support of their argument, *In re Alstom SA Securities Litigation, 406 F. Supp. 2d 402, 419-21 (S.D.N.Y. 2005).* In its thoughtful discussion, the court in *Alstom* concluded that Sarbanes-Oxley does not apply to § 18 claims for two reasons: (1) § 18 does not require proof of fraudulent intent; and (2) nothing in the statutory framework or legislative history of Sarbanes-Oxley shows a clear intent to revise the express limitations period set forth in § 18 itself. *406 F. Supp. 2d at 420.* We adopt the analysis of *Alstrom* and hold that the Sarbanes-Oxley Act did not extend the one-year/three-year periods set forth in *15 U.S.C. § 78r(c).*

The second question is whether plaintiff has pled himself **[*20]** out of court by alleging facts showing that he did not file this action "within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." *15 U.S.C. § 78r(c).* As with the §§ 10(b) and 20(a) claims, defendants assert that plaintiff had inquiry notice of his § 18 claim on March 11, 2005 and that because he did not file this action until March 15, 2006, he is barred by the one-year statute of limitations. We reject this argument for the same reasons we rejected it with respect to the §§ 10(b) and 20(a) claims. Defendants fare better with the three-year limitations period. [4] Plaintiff's cause of action under § 18 accrues at the time of the stock purchase. *See*

*Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518, 527 (S.D.N.Y. 1977).* The stock purchase occurred on October 31, 2001, so the three-year limitations period expired on October 31, 2004. Because plaintiff did not file this action until March 15, 2006, the statute of limitations bars his § 18 claim.

[4] Defendants refer to this as a three-year "statute of repose," but it is a statute of limitations because it relates to the accrual of plaintiff's cause of action, see our discussion *infra* regarding the difference between a statute of limitations and a statute of repose.

**[*21]** Plaintiff maintains that the filing of the class action complaint in the lead case in May 2004 tolled the running of the statute under the class action tolling doctrine announced in *American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974).* The *American Pipe* tolling doctrine "works to suspend the limitations clock for putative class members upon the filing of a class action complaint, preserving for each that portion of the limitations period that remained at the time the class action was filed. After a statute has been tolled, the limitations clock then resumes ticking again only after the court makes a class certification decision and the class member 'opts out' of the class." *In re Brand Name Prescription Drugs Antitrust Litig., No. 94 C 897, 1998 U.S. Dist. LEXIS 12534, 1998 WL 474146, at *7 (N.D. Ill. Aug. 6, 1998)* (Kocoras, J.).

Plaintiffs who commence their own individual actions prior to a class certification determination in the putative class action, however, cannot benefit from the tolling doctrine. *See, e.g., 1998 U.S. Dist. LEXIS 12534, [WL] at *8* (refusing to apply the doctrine where plaintiffs "made a conscious decision early on to pursue their claims on an entirely separate, though **[*22]** essentially parallel, track from that of the Class case. These Plaintiffs filed their own lawsuits and disavowed class status. . . . [I]t would be inequitable to now allow the Individual Plaintiffs to reap the benefits of a doctrine which is designed for a group--the Class and its putative members--which they have disavowed being a part of from the beginning. In fact, class action tolling has been denied in such situations where a plaintiff 'wants his cake and to eat it, too.'"); *Calvello v. Elec. Data Sys., No. 00CV800, 2004 U.S. Dist. LEXIS 8744, 2004 WL 941809, at *4 (W.D.N.Y. Apr. 15, 2004)* (collecting cases). Here, plaintiff has chosen to pursue separate litigation prior to a

determination on class certification; therefore, the *American Pipe* tolling rule is not available to him. [5] We are not persuaded by plaintiff's unsupported argument that we should apply the tolling doctrine because no motion for class certification has yet been filed in the class action.

    5  Our conclusion that plaintiff cannot rely on the tolling doctrine applies equally to the claims against E & Y.

[*23] Plaintiff's § 18 claim in Count III of the complaint will be dismissed with prejudice as barred by the statute of limitations.

### 3. *The Crunch Acquisition Agreement*

Defendants contend that all of plaintiff's claims must be dismissed because they are barred by the terms of the Crunch Acquisition Agreement pursuant to which plaintiff acquired his Bally stock. The portions of the Agreement on which defendants rely are as follows:

ARTICLE IX

*INDEMNIFICATION*

. . .

9.03 *Survival.* All representations and warranties contained in or made pursuant to this Agreement, and the rights of the parties to seek indemnification with respect thereto, shall survive the Closing Date until the date on which the final audit opinion covering Bally's consolidated financial statements for the fiscal year ending December 31, 2002 is released and delivered to Bally, but in no event later than March 31, 2003.

. . .

ARTICLE XII

*MISCELLANEOUS*

. . .

12.06 *Entire Agreement.* This Agreement (together with the certificates, agreements, schedules, instruments and other documents referred to herein and the Confidentiality Agreement) constitutes the entire agreement [*24] between the parties with respect to the subject matter hereof and thereof and supersedes all prior agreements, both written and oral, with respect to such subject matter.

(Crunch Acquisition Agreement, Ex. 2 to Decl. of Michael J. Faris in Support of Mot. to Dismiss of Bally and Toback, at 60-62, 71.)

In defendants' view, § 9.03 sets forth a three-year "contractual limitations period" for any claims for breach of representations and warranties contained in the Agreement, which expired before plaintiff filed suit. We reject this argument. For one thing, plaintiff is not suing for breach of the Agreement. He is suing for securities fraud as well as common-law and statutory fraud. In any event, it is clear from the context of § 9.03 and its inclusion in the article concerning indemnification that it refers to a period during which claims for indemnification must be asserted, but not other types of claims. Plaintiff does not seek indemnification; thus, § 9.03 is inapplicable.

Section § 12.06, an integration clause, is also irrelevant to plaintiff's claims. The provision does not address prior representations at all; it simply states that the Agreement is no more than what [*25] it says and that there are no prior *agreements* between the parties. Plaintiff does not seek to recover on any prior agreement. The integration clause does not bar plaintiff's claims.

### B. *The Motion of E & Y*

E & Y contends that plaintiff's § 10(b) claim (the only federal claim brought against E & Y) as well as plaintiff's state-law claims are barred by the applicable statutes of repose.

### 1. *Section 10(b) Claim*

As stated *supra,* plaintiffs must bring § 10(b) claims by no later than "the earlier of 2 years after the discovery of the facts constituting the violation or 5 years after such violation." *28 U.S.C. § 1658(b).* E & Y argues that the five-year statute of repose bars plaintiff's claim because its 1999 and 2000 audit opinions had both been issued by February 13, 2001, and plaintiff did not file suit until after the statute of repose expired on February 13, 2006. [6]

Plaintiff responds that he did not receive the February 2001 audit opinion until it was included in the documents reviewed by him in connection with his entering into the Crunch Acquisition Agreement in October 2001. In plaintiff's view, the statute of repose begins **[*26]** to run from the stock purchase, not from the issuance of the last audit opinion.

> 6    Although plaintiff alleges that the 2001 audit opinion also contained misrepresentations, that opinion was not issued until February 2002--after plaintiff had already acquired Bally stock. Plaintiff does not contend in his response brief that the 2001 audit opinion should be considered in the statute of repose analysis.

The crucial issue is how to interpret the term "violation" as it is used in the Sarbanes-Oxley statute of repose. Section 10(b) makes it unlawful to "use or employ" misrepresentations "in connection with the purchase or sale of any security." For purposes of triggering the statute of repose, does the "violation" occur when the alleged misrepresentation is made, or when the stock purchase occurs? The weight of authority in this district is that it occurs when the alleged misrepresentation is made. *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., No. 02 C 5893, 2006 U.S. Dist. LEXIS 15517, WL 560589, at *2 (N.* **[*27]** *D. Ill. Feb. 28, 2006)* (Guzman, J.); *Waldock v. M.J. Select Global, Ltd., No. 03 C 5293, 2004 U.S. Dist. LEXIS 23844, 2004 WL 2278549, at *4 (N.D. Ill. Oct. 7, 2004)* (St. Eve, J.); *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp., 192 F. Supp. 2d 852, 864 (N.D. Ill. 2002)* (Bucklo, J.) (citing two previous decisions).

This interpretation makes sense in light of the distinction between a statute of limitations and a statute of repose. Statutes of repose are measured from the time a defendant took a particular action, not from the accrual of a claim based on that action. *See Beard v. J.I. Case Co., 823 F.2d 1095, 1097 n.1 (7th Cir. 1987).* "A statute of repose . . . limits the time within which an action may be brought and is not related to the accrual of any cause of action; the injury need not have occurred, much less have been discovered. Unlike an ordinary statute of limitations which begins running upon accrual of the claim, the period contained in a statute of repose begins when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted." 54 C.J.S. Limitations of Actions § 5 (2005).

Our colleague Judge **[*28]** Bucklo explained in *Wafra* how these principles apply to the concept of a § 10(b) "violation":

> [I]t appears that a "violation" under *Rule 10b-5* is distinct from the concept of a "cause of action" under that rule. A defendant who makes a knowingly false representation with the purpose of inducing a sale of securities violates *Rule 10b-5* even if no purchaser is taken in by the lies and no purchase has actually occurred. That the cause of action has not accrued at that point is beside the point, because the defendant has committed a fraudulent act. This distinction is particularly clear where, as here, the defendant accused of misrepresentation is not the seller; the last act committed by [the accountant] with regard to the fraudulent audit was its alleged misrepresentations.

*192 F. Supp. 2d at 864* (citation omitted). We follow the reasoning of Judge Bucklo in *Wafra* and the weight of authority in this district and hold that the "violation" triggering the statute of repose for a § 10(b) claim is the defendant's act of publishing the allegedly false statements in the audit opinions and not the plaintiff's purchase of securities.

Plaintiff asserts **[*29]** that we should apply the "continuing violation doctrine," which the Seventh Circuit has recognized in civil rights, employment discrimination, and copyright actions. In general terms, the doctrine allows certain of these types of claims to be premised on otherwise time-barred acts that can be linked to conduct falling within the limitations period; the rationale is that such claims are based on a continuing wrong constituting a pattern or practice and not on discrete acts. *See generally Lucas v. Chicago Transit Auth., 367 F.3d 714, 724 (7th Cir. 2004).* The Seventh Circuit has never extended the doctrine to securities fraud actions, nor, as far as we can tell, have any other higher courts. Plaintiff urges us to follow a single decision from this district, *SEC v. Ogle, No. 99 C 609, 2000 U.S. Dist. LEXIS 239, 2000 WL 45260, at *4-5 (N.D. Ill. Jan. 11, 2000)*, in which the court applied the continuing violation doctrine to extend the five-year statute of limitations on the SEC's claim for civil penalties arising from the

defendants' alleged market manipulation. *Ogle* is inapposite because it dealt with a statute of limitations, not a statute of repose. Even if *Ogle* had dealt [*30] with a statute of repose, however, we would decline to follow it because the continuing violation doctrine has no applicability where the complained-of conduct consists of discrete acts. *See AMTRAK v. Morgan, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).* Plaintiff alleges that E & Y made misrepresentations in audit reports, which are separately identifiable discrete acts. There is no basis for applying the continuing violation doctrine.

Because the § 10(b) statute of repose was triggered by the issuance of E & Y's audit opinion on February 13, 2001 (the last alleged misrepresentation by E & Y that plaintiff could have relied upon in purchasing Bally stock), and plaintiff filed suit more than five years after that date, his claim against E & Y is barred. Count I will be dismissed with prejudice as against E & Y.

### 2. *State-Law Claims*

We have disposed of the only federal claim against E & Y. Ordinarily, we should relinquish jurisdiction of pendent state-law claims when the federal claims are dismissed before trial, but there are some cases in which we should exercise supplemental jurisdiction in the interest of judicial economy to decide the state-law [*31] claims on the merits. *See Rothman v. Emory Univ., 123 F.3d 446, 454 (7th Cir. 1997).* This is one of those cases. E & Y argues that the claims are barred by the Illinois Public Accounting Act, *735 ILCS 5/13-214.2,* which contains a five-year statute of repose for "[a]ctions based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act." The trigger for the statute of repose is the "act or omission alleged in such action to have been the cause of injury to the person bringing such action against a public accountant." *735 ILCS 5/13-214.2(b).* The Illinois Accounting Act has been interpreted broadly to apply not just to common-law tort claims, but also to statutory claims such as those brought pursuant to the Illinois Consumer Fraud Act. *See Terrell v. Childers, 920 F. Supp. 854, 862 (N.D. Ill. 1996).*

E & Y was and is registered under the Illinois Accounting Act. [7] The repose period--five years--is identical to that of a § 10(b) claim. Our analysis is the same for the state-law claims as it was for the § 10(b) claim. Plaintiff filed suit more than five years after E & [*32] Y published the alleged misrepresentations (the "act or omission alleged . . . to have been the cause of injury," *735 ILCS 5/13-214.2(b)).* Accordingly, plaintiff's state-law fraud claims in Counts IV and V of the complaint will be dismissed as barred by the statute of repose.

> 7    In resolving a motion to dismiss, we are entitled to take judicial notice of such matters in the public record without converting the motion into a motion for summary judgment. *Anderson v. Simon, 217 F.3d 472, 474-75 (7th Cir. 2000).*

### CONCLUSION

The pending motions to dismiss the complaint have been narrowed to defendants' arguments that plaintiff's claims are time-barred. The following motions are granted in part and denied in part: (1) the motion of Lee S. Hillman; (2) the motion of John W. Dwyer; and (3) the motion of Bally Total Fitness Holding Corporation and Paul A. Toback. The motions are denied as to Counts I, II, IV, and V of the complaint, but granted as to Count III of the complaint. Count III (which [*33] is asserted against the Bally Defendants only) is dismissed with prejudice.

The motion of Ernst & Young, LLP is granted, and Counts I, IV, and V are dismissed with prejudice as against Ernst & Young, LLP. This disposition terminates the case as to Ernst & Young.

Our minute order of July 19, 2006 is vacated to the extent that we denied plaintiff's motion to amend the complaint. Plaintiff's motion to amend the complaint to supplement his scienter allegations is granted, and plaintiff may file an amended complaint by October 27, 2006.

DATE: September 29, 2006

John F. Grady, United States District Judge

TAB 7

LEXSEE 2003 U.S. DIST. LEXIS 20689

**BONNIE SHAFFER, Plaintiff, v. COMBINED INSURANCE COMPANY OF AMERICA, Defendant.**

**No: 02 C 1774**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 20689*

**November 17, 2003, Decided
November 18, 2003, Docketed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Costs and fees proceeding at *Shaffer v. Combined Ins. Co. of Am., 2004 U.S. Dist. LEXIS 4257 (N.D. Ill., Mar. 16, 2004)*

**DISPOSITION:**     [*1]    Defendant's Motion for Summary Judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant employer alleging discrimination in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* The employer moved for summary judgment pursuant to *Fed. R. Civ. P. 56* asserting that the complaint was untimely under *42 U.S.C.S. § 2000e-5(f)(1)*.

**OVERVIEW:** The employee received her right-to-sue letter from the Equal Employment Opportunity Commission on September 17, 2001. She and nine other plaintiffs filed their original action on December 13, 2001, three days before the employee's 90-day filing period ran out. On February 12, 2002, the employee was dismissed without prejudice from the original action. The employee did not file her own suit until March 8, 2002. The employee argued that the pending class action tolled the statute of limitations for class members and that under the Crown, Cork & Sealing tolling rule, she, as a member of a class action, was entitled to equitable tolling from the 90-day filing rule until class certification is denied regardless of whether she had filed her own legal action. That rule was inapplicable. The employee voluntarily dismissed her first suit. She could not claim the protection of a putative class member. When she withdrew her suit, there were three days in the limitations period, which meant she had to until February 15, 2002 to file suit.

**OUTCOME:** The employer's motion for summary judgment was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN2] Although the moving party on a motion for summary judgment is responsible for demonstrating to

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 65 of 82

Page 2
2003 U.S. Dist. LEXIS 20689, *1

the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN3] In deciding a summary judgment motion, disputed facts are material when they might affect the outcome of the suit.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN4] When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. However, a metaphysical doubt will not suffice.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN5] If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > General Overview*
[HN6] *42 U.S.C.S. § 2000e-5(f)(1)* requires the Equal Employment Opportunity Commission (EEOC) to determine whether it wishes to file a civil action on behalf of an aggrieved party in a Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, matter. If the EEOC declines to so proceed, it must provide a right-to-sue letter to the aggrieved party, who then has 90 days to file a charge against the allegedly discriminating party.

*Civil Procedure > Dismissals > Voluntary Dismissals >*

*General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN7] A suit dismissed without prejudice is treated for statute of limitations purposes as if it has never been filed.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN8] Under the Crown, Cork & Seal tolling rule, once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.

*Civil Procedure > Class Actions > Certification*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN9] Plaintiffs that file their own individual lawsuit before class certification is denied do not obtain the benefits of the Crown, Cork & Seal rule regarding class-action tolling.

*Governments > Legislation > Statutes of Limitations > Tolling*
[HN10] Equitable tolling rarely applies, and the doctrine should not be used in situations where the plaintiff negligently failed to preserve her legal rights.

*Governments > Legislation > Statutes of Limitations > Tolling*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > General Overview*
[HN11] Receipt of a second Equal Employment Opportunity Commission Notice does not constitute grounds for equitable tolling where a party has actual knowledge of the first Notice.

**COUNSEL:** For Bonnie Shaffer, PLAINTIFF: Thomas R Meites, Meites, Mulder, Burger & Mollica, Chicago, IL USA. Johanna Josie Raimond, Meites, Mulder, Burger & Mollica, Chicago, IL USA.

**JUDGES:** JOHN W. DARRAH, United States District Judge.

**OPINION BY:** JOHN W. DARRAH

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Bonnie Shaffer ("Shaffer"), filed suit against Defendant, Combined Insurance Company of America ("Combined"). Shaffer alleges violations of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e*. Presently before the Court is Combined's Motion for Summary Judgment. For the reasons that follow, Combined's Motion for Summary Judgment is granted.

**LEGAL STANDARD**

[HN1] Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*; *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc., 40 F.3d 146, 150 (7th Cir. 1994)*. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . **[*2]** ." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Thus, [HN2] although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex, 477 U.S. at 322-27*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-56, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*; *Waldridge v. American Hoechst Corp., 24 F.3d 918, 923 (7th Cir. 1994)*.

[HN3] Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker, 957 F.2d 506, 507-08 (7th Cir. 1992)*. [HN4] When reviewing a motion for summary judgment, a court must view all inferences to **[*3]** be drawn from the facts in the light most favorable to the opposing party. *Anderson, 477 U.S. at 247-48*; *Popovits v. Circuit City Stores, Inc., 185 F.3d 726, 731 (7th Cir. 1999)*. However, a metaphysical doubt will not suffice. *Matsushita, 475 U.S. at 586*.

[HN5] If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson, 477 U.S. at 249-250*.

**BACKGROUND**

The undisputed facts, for the purposes of this motion, taken from the parties' Local Rule 56.1(a) & (b) statements of material facts (referred to herein as "Pl.'s 56.1" and "Def's 56.1") and exhibits, are as follows.

Combined is a nationwide insurance company that sells supplemental insurance door to door to the public. Pl.'s 56.1 P1. Shaffer began selling insurance for Combined in Iowa as a sales agent in 1994. Def.'s 56.1 P10. Shaffer filed her underlying charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 31, 2001. Def.'s 56.1 P2.

On September 17, 2001, the EEOC issued Shaffer a Dismissal and Notice of Rights ("right-to-sue letter"). **[*4]** Def.'s 56.1 P3. On December 13, 2001, Shaffer, along with nine other plaintiffs, filed suit against Combined in the Northern District of Illinois before the Honorable Judge Alesia in *Radmanovich v. Combined Insurance Company of America*, 01 C 9502 ("the original *Radmanovich* action"). Def.'s 56.1 P5.

On February 5, 2002, Judge Alesia, *sua sponte*, informed these plaintiffs in open court that they could not maintain the original *Radmanovich* action with multiple named plaintiffs. Def.'s 56.1 P6. He gave the plaintiffs two options: either (1) convert the original action to a class action with one named plaintiff; or (2) dismiss all but one plaintiff from the original action and have the remaining plaintiffs each file individual suits. Def. Ex. C., Tr. of Proceedings, Feb. 5, 2002, at 3-6.

On February 8, 2002, Shaffer and eight other plaintiffs in the original *Radmanovich* action filed a motion requesting Judge Alesia to enter an order incorporating his February 5 order. Def.'s 56.1 P7. On February 12, 2002, Judge Alesia granted this motion and dismissed Shaffer and the eight other plaintiffs from the original *Radmanovich* action without prejudice. He also granted **[*5]** the remaining plaintiff, Traci Radmanovich, leave to file an amended complaint by February 27, 2002. Pl.'s Resp. to Def.'s 56.1 P8.

On February 26, 2002, Traci Radmanovich filed her

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 67 of 82

Page 4
2003 U.S. Dist. LEXIS 20689, *5

amended class action complaint against Combined ("the *Radmanovich* class action"). Shaffer and the other plaintiffs in the original *Radmanovich* action were members of the class as described in Traci Radmanovich's amended complaint. Pl.'s 56.1 P167. On March 8, 2002, Shaffer filed the instant lawsuit. Def.'s 56.1 P9.

**ANALYSIS**

Combined argues that Shaffer's individual lawsuit is barred by the ninety-day filing requirement of *42 U.S.C. § 2000e-5(f)(1)*. [HN6] That statute requires the EEOC to determine whether it wishes to file a civil action on behalf of an aggrieved party in a Title VII matter. If the EEOC declines to so proceed, it must provide a right-to-sue letter to the aggrieved party, who then has ninety days to file a charge against the allegedly discriminating party.

[HN7] "[A] suit dismissed without prejudice is treated for statute of limitations purposes as if it has never been filed." *Elmore v. Henderson, 227 F.3d 1009, 1011 (7th Cir. 2000)*; [*6] *Accord Beck v. Caterpillar Inc., 50 F.3d 405, 407 (7th Cir. 1995)*; *Robinson v. Willow Glen Acad., 895 F.2d 1168, 1169 (7th Cir. 1990)*; *United States v. Mt. Vernon Mem'l Estates, Inc., 734 F.2d 1230, 1236 (7th Cir. 1984)*.

In this case, Shaffer received her right-to-sue letter from the EEOC on September 17, 2001. Shaffer and the other *Radmanovich* plaintiffs filed their original action on December 13, 2001 -- just three days before Shaffer's ninety-day filing period ran out. On February 12, 2002, Shaffer was dismissed without prejudice from the original *Radmanovich* action. Shaffer did not file her own suit until March 8, 2002. Combined contends that this suit is barred because it was filed long after December 17, 2001, as required by *42 U.S.C. § 2000e-5(f)*.

Shaffer argues that a pending class action tolls the statute of limitations for class members. *American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 552-53, 38 L. Ed. 2d 713, 94 S. Ct. 756 (1974)*. Moreover, Shaffer contends that all class members, regardless of whether they have filed their own legal action, are entitled to equitable [*7] tolling from the ninety-day filing rule until class certification is denied. [HN8] "Once the statute of limitations has been tolled, it remains tolled for *all members* of the putative class until class certification is denied." *Crown, Cork & Seal Co. v. Parker, 462 U.S.*

345, 354, 76 L. Ed. 2d 628, 103 S. Ct. 2392 (1983) (emphasis added). Therefore, Shaffer claims that she remained an absent class member, after her dismissal from the original *Radmanovich* action, until at least June 26, 2003, when Judge Alesia finally denied class status.

However, [HN9] plaintiffs that file their own individual lawsuit *before* class certification is denied do not obtain the benefits of the *Crown, Cork & Seal* class-action tolling. *Wachovia Bank & Trust Co., N.A. v. Nat'l Student Mktg. Corp., 209 U.S. App. D.C. 9, 650 F.2d 342, 346 n.7 (D.C. Cir. 1981)*; *Chazen v. Deloitte & Touche, LLP, 247 F. Supp. 2d 1259, 1271-72 (N.D. Ala. 2003)*; *Prohaska v. Somafor, S.N.C., 138 F. Supp. 2d 422, 432-33 (W.D.N.Y. 2001)*; *Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 513-14 (S.D.N.Y. 2000)*; *Rahr v. Grant Thorton LLP, 142 F. Supp. 2d 793, 799-800 (N.D. Tex. 2000)*; [*8] *Chinn v. Giant Food, Inc., 100 F. Supp. 2d 331, 334-35 (D. Md. 2000)*; *Wahad v. City of New York, No. 75 Civ. 6203, 1999 U.S. Dist. LEXIS 12323, 1999 WL 608722, at *5-6 (S.D.N.Y. Aug. 12, 1999)*; *Stutz v. 3M, 947 F. Supp. 399, 400-04 (S.D. Ind. 1996)*; *Pulley v. Burlington N., Inc., 568 F. Supp. 1177, 1179-80 (D. Minn. 1983)*.

Generally, these opinions reflect a policy that plaintiffs who elect to individually pursue their own claims cannot "reap the benefits of a doctrine which is designed for a group -- the class and its putative members." *In re Brand Name Prescription Drugs Antitrust Litig., 1998 U.S. Dist. LEXIS 12534, No. 94 C 897, 1998 WL 474146, at *8 (N.D. Ill. Aug. 6, 1998)* (Kocoras, J.); *see also Chemco, Inc. v. Stone, McGuire & Benjamin, 1992 U.S. Dist. LEXIS 11657, No. 91 C 5041, 1992 WL 188417, at *2 (N.D. Ill. July 29, 1992)* ("Only if class certification was denied . . . would the putative class members be able to bring suits individually under *American Pipe* [and *Crown, Cork & Seal*].") (Zagel, J.). [1]

> 1   *But see Amati v. City of Woodstock, 1997 U.S. Dist. LEXIS 14281, Nos. 92 C 20347, 94 C 50235, 1997 WL 587493, at *6 (N.D. Ill. Aug. 7, 1997)* (allowing, without discussing any related authority on the issue, new plaintiffs to file suit during the pendency of class certification instead of intervening in the class action).

[*9] Shaffer, in voluntarily dismissing her first suit, can no longer claim the protection of a putative class member under *American Pipe* and *Crown, Cork, & Seal*. Shaffer filed her first lawsuit before Judge Alesia on

December 13, 2001, three days before the ninety-day period for filing would have expired. Tolling the remaining part of that period before she withdrew from that suit and remained a putative class member permitted her to file this action within the three untolled days remaining, until February 15, 2002. Shaffer did not do so; she chose to voluntarily withdraw from the class and file this suit three weeks thereafter, on March 8, 2002.

Shaffer next argues that the ninety-day filing requirement should be equitably tolled. [HN10] Equitable tolling rarely applies, and the doctrine should not be used in situations where the plaintiff negligently failed to preserve her legal rights. *Tyler v. Runyon, 70 F.3d 458, 465 n.8 (7th Cir. 1995)* (citing *Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96, 112 L. Ed. 2d 435, 111 S. Ct. 453 (1990))*. Other courts have discussed equitable tolling in the context of the ninety-day filing rule of *§ 2000e-5(f)*. [HN11] "Receipt of a second EEOC Notice **[*10]** does not constitute grounds for equitable tolling where a party has actual knowledge of the first Notice." *Santini v. Cleveland Clinic Fla., 232 F.3d 823, 825 (11th Cir. 2000)*; *see also Witt v. Roadway Express, 136 F.3d 1424, 1430 (10th Cir. 1998)*; *Davidson v. Serv. Corp. Int'l, 943 F. Supp. 734, 737-40 (S.D. Tex. 1996)*, *aff'd sub nom. Davidson v. Guardian Plans, Inc., 132 F.3d 1454 (5th Cir. 1997)*.

Here, Shaffer suggests that Judge Alesia, *sua sponte*, dismissed her from the original *Radmanovich* action, and that a reasonable time period was necessary to r-file a new complaint. The records of the proceeding is to the contrary. On February 5, 2002, Judge Alesia gave the original *Radmanovich* plaintiffs, including Shaffer, a choice: (1) either convert the original action to a class action with one named plaintiff; or (2) dismiss all but one plaintiff from the original action and have the remaining plaintiffs each file an individual suit. It is clear that on February 12, 2002, Shaffer elected to be dismissed from the original *Radmanovich* action, pursuant to Judge Alesia's February 5 ruling. Under these **[*11]**

circumstances, Shaffer cannot be said to be surprised regarding the ninety-day filing requirement. Shaffer's conduct in the untimely refiling of her claim will not equitably toll the ninety-day filing requirement further.

Finally, Shaffer argues that Combined should be estopped from raising the ninety-day filing requirement as a defense because it waited to present this argument until this Motion for Summary Judgment. However, Shaffer's only authority on this issue discusses motions to compel discovery. *Price v. Maryland Cas. Co., 561 F.2d 609, 611-12 (5th Cir. 1977)*; *Commonwealth Edison Co. v. Allis-Chalmers Manu. Co., 40 F.R.D. 96, 108 (N.D. Ill. 1966)*.

Shaffer offers no support for the proposition that a defendant who properly pleads an affirmative defense must use that defense as soon as possible or the defense is waived. Here, Combined properly pled the ninety-day filing requirement as an affirmative defense at the earliest possible time -- in its Answer. Therefore, Combined is not estopped from raising the filing requirement of *§ 2000e-5(f)*.

## CONCLUSION

For the foregoing reasons, Combined's Motion for Summary Judgment is granted.

**[*12]** Dated: November 17, 2003

JOHN W. DARRAH

United States District Judge

## JUDGMENT IN A CIVIL CASE

Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

Date: 11/17/2003

TAB 8

LEXSEE 2005 U.S. DIST. LEXIS 44756

**TEACHERS' RETIREMENT SYSTEM OF LOUISIANA, the Retirement System for Teachers employed by the State of Louisiana, Plaintiff, v. QWEST COMMUNICATIONS INTERNATIONAL INC., a Delaware corporation having its principal office and place of business in Denver, Colorado, et al., Defendants.**

**Civil Case No. 04-cv-0782-REB-CBS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*2005 U.S. Dist. LEXIS 44756; Fed. Sec. L. Rep. (CCH) P93,530*

**September 23, 2005, Decided**

**COUNSEL:** **[\*1]** Teachers' Retirement System of Louisiana, the Retirement System for Teachers employed by the State of Louisiana, Plaintiff: Charles G. Michaels, LEAD ATTORNEY, Charles G. Michaels, Attorney at Law, Denver, CO.; I. Walton Bader, LEAD ATTORNEY, Bader & Bader, LLP, White Plains, NY.

For Qwest Communications International, Inc., a Delaware corporation having its principal office and place of business in Denver, Colorado, Defendant: Alfred P. Levitt, David Robert Boyd, Jonathan D. Schiller, LEAD ATTORNEYS, Boies, Schiller & Flexner, LLP-DC, Washington, DC.; Kenneth F. Rossman, IV, LEAD ATTORNEY, Boies, Schiller & Flexner, LLP-Oakland CA.; Marcy Marie Heronimus, Terence C. Gill, LEAD ATTORNEYS, Sherman & Howard, L.L.C.-Denver, Denver, CO.

For William L. Eveleth, Defendant: James E. Scarboro, LEAD ATTORNEY, Arnold & Porter LLP-CO, Denver, CO.; Karoline E. Jackson, Larry A. Mackey, LEAD ATTORNEYS, Barnes & Thornburg-Indianapolis, Indianapolis, IN.

For Douglas K. Hutchins, Defendant: John M. Richilano, LEAD ATTORNEY, Richilano & Gilligan, P.C., Denver, CO.

For Bryan K. Treadway, Defendant: James E. Scarboro, LEAD ATTORNEY, Arnold & Porter LLP-CO, Denver, CO.; John S. Darden, **[\*2]** M. Robert Thornton, LEAD ATTORNEYS, Benjamin Lee, King & Spalding, LLP-Atlanta, Atlanta, GA.

For John M. Walker, Defendant: James E. Scarboro, LEAD ATTORNEY, Arnold & Porter LLP-CO, Denver, CO.; Stephen C. Peters, LEAD ATTORNEY, Lindquist & Vennum, P.L.L.P.-Colorado, Denver, CO.

For Richard L. Weston, "DOES" numbers 1 through 10, Defendant: Douglas P. Lobel, LEAD ATTORNEY, Robert Thomas Cahill, Jr., Cooley Godward Kronish LLP-Reston VA, Reston, VA.; James E. Scarboro, LEAD ATTORNEY, Arnold & Porter LLP-CO, Denver, CO.

**JUDGES:** Robert E. Blackburn, United States District Judge.

**OPINION BY:** Robert E. Blackburn

**OPINION**

**ORDER CONCERNING DEFENDANTS' MOTIONS TO DISMISS**

**Blackburn, J**

This matter is before me on the following motions: 1) defendant Qwest Communications International, Inc.'s motion to dismiss [# 37], filed September 7, 2004; 2) the individual defendants' motion to dismiss [# 54], filed November 9, 2004; and 3) defendant Douglas Hutchins' motion to dismiss [# 61], filed December 16, 2004. The motions are, granted in part and denied in part.

**I. JURISDICTION**

The motions to dismiss concern claims asserted by

2005 U.S. Dist. LEXIS 44756, *2; Fed. Sec. L. Rep. (CCH) P93,530

plaintiff Teachers' Retirement System of Louisiana [*3] (TRSL). TRSL alleges claims under *§ 10(b)*, *§ 18(a)*, and *§ 20(a)* of the Securities Exchange Act of 1934 (the 1934 Act). I have jurisdiction over these claims under *15 U.S.C. § 78aa*, and *28 U.S.C. § 1331*. The plaintiff asserts claims also under Colorado law. I have supplemental jurisdiction over these state law claims under *28 U.S.C. § 1367*.

## II. FACTS

The Complaint addressed in the motions to dismiss is the plaintiff's Amended Complaint, filed July 26, 2004. I will refer to this document as the Complaint, and I will refer to specific paragraphs by their number ( P 1). Qwest is a publically traded communications company which provides telephone service and a wide variety of other communications services in the United States and internationally. TRSL alleges that Qwest disseminated false and misleading reports about Qwest's financial performance, and that TRSL purchased Qwest stock in reliance on these false reports.

TRSL alleges that certain Qwest financial reports were false because Qwest and the individual defendants fraudulently manipulated two transactions to permit Qwest to improperly recognize revenue [*4] on those transactions. These transactions are known as the Genuity, transaction and the ASFB transaction. TRSL says its complaint is limited to the alleged improper manipulation of the Genuity and ASFB transactions.

TRSL alleges that Qwest improperly reported 100 million dollars in revenue in the third quarter of 2000 based on the Genuity transaction. P 134 - 40. TRSL says this improper recognition of revenue permitted Qwest to report a 12.4 percent increase in revenue for the third quarter of 2000, as compared to the third quarter of 1999. P 135. "QWEST was thus able to claim that it met QWEST's prediction of double digit growth every quarter." *Id.* A proper report of revenue from the Genuity transaction would have resulted in reported revenue growth of 9.8 percent, which according to TRSL would constitute "a material variation from the earlier predictions of QWEST management." P 136.

TRSL contends also that Qwest improperly reported 33.6 million dollars in sales revenues based on the ASFB transaction in the second quarter of 2001. TRSL says this improper recognition of revenue permitted Qwest to report a 12.2 percent increase in revenue for the second quarter of 2001, as compared [*5] to the third quarter of 1999. P 191. This met Qwest's previous estimate of 12 to 13 percent revenue growth for that quarter. *Id.;* A proper report of revenue from the ASFB transaction would have resulted in reported revenue growth of 11.5 percent, according to TRSL. P 192.

According to TRSL, the recognition of revenue on these transactions was contrary to Generally Accepted Accounting Principles (GAAP). GAAP is a widely recognized set of accounting principles, standards, and procedures. However, GAAP is not "a canonical set of rules that will ensure identical accounting treatment of identical transactions by all accountants." ***Thor Power Tool Co. v. C. L R.,*** *439 U.S. 522, 544, 99 S. Ct. 773, 58 L. Ed. 2d 785 (1979).* Rather, GAAP generally tolerates a range of reasonable treatments.

Based on these allegations, TRSL asserts six claims against all of the defendants; in its complaint:

1) A claim under § 10(b) of the 1934 Act, *15 U.S.C. § 78j(b)*;

2) A claim under § 18(a) of the 1934 Act, *15 U.S.C. § 78r(a)*;

3) A claim under § 20(a) of the 1934 Act, *15 U.S.C. § 78t(a)*;

4) A claim under the Colorado Securities Act, *§§ 11-51-501* & [*6] *604*, C.R.S.;

5) A claim for negligent misrepresentation; and

6) A claim for common law fraud and deceit.

Qwest has filed a motion to dismiss each of the plaintiff's claims. Defendants Weston, Eveleth, Walker, and Treadway have filed a combined motion to dismiss. Defendant Hutchins has filed a separate motion to dismiss asserting essentially the same grounds asserted by the other individual defendants. I will refer to the individuals who have filed motions to dismiss collectively as the individual defendants.

## III. STANDARD OF REVIEW

In their motions to dismiss, the defendants argue that the plaintiff's claims against them must be dismissed because the plaintiff's factual allegations are not sufficient to support the claims asserted, or because the

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 72 of 82

Page 3

2005 U.S. Dist. LEXIS 44756, *6; Fed. Sec. L. Rep. (CCH) P93,530

relevant statute of limitations expired before the plaintiff filed its complaint. For the purpose of ruling on a motion to dismiss under *FED. R. Civ. P. 12(b)(6)*, the complaint is construed in the light most favorable to plaintiffs, and its allegations are taken as true. *See, e.g., Daigle v. Shell Oil Co., 972 F.2d 1527, 1533 (10th Cir.1992)*. In appraising the sufficiency of the plaintiffs' allegations, "the [*7] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. With regard to some of the plaintiffs' claims, the defendants argue that the plaintiffs' allegations do not satisfy the particular pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), as stated in *15 U.S.C. § 78u-4(b)(1)* and *(2)*.

## IV. STATUTE OF LIMITATIONS - *§ 10(b)*, *§ 18(a)*, AND *§ 20(a)* CLAIMS

Qwest argues that TRSL's claims under *§ 10(b)*, *§ 18(a)*, and *§ 20(a)* are barred by the applicable statute of limitations. TRSL's complaint and its argument in response to Qwest's motion to dismiss clearly indicate that TRSL's claims are limited to alleged fraud based on the Genuity and ASFB transactions. I conclude that claims limited to these two transactions are not barred by the statute of limitations.

### A. Applicable Period of Limitations

Prior to July 28, 2002, a one year statute of limitations was applicable to claims under *§ 10(b)*. *Section 804* of [*8] the Sarbanes-Oxley Act extended the applicable statute of limitations for any "private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws" to the earlier of two years following notice or five years after the occurrence of the facts giving rise to the claim. *28 U.S.C. § 1658 (2004)*. The plaintiffs' *§ 10(b)* claim is subject to this two year statute of limitations because the complaint was filed after July 28, 2002.

Qwest argues that TRSL's *§ 18* claims are not covered by the two year statute of limitations in *§ 1658*. Rather, Qwest argues that *§ 18(c)* of the 1934 Act, which provides for a one year period of limitations for *§ 18* claims, controls TRSL's § 18 claims. *15 U.S.C. § 78r(c)*. I conclude that the two year period of limitations of *§ 1658*

is applicable to ABP's *§ 18* claims. The United States Supreme Court has noted that *§ 18* target's "the precise dangers that are the focus of *§ 10(b)*, and the intent motivating (both) sections is the same -- to deter fraud and manipulative practices in the securities markets, and to [*9] ensure full disclosure of information material to investment decisions." *Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 286, 296, 113 S. Ct. 2085, 124 L. Ed. 2d 194 (1993)* (quotation land citations omitted). *Section 1658* applies to private rights of action involving claims of fraud, deceit, manipulation, or contrivance. *Section 18* easily falls within these parameters. The defendants arguments to the contrary are unavailing.

*Section 20(a)* is a secondary liability provision based on underlying violations of federal securities laws. *Section 20(a)* shares the limitations period of the statute that defines the underlying violation. TRSL's *§ 20(a)* claim is based on alleged underlying violations of *sections 10(b)* and *18(a)*. Thus, the *§ 20(a)* claim is subject to the same two year period of limitations as the underlying claims.

### B. Events Triggering the Statute of Limitations

In the context of securities fraud, the Tenth Circuit has held that the statute of limitations begins to run "once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Sterlin v. Biomune Systems, 154 F.3d 1191, 1201 (10th Cir. 1998)*. [*10] The standard outlined in *Sterlin* and similar cases is viewed often as a two step process: 1) the date when the plaintiff was on "inquiry notice" of the possibility of fraud; when there existed "sufficient storm warnings" to alert a reasonable person to the possibility that misleading statements or significant Omissions had been made; and 2) the period thereafter during which a diligent investor should have discovered the facts underlying the alleged fraud. *Id. at 1202 - 05*. Step two of the *Sterlin* analysis does not require that a plaintiff have notice of the precise contours of the fraudulent scheme. Rather, discovery of essential facts indicating that there was or is a fraudulent scheme is all that is required.

Again, TRSL's claims are limited to two discrete transactions undertaken by Qwest, the Genuity transaction and the ASFB transaction. TRSL argues that it could not have discovered the specific facts concerning the Genuity and ASFB transactions until after the SEC

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 73 of 82

Page 4

2005 U.S. Dist. LEXIS 44756, *10; Fed. Sec. L. Rep. (CCH) P93,530

filed its complaint against several individual Qwest officials in *SEC v. Arnold, et al.,* No. 03-CV-328-REB-OES, *Complaint,* filed February 25, 2003. Qwest argues **[*11]** that TRSL had notice of the alleged accounting issues underlying its federal securities claims by March 11, 2002. By that date, Qwest notes, at least a dozen lawsuits asserting *§ 10(b)* claims were pending against Qwest, and Qwest had disclosed that the SEC had begun an informal investigation into Qwest's accounting. In general, these other complaints allege much broader and long-standing schemes to manipulate Qwest's financial picture than that alleged by TRSL. Qwest does not argue that any of these lawsuits revealed the facts underlying the allegations of fraud concerning the Genuity and ASFB transactions. Qwest does not state how the facts of these particular transactions could have been known to TRSL before the SEC filed its complaint in *SEC v. Arnold, et al.* on February 25, 2003.

The SEC's February 25, 2003, complaint describes in detail the alleged fraud involved in the Genuity and ASFB transactions. *SEC v. Arnold, et al.,* No. 03-CV-328- REB-OES, *Complaint,* filed February 25, 2003. The filing of the SEC complaint is a clear indication that the government agency charged with enforcement of the securities laws had investigated the facts concerning these **[*12]** two transactions, and had concluded that there were sufficient facts to support allegations of securities fraud in a civil case. The SEC complaint describes in detail the two particular transactions which form the basis of the plaintiff's claims in this case, and outlines how those facts are alleged to constitute securities fraud under various federal laws. The SEC complaint amounts to notice to the plaintiff of the facts underlying the alleged fraud about which they now complain. For a diligent investor, the filing of the SEC complaint in *SEC v. Arnold, et al.* on February 25, 2003, constitutes clear notice of the facts underlying the alleged fraud in the 'tenuity and ASFB transactions. With this notice, the statute of limitations began to run on TRSL's federal securities claims based on the Genuity and ASFB transactions. The statute of limitations expired two years later, on February 25, 2005. TRSL first asserted its federal securities claims in its amended complaint, filed July 26, 2004, within the two year period of limitations for claims based on the Genuity and ASFB transactions.

I note that this statute of limitations analysis is limited to securities fraud claims **[*13]** based only the Genuity and ASFB transactions. The fact that TRSL has asserted timely claims that are narrowly focused on these two transactions does not mean that TRSL necessarily will be permitted to expand its claims to include a more broad expanse of events and statements.

C. Tolling

TRSL has indicated a desire to amend its complaint to add additional claims to its complaint, including reiterations of the claims which have survived motions to dismiss in *In re Qwest.* It appears that many, and possibly all, of these proposed additional claims, would be barred by the statute of limitations if presented in this case. Because TRSL has indicated a desire to adopt numerous additional claims, and because the parties may raise additional factual contentions concerning the application of the statute of limitations to TRSL's current claims, I will address TRSL's tolling argument briefly.

TRSL claims that the statute of limitations was tolled when the putative class action complaint was filed in *In re Qwest Communications International, Inc. Securities Litigation,* No. 01-cv-01451-REB-CBS. TRSL is a member of the proposed class in *In re Qwest.* TRSL relies **[*14]** on the tolling doctrine established in *American Pipe and Construction Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974).* [1] In *American Pipe,* a putative class action' was filed, but class certification was denied eventually. An individual plaintiff theri sought to intervene, pursuing identical claims, but after the statute of limitations had expired. The Court concluded that the statute of limitation on the individual plaintiff's claims had been tolled while the putative class action was pending. "(T)he filing, of a timely class action complaint commences the action for all members of the class as subsequently determined." *American Pipe, 414 U.S. at 550.* The Court held later that "(o)nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983).*

1 TRSL quotes *American Pipe* on page 12 of its response, but does not provide a pinpoint citation, or any citation at all, for the quotation. Similarly, TRSL frequently discusses specific allegations in its complaint, but again provides no pinpoint citations to its complaint. Both common courtesy

2005 U.S. Dist. LEXIS 44756, *14; Fed. Sec. L. Rep. (CCH) P93,530

and REB Civ. Practice Standard II.D.2. require "specific references in the form of pinpoint citations. . . ." Future filings which do not contain the required pinpoint citations may be stricken.

[*15] There are significant limitations on *American Pipe* tolling. First, the filing of a putative class action complaint tolls the period of limitations only for claims that are identical to the claims asserted in the putative class action complaint. *Johnson v. Railway Express Agency,* 421 U.S. 454, 467 n.14, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975). Second, a plaintiff who is a member of a putative class who files an action independent of the class before the class is certified, or class certification is denied, cannot benefit from *American Pipe* tolling. I agree with the analysis of this issue in *In re WorldCom, Inc. Securities Litigation,* 294 F.Supp.2d 431 (S.D.N.Y. 2003). "(P)laintiffs who choose to file an independent action without waiting to consider the determination of class certification are not entitled to enjoy the benefits of the tolling rule. Applying the tolling doctrine to separate actions filed prior to class certification would create the very inefficiency that *American Pipe* sought to prevent." *Id.* at 451.

The issue of class certification has not yet been resolved in *In re Qwest.* At this point in time, [*16] TRSL cannot rely on the putative class action in *In re Qwest* as tolling the statute of limitations for other federal securities fraud claims it may wish to pursue.

## V. § 10(b) CLAIMS

Qwest and the individual defendants argue that TRSL's allegations are not sufficient to state a claim for relief under § 10(b). Section 10(b) makes it unlawful for any person to employ any manipulative or deceptive device, in contravention of the rules and regulations of the Securities and Exchange Commission (SEC), in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). SEC *rule 10b-5* provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which [*17] operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. s 240.10b-5 (1994). Liability under *Rule 10b-5(b)* is predicated on an untrue statement of material fact, or omission to state a material fact. To state a claim under § 10(b) and *rule 10b-5(b),* a plaintiff must allege that the defendant: a) made an untrue statement of material fact or failed to state a material fact; b) in connection with the purchase or sale of a security; c) with scienter; and d) the plaintiff relied on the misrepresentation and sustained damages as a proximate result of the misrepresentation. *See, e.g., Anixter v. Home-Stake Products,* 77 F.3d 1215, 1225 (10th Cir. 1996). TRSL's § 10(b) claims are based, in large part, on allegations that the defendants made materially false statements.

To some extent, TRSL also alleges § 10(b) claims against certain defendants for "scheme liability" under *Rule 10b-5(a)* or *(c).* To state a claim under *Rule 10b-5(a)* or *(c),* a plaintiff must allege a) that the defendant committed a manipulative or deceptive act; b) in furtherance of the alleged scheme to defraud; c) scienter; [*18] and d) reliance. *See, e.g., In re Global Crossing, Ltd. Securities Litigation,* 322 F.Supp.2d 319, 336 (S.D.N.Y. 2004).

The level of scienter required to support a § 10(b) claim is intent to deceive, manipulate, or defraud. *City of Philadelphia v. Fleming Companies, Inc.,* 264 F.3d 1245, 1259 (10th Cir. 2001). Proof of recklessness is sufficient to establish a § 10(b) claim. In this context, a defendant acts recklessly when his or her conduct amounts to an extreme departure from the standards of ordinary care, and presents a danger of misleading' buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of the danger. *Id.* at 1260. In the context of a claim based

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 75 of 82

Page 6

2005 U.S. Dist. LEXIS 44756, *18; Fed. Sec. L. Rep. (CCH) P93,530

on non-disclosure of material facts, a plaintiff must show that the defendant '1) knew of the material fact; and 2) knew that failure to reveal the fact likely would mislead investors. *Fleming, 264 F.3d at 1261*.

A. PSLRA Requirements

A *section 10(b)* claim is a type of fraud claim. Under *FED. R. Civ. P. 9(b)*, a plaintiff must plead with particularity the facts supporting a fraud **[\*19]** claim. In addition, the Private Securities Litigation Reform Act of 1995 (PSLRA) imposes particular pleading requirements on complaints alleging securities fraud under *§ 10(b)*. *15 U.S.C. § 78u-4(b)(1)* and *(2)*. The PSLRA provides:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) Made an untrue statement of a material fact; or

(B) Omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that 'belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or **[\*20]** omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(1)* and *(2)*. Generally, the PSLRA is

seen as imposing an enhanced standard of pleading that is more strict than that of *Rule 9(b)*. *Fleming, 264 F.3d at 1258*.

In sum, the PSLRA requires the plaintiffs 1) to specify each statement alleged to have been misleading, and the reason or reasons the statement is misleading; and 2) with regard to each act or omission alleged to violate *§ 10(b)*, to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, i.e. scienter. *See, e.g., Pirraglia v. Novell, Inc., 339 F.3d 1182, 1186 (10th Cir. 2003)*. Courts must look to the totality of the pleadings to determine whether the plaintiff's allegations support a strong inference of fraudulent intent, or scienter, as required by the PSLRA. *Fleming, 264 F.3d at 1262*. In this context, a strong inference of scienter is "a conclusion logically based upon particular **[\*21]** facts that would convince a reasonable person that the defendant knew a statement was false or misleading. *Adams v. Kinder Morgan, Inc., 340 F.3d 1083, 1105 (10th Cir. 2003)*. I have considered the totality of the plaintiff's allegations in determining whether those allegations meet the requirements of the PSLRA.

When considering the adequacy of an inference of scienter under the PSLRA, a court must consider negative inferences which may be drawn against the plaintiff. *Pirraglia v Novell, Inc., 339 F.3d 1182, 1187* - 88 (10th Cir. 2003). In other words, a court must evaluate a plaintiffs suggested inference in the context of other reasonable inferences that may be drawn from the facts alleged. *Id.* The inference of scienter suggested by the plaintiff must be strong in light of the overall context of the allegations including reasonable inferences against the plaintiff's position. *Id.*

B. Materiality

Qwest argues that TRSL's *§ 10(b)* claim fails because TRSL has not alleged a material misrepresentation. A statement or misrepresentation is not actionable under *§ 10(b)* unless the statement or misrepresentation is material. **[\*22]** For a given fact to be material "there must be a substantial likelihood" that the fact "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Garcia v. Cordova, 930 F.2d 826, 829 (10th Cir. 1991)* (quotation omitted).

TRSL alleges that Qwest improperly reported 100

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 76 of 82

Page 7

2005 U.S. Dist. LEXIS 44756, *22; Fed. Sec. L. Rep. (CCH) P93,530

million dollars in revenue in the third quarter of 2000 based on the Genuity transaction. P 134 - 40. TRSL says this improper recognition of revenue permitted Qwest to report a 12.4 percent increase in revenue for the third quarter of 2000, as compared to the third quarter of 1999. P 135. "QWEST was thus able to claim that it met QWEST's prediction of double digit growth every quarter." *Id.* A proper report of revenue from the Genuity transaction would have resulted in reported revenue growth of only 9.8 percent, according to TRSL, "a material variation from the earlier predictions of QWEST management." P 136.

TRSL alleges also that Qwest improperly reported 33.6 million dollars in sales revenues based on the ASFB transaction in the second quarter of 2001. TRSL says this improper recognition of revenue permitted Qwest to **[\*23]** report a 12.2 percent increase in revenue for the second quarter of 2001, as compared to the third quarter of 1999. P 191. This met Qwest's previous estimate of 12 to 13 percent revenue growth for that quarter. *id.* A proper report of revenue from the ASFB transaction would have resulted in reported revenue growth of only 11.5 percent, according to TRSL. P 192.

Qwest argues that the allegedly improper recognition of revenue on these two transactions is immaterial in comparison to 4.8 billion dollars of revenue recognized in the third quarter of 2000, and the 5.2 billion dollars of revenue recognized in the second quarter of 2001. It is true that the amounts of revenue that TRSL says were recognized improperly are fairly small in comparison to the total amount of revenue recognized in the relevant quarters. However, TRSL has alleged that the improper recognition of this revenue permitted Qwest to claim that it continued to meet its own predictions of revenue growth, rather than falling short of those predictions. TRSL claims that the difference between meeting expectations and not meeting expectations was material to the market for Qwest stock. It is conceivable that TRSL could **[\*24]** prove that the difference between meeting expectations and not meeting expectations would have been material to a reasonable investor. TRSL adequately has alleged that the improper reporting of revenue by Qwest was material.

## C. False & Misleading Statements - Individual Defendants

The individual defendants argue that TRSL has not alleged that they made any false or misleading

statements. TRSL has not cited any portion of the complaint that alleges that any of the individual defendants made any statement that is the basis for TRSL's *§ 10(b)* claim. However, as noted above, a false statement is not the only possible basis for *§ 10(b)* liability. TRSL has alleged that the defendants "employed devices, schemes or artifices to defraud. . . ." P 209. *Section 10(b)* liability can be based on either "a material misstatement (or omission) **or** the commission of a manipulative act." ***Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994)*** (emphasis added).

In essence, TRSL alleges that the individual defendants manipulated either the Genuity or ASFB transactions in an effort to improperly recognize revenue on those transactions. **[\*25]** TRSL alleges that the individual defendants' manipulation of these transactions formed the basis of false statements made by Qwest concerning Qwest's financial status. Such manipulative acts properly can be the basis for a *§ 10(b)* claim against the individual defendants even though the individual defendants are not alleged to have made false statements.

## D. Scienter - Individual Defendants

Again, under the PSLRA the plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(1) and (2)*. At a minimum, the plaintiff's allegations must support a strong inference of recklessness, which means conduct that amounts "to an extreme departure from the standards of ordinary care, and presents a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of the danger." ***City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1260 (10th Cir. 2001)***.

A variety of factors may be relevant in considering the plaintiff's scienter allegations. For example, an allegation **[\*26]** that the defendants failed to follow GAAP, by itself, is insufficient to support a strong inference of scienter. ***Adams, 340 F.3d at 1105-06***. However, allegations of pervasive and long-standing accounting machinations, or large scale accounting machinations, may support a strong inference of scienter under the PSLRA. ***Id.; In re Micro Strategy, Inc. Securities Litigation, 115 F.Supp.2d 620, 635 (E.D.Va. 2000)*** (number, size, timing, nature, frequency, and

2005 U.S. Dist. LEXIS 44756, *26; Fed. Sec. L. Rep. (CCH) P93,530

context of accounting manipulations, combined with other circumstances, can provide support for strong inference of scienter).

Allegations that demonstrate a defendant's motive and opportunity to commit securities fraud also can support a strong inference of scienter. *Fleming, 264 F.3d at 1261*. To support a strong inference of scienter by pleading motive and opportunity, the plaintiff must allege that the defendant benefitted from the alleged fraud in some concrete and personal way, "as when the defendants made material misrepresentations to maintain a high stock price and then sold their own shares at a profit." *Id., citing Novak v. Kasaks, 216 F.3d 300, 307-08 (2nd Cir. 2000).* [*27] Generally, allegations concerning a defendant's motive and opportunity to commit securities fraud are not, by themselves sufficient to support a strong inference of scienter. *Id. at 1262.*

In addition, a defendant's knowledge of the true material facts also can support a strong inference of scienter. A manipulation or false statement presents a danger of misleading buyers or sellers only when the manipulation or statement concerns material information. A scheme or misrepresentation is fraudulent only if the defendant was aware that the falsehood he sought to present would be viewed by the reasonable investor as having significantly altered the total mix of information made available. *Garcia v. Cordova, 930 F.2d 826, 829 (10th Cir. 1991)* (quotation omitted). Again, to establish al *§ 10(b)* claim based on non-disclosure of material facts, a plaintiff must show that the defendant 1) knew of the material fact; and 2) knew that failure to reveal the fact likely would mislead investors. *Fleming, 264 F.3d at 1261.*

The essence of TRSL's claim against the individual defendants is that their machinations on the Genuity and ASFB transactions [*28] permitted Qwest to conceal the fact that it had not earned as much revenue on these transactions as it claimed. The plaintiff alleges that each of the individual defendants was involved either in the Genuity transaction or the ASFB transaction. Only Graham and Arnold are alleged to have been involved in both transactions. The individual defendants allegedly helped to structure these transactions to permit Qwest to recognize revenue on the transactions when the defendants knew the recognition of revenue was improper. According to the plaintiff, the improper recognition of revenue on these transactions permitted

Qwest to claim that it was meeting its own projections for revenue growth, as opposed to not meeting those projections. This difference -- meeting projections versus not meeting projections -- is the basis for the plaintiff's claim that the alleged financial misrepresentations made by Qwest were material, and had an effect on TRSL's decision to purchase or hold Qwest stock.

As discussed above, the magnitude of the improper revenue recognition alleged by TRSL is relatively small, compared to the revenue numbers claimed by Qwest in the relevant quarters. The size and pervasiveness [*29] of the two alleged manipulations undertaken' by the individual defendants provide little if any support to a strong inference of scienter.

TRSL also does not allege facts that indicate that the defendants' motive and opportunity, to engage in the alleged fraud is a substantial factor in the scienter analysis. None of the individual defendants is alleged to have profited from sales of Qwest stock during the relevant time, nor has TRSL alleged that the individual defendants benefitted from the alleged fraud in any other concrete, personal way.

Finally, I conclude that the individual defendants' alleged knowledge of the true facts and tile materiality of the alleged accounting machinations does not provide substantial support to a strong inference of scienter. Although TRSL alleges that the individual defendants sought improperly to recognize revenue on the Genuity and ASFB transactions, I find that the complaint does not allege that the individual defendants were aware that the improper recognition of revenue on the transaction or transactions in which they were involved was likely to deceive Qwest investors. Nothing in the complaint indicates that the individual defendants were aware [*30] that the improper recognition of revenue they allegedly engineered was material to a reasonable investor in Qwest stock.

None of the facts alleged indicates that the individual defendants were aware of the larger picture of Qwest's overall revenue. Rather, the complaint indicates that each individual defendant was concentrating on meeting the revenue goals stated by Qwest management, and the management of his particular division within Qwest. PP 110, 148. Absent some indication that the individual defendants were aware that the improper recognition of revenue would materially alter the overall financial picture Qwest presented to the public, the individual

2005 U.S. Dist. LEXIS 44756, *30; Fed. Sec. L. Rep. (CCH) P93,530

defendants cannot be said to have acted with intent to mislead buyers or sellers of Qwest stock when they acted to recognize revenue improperly. Absent allegations of specific facts that support a conclusion that the individual defendants possessed such knowledge, the allegations concerning the individual defendants' knowledge of the true facts and the materiality of the alleged misrepresentations are not sufficient to support a strong inference of scienter. The plaintiff cannot rely on generalized imputations of such knowledge [*31] to the individual defendants. *Fleming, 264 F.3d at 1263-64.*

In short, the plaintiff's allegations concerning the individual defendants do not support a strong inference of scienter, as required by the PSLRA. The individual defendants' motion to dismiss TRSL's *§ 10(b)* claim should be granted.

### VI. *§ 18(a)*

Liability under *§ 18* can be established by showing 1) a false or misleading statement or omission; 2) made or caused to be made by a defendant; 3) that is material; 4) contained in an SEC filing; and 5) on which the plaintiff relied in the purchase or sale of a security. *See, e.g.*, *Magna Inv. Corp. v. John Does One Hundred, 931 F.2d 38, 40 (11 Cir. 1991)*. In order to plead a *§ 18(a)* claim, a plaintiff must allege that it purchased stock in reliance on a specific document filed with the SEC under the Securities Exchange Act of 1934. *15 U.S.C. § 78r(a)*. TRSL concedes that it has not alleged reliance on allegedly fraudulent statements in a relevant SEC fling in its complaint. *Opposition*, p. 22.

TRSL has withdrawn its *§ 18(a)* claims against the individual defendants. TRSL concedes that it [*32] has not alleged that any of the individual defendants signed the relevant form 10-Ks that are the basis of TRSL's *§ 18(a)* claim. Absent such an allegation, TRSL concedes that it cannot state a *§ 18(a)* claim against the individual defendants'. TRSL's *§ 18(a)* claim against the individual defendants must be dismissed on this basis.

Qwest argues that TRSL has not alleged actual reliance on allegedly false statements in and SEC filing in support of TRSL's *§ 18(a)* claim against Qwest. TRSL concedes that such an allegation is necessary to state a claim under *§ 18(a)*, and that it has not made such an allegation. *Opposition*, p. 22. Absent this key allegation, TRSL's *§ 18(a)* claim against Qwest should be dismissed.

### VII. *§ 20(a)*

The Plaintiff asserts a claim under § 20(a) of the 1934 Act, *15 U.S.C. § 78t*, against Qwest. Under *§ 20(a)*, "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator." *Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998)*. A *§ 20(a)* claim must be predicated on liability under *§ 10(b)* and *Rule 10b-5*. [*33] Qwest argues that TRSL has not alleged that Qwest had control over a primary violator.

TRSL alleges that the "defendants are controlling persons of the defendant QWEST as defined in *Section 20(a)* . . ." P 232. Focusing only on Qwest, this sentence alleges that Qwest is a controlling person of Qwest. TRSL does not allege that Qwest was a controlling person as to any primary violator other than Qwest. *Section 20(a)* imposes vicarious liability for the acts of a primary violator. If Qwest is both the controlled person, the primary violator, and the controlling person, vicarious liability is of no import because Qwest is primarily liable. In this context, a *§ 20(a)* claim is simply an irrelevant duplication of the underlying *§ 10(b)* claim. Absent an allegation that Qwest controlled another defendant who is a primary violator, TRSL's *§ 20(a)* claim against Qwest must be dismissed.

The individual defendants also argue that TRSL has not sufficiently alleged that any of the individual defendants controlled a person who committed a primary violation of the securities laws. SEC regulations define control as "the possession, direct or indirect, of the power to direct or cause the direction [*34] of management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." *17 C.F.R. § 230.405*. The plaintiff alleges that the individual defendants are controlling persons of Qwest. P 232. Some of the individual defendants held management authority in certain divisions of Qwest. However, the allegations in the complaint do not indicate that any of the individual defendants controlled Qwest with regard to the primary securities law violation alleged against Qwest. Again, the primary violation alleged is that Qwest used improperly recognized revenue from the Genuity and ASFB transactions to inflate Qwest's overall revenue picture to make it appear that Qwest was meeting its stated goals for revenue growth. In contrast, there is no allegation that any individual defendant had management authority over Qwest's overall revenue picture or financial reporting to

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 79 of 82

Page 10

2005 U.S. Dist. LEXIS 44756, *34; Fed. Sec. L. Rep. (CCH) P93,530

the public. Absent such authority, none of the individual defendants can be said to be control persons with respect to the primary securities law violation alleged against Qwest. TRSL's *§ 20(a)* claim against the individual defendants must be dismissed.

## VIII. NEGLIGENT MISREPRESENTATION [*35] - STATUTE OF LIMITATIONS

TRSL asserts a state law claim for negligent misrepresentation. Again, TRSL's complaint is related only to the Genuity and ASFB transactions, and TRSL's notice of the alleged fraud in these transactions controls the statute of limitations analysis.

Qwest argues that the two year statute of limitations stated in *§ 13-80-102(1)(a), C.R.S.,* bars TRSL's state law negligent misrepresentation claim. Section 102(1)(a) applies to "(t)ort actions, including but not limited to actions for negligence, trespass, malicious abuse of process, malicious prosecution, (and other actions)." In contrast, the three year statute of limitations of *§ 13-80-101(1)(c), C.R.S.,* is applicable to civil actions "for fraud, misrepresentation, concealment, or deceit . . . ." I previously have held that the three year period of limitations of *§13-80-101(1)(c)* is applicable to negligent misrepresentation claims against Qwest based on the type of misrepresentation at issue here. ***Stichting Pensioenfonds, ABP v. Qwest,*** 2005 U.S. Dist. LEXIS 9026 (now consolidated with ***In re Qwest),*** order filed March 28, 2005, p. 40.

Qwest argues that TRSL was on notice of its negligent misrepresentation [*36] claim no later than early February, 2002. Again, by that date at least a dozen lawsuits asserting *§ 10(b)* claims were pending against Qwest, Qwest had disclosed that the SEC had begun an informal investigation into Qwest's accounting, and there had been substantial press coverage concerning suspected fraud at Qwest. I agree that as of February 2002, TRSL was on notice of a variety of bases for negligent misrepresentation claims against Qwest.

TRSL first asserted its negligent misrepresentation claim on April 1, 2004. To the extent this claim is based on the Genuity and ASFB transactions, the claim is not barred by the statute of limitations. As discussed above, the current record indicates that TRSL was not on notice of its claims related to the Genuity and ASFB transactions until February 25, 2003. TRSL complaint was filed less than 14 months later. TRSL's negligent

misrepresentation claim is not barred by the statute of limitations.

## IX. STATE LAW CLAIMS FAILURE TO STATE A CLAIM

A. Colorado Securities Act

TRSL asserts a claim under *§ 11-51-604(3), C.R.S.,* part of the Colorado Securities Act. Section 604(3) provides, in relevant part

> (3) Any person who recklessly, **[*37]** knowingly, or with an intent to defraud sells or buys a security in violation of section 11-51-501(1) . . . is liable to the person buying or selling such security . . . in connection with the violation for such legal or equitable relief that the court deems appropriate, including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorney fees.

*Section 11-51-501(1)* provides
> (1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
>
> (a) To employ any device, scheme, or artifice to defraud;
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (c) TO engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Privity. The defendants argue that the language of *§ 604(3)* indicates that a claim for violation of that section, based on an underlying violation of *§ 501(1),* can be brought only when there is privity between the plaintiff **[*38]** and the defendant; only when the plaintiff alleges that the plaintiff purchased or sold a security from or to

Case 3:00-cv-01621-AWT    Document 403-2    Filed 08/17/2007    Page 80 of 82

Page 11

2005 U.S. Dist. LEXIS 44756, *38; Fed. Sec. L. Rep. (CCH) P93,530

the defendant.

Although *§ 604(3)* can be read to include a privity requirement, I find that the holding of the Colorado Supreme Court in *Rosenthal v. Dean Whitter Reynolds, Inc.,* precludes such a reading. *908 P.2d 1095 (Colo. 1995).* The *Rosenthal* court applied § 11-51-125(2), the predecessor of *§ 604(3).* Section 125(2) read,

> Any person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11-51-123 [the predecessor of § 501(1)] is liable to the person buying or selling a security in connection with'the violation for such legal or equitable relief which the court deems appropriate, including rescission, actual damages, interest at the statutory rate costs, and reasonable attorney fees.

The language of § 125(2) is nearly identical to that of § 604. The *Rosenthal* court held,

> to state a claim pursuant to section 11-51-125(2), a plaintiff must allege the following: (1) that the plaintiff is a purchaser or seller of a security; (2) that the security is a "security"; **[*39]** (3) that the defendant acted with the requisite scienter; (4) that the defendant's conduct was in connection with the purchase or sale of a security; (5) that the defendant's conduct was in violation of section 11-51-123 [the predecessor of § 501(1)]; and (6) that plaintiff relied upon defendant's conduct to his or her detriment, or that defendant's conduct caused plaintiffs injury.

*Rosenthal,* 908 P.2d at 1102. These elements, adopted by the Colorado Supreme Court, do not include a privity requirement. TRSL's claim under *§ 604(3)* is not subject to dismissal for failure to allege privity between TRSL and the defendants.

Scienter. As noted in *Rosenthal,* a plaintiff asserting a claim under the provisions of the Colorado Securities Act discussed above must allege, *inter alia,* that the defendant acted with the requisite scienter. *908 P.2d at 1102.* The provisions of *§ 11-51-501(1)* closely parallel those of *Rule 10b-5(b).* When parallel provisions of

Colorado amid federal law are involved, Colorado courts find federal authorities to be highly persuasive in interpreting the Colorado Securities Act. *See, e.g., Lowery v. Ford Hill Init. Co.,* 192 Colo. 125, 556 P.2d 1201, 1205 (Colo. 1976). **[*40]**

As discussed in Section V-D above, the allegations in the complaint do not indicate that any of the individual defendants were aware of the materiality of the manipulations they allegedly engineered, or the materiality of the false statements allegedly made possible by their manipulations. Absent awareness of the alleged materiality of their actions, the individual defendants cannot be said to have acted with intent to defraud under the standards of *§ 10(b)* and *Rule 10b-5,* or under the parallel provisions of the Colorado Securities Act. TRSL's Colorado Securities Act claim must be dismissed as to the individual defendants.

B. Negligent Misrepresentation

Qwest argues that the plaintiff's negligent misrepresentation claim must be dismissed because Qwest owed no duty to the plaintiff, and because the economic loss rule bars such a claim.

The Colorado courts have adopted the *Restatement (Second) of Torts § 552(1) (1976),* and' its definition of a claim of negligent misrepresentation.

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in **[*41]** their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Fluid Technology, Inc. v. CVJ Axles, Inc.,* 964 P.2d 614, 616 (Colo.App., 1998) (citing *Restatement (Second) of Torts § 552(1) (1976)).* The plaintiff has alleged that the defendants, in the course of their business, profession, or employment, supplied false information to the market concerning Qwest's business, which information was known to be used as a guide by those investing in Qwest stock, and which information was known'to have an affect on the price of Qwest stock. The plaintiffs claim to

2005 U.S. Dist. LEXIS 44756, *41; Fed. Sec. L. Rep. (CCH) P93,530

have relied justifiably on the false information provided by the defendants, and to have suffered a financial loss as a result of their reliance on this information. P 53. The facts alleged by the plaintiff are sufficient to state a claim for negligent misrepresentation.

Qwest argues that it cannot be liable on such a claim because a corporation has no duty to its shareholders. In supplying information for the guidance of others [*42] in business transactions, one often will face the foreseeable risk that inaccurate information may cause harm to those relying on the information. In this context, one undertakes a duty to exercise reasonable care in providing information. The information in question in this case is information on which investors routinely, foreseeably, and justifiably rely. In this context, the defendants had a duty to exercise reasonable care. Further, Qwest is liable for the actions of its employees and agents. Many of the defendants are employees and agents of Qwest who allegedly supplied false information to investors.

Qwest argues also that the economic loss rule prohibits the plaintiff from pursuing a negligent misrepresentation claim. The Colorado Supreme Court has said that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care, under tort law." *Grynberg v. Agri Tech, Inc.,* 10 P.3d 1267, 1269 (2000). The court described the rule in similar terms in *Town of Alma v. Azco Construction, Inc.,* 10 P.3d 1256, 1264 (2000). The rule [*43] "serves to maintain a distinction between contract and law." *Id. at 1262.*

In the present case, there is no need to preserve this distinction. TRSL does not assert any claims that sound in contract. Its negligent misrepresentation claim is based on the duty, established in Colorado law, to exercise reasonable care when supplying information for the guidance of others in their business transactions. Assuming the allegations of the Complaint to be true, the plaintiff may be able to establish that Qwest and the other defendants tortiously breached this duty.

The individual defendants argue that the plaintiff has not alleged that the individual defendants were involved in the public pronouncement of the allegedly false financial reports that are the basis of TRSL's complaint. I conclude that involvement in Qwest's public pronouncements is not required to support TRSL's negligence claim. TRSL has alleged that the individual

defendants knew that the recognition of revenue on the transactions in which they were involved was improper and false, but the defendants 'nonetheless structured the transactions to permit their divisions to report the false recognition of revenue. [*44] Further, the allegations in the complaint indicate that the individual defendants were aware that this false information would be published by Qwest in reporting its financial results. This is sufficient to allege that the individual defendants negligently supplied false information for the guidance of others.

The individual defendants argue also that the plaintiff has not alleged that the allegedly false information caused TRSL to engage in transactions in Qwest stock. TRSL alleges that it "relied upon the said false and misleading representations in purchasingthe securities of QWEST during the period of wrongdoing set forth in this Complaint. P 53. Under the applicable notice pleading standards, this allegation is sufficient.

In short, applying the notice pleading standard of *FED. R. Civ. P. 8,* I conclude that the plaintiff has stated a state law claim for negligent misrepresentation against the defendants.

C. Common Law Fraud

Qwest argues that TRSL has not alleged facts supporting an inference of actual reliance on Qwest's allegedly fraudulent statements. TRSL essentially concedes that this is trued *Opposition,* p. 35. On this basis, Qwest's motion to dismiss TRSL's common [*45] law fraud claim should be granted.

As discussed above, TRSL's allegations bear no indication that the individual defendants knew that the manipulations in which they participated would form the basis of materially false statements that would be likely to mislead Qwest investors. Again, absent knowledge that the improper recognition of revenue would be material to a reasonable Qwest investor, the individual defendants cannot be said to have acted with fraudulent intent; with intent to mislead buyers or sellers of Qwest stock. The individual defendants', motion to dismiss TRSL's common law fraud claim should be granted.

## X. AMENDMENT OF COMPLAINT

TRSL repeatedly states its intention to amend its complaint in its opposition to the motion to dismiss. To the extent TRSL's opposition can be read to include a

2005 U.S. Dist. LEXIS 44756, *45; Fed. Sec. L. Rep. (CCH) P93,530

motion to amend its complaint, such a motion is improper. D.C.COLO.LCivR 7.1 C prohibits the inclusion of a motion in a response or reply to another motion. I will not view TRSL's opposition as including a motion to amend its complaint.

## XI. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1) That defendant Qwest Communications International, Inc.'s, motion to dismiss **[*46]** [# 37], filed September 7, 2004, is **GRANTED** as to the plaintiff's claim under *§ 18(a)* (Count Two), *§ 20(a)* (Count Three), and the plaintiff's claim for common law fraud (Count Six);

2) That defendant Qwest Communications International, Inc.'s, motion to dismiss [# 37], filed September 7, 2004, otherwise is **DENIED;**

3) That the motion to dismiss of defendants Weston, Eveleth, Walker, and Treadway [# 54], filed November 9, 2004, is **GRANTED** as to the plaintiff's claims under *§ 10(b)* (Count One), *§ 18(a)* (Count Two), *§ 20(a)* (Count

Three), the Colorado Securities Act (Count Four), and plaintiff's common law fraud claim (Count Six);

4) That the motion to dismiss of defendants Weston, Eveleth, Walker, and Treadway [# 54], filed November 9, 2004, otherwise is **DENIED;**

5) That defendant Douglas Hutchins' motion to dismiss [# 61], filed December 16, 2004, is, **GRANTED** as to the plaintiff's claims under *§ 10(b)* (Count One), *§ 18(a)* (Count Two), *§ 20(a)* (Count Three), the Colorado Securities Act (Count Four), and plaintiff's common law fraud claim (Count Six); and

6) That defendant Douglas Hutchins' motion to dismiss [# 61], filed December 16, 2004, otherwise **[*47]** is **DENIED.**

Dated September 23, 2005, at Denver, Colorado.

BY THE COURT:

s/ Robert E. Blackburn

United States District Judge