# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RUSSELL CARLSON, Individually And On
Behalf Of All Others Similarly Situated,

                             Plaintiffs,

        v.

XEROX CORPORATION, KPMG LLP,
PAUL A. ALLAIRE, G. RICHARD THOMAN,
ANNE MULCAHY, BARRY D. ROMERIL,
GREGORY TAYLER AND PHILIP FISHBACH,

                         Defendants.

3:00-CV-1621 (AWT)

This document relates to:

| | | |
|---|---|---|
| 00-cv-01758 | 00-cv-01908 | 01-cv-00449 |
| 00-cv-01779 | 00-cv-01916 | 01-cv-00497 |
| 00-cv-01792 | 00-cv-01967 | 01-cv-00583 |
| 00-cv-01795 | 00-cv-02029 | 01-cv-00584 |
| 00-cv-01824 | 01-cv-00244 | 01-cv-00591 |
| 00-cv-01846 | 01-cv-00285 | 01-cv-00614 |
| 00-cv-01883 | 01-cv-00341 | |

## JOINT DECLARATION OF GLEN DEVALERIO, BRAD N. FRIEDMAN, AND DENNIS J. JOHNSON IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND REIMBURSEMENT AWARD TO LEAD PLAINTIFFS

## <u>TABLE OF CONTENTS</u>

I.    <u>INTRODUCTION</u> ...............................................................................................1

II.   <u>SUMMARY OF LITIGATION</u> ......................................................................2

    A.    Initial Complaint ......................................................................................3

    B.    Appointment of Lead Plaintiffs and Lead Counsel...........................................4

    C.    Plaintiffs' Amended Complaints and Defendants' Motions to Dismiss ...........6

    D.    The Parties' Rule 26(f) Planning Meeting Report ...........................................11

    E.    Lead Plaintiffs' Document Discovery ...........................................................13

        *1.    Documents Produced Informally by Xerox and KPMG* ........................13

        *2.    Deposition Transcripts and Exhibits from the SEC Litigation* ..............17

        *3.    Summary Judgment Pleadings from the SEC Litigation*........................17

        *4.    Lead Plaintiffs' Formal Document Requests*...........................................18

        *5.    Issue Memoranda*....................................................................................18

        *6.    Retention of Accounting Expert* ............................................................21

    F.    Class Certification....................................................................................22

    G.    Depositions ..............................................................................................24

        *1.    Establishing Lead Plaintiffs' Deposition Program*................................24

        *2.    Lead Plaintiffs' Attempts to Expedite the Deposition Program* ............26

            a.    <u>Requests for Admission</u> .................................................................26

            b.    Motion to Use Deposition Transcripts Under
               <u>Fed. R. Civ. P. 32</u>.........................................................................27

        *3.    Fact Witness Depositions*.......................................................................28

    H.    Settlement Negotiations...............................................................................31

        *1.    2003/2004 Settlement Attempt (with the Xerox Defendants)* ................31

2.   *2005 Settlement Attempt (with KPMG)*.......................................32

3.   *2007 Settlement Attempt (with KPMG)* ...................................32

4.   *2007/2008 Settlement Attempt (with Xerox and KPMG)* ......................34

III.  SETTLEMENT.....................................................................35

   A.   Preliminary Approval of Settlement and Notice................................35

   B.   Terms of the Settlement......................................................36

   C.   Settlement Administration ...................................................37

   D.   Plan of Allocation and Settlement Proceeds ..................................39

IV.  EVALUATION OF THE PROPOSED SETTLEMENT ...........................42

   A.   Risks Involved in Establishing Liability and Damages .........................42

      1.   *Risks of Establishing Liability* ..........................................43

         a.   Problematic Procedural Circumstances .........................43

         b.   Difficulty of Proving Scienter.................................45

            i.   *Independent Approval of Xerox's ROE Methodology* ..........45

            ii.   *Independent Approval of Xerox's MN Methodology* ...........48

            iii.   *Exoneration from Liability for the XMEX Fraud* ................49

            iv.   *The SEC Required the 2nd Restatement* ...............50

         c.   Difficulty of Proving Materiality...................................51

         d.   Difficulty of Proving Reliance.....................................52

      2.   *The Risks of Establishing Damages*.....................................52

         a.   Difficulty of Proving Loss Causation .............................52

         b.   Difficulty of Proving Damages as to KPMG................................55

      3.   *The Risks of Maintaining a Class Action Through Trial*......................56

　　　　4.　　*The Ability of Defendants to Withstand Greater Judgment* ....................56

　B.　The Reasonableness of the Settlement...............................................................57

　C.　The Reasonableness of the Plan of Allocation ................................................59

　D.　The Reasonableness of the Request for Attorneys'
　　　Fees and Reimbursement of Expenses...............................................................60

VI.　CONCLUSION.........................................................................................................66

Pursuant to 28 U.S.C. § 1746, we, Glen DeValerio, Brad N. Friedman and Dennis J. Johnson, declare under penalty of perjury that the following is true and correct.

## I.      INTRODUCTION

1.      Our respective law firms, Berman DeValerio Pease Tabacco Burt & Pucillo ("Berman DeValerio"), Milberg LLP ("Milberg") and Johnson & Perkinson ("J&P") (collectively, "Lead Counsel"), were appointed, and acted as, Lead Counsel during the bulk of this action ("Action").

2.      The parties have entered into an agreement to settle the Action ("Settlement"). The March 27, 2008, Stipulation and Agreement of Settlement ("Stipulation") provides for settlement fund of $750 million in cash, plus accrued interest ("Settlement Fund").  The Settlement Fund encompasses:  (i) a $670 million settlement between Plaintiffs, on the one hand, and Defendants Xerox Corporation ("Xerox Corporation" or "Company"), Barry D. Romeril, Paul A. Allaire, Anne Mulcahy, Gregory Tayler, Philip Fishbach and G. Richard Thoman, on the other hand; and (ii) an $80 million settlement between Plaintiffs and KPMG LLP ("KPMG").

3.      We make this Declaration in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement, Plan of Allocation, Award of Attorneys' Fees and Reimbursement of Expenses, and Reimbursement Award to Lead Plaintiffs.  We participated actively throughout every phase of the Action and would be competent to testify that the following facts are true to the best of our knowledge, information and belief.

4.      The purpose of this Declaration is to set forth the facts that support the contentions of the Lead Plaintiffs that:  (a) the proposed settlement is fair, reasonable and adequate and should be approved by the Court; (b) that the joint fee application of Plaintiffs' counsel requesting fees of 20% of the Settlement Fund, and reimbursement of litigation expenses

1

of $3,314,399.90; and (c) Lead Plaintiffs' request for reimbursement of costs and expenses should be approved by the Court.  It is respectfully submitted that the Settlement is fair, reasonable and adequate.  Balancing the excellent return that the Settlement represents with the substantial risks the Class faced during the litigation – which would have grown exponentially were this case to proceed to trial – Lead Counsel manifestly achieved an outstanding result for the Class.  Indeed, when settled, the Settlement was one of the ten largest settlements in a private class action lawsuit alleging violations of the federal securities laws since the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA").   The Settlement thus ensures a substantial recovery for Class members, takes advantage of the opportunity to reach a pretrial resolution of the Action, eliminates the risks related to an adverse judgment at trial and the collectability of any judgment received.  In addition, Lead Plaintiffs' request for an award of attorneys' fees and expenses is reasonable and in line with those awarded in similar cases. Indeed, the Honorable Judge Alfred M. Wolin, U.S.D.J. (Ret.), whom Lead Plaintiffs retained to provide an independent assessment of the reasonableness of Lead Counsel's attorneys' fee request, concluded unequivocally that it was in step with awards in comparable cases and perfectly appropriate under the circumstances of this case.  *See* Lead Plaintiffs' Memorandum Summarizing the Background of the Wolin Report Submitted in Support of Lead Counsel's Award of Attorneys' Fees and Reimbursement of Expenses ("Wolin Memorandum").

5.      A Final Approval hearing is scheduled for October 7, 2008, at 3:00 p.m.

## II.      SUMMARY OF LITIGATION

### A.      Initial Complaint

6.      On August 24, 2000, the Law Offices of Dennis J. Johnson ("LODJJ"), a predecessor of J&P, filed the first of several initial complaints in this case ("Original

Complaint") after Xerox announced that, among other things, it experienced problems with bad debts at Xerox's subsidiary in Mexico ("XMEX") and that the SEC had initiated an investigation into the Company's accounting at XMEX.

7.      The Original Complaint was filed on behalf of Russell Carlson and a class of all persons or entities who purchased Xerox's common stock during the period January 25, 2000 through and including July 27, 2000 ("Original Class Period"). The Original Complaint alleged violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. Section 240.10b-5, as well as Section 20(a) of the Exchange Act. In particular, Plaintiffs alleged that Defendants issued false or misleading statements by failing to disclose the substantial accounting problems that affected Xerox's Mexican operations ("XMEX") and the impact that those problems had on the Company's revenues, earnings and performance.[1]

8.      At the time the Original Complaint was filed, a separate action was pending against Xerox and previous officers and directors of Xerox alleging a class period subsumed within that alleged in this matter. *See In re Xerox Sec. Litig.*, CA No. 3:99-CV-2374 (AWT) (D. Conn.) ("*Xerox I*"). Three of the four firms initially appointed as lead counsel in this case, Milberg; Stull, Stull & Brody ("SSB"); and Bernstein Liebhard & Lifshitz LLC ("BLL"); were already serving as lead counsel in *Xerox I*.[2]

9.      The allegations in *Xerox I*, which concern improper false statements concerning the success of a corporate restructuring, are unrelated to the allegations here. That said, the

---

[1]      Named as Defendants in the Original Complaint were Xerox, KPMG, and four of Xerox's current or former officers and/or directors: Paul A. Allaire, G. Richard Thoman, Anne Mulcahy and Barry D. Romeril (collectively, the "Original Individual Defendants") (collectively with Xerox and KPMG, the "Original Defendants").

[2]      LODJJ was not then, nor has it or J&P ever been, involved in *Xerox I*.

existence of *Xerox I* posed significant difficulties for Plaintiffs in this case, particularly with respect to their ability to prove loss causation.

**B.   Appointment of Lead Plaintiffs and Lead Counsel**

10.   On October 23, 2000, Plaintiffs Gemini Systems Corp., Dr. Paul Dantzig, Thomas Zambito, Sol Bronheim and Rose Bronheim moved, among other things, for Lead Plaintiff status and for appointment of Milberg, SSB, BLL, and LODJJ as Lead Counsel.  On January 10, 2001, the Court held a telephonic status conference on the issue of the Lead Plaintiff and Lead Counsel appointments.

11.   That same day, the Court entered an Order ("January 10th Order"), among other things, consolidating the actions; appointing Gemini Systems Corp., Paul Dantzig, Thomas Zambito, Sol Bronheim and Rose Bronheim as Lead Plaintiffs ("Initial Lead Plaintiffs"); and the law firms of Milberg, SSB, BLL and LODJJ as Lead Counsel ("Initial Lead Counsel").[3]

12.   On February 6, 2001, *The Wall Street Journal* ("*WSJ*") published an article disclosing that a whistleblower from Xerox's corporate offices, along with several XMEX executives, believed that the fraudulent conduct at Xerox went well beyond the accounting issues that Xerox previously claimed to be confined to XMEX.

13.   Following that revelation, on February 15, 2001, Berman DeValerio filed a lawsuit on behalf of plaintiffs Margolis Partnership and Roelf Iest (collectively, "Margolis Plaintiffs"), captioned *Margolis P'ship v. Xerox Corp. et al.,* 3:01-CV-0244 (AWT) (hereinafter "*Margolis* Action") naming Xerox, KPMG, and several of the Original Individual Defendants as defendants.  The *Margolis* Action alleged federal securities violations during a period from February 15, 1998 through February 6, 2001.  Specifically, the *Margolis* Action alleged that, in

---

[3]   On March 1, 2001, the Court modified the January 10th Order to apply it to all cases arising out of the same subject matter as the consolidated action.

addition to accounting failures at XMEX, Xerox also improperly recognized revenues by:  (1) prematurely booking those portions of lease payments properly attributable to future revenue streams from services and supplies; and (2) boosting short-term results by overstating the value of future payments from leases originated in developing countries.[4]

14.     On April 16, 2001, Initial Lead Plaintiffs, along with Xerox bond purchaser Alvin Feder, filed a Consolidated Amended Complaint ("AC") lengthening the Original Class Period to February 15, 1998 through February 6, 2001.[5]  In addition to allegations of accounting fraud at XMEX, the 154-page, 398-paragraph AC also contained, among other things, allegations of:  (1) improper deferred costs in long-term lease payments; (2) improper recognition of sales of revenue streams from long-term rentals to banks; (3) improper recognition of revenues from long-term rentals as long-term leases; and (4) improper failures to write-off bad debts.

15.     The allegations in the AC were based on Initial Lead Counsel's exhaustive investigation, which included:  (1) interviews of former employees at Xerox's U.S. headquarters; (2) interviews of former employees of Xerox Business Services Division, which included XMEX and South America; (3) interviews of former employees at XMEX; and (4) consultation with forensic accountants based on their examination of the Company's financial reports.

16.     After several status conferences and extensive briefing over the next seven months, the Court entered an Order dated January 4, 2002, among other things:  (1) consolidating the Original Complaint and the *Margolis* Actions; (2) appointing LASERS, Paul Dantzig and Thomas Zambito as Co-Lead Plaintiffs (collectively, "Lead Plaintiffs"); and (3) appointing Milberg, J&P, and Berman DeValerio as Lead Counsel.

---

[4]     Several lawsuits similar to the Margolis Action were also filed on behalf of various plaintiffs (collectively with the Margolis Action, the "Margolis Actions").

[5]     The AC also added two new defendants:  Philip Fishbach and Gregory Tayler (collectively with the Original Individual Defendants, "Individual Defendants," and collectively with the Original Individual Defendants and Xerox, "Xerox Defendants").

C.       **Plaintiffs' Amended Complaints and Defendants' Motions to Dismiss**

17.       During the course of the lead plaintiff appointment process, Lead Plaintiffs diligently proceeded with their investigation of Xerox and KPMG as the story continued to unfold, compounding the initial work with a review of subsequent news stories, analyst reports, SEC filings, and the wrongful termination complaint filed by whistleblower James Bingham, Xerox's former Assistant Treasurer.  Lead Plaintiffs also identified and interviewed additional former employees of Xerox and KPMG, many of whom further confirmed the scope of the fraud.

18.       On May 31, 2001, Xerox filed the 1st Restatement, acknowledging improper accounting at XMEX, as well as an improperly established and used $100 million reserve and improper adjustments of residual values related to certain sales-type leases.  Moreover, on that date, Xerox announced that the SEC was continuing its investigation into the Company's accounting.

19.       Armed with information from the foregoing sources, Lead Plaintiffs drafted and filed a 162-page, 375-paragraph Second Consolidated Amended Complaint on February 11, 2002 ("SAC").  The SAC alleged that the Defendants issued false and misleading statements during the period from February 17, 1998 through February 6, 2001.  Among other things, the SAC detailed how Xerox's financial results were materially overstated due to:  (1) Defendants' misstatements related to the accounting machinations purportedly corrected in the 1st Restatement; (2) Defendants' utilization of improper accounting for its sales-type leases; (3) Defendants' improper boosting of revenues by applying improper accounting to the sales of future revenue streams; and (4) improper internal controls.

20.       The SAC also detailed KPMG's GAAS violations in knowingly or recklessly failing to qualify, modify, or abstain from issuing audit opinions on Xerox's fiscal 1997, 1998

and 1999 financial statements, which were materially false and misleading.  The SAC further alleged that, as a direct result, market prices of Xerox's common stock and bonds were artificially inflated throughout the Class Period and that Lead Plaintiffs and the Class purchased their securities at those inflated prices, suffering damage thereby.

21.     On April 11, 2002, the SEC filed a civil fraud complaint settling its enforcement action against Xerox ("SEC Complaint").  The SEC Complaint alleged that Xerox employed a variety of undisclosed accounting actions to disguise the Company's true operating performance, most of which violated GAAP and accelerated Xerox's recognition of equipment revenue by over $3 billion and increased its pre-tax earnings by approximately $1.5 billion over the four-year period from 1997 through 2000.

22.     Thereafter, on or about June 28, 2002, Xerox filed the 2nd Restatement, pursuant to which it restated $6.4 billion in revenues from fiscal years 1997 through 2002.

23.     In the meantime, on May 6, 2002, the Xerox Defendants and KPMG had each filed motions to dismiss the SAC.  In light of the SEC Complaint and the 2nd Restatement, however, Lead Plaintiffs moved for an extension of time for Plaintiffs to respond to Defendants' motions to dismiss and sought leave to file a *third* amended complaint containing substantial new allegations.

24.     Following a telephonic status conference on September 5, 2002, the Court ordered that the Third Consolidated Amended Complaint ("TAC") be docketed and deemed the operative complaint.  The same day, the Court also denied, as moot, Defendants' Motions to Dismiss the SAC and directed the Defendants' to respond to the TAC by December 2, 2002.

25.     The TAC, filed on September 11, 2002, was 191 pages long and contained 522 paragraphs.  The TAC detailed information already in the SAC, as well as specific data

subsequently culled from publicly available sources, including the 2nd Restatement, the SEC settlements with Xerox, and interviews by Lead Counsel with various former Xerox and KPMG employees.

26.     In order to further support the allegations of securities fraud, the TAC contains fold out graphs chronicling, among other things: (1) Defendants' misleading statements and the positive impact that such statements had on the market price of Xerox securities; (2) the timing of the disclosures of negative information and the negative impact such disclosures had on the price of Xerox securities; and (3) Defendants' scienter.

27.     On December 2, 2002, the Xerox Defendants filed a motion to dismiss the TAC. The Xerox Defendants' 28-page motion argued that the TAC:  (a) failed to plead scienter regarding the accounting practices reviewed and approved by KPMG; and (b) failed to plead Xerox's scienter regarding two of three alleged accounting violations at XMEX.  Additionally, the Individual Defendants filed a motion to dismiss, arguing that Lead Plaintiffs had not adequately alleged their scienter with respect to the uncollectible receivables at XMEX.

28.     Three days later, on December 5, 2002, KPMG filed a separate motion to dismiss the TAC.  In its 22-page memorandum, KPMG argued the TAC was deficient as to KPMG's scienter because it lacked motive and opportunity allegations and failed to plead that KPMG acted recklessly.   Specifically, KPMG argued that allegations of violations of GAAP and GAAS were insufficient to support a strong inference of scienter.  Moreover, KPMG argued that the claims of Plaintiffs who purchased Xerox securities after February 6, 2002 were time-barred, having arisen more than one year after "discovery" of the facts from the February 6, 2001 *WSJ* article featuring the allegations of whistle-blower James Bingham.

29.     On January 24, 2003, Lead Plaintiffs filed three separate opposition briefs – a 79-page opposition to the Xerox Defendants' motion to dismiss, a 26-page opposition to the Individual Defendants' supplemental motion to dismiss, and a 35-page opposition to KPMG's motion to dismiss.

30.     In their opposition to the Xerox Defendants' motion to dismiss, Lead Plaintiffs demonstrated how KPMG's initial objections to, and subsequent participation in, the fraud demonstrated Defendants' scienter.  Furthermore, Lead Plaintiffs argued that the magnitude of the GAAP violations and the amount of the restatements supported a strong inference of scienter and that the Individual Defendants had the motive and opportunity to commit fraud.

31.     In their opposition to KPMG's motion to dismiss, Lead Plaintiffs cited allegations demonstrating that KPMG knowingly or recklessly participated in the fraud and engaged in a subsequent cover-up in signing off on the 1st Restatement.  In addition, Lead Plaintiffs showed that claims of investors in Xerox's stock who purchased after February 6, 2002 were not time-barred, as the full extent of the alleged fraud was not revealed to the public until the 2nd Restatement was filed.[6]

32.     During the 2 ½ year pendency of Defendants' motions to dismiss, Lead Plaintiffs aggressively sought to protect Plaintiffs' rights, filing a motion for a partial lifting of the discovery stay to provide Plaintiffs with materials already produced in the SEC Litigation and investigations, as well as a motion to serve document preservation subpoenas on several third parties suspected to have information germane to Plaintiffs' claims.  When Plaintiffs prevailed

---

[6]     Lead Counsel also engaged in further litigation with Defendants related to their motions to dismiss.  In particular, the Declaration of Menachem Brenner ("Brenner Declaration") was submitted in support of the Xerox Defendants' motion and purported to demonstrate that the sales of Xerox's stock by the Individual Defendants did not give rise to an inference of scienter.  With its opposition to the motions to dismiss, Lead Counsel filed a motion to strike the Brenner Declaration ("Motion to Strike"), arguing that it constituted information not referenced in the TAC.  After reply and sur-reply briefing, the Court granted the Motion to Strike, in part, on September 29, 2003, striking materials that it deemed to constitute expert testimony or premised on factual assertions not found in the underlying SEC filings and construing all references to tables and graphs as references to the underlying filings.

on the latter Motion, subpoenas were served on various non-parties to preserve relevant information.

33.     On July 13, 2005, the Court issued an Order denying Defendants' motions to dismiss.

34.     KPMG answered the TAC on October 31, 2005 and asserted sixteen (16) affirmative defenses, the most notable of which were that:  (1) Plaintiffs' claims were barred by the statute of limitations; (2) a good faith belief in the accuracy of its statements insulated KPMG from liability for Plaintiffs' claims; (3) Plaintiffs' could not prove scienter; (4) Plaintiffs' claims were improperly brought as a class action; (5) KPMG was not liable for the falsity of any statements because the truth about them had already been disclosed; and (6) KPMG had no liability due to its reasonable reliance on the misrepresentations of Xerox's management.

35.     On November 1, 2005, the Xerox Defendants answered the TAC and asserted twenty-three (23) affirmative defenses, the most notable of which were:  (1) the reasonable reliance on advice of others upon which the Xerox Defendants had the right to rely insulated them from liability for Plaintiffs' claims; (2) Plaintiffs could not prove scienter; (3) Plaintiffs' claims were barred by the statute of limitations; (4) Plaintiffs' claims were improperly brought as a class action; (5) the Xerox Defendants were not liable for the falsity of any statements because the truth about them had already been disclosed; (6) Plaintiffs' claims were not material; (7) Plaintiffs could not prove loss causation; (8) Plaintiffs could not rely on the "fraud-on-the-market" theory to prove reliance; (9) the SEC complaints and settlement had no preclusive effect or evidentiary weight; and (10) the 1st Restatement and 2nd Restatement were not admissions of wrongdoing such as fraud or intentional/reckless deviation from GAAP.

**D.      The Parties' Rule 26(f) Planning Meeting Report**

36.      Subsequent to the Court's denial of Defendants' motions to dismiss, the parties

engaged in a planning meeting regarding scheduling, disclosures and discovery.  Not

surprisingly, given the number of parties and counsel, those negotiations were extensive and took

several months to complete.  On November 21, 2005, Lead Plaintiffs and the Defendants filed

their Rule 26(f) Report of the Parties' Planning Meeting, reporting that the parties reached

agreement on most issues related to scheduling, disclosures and discovery.

37.      The parties' most significant disagreement concerned the number and length of

depositions that each party would be entitled to take, as well as timing of fact witness

depositions.  The parties also disagreed on several class certification and confidentiality order

issues.  To resolve those disputes, the parties submitted position statements to the Court on

December 2, 2005.

38.      In Plaintiffs' position statement, Lead Plaintiffs argued that:  (1) Plaintiffs should

be permitted to take 50 days of fact witness depositions and that several of those depositions

should be permitted to last longer than one day; (2) depositions should be measured in half-day

increments; (3) Plaintiffs should be permitted to begin depositions within six months of the filing

of the Rule 26(f) Report; (4) there should be dates certain for class certification briefing; and (5)

the Xerox Defendants' proposed paragraph in the Confidentiality Order, which sought the right

to designate documents produced by third parties as "privileged" under the terms of the

Confidentiality Stipulation, was contrary to established law.

39.      In their position statement, the Xerox Defendants sought: (1) a limitation of 25

seven-hour depositions per side; (2) not to be required to oppose class certification prior to the

"substantial completion" of class discovery; and (3) to have the Confidentiality Order permit

Defendants to assert their own privileges over documents produced by other parties.[7]

40.     On January 30, 2006, the Court conducted a telephonic status conference to

address the remaining disputes.  During that conference, the parties informed the Court of their

agreement to proceed with document discovery and to table the remaining disputes until that

process had run its course.

41.     On February 3, 2006, the Court entered an Order approving the Rule 26(f) Report,

provided that the parties continued to work to resolve their remaining differences.  The Court

further directed the parties to bring any open issues to the Court's attention at an appropriate

time.  Consistent with the parties' request, the Court set a discovery deadline of November 21,

2007, and a deadline for dispositive motions of July 31, 2008.

### E.     Lead Plaintiffs' Document Discovery

#### 1.     *Documents Produced Informally by Xerox and KPMG*

42.     Having waited 2 ½ years to obtain rulings on Defendants' motions to dismiss,

Lead Plaintiffs believed that if they proceeded with formal discovery (*e.g.,* document requests,

objections, court resolution of disputes), Defendants might have stalled Plaintiffs' access to any

discovery by refusing to produce various documents, thereby forcing Plaintiffs to seek Court

assistance.  Lead Plaintiffs proposed instead that Defendants produce all transcripts of testimony

taken, and documents produced, in the SEC Litigation and SEC investigations.  In exchange,

Lead Plaintiffs agreed not to serve formal document requests until later in the litigation.

43.     Over the following months, Defendants informally produced:  (1) transcripts and

exhibits from depositions and witness interviews taken in connection with any SEC investigation

---

[7]     On January 25, 2006, the Court rejected the Xerox Defendants' request to be allowed to designate
documents produced by other parties as "privileged" under the terms of the Confidentiality Order.

of Xerox and/or KPMG; and (2) documents produced during the SEC Litigation.  In addition, the Individual Defendants agreed to produce documents produced in response to requests from the SEC or any party in the SEC Litigation.

44.     Lead Counsel's decision to engage in informal discovery conferred a substantial benefit on the Class.  By avoiding formal document discovery, Lead Counsel eliminated the cumbersome motion practice that invariably follows formal document requests in complex cases such as this one, with millions of responsive documents in question.  Indeed, whereas similar cases might prompt dozens of discovery motions, Lead Counsel were able to obtain the vast majority of the documents necessary to prove Plaintiffs' claims without filing, and waiting for the resolution of, a single motion to compel production.  As a result, significantly fewer attorney hours were spent on document discovery issues and Plaintiffs' receipt of the documents was greatly expedited – both immeasurable benefits to the Class.

45.     Lead Counsel's extensive document discovery program commenced in late 2005 and consisted of over four million pages of documents, much of it in electronic format.[8]  In contrast to other similar cases, Defendants' entire production required careful analysis because it contained only the key documents on which the SEC focused its attention.[9]  At the same time, due to the age of this case, Lead Counsel needed to conduct as efficient a review as possible, which would enable them to turn quickly to a deposition program before witness memories faded irretrievably.  Accordingly, it was incumbent upon Lead Counsel to institute a streamlined

---

[8]     Defendants also made several subsequent informal productions.  For example, on November 1, 2007, KPMG produced an additional 17,000 pages of documents that had been omitted from KPMG's original production. In addition, beginning in July 2007, Lead Counsel sought, and eventually obtained, production of KPMG's Audit Manual, KPMG's SEC Manual, privilege logs and other missing workpapers.

[9]     Although the instances of document dumps on class counsel are legion, regulated entities are obviously loath to engage in such litigation tactics with the SEC.

document review process that nevertheless was successful in culling the key documents from the millions of pages that Defendants produced.

46.     A significant decision Lead Counsel had to make in this regard was how to house the electronic portion of Defendants' document production.  Following research and a bidding and negotiation process with several document database hosting vendors, Lead Counsel retained Legal Internet, LLC ("Lextranet").  Lextranet offered the greatest combination of flexibility and price, combining an attractive package of document/transcript review and coding options at a more moderate cost than several other comparable products.  In particular, Lextranet agreed to format the electronic documents, upload them onto a password-protected, secure website, and provide expert assistance to Lead Counsel in connection with the review and coding of the documents without charging a monthly hosting fee for the documents.

47.     Another important determination Lead Counsel had to make concerned the document review protocol.  Although Lead Counsel carefully considered the pros and cons of outsourcing the documents to code their so-called "objective" components (*e.g.*, names, dates and document types), they decided against that route for several reasons.  First, due to the 2 ½ year pendency of Defendants' motions to dismiss, it was incumbent upon Lead Counsel to begin its document review program immediately and outsourcing would have unduly delayed that process by at least three to six months.  Moreover, the complexity of the documents and the likelihood that a great percentage of them would relate to Plaintiffs' claims weighed heavily in favor of having attorneys review and code them in full.  Indeed, while outsourcing "objective" coding had the surface appeal of reducing costs, attorneys still would have had to re-review and cross-check all of that coding work due to the assumed importance of each document, thereby doubling the time and cost associated with coding each document.  For those reasons, among

others, Lead Counsel made an informed strategic decision to give attorneys the responsibility to code all documents.[10]

48.    To prepare the attorneys for the document review, Lead Counsel compiled a packet of relevant background materials.  Included within that packet was the TAC as well as a summary of Plaintiffs' allegations, an explanation of terms, significant pleadings, a chronology of events, a cast of characters and a synopsis of other information that was known about each accounting manipulation.  All reviewing attorneys were required to familiarize themselves with the background materials before they were tasked to review the documents.  In addition, Lead Counsel conducted an introductory training session to present reviewing attorneys with an overview of the case, discuss the manner in which the document review would be conducted, and offer reviewers the opportunity to ask any questions they had before commencing the review.

49.    Lead Counsel also prepared a detailed Coding Manual that outlined procedures and guidelines according to which the review was to be conducted.  To ensure continuing education of coding attorneys, Lead Counsel conducted weekly conference calls during which examples of proper and improper coding were reviewed and discussed.  Moreover, throughout the review, Lead Counsel consistently monitored the work product and contemporaneously evaluated the discovery of key documents, meeting and/or talking individually with each coding attorney to provide constructive feedback on their work.

50.    To further maximize efficiency, discrete aspects of the training and oversight for the document coding project were divided among the three Lead Counsel firms.  In addition, the documents themselves were categorized (*e.g.,* KPMG workpapers by year, Xerox Brazil, Xerox

---

[10]    Notwithstanding that decision, Lead Counsel was by no means slavishly dedicated to that principle above all others.  For example, when Lead Counsel gained a more complete grasp of relevant issues in the case, they eliminated most "objective" coding for documents that were less pertinent to Plaintiffs' claims, knowing that a reevaluation of those documents based on newly gathered information was highly unlikely to occur.

Europe, etc.) and then distributed by category among each firm's discovery team. That crucial step allowed reviewers to develop expertise quickly on a particular segment of Defendants' widespread fraud. As such knowledge developed, Lead Counsel organized monthly training sessions conducted by each discovery team as a means of transferring that expertise to others on a more expedited basis. In addition, Lead Counsel conducted telephonic monthly training sessions during which Lead Counsel's in-house forensic accountant gave interactive presentations, each of which was designed to examine a particular method by which Defendants manipulated Xerox's accounting function.

51.     Having prioritized the review of the most important categories of documents, fewer and fewer key documents were discovered as the project progressed. Accordingly, Lead Counsel reduced the number of reviewers on two separate occasions and streamlined the coding protocol to eliminate "objective" coding for certain types of documents so that the scaled back team of reviewers could work through the remaining documents on an expedited basis. Indeed, whereas more than 100 attorneys were coding documents at the height of the review, the team was less than 20% of that size when Lead Counsel concluded the review. Moreover, at that time, Lead Counsel had eliminated "objective" coding altogether on all but the key documents in the case.

52.     Overall, the document review process ended in only fifteen (15) months, an extraordinary accomplishment considering the size of the production, the volume of documents uncovered and the complex nature of the documents being reviewed. The resulting document and coding sheet database became critical to Lead Counsel's ability to search for documents by issue; to determine witness knowledge on a particular issue; to prepare for and take depositions; and to meaningfully participate in settlement discussions.

## 2. Deposition Transcripts and Exhibits from the SEC Litigation

53.     Lead Plaintiffs also reviewed and digested all of the deposition transcripts produced by the Defendants from the SEC Litigation and prior investigations.  In total, Defendants produced 68 days of deposition transcripts, taken from 48 witnesses during the SEC Litigation, many of whom were deemed key witnesses in the *Carlson* action.  Additionally, Defendants produced 87 days of investigative deposition transcripts, taken from 39 witnesses during the SEC investigations, many of whom, again, were deemed key witnesses in this action.

## 3. Summary Judgment Pleadings from the SEC Litigation

54.     During the first quarter of 2006, following denial of summary judgment motions filed by individual KPMG partners and the subsequent settlement of the SEC's claims by KPMG, Lead Plaintiffs obtained and reviewed all of the summary judgment pleadings and exhibits from the SEC Litigation.  Lead Plaintiffs then drafted a 58-page memorandum outlining the substance of the KPMG defendants' arguments and supporting evidence – each of which was anticipated to mirror a defense raised in this action.  In addition, Lead Plaintiffs' memorandum highlighted the differences between the SEC Litigation and the *Carlson* Action relative to the elements of claims, the named defendants, and the scope of the alleged misconduct.  Lead Plaintiffs' memorandum also summarized all cited exhibits and expert reports.

55.     Lead Plaintiffs utilized the summary judgment analyses repeatedly in conducting discussions with Plaintiffs' accounting expert so as to come to an understanding of the complex accounting regulations and procedures attendant to Xerox's accounting and to impeach Defendants' purportedly "independent" analyses that were alleged to support Xerox's accounting actions.

### 4.     Lead Plaintiffs' Formal Document Requests

56.     After preliminarily assessing the contents of Defendants' informal document production, on March 2, 2006, Lead Plaintiffs served formal document requests on KPMG and the Xerox Defendants, seeking 29 categories of documents from KPMG and 14 categories of documents from the Xerox Defendants that were not produced with the informal production.  In addition, on December 22, 2005, Lead Plaintiffs served a subpoena on PricewaterhouseCoopers ("PwC"), the public auditing firm involved in several investigations and the restatement of Xerox's accounting, seeking several other categories of documents that were absent from Defendants' informal production.

### 5.     Issue Memoranda

57.     In an effort to distill the knowledge obtained from Lead Plaintiffs' review of Defendants' massive document production, Lead Plaintiffs enlisted the most experienced attorneys to draft detailed issue memoranda analyzing each distinct fraud allegation in the TAC ("Issue Memos").  The Issue Memos – designed to be dynamic reference manuals for Lead Plaintiffs' deposition and trial preparation – exhaustively analyzed the key evidence supporting each element of Plaintiffs' claims.  In that regard, the Issue Memos became an irreplaceable resource, acting not only as a primary deposition preparation tool, but also as one of the key bases for the factual presentations that Lead Plaintiffs made on four occasions during settlement negotiations and mediation.

58.     Lead Plaintiffs' creation of the Issue Memos was a two-pronged process.  Lead Plaintiffs began by assigning a team of seasoned document reviewers to conduct an in-depth "second level" evaluation and comparison of the "hot" (most helpful) and "contra" (most harmful) documents discovered during the review, culling them down to a limited number of

potential deposition and trial exhibits and sorting those that remained according to the issue(s) each addressed. That review process was streamlined and efficient. In large part, the task of "second level" reviewers was simplified by detailed attorney notes from the initial document review. Indeed, those notes focused the "second level" reviewers' attention on the key aspects of each "hot" and "contra" document and allowed them to isolate the most important documents that would be necessary to prove all elements of Plaintiffs' claims.[11]

59.     Once the second level review had been completed, those reviewers then drafted Issue Memos on the subject matter about which they had developed expertise. Drafts were then submitted to senior in-house attorneys, who refined them to be used as encyclopedic reference manuals on each subject area. Ultimately, Issue Memos were completed on eleven (11) distinct fraudulent practices, including therein citations to key documents, SEC testimony and expert analysis.[12]

60.     The Issue Memos comprised more than 1,000 pages of analysis and citations to applicable accounting standards, documents and deposition testimony (taken in both the SEC investigations and the SEC Litigation) on the following topics:

1)  **Return on Equity ("ROE")**:  one of Defendants' unique accounting gimmicks that improperly shifted revenues from the finance to the equipment component of bundled leases;

2)  **Margin Normalization ("MN")**:  another pervasive and novel accounting gimmick that improperly shifted revenues from the service to the equipment component of bundled leases;

---

[11]     Parenthetically, the "second level" review process also allowed Lead Counsel to identify categories of documents that still needed to be produced from Defendants or other third parties. For example, in July 2006, Lead Counsel determined that they had not received full copies, with exhibits, of all expert reports submitted in the SEC Litigation. After Defendants claimed they did not have complete sets of such documents, Lead Counsel obtained them through negotiations with the SEC, gaining priceless insight into Defendants' defenses.

[12]     Lead Counsel fully vetted the subject matter of the Issue Memos with their accounting expert to ensure the accuracy of the final memoranda.

3) **Sales-Type Lease Misclassification**:  Defendants improperly classified Central and South American leases as sales-type leases rather than operating leases in order to prematurely accelerate the recognition of revenue from those leases;

4) **Reserve Accounting**:  Defendants used cookie-jar reserves, acquisition reserves, and restructuring reserves to artificially boost revenues;

5) **"Portfolio Asset Strategy" ("PAS") Transactions**:  Xerox inadequately disclosed and improperly accounted for purported "sales" of portfolios of lease revenue streams to third parties in an effort to boost current period revenues;

6) **Residual Value Adjustments**:  Defendants improperly and retroactively adjusted  assigned residual values in sales-type leases upward to increase current period income by decreasing current period costs;

7) **XMEX:**  Defendants employed several accounting machinations to artificially inflate current period revenues (ultimately leading to the 1st Restatement);

8) **Sales of Lease Receivables to Special Purpose Entities**:  Defendants used securitizations and sales of finance receivables to special purpose entities to misrepresent Xerox's earned financing income and debt;

9) **Undisclosed Factoring Transactions**:  Defendants improperly accounted for recourse sales of Xerox assets, thereby overstating current period revenues;

10) **Recognition of Sales Revenue Prior to Actual Installation**:  Defendants prematurely recognized revenue from post-reporting period delivery and installation of Xerox equipment;

11) **Consolidation of Xerox's South African Affiliate**:  Defendants knowingly failed to eliminate intercompany accounts receivables due to inappropriate consolidated reporting of the financials of Xerox's South African affiliate.

61.     Lead Plaintiffs also prepared a separate Issues Memo concerning the evidence supporting a strong inference of Xerox's, KPMG's, and the Individual Defendants' scienter with respect to *each* of the foregoing manipulations.

62.     In addition, Lead Plaintiffs prepared global Issue Memos concerning several overarching topic areas, including:

1) **Earnings Management** – addressing evidence that Defendants' overall motive in using each separate and distinct accounting gimmick was to create the appearance

20

that Xerox had revenues substantial enough to meet or beat analysts' expectations on a quarterly and annual basis;

2) **Internal Controls** – addressing the breakdown in Xerox's internal controls that facilitated the worldwide scope of the alleged fraud, and demonstrated how the lax tone at the top of the Xerox organization was a primary enabler of the fraud;

3) **KPMG's Lack of Independence** – addressing KPMG's lack of impartiality due to significant audit and consulting fees generated from the Xerox engagement.

63.     As deposition preparation began in earnest, Lead Plaintiffs continued to update the Issue Memos with information and citations from documents obtained through formal document requests and targeted searches of the Lextranet database.  As a result, the Issue Memos acted as a road map for Lead Plaintiffs to use in deposition and mediation preparation, forming the basis for various deposition outlines, and mediation statements and presentations.

### 6.     Retention of Accounting Expert

64.     Given the complexity and scope of the accounting manipulations here, it was imperative for Lead Plaintiffs to hire an accounting expert early in the process.  Lead Plaintiffs' choice was consistent with their practice of promoting efficient litigation.  In choosing Hemming Morse, Inc. ("Hemming") – the SEC's expert in the SEC Litigation – Lead Plaintiffs assured that the interests of the Class would be served in that Plaintiffs' expert would not need to spend hundreds (or thousands) of hours and bill hundreds of thousands of dollars to overcome the substantial learning curve presented by the facts and issues in this case.  Moreover, the retention of an accounting firm that already knew many of the basic facts of the case greatly expedited Lead Plaintiffs' litigation preparation.  Indeed, Lead Plaintiffs conferred with Hemming on numerous occasions from August 2006 until this case settled in March 2008.  Those consultations – which did not result in a significant expense to the class – were an instrumental

part of Lead Plaintiffs' preparation for drafting Issue Memos, taking depositions, and engaging in settlement negotiations and mediation.

### F.    Class Certification

65.    Lead Plaintiffs filed a Motion for Class Certification on January 19, 2006, supported by a 28-page Memorandum of Law.  Lead Plaintiffs advanced the following entity and individuals as class representatives:  LASERS, Dr. Paul Dantzig, Thomas Zambito, Joseph DiNardo, Fernan Cepero, Leonard Nelson, John Stutsman, and Sol Sachs ("Proposed Class Representatives").[13]

66.    On February 6, 2006, the Xerox Defendants served document requests on the Proposed Class Representatives.  The Xerox Defendants' discovery was far reaching.  Among the documents sought were all those pertaining to: (1) Lead Plaintiffs' brokerage accounts or trades for the prior ten years; (2) any other litigation; (3) tax returns for the prior five years; and (4) documents reflecting the Lead Plaintiffs' financial assets.  Additionally, the Xerox Defendants sought documents from all Plaintiffs' counsel's files related to investigations of Defendants related to any of the several complaints filed in the consolidated *Carlson* Action.[14]

67.    In April 2006, the parties agreed to defer service of responses and objections until July 31, 2006 (for responses to the Xerox Defendants' requests), and until August 7, 2006 (for responses to KPMG's requests), deadlines that were later extended to March 7, 2007.

68.    On March 7, 2007, Lead Plaintiffs served Plaintiffs' Objections and Responses to Defendants' document requests and, after months of meet-and-confer negotiations, produced Lead Plaintiffs' and the Proposed Class Representatives' documents.  The job of isolating those

---

[13]    Sol Sachs, Leonard Nelson and Fernan Cepero subsequently withdrew themselves from consideration as class representatives.

[14]    KPMG served a similar set of document requests on or about February 7, 2006.

documents was particularly onerous for LASERS.  In particular, Lead Plaintiffs needed to review more than 200 boxes of archived documents and tens of thousands of pages of electronic files for relevance and privilege, a task that took three attorneys working full-time nearly a month to complete.  Additionally, Lead Plaintiffs had to review its entire working files – more than 30 bankers' boxes worth – for relevance and privilege in order to produce materials related to counsel's investigation prior to the filing of any original complaint, the FAC, the SAC and the TAC.  Moreover, to obtain documents on behalf of Plaintiff Dantzig, Lead Plaintiffs had to contact various attorneys to negotiate the right to obtain files from other litigation.  Additionally, Plaintiff Zambito contacted the brokerages and financial institutions with whom he maintained accounts and Lead Plaintiffs met with him at his home in Rochester, New York to assist in the search of his personal files in an effort to secure all responsive documents.  Lead Plaintiffs also contacted all Plaintiffs' counsel to obtain documents from their files related to investigations of Defendants related to any of the several complaints filed in the consolidated *Carlson* Action.  In all, Lead Plaintiffs reviewed for privilege and produced approximately 300,000 responsive documents.[15]

### G.  Depositions

#### 1.  *Establishing Lead Plaintiffs' Deposition Program*

69.    In March 2007, Lead Plaintiffs proposed to take 70 *days* of deposition testimony, measured in half-day increments, with no depositions to last more than three days.  Lead Plaintiffs demonstrated the reasonableness of that proposal by reviewing the KPMG summary judgment memorandum, the Issue Memos and the transcripts of prior proceedings to assemble a non-exhaustive list of 85 deponents necessary for deposition ("Deponent List").  Lead Plaintiffs

---

[15]    In addition, Lead Counsel had to contact all counsel representing plaintiffs in any action underlying the consolidated *Carlson* case to obtain any investigative materials in their possession.

provided Defendants with the Deponent List, which contained each individual's name, titles, job responsibilities and a description of their knowledge relevant to Plaintiffs' claims.

70.     Although Defendants rejected Lead Plaintiffs' proposal, it did prompt them to increase the number of depositions they were willing to allow.  Thus, Defendants moved to an offer of forty (40) *days* of deposition testimony per side measured in half-day (3.5 hour) increments.  Given the breadth of knowledgeable witnesses in this case, however, Lead Plaintiffs could not agree to such a deposition program.

71.     By way of compromise, Lead Plaintiffs offered to reduce the number of depositions they would take if Defendants would stipulate to the admissibility of the depositions taken in the SEC Litigation.  In that way, Lead Plaintiffs could improve the efficiency of the litigation by avoiding duplicative questioning of a deponent as to matters that had been adequately covered by the SEC.  Despite the obvious efficiency that would have been gained, Defendants rejected Plaintiffs' proposal and the parties agreed to refer the matter to the Court.

72.     On June 15, 2007, the parties filed revised position statements concerning the parties' remaining deposition disputes.  Lead Plaintiffs' submission requested 70 *days* of deposition testimony, including 15 multi-day depositions, and to measure depositions in half-day increments.  In support of that position, Lead Plaintiffs provided the Court with the Deponent List.  On June 22, 2007, Defendants filed an opposing position statement, arguing that each party could take 40 depositions, none of which were to exceed one seven-hour day.

73.     The Court scheduled a telephonic status conference for July 18, 2007 to address the disputed issues regarding the number and length of depositions.  The day before the telephonic status conference, however, the Xerox Defendants requested that the Court coordinate the deposition program in the *Carlson* Action with depositions in a class action suit captioned

*Patti v. Xerox Corp., et al.*, 02-CV-1138 (AWT), which alleged violations by Xerox of the

Employee Retirement Income Security Act of 1974 ("ERISA Action").   Lead Plaintiffs objected

to the proposal on grounds that it would delay discovery in the *Carlson* Action, as document

production in the ERISA Action had not yet begun.   Nevertheless, at the July 18, 2007 status

conference, the Court directed the parties to try to reach agreement on a coordination proposal.

74.     After repeated attempts to reach an agreement on the parameters of a deposition

program and coordination with the ERISA Action, the parties returned to the Court to resolve

their disputes.  On July 30, 2007, the Court held a joint hearing for the parties in the *Carlson*

action and the ERISA Action.  Although Lead Plaintiffs argued that 70 deposition days would be

appropriate and that coordination would severely prejudice the Plaintiffs, the Court stated that it

was likely to limit Plaintiffs to 50 depositions and was inclined to coordinate depositions with

the ERISA Action.  In lieu of entering an Order to that effect, the Court proposed that the parties

attempt to reach an agreement while they were together at the Courthouse.

75.     Lead Plaintiffs negotiated an agreement that maximized their ability to control the

course of what was likely to be a strictly limited deposition program.  The agreement that Lead

Plaintiffs exacted, which provided that Plaintiffs could take 50 depositions and divided

deponents into "common" and "non-common" deponents vis-à-vis the ERISA Action, allowed

Lead Plaintiffs to begin at least part of their deposition program almost immediately.  As a result,

Lead Plaintiffs helped Plaintiffs avoid the severe prejudice that would have occurred had they

been required to suspend depositions until after the ERISA plaintiffs reviewed the 4 million

relevant documents in this case – which Lead Plaintiffs believed would likely have taken over a

year.

### 2.      *Lead Plaintiffs' Attempts to Expedite the Deposition Program*

76.      In an effort to manage the deposition process in the most efficient manner, Lead Plaintiffs utilized numerous procedural devices to ensure that the limited depositions resulted in Plaintiffs eliciting the maximum quantity and quality of evidence attainable.  Indeed, the hurdles presented by the age of the case – *e.g.*, faded memories and deceased witnesses – and the widespread nature of the fraud – *e.g.*, unavailable and foreign witnesses – made this an imperative as it was likely that many of the depositions would eventually serve as trial testimony.

### a.      Requests for Admissions

77.      On or about August 22, 2007, Lead Plaintiffs served Plaintiffs' First Set of Requests to Admit on all Defendants ("1st Request to Admit"), seeking admissions as to the authenticity and admissibility of numerous documents that Plaintiffs anticipated using during the deposition process and/or at trial.  On or about August 29, 2007, Lead Plaintiffs served Plaintiffs' Second Set of Requests to Admit on all Defendants ("2nd Request to Admit") (collectively with the 1st Request to Admit, "Requests to Admit"), seeking admissions as to the authenticity and admissibility of numerous documents cited by Defendants in various Wells Committee Submissions.

78.      The goal of the Requests to Admit was to eliminate the need to authenticate documents during the deposition program, thereby reducing the length of many depositions and eliminating altogether the need to take certain others.  On or about September 24, 2007, and October 1, 2007, Defendants objected to the 1st Request to Admit and the 2nd Request to Admit, respectively.  By letter dated January 8, 2008, Lead Plaintiffs proposed that Defendants instead serve Lead Plaintiffs, within 14 days after a deposition, with admissions as to the authenticity of the exhibits marked in that deposition.  Defendants rejected that proposal, offering only to

26

stipulate to the authenticity of any deposition transcript from the SEC Litigation prior to a deposition in the *Carlson* case to which the transcript was relevant.

79.     Lead Plaintiffs were weighing the benefit of filing a motion to compel responses to the Requests to Admit when the parties settled the case in March 2008.

          b.     <u>Motion to Use Deposition Transcripts Under Fed. R. Civ. P. 32</u>

80.     On October 9, 2007, Lead Plaintiffs filed a motion seeking to use the deposition transcripts from the SEC Litigation pursuant to Rule 32 of the Fed. R. Civ. P. as if they were taken in this case ("Rule 32 Motion").  Given the substantial identity of interests and issues among the two cases, the Rule 32 Motion was an excellent means to expedite the deposition process, as it would drastically limit duplicative testimony without prejudice to the Defendants' cross-examination rights.  Moreover, from a strategic standpoint, the specter of a successful Rule 32 Motion put tremendous pressure on the Xerox Defendants to settle the case, because it would have provided Plaintiffs with damaging testimony that otherwise might not have reached a jury.

81.     It was thus no surprise that the Xerox Defendants opposed the Rule 32 Motion on October 30, 2007, despite the obvious efficiency that using the SEC Litigation transcripts would have created.  On December 12, 2007, the parties presented oral argument to the Court on the Rule 32 Motion during a telephonic status conference.  On March 7, 2008, the date that the parties notified the Court that the case had been settled, the Court denied the Rule 32 Motion.[16]

---

[16]     It should be noted that the Rule 32 Motion was pending throughout Plaintiffs' entire deposition program. As a result, Lead Counsel had to be prepared at each deposition, in case of its denial, to recreate the entirety of the key SEC testimony in addition to eliciting testimony on issues over and above those addressed by the SEC.

### 3.     *Fact Witness Depositions*[17]

82.     Lead Plaintiffs split the 50 anticipated witnesses into three groups based on their affiliation (*e.g.*, Xerox, KPMG, PwC, etc.) and geography (U.S., South America and Europe, etc.) so that labor could be best divided both in terms of substantive knowledge and travel expenses among Lead Counsel firms.  Lead Plaintiffs then had investigators obtain contact information for most potential deponents (many of whom resided overseas) and conducted extensive research on the Hague Convention and other deposition procedures in foreign countries, including Canada, Mexico, Brazil, Ireland, England, France, Germany and Japan.

83.     Lead Plaintiffs then prepared extensive deposition packets for anticipated witnesses, assembling exhibits and key prior testimony, and developing specific questions for each witness.  To do so, Lead Plaintiffs reviewed each Issue Memorandum, SEC deposition digests, and pertinent "hot" and "contra" documents for information related to each witness and his or her subject matter knowledge.

84.     The preparation of deposition kits was exponentially more labor intensive in this case than in other securities fraud cases.  As discussed above, the fraudulent conduct was widespread, multi-faceted, and entirely unique to Xerox.  As a consequence, Lead Plaintiffs had to master the evidence concerning various aspects of each alleged fraud, including its development, implementation, and eventual reversal in one or both of two restatements.  In addition, the existence of deposition transcripts both from the SEC Litigation and the SEC investigations (up to six days in some instances) added to the difficulty.  They, in fact, required

---

[17]     Simultaneous with the deposition program, Lead Counsel continued efforts to obtain relevant information on an informal basis.  For example, on November 1, 2007, Xerox provided Lead Plaintiffs with the address in Brazil for Carlos Salles, former head of Xerox Brazil.  After confirming that Mr. Salles was not represented by counsel, Lead Counsel interviewed him and discussed meeting with him in the U.S. in January 2008.  Mr. Salles indicated that he had information regarding the improper structuring of Brazilian leases.  Later that day, Mr. Salles confirmed his willingness to travel to the U.S. for a deposition and/or further interview.

Lead Plaintiffs virtually to memorize each witness' prior testimony on all subjects because: (a) the SEC investigation transcripts were inadmissible at trial; (b) there was no guarantee that the SEC Litigation transcripts would be usable at trial; and (c) there was a high likelihood in this decade-old case that witnesses would forget many events that happened between 6 and 10 years earlier.  As a result, Lead Plaintiffs had to be completely prepared to refresh witness recollection or impeach testimony because of the high likelihood that each deposition would function as trial testimony.

85.     The scheduling difficulties wrought by the Court's ERISA Action coordination Order also exponentially increased the level of deposition preparation.  Because Lead Plaintiffs could not completely control the scheduling of depositions, they were forced to prepare deposition packets for many deponents well in advance of the deposition.  Indeed, at the time of settlement, Lead Plaintiffs had already prepared deposition kits for 20-25 of the remaining key witnesses they identified as necessary to depose.

86.     In all, Lead Plaintiffs took seven depositions, approximately 14% of Plaintiffs' allotment, including the following:

    **A.**  **James Bingham**, a former Xerox Assistant Treasurer, who was responsible for developing and implementing the ROE accounting methodology and who was a lead negotiator on Xerox's Rank Acquisition;

    **B.**  **Richard Lill**, a former head of the finance arm of Xerox's Financial Planning and Analysis group, who was responsible for performing the ROE calculation for Xerox's U.S. operations and involved in establishing the pricing for Xerox's financing as it was offered to Xerox's customers;

    **C.**  **Charles Hall**, a former Head of Xerox's Internal Audit Department during the Class Period, who was responsible for Xerox's internal audit reports that issued critical ratings of, among other things, Xerox's accounting issues in Mexico and Brazil;

    **D.** **Patrick Fulford**, a former Xerox Vice President of Finance for the U.S. operations at all times during the Class Period, who was responsible for Xerox's quarterly closing process and Xerox's 1993 and 1998 restructuring reserves;

    **E.** **Russell Okasako**, a former Xerox Vice President of Taxes, who had information concerning the Rank acquisition, as well as various other accounting machinations, including ROE and the ACT Refund;

    **F.** **Chris Ross-Parker**, a Xerox Manager for Group Financial Reporting at Xerox Europe, who was responsible for tracking the results of two major fraudulent methodologies, MN and ROE; and

    **G.** **Donald Weber**, a former Xerox Vice President of Finance who had involvement with Xerox's 1993 and 1998 Restructuring Reserves, as well as Xerox's retroactive residual value uplifts at XMEX, ROE manipulations at Xerox's Brazilian operating unit ("XBRA"), and the corporate approval process for non-operational accounting actions undertaken by XBRA and XMEX**.**

    87.    Notably, Mr. Bingham's testimony – the last deposition taken before Defendants sought to stay all subsequent depositions in lieu of settlement discussions – was perhaps the most damaging to Defendants.  Mr. Bingham's interview with the *WSJ* earned him credit as the person who "blew the whistle" on Defendants' attempts to limit the public's knowledge of the worldwide scope of Xerox's accounting manipulations.  At his deposition, with Lead Plaintiffs fully prepared to refresh his recollection on key events from the five days of prior testimony he had given to the SEC, Mr. Bingham emotionally recounted his experience at Xerox with exacting detail.  He was able to describe the inner workings of many aspects of Xerox's fraudulent accounting with great particularity, including ROE, Reserve Accounting, PAS transactions, and improper Sales-type leasing categorizations.  In addition, he identified senior executives including Individual Defendants Barry Romeril, Greg Tayler and Philip Fishbach as having direct knowledge of the fraudulent nature of each manipulation.

### H.      Settlement Negotiations

#### 1.      *2003/2004 Settlement Attempt (with the Xerox Defendants)*

88.      During the first half of 2003, while Defendants' motions to dismiss were pending, Lead Plaintiffs and counsel to the Xerox Defendants initiated settlement discussions.  As part of that process, both parties conducted preliminary damages assessments with the assistance of independent damages experts, with retaining Philadelphia Investment Banking Company to perform Plaintiffs' analysis.  In addition, Lead Plaintiffs discussed the potential of including various corporate governance changes as part of any proposed settlement.

89.      Given Xerox's financial condition at the time, it was clear that a substantial component of any potential settlement would have been Xerox securities.  Lead Plaintiffs retained financial experts to opine on Xerox's business plans and whether such securities would have future value.[18]  In the end, the parties realized that their views of the settlement value of the case were diametrically opposed to one another.  Negotiations broke down shortly thereafter.

90.      Almost one year later, on or about April 23, 2004, the parties resumed discussions of possible settlement and addressed whether the retention of a mediator would help.  Ultimately, Professor Eric D. Green ("Professor Green") of Resolutions, LLC, of Boston, MA, was chosen as an acceptable mediator, but the talks ended before Professor Green could be enlisted to assist.

#### 2.      *2005 Settlement Attempt (with KPMG)*

91.      Beginning in 2005, Lead Plaintiffs and counsel for KPMG initiated settlement negotiations.  Soon thereafter, they agreed to participate in an in-person meeting without the assistance of a mediator.  Such a meeting took place on July 21, 2005, during which KPMG presented several arguments concerning its lack of culpability.  Although no resolution was

---

[18]      Xerox's counsel permitted Lead Counsel to have access to appropriate Xerox representatives to review Xerox's financial condition.

reached, the parties agreed to meet again at some point in the near future.  The parties met on two more occasions over the next few months in an attempt to partially settle the case.  Due to the divergent positions of the parties as to KPMG's exposure and Plaintiffs' ability to successfully litigate against Xerox alone after a settlement with KPMG, the parties were unable to reach any resolution.

### 3.        2007 Settlement Attempt (with KPMG)

92.        On or about November 1, 2006, Lead Plaintiffs and counsel to KPMG reopened a dialogue regarding potential settlement and agreed to enter into mediation.  With the hope that the Xerox Defendants might join the discussions at some point, the parties agreed to retain Professor Green, as the Xerox Defendants had already approved of his involvement with settlement discussions.  Mediation dates were set for January 24-25, 2007.

93.        In advance of the mediation, Lead Plaintiffs updated its prior damages report to reflect changes in the law resulting from the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).  In addition, Lead Plaintiffs revised its report to reflect Lead Counsel's heightened knowledge of the facts – most notably the factual and theoretical basis for concluding that the massive stock drops associated with partial disclosures in October 1999 could be attributable to the fraud alleged here as opposed to being attributable to *Xerox I*.  Lead Plaintiffs also engaged a second damages expert, Forensic Economics ("Forensic"), to perform an updated damages analysis, taking into account the *Dura* case and Lead Plaintiffs' advanced factual knowledge.

94.        In further preparation for the mediation, Lead Plaintiffs conducted an exhaustive analysis of the Issue Memos, underlying documents and testimony, and expert auditing and damages reports through the prism of Exchange Act auditor liability.  From that evaluation of the

facts and law, Lead Plaintiffs drafted a 35-page mediation statement concerning KPMG's liability and damages exposure, which was submitted to Professor Green on January 17, 2007.

95.     On January 24-25, 2007, Lead Plaintiffs met with KPMG's counsel at their office in New York City, with Professor Green acting as mediator.  Each side made presentations on the merits of Plaintiffs' claims, followed by discussions regarding the strengths and weaknesses of each position.  That process continued throughout the following day.

96.     At the conclusion of the second day, the parties agreed to reconvene in February 2007, to present rebuttal positions on the issues of damages, loss causation, and several substantive issues, including KPMG's liability for the 2000 audit and the XMEX issues.  The parties further agreed to exchange memoranda on damages in advance of the mediation.  Lead Plaintiffs and KPMG subsequently agreed to reconvene the mediation on February 15, 2007.

97.     In preparation for the second mediation session, Lead Plaintiffs enlisted Forensic to perform Plaintiffs' loss causation analysis.  That detailed report consisted of an event study of partial disclosures of the fraud Plaintiffs alleged and two sets of damages conclusions – one more conservative conclusion based on strong supporting evidence and the other more aggressive conclusion based on moderate evidentiary support.  In addition, Lead Plaintiffs developed a detailed presentation on the substantive issues highlighted during the first mediation session, as well as a written report on damages based on Forensic's loss causation analysis.

98.     The parties exchanged written damages statements on February 9, 2007.  In response to KPMG's submission, Lead Plaintiffs submitted a rebuttal to KPMG prior to the mediation.

99.     At mediation, Lead Plaintiffs presented arguments on substantive issues, including the reasons why KPMG was liable for Xerox's XMEX fraud, Xerox's fraudulent 2000

audit, and other accounting issues investigated by PwC.  After difficult arm's length negotiations and alternating exchanges of settlement demands and offers, the parties remained far apart and thus the mediation concluded with no resolution and no plans to resume settlement discussions.

### 4.      2007/2008 Settlement Attempt (with Xerox and KPMG)

100.     In or around August 2007, Lead Plaintiffs and counsel to the Xerox Defendants discussed a potential window of opportunity for settling the case.  Attempting to seize the opportunity, the parties agreed to a meeting in October 2007 with counsel and clients present – but without a mediator – to "break the ice" regarding renewed talks.

101.     That meeting took place on October 19, 2007, with each side making an oral presentation and answering follow-up questions.  The parties left the meeting with an understanding that the Xerox Defendants would contemplate a future mediation.  Thereafter, the Xerox Defendants agreed to participate in a February 11-12, 2008 mediation session led by Attorney Robert A. Meyer, Esq. ("Meyer"), of Loeb & Loeb LLP in Los Angeles, CA.  In an effort to reach a potential global settlement, Lead Plaintiffs further agreed to permit KPMG to attend the mediation.

102.     In preparation for the mediation, Lead Plaintiffs performed an analysis on a scale similar to that of their preparations for the KPMG mediation, but with a focus instead on the Xerox Defendants' liability.  On February 1, 2008, Lead Plaintiffs submitted a 30-page Mediation Statement to Meyer detailing the numerous liability, loss causation and damages issues in the case as they pertained to the Xerox Defendants' potential exposure to judgment.

103.     On Friday, February 8, 2008, Meyer presented Lead Plaintiffs with detailed questions soliciting counsel's response to the Xerox Defendants' positions, among other things, asking about:  (a) when the case would likely go to trial; (b) whether the case was solely about

the timing of revenue recognition; (c) whether KPMG would be exonerated because of Xerox's failure to provide full and accurate information; (d) whether the truth was provided to the market in Xerox's public disclosures during the Class Period; (e) how certain accounting manipulations worked; (f) whether any independent investigations concluded that the accounting was appropriate; and (g) the factual details of Plaintiffs' loss causation argument. Demonstrating the utility of their discovery efforts, Lead Plaintiffs submitted a detailed 15-page response to Meyer on Sunday, February 10, 2008.

104.    During the February 11-12 mediation, the parties argued the merits of each side's respective strengths and weaknesses, exchanging various settlement proposals in two days of hard fought negotiations. Eventually, Lead Plaintiffs, the Xerox Defendants and KPMG negotiated a global settlement of the nearly eight year old case for $750 million in cash – one of the top securities fraud settlements in U.S. history. In the days thereafter, the parties negotiated and finalized a Stipulation of Settlement ("Stipulation") memorializing the terms of the Settlement, which was filed with the Court on March 27, 2008. *See* Dkt. 463.

## III.    **SETTLEMENT**

### A.    **Preliminary Approval of Settlement and Notice**

105.    The parties notified the Court of the Settlement during a status conference held on March 7, 2007. After the parties submitted documentation requesting preliminary approval of the Settlement, this Court entered an Order on March 27, 2008 preliminarily approving the Settlement embodied in the Stipulation ("Preliminary Approval Order"). The Preliminary Approval Order: (a) approved a form of Notice; (b) approved the form of publication notice; (c) ordered that any Class members wishing to exclude themselves from the Class do so by letters postmarked no later than July 1, 2008; (d) ordered that any Class members wishing to object to

the Settlement file their papers by July 1, 2008; and (e) ordered a fairness hearing to take place at 3 p.m. on October 7, 2008.

**B.** **Terms of the Settlement**

106.     If approved, the proceeds of the Settlement will be distributed to members of the Class.  Pursuant to the terms of the Stipulation, Defendants are paying the aggregate settlement amount of $750 million to Lead Plaintiffs in installments according to the following schedule: (a) $10 million on April 1, 2008; $150 million on May 21, 2008; $150 million on July 1, 2008; $150 million on July 21, 2008; and $290 million on October 1, 2008.  The Settlement installment payments have been, and will be, deposited in an interest-bearing escrow account for the benefit of the Class starting on April 2, 2008, and have accrued approximately $1,882,410.75 in interest as of September 15, 2008.

107.     As set forth and defined in the Stipulation, on the Effective Date, Lead Plaintiffs and all other members of the Class on behalf of themselves, their heirs, executors, administrators, successors and assigns will release and discharge the Defendants; all Settled Claims will be dismissed on the merits and with prejudice as to all Class members; and all Class members will be barred from prosecuting any other action raising any Settled Claims against any released party.

**C.** **Settlement Administration**

108.     Subsequent to the Settlement, Lead Plaintiffs retained a laims dministrator on behalf of the Class ("Claims Administrator").  The Claims Administrator was chosen after a competitive bidding process and extensive negotiations thereafter to significantly reduce third party costs, such as broker nominee charges typically incurred during securities class action

settlement administrations.  The Court approved the Claims Administrator in the Preliminary Approval Order.

109.     Lead Counsel's choice of claims administrators typified their practice of conducting efficient and cost-effective litigation:  Not only did the Claims Administrator submit the lowest "per claim" bid, it was also able to offer significant costs savings to the Class as a result of work that it had already completed as claims administrator for the SEC's Xerox Fair Fund administration ("Fair Fund Administration").  For example, the Claims Administrator had already compiled a list of approximately 600,000 names of potential Class members during the Fair Fund Administration, the possession of which saved hundreds of thousands of dollars in broker nominee charges and allowed Lead Counsel to mail Notice packages to a significant percentage of the Class much earlier than would otherwise have been possible.[19]  Moreover, the Claims Administrator already had in place a staff of telephone operators who were intimately familiar with the underlying facts of the case and could be tutored at no cost to the Class to provide answers to shareholder questions that were particular to the *Carlson* administration.

110.     With the Claims Administrator's assistance, Lead Plaintiffs drafted the Notice of Pendency of Class Action and Proposed Settlement, Motion for Attorneys' Fees and Proposed Fairness Hearing ("Notice"), a Summary Notice of Pendency of Class Action and Proposed Settlement, Motion for Attorneys' Fees and Proposed Fairness Hearing ("Summary Notice"), and a shareholder Proof of Claim form.

111.     In accordance with the Preliminary Approval Order, Lead Plaintiffs caused the Notice to be mailed to all Class members who could be identified from Xerox's stock transfer records and through the efforts of the Claims Administrator.  In a mailing effort that began on

---

[19]     Indeed, as a consequence, Lead Counsel was able to ensure that the Notice was mailed to more than half of the putative Class members within weeks of the issuance of the Preliminary Approval Order, greatly enhancing the Due Process afforded to prospective Class members.

April 9, 2008, a total of 1,036,460 Notices were sent to potential Class members.  The Affidavit

of Carole K. Sylvester re: Mailing and Publication of Notice and Requests for Exclusion

("Sylvester Aff."), dated September 15, 2008, attests to the compliance with the Court's Order

on Notice to the Class.  A true and accurate copy of the Sylvester Aff. is included in

Compendium of Declarations/Affidavits in Support of Final Approval of Class Action

Settlement, Plan of Allocation, Award of Attorneys' Fees and Reimbursement of Expenses, and

Reimbursement Award to Lead Plaintiffs ("Compendium of Affidavits" or "Aff. Comp."), Tab 5.

Lead Plaintiffs and the Claims Administrator expended significant time and energy ensuring that

the largest brokers, banks and other financial institutions acting as nominees for purchasers of

Xerox securities complied with the Notice program ordered by this Court.

112.    Additionally, pursuant to the Preliminary Approval Order, the Summary Notice

was published in the national edition of *The Wall Street Journal* and was released over the

Global Media Circuit of *Business Wire* on April 25, 2008.  The Affidavit of George A. Bauer III

Regarding Publication of the Summary Notice of Pendency of Class Action, Proposed

Settlement and Settlement Hearing ("Bauer Affidavit") attests to the compliance with the Court's

Order on publication notice to the Class.  *See* Aff. Comp., Tab 4.

113.    The Notice provided a detailed description of:  (1) the Action; (2) the nature of

the claims; (3) the history of the litigation; (4) the potential outcome if this Action were to

proceed to trial; (5) the terms of the proposed settlement and the Plan of Allocation, including

the manner in which the Settlement Fund would be divided among the Class; (6) the process and

deadline for filing objections, requests for exclusion and claim forms; (7) the date, time, and

place of the Court's hearing to determine the fairness of the Settlement; (8) the right of Class

members to be heard at the hearing; and (9) the claims to be released.  The Notice also informed

the Class that Lead Plaintiffs would apply for: (1) an award of attorneys' fees not to exceed 20% of the Settlement fund, plus reimbursement for expenses of no more than $5,000,000; and (b) move the Court to award a payment to Lead Plaintiffs for their reasonable costs and expenses (including lost wages) directly relating to their representation of the Class.

114.    Moreover, both the Notice and Summary Notice was published on the websites of the Lead Counsel firms and the Claims Administrator and are available to investors on the Internet.

115.    To date, Lead Plaintiffs have paid $996,110.22 out of the Settlement Fund to cover the costs related to Settlement notice and administration.

**D.    Plan of Allocation and Settlement Proceeds**

116.    As set forth and defined in the Stipulation and Notice, the $750 million cash settlement and the interest earned thereon constitutes the gross Settlement Fund ("Gross Settlement Fund"). The Gross Settlement Fund, less all taxes, approved costs, fees and expenses ("Net Settlement Fund") will be distributed to members of the Class who submit valid and timely Proofs of Claim ("Authorized Claimants") in accordance with a "Plan of Allocation." Each Authorized Claimant will receive, on a proportionate basis, that share of the Net Settlement Fund that the Authorized Claimant's Recognized Loss bears to the total Recognized Losses of all Authorized Claimants. The allocation formula specifically accounts for the strengths and weaknesses of Plaintiffs' claims, as alleged, in determining each Claimant's *pro rata* share of the Settlement Fund.

117.    The Plan of Allocation is based on the expert opinions of Howard Mulcahy of Forensic Economics, Inc. ("Forensic Economics"). Mr. Mulcahy specializes in computing damages under the Securities Act of 1933 and the Securities and Exchange Act of 1934.

Forensic Economics is serving as Lead Plaintiffs' primary damages expert in connection with this Action.

118.    The Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund by taking into account the varying levels of price inflation caused by the alleged false and misleading statements at specific points during the Class Period.  As a result, members of the Class will benefit differently under the Plan of Allocation based on whether they bought and/or sold their shares before or after the alleged partial disclosures.  The development of the Plan of Allocation did not take into account the individual interests of the Lead Plaintiffs.

119.    As set forth in the Notice, the principal elements of the Plan of Allocation are as follows:

A.    For shares of Xerox common stock purchased during the Class Period and sold at a loss during the Class Period, "Recognized Claim" will be the lesser of:

    i.    The Purchase Price Paid, including commissions and transaction charges (the "PPP") less the Sales Proceeds Received, net of commissions and transaction charges (the "SPR"), OR

    ii.    The Loss Amount per share on the date of Purchase as shown in the above table, less the Loss Amount per share on the date of Sale as shown in the above table.

B.    For shares of Xerox common stock purchased during the Class Period and sold at a loss during the period June 28, 2002 through September 27, 2002 (the 90 days following the end of the Class Period), "Recognized Claim" will be the lesser of:

    i.    The PPP less the greater of (i) the SPR, or (ii) $6.97 per share, OR

    ii.    The Loss Amount per share on the date of Purchase as shown in the above table.

C.    For shares of Xerox common stock purchased during the Class Period for more than $6.97 per share2 and still held on September 25, 2002, "Recognized Claim" will be the lesser of:

    i.    The PPP less $6.97 per share, OR

      ii.      The Loss Amount per share on the date of Purchase as shown in the above table.

D.      For Xerox Bonds purchased during the Class Period and sold at a loss during the Class Period, "Recognized Claim" will be the lesser of:

      i.      75% of the difference between (i) the Purchase Price Paid, including commissions and transaction charges but excluding any accrued interest (the "BPPP") less (ii) the Sales Proceeds Received, net of commissions and transaction charges but excluding any accrued interest (the "BSPR"), OR

      ii.      75% of the difference between (i) the Loss Amount per Bond4 on the date of Purchase as shown in the above table, less (ii) the Loss Amount per Bond on the date of Sale as shown in the above table.

E.      For Xerox Bonds purchased during the Class Period and sold at a loss during the period June 28, 2002 through September 27, 2002, "Recognized Claim" will be the lesser of:

      i.      75% of the difference between (i) the BPPP less (ii) the greater of (a) the BSPR, or (b) the Holding Value for such Bonds as shown in the above table, OR

      ii.      75% of the Loss Amount per Bond on the date of Purchase as shown in the above table.

F.      For Xerox Bonds purchased during the Class Period for more than the Holding Value for such Bonds5 and still held on September 27, 2002, "Recognized Claim" will be the lesser of:

      i.      75% of the BPPP less the Holding Value per Bond held, OR

      ii.      75% of the Loss Amount per Bond on the date of Purchase as shown in the above table.

120.      To the extent an Authorized Claimant had a gain from his, her or its overall transactions in Xerox securities during the Class Period, the value of the "Recognized Claim" will be zero.  To the extent that the Authorized Claimant suffered an overall loss on his, her or its overall transactions in Xerox securities during the Class Period, but that loss was less than the

"Recognized Claim" calculated under the Plan of Allocation formula, then the "Recognized Claim" shall be limited to the actual loss.[20]

## IV.   **EVALUATION OF THE PROPOSED SETTLEMENT**

121.   The Settlement is the result of arm's-length negotiations between experienced counsel who have concluded that the Settlement is fair, reasonable and adequate.  Settlement at this time avoids long and costly additional litigation, including the inevitable appeals after trial. Settlement also provides a huge benefit on behalf of the Class while avoiding the dangers of trial. After the completion of a substantial portion of factual discovery, it is the informed opinion of Lead Plaintiffs that the significant risks involved in taking this case to trial amply justify this Settlement.  In addition, the Settlement represents a significant percentage recovery of the amount of the Class's damages as estimated by Plaintiffs.

### A.   **Risks Involved in Establishing Liability and Damages**

122.   Although we believe that Plaintiffs have a strong case on the merits, the risks associated with establishing liability and damages – including difficult issues of law and fact relating to *scienter*, materiality, reliance, causation, and the amount of damages sustained by the Class – weighed heavily in favor of the Settlement.

#### 1.   *Risks of Establishing Liability*

##### a.   Problematic Procedural Circumstances

123.   One significant procedural reality that posed significant risks to Lead Plaintiffs' ability to establish liability in this case was its age.  The allegations in the TAC related to

---

[20]    The Plan of Allocation does not "offset" losses for those institutions or individuals who have holdings in Xerox purchased prior to the commencement of the Class Period that were subsequently sold during the Class Period.

financial misstatements in Xerox's 1997 to 2001 fiscal years, and thus much of the conduct – and many of the documents – central to those allegations dated back more than a decade.

124.    Lead Plaintiffs experienced the impact of that litigation risk first-hand during depositions, when key witnesses repeatedly had no memory of documents and events with which they were intimately involved.  In fact, despite having drafted or executed certain documents, some witnesses nevertheless failed to recall them or the circumstances surrounding their creation and/or circulation.  Several witnesses even drew blanks on certain subjects when Lead Plaintiffs read back their own prior testimony from the SEC Litigation or investigations.  As a result, the mere authentication of documents was difficult for Lead Plaintiffs to accomplish, let alone establishing a factual record of the attendant circumstances.

125.    The SEC's decision not to pursue various aspects of the fraud alleged in *Carlson* posed another limitation on Lead Plaintiffs' ability to prove liability.  First, the SEC's decision to limit the scope of its allegations prompted Defendants to argue that they were exonerated from liability for additional conduct alleged in the *Carlson* matter, forcing Plaintiffs to contend with an additional defense.  Moreover, the SEC Litigation concerned only KPMG's liability, falling far short of creating the evidentiary record necessary to establish the liability of all of the *Carlson* Defendants.

126.    Among other things, the SEC Litigation failed to address the following issues germane to Plaintiffs' claims:

- Xerox's liability and scienter;

- The Individual Xerox Defendants' liability and scienter;

- The rampant churning of sales-type lease contracts in South America, which Lead Plaintiffs alleged to account for $2.2 billion of the $6.4 billion restatement of revenues in the 2nd Restatement;

- The alleged use of improperly short economic life assumptions for leased equipment to ensure that shorter term leases qualified for sales-type lease accounting, which contributed to almost $600 million of the revenue restated in the 2nd Restatement;

- The alleged accounting issues at XMEX that gave rise to the $170 million 1st Restatement; and

- The alleged improper consolidation of Xerox's South African affiliate.

127.    Similarly, none of the SEC testimony concerned reliance and damages, two required elements of Plaintiffs' claims here that were unnecessary for the SEC to prove in its case.

128.    Another noteworthy procedural reality that increased the risk profile of this case was the lack of parallel criminal proceedings.  Several other class cases were litigated alongside or after federal criminal actions based on the same conduct alleged in the accompanying class case, including *Enron*, *Tyco*, *Worldcom*, *AOL Time Warner*, *Cendant, Royal Ahold, Bristol Myers, McKesson* and *Qwest*.  Clearly, the absence of related criminal proceedings here would have diminished the seriousness of the fraud in any jury member's eyes.

129.    Still another procedural risk concerned the likelihood of lengthy appeals. Regardless of the outcome of any eventual trial, which undoubtedly would have required several weeks, if not months, and involved the introduction of hundreds of exhibits, vigorously contested pre-trial and *in limine* motions and significant expenses, it is a virtual certainty that the verdict would have been appealed.  All of the foregoing would delay the ability of the Class to recover for years – assuming, of course, the Lead Plaintiffs were ultimately successful on their claims. Thus, the Settlement provides an immediate, significant and certain pecuniary recovery to the members of the Class.  Settlement at this juncture clearly avoids substantial, continued and

uncertain litigation through further discovery, summary judgment, a protracted trial, and post-trial proceedings.

b.     Difficulty of Proving Scienter

130.     The overwhelming litigation risk Lead Plaintiffs faced was that Plaintiffs would be unable to prove that Defendants acted with scienter.  That risk, while typically present in Rule 10b-5 cases, was particularly acute here because Defendants had the opportunity to create a paper trail *during the Class Period* that purported to exonerate them.  In particular, Defendants centered their defense strategy on several "independent" investigations of Xerox's accounting, all of which substantially condoned the Company's accounting actions.  Indeed, Defendants can cite to any number of law firms, forensic auditors, audit engagement teams and accounting experts that concluded that Xerox's lease accounting conformed to GAAP.  The myriad of evidence supporting the GAAP compliance of Xerox's accounting posed a serious risk that Defendants would persuade a jury that they lacked scienter with respect to the conduct Plaintiffs alleged.

i.     *Independent Approval of Xerox's ROE Methodology*

131.     SFAS 13 governs the classification of leases as *operating* or a *sales-type* leases, the latter type permitting a lessor to record revenue attributable to equipment immediately, but requiring service and finance revenue to be recorded ratably over the term of the lease.[21]  SFAS 13 further articulates detailed calculations proscribing the specific manner by which a lessor must allocate revenue among lease components of a sales-type lease.  One basic principle is that equipment value must be determined ***first*** based on the machine's "normal selling price," with

---

[21]     As a result, it is clearly preferable for a company's leases to be classified as sales-type leases in order to increase the amount of revenue it can recognize at the outset of a lease.

financing revenue determined thereafter using the equipment value as part of the SFAS 13 calculation.

132.    One of the primary accounting gimmicks that Defendants employed was Xerox's ROE methodology, which used a complicated formula to reallocate financing revenue to the equipment portion of bundled lease transactions.  Plaintiffs alleged that Defendants implemented ROE knowingly or recklessly disregarding that the methodology improperly backed into equipment value by using an arbitrary finance value and ultimately overstated equipment revenue by more than $2.7 billion during the Class Period.  Defendants, on the other hand, claimed that they deviated from SFAS 13's proscribed formula because: (1) Xerox had an insufficient number of direct cash sales to make reliable and cost-effective estimates of the fair value of its equipment; and (2) Xerox's sales data entry systems did not properly allocate revenue to the equipment, service and finance streams of bundled leases.

133.    Substantial evidence exists to support Defendants' arguments and undermine Plaintiffs' claims with respect to ROE.  Most notably, Defendants would have been able to introduce clean audit opinions from KPMG throughout the Class Period.  Indeed, KPMG repeatedly reviewed and approved ROE calculations as an appropriate application of GAAP, noting in its audit opinions only that the methodology's "topside" nature qualified it as an audit risk.

134.    In addition, Defendants could have cited the work of two separate teams of independent auditors, both of which also concluded that ROE complied with GAAP.  First, the Xerox Audit Committee engaged the law firm of Paul, Weiss, Rifkind, Wharton & Garrison and a team of forensic accountants from PwC led by Harvey Kelly ("Kelly") in March 2001 to conduct a special investigation of accounting issues raised by whistleblower James Bingham.

Similarly, Xerox's management retained the law firm of Skadden, Arps, Slate, Meagher & Flom and another team of PwC forensic accountants led by Daniel Dooley ("Dooley") to conduct a similar analysis (collectively with the investigation of Kelly's team, the "Special Investigations"). The Special Investigations independently concluded that, but for a few immaterial retroactive adjustments, Xerox's lease accounting methodology produced GAAP-compliant results. As a result, Xerox included only minor adjustments in the 1st Restatement with respect to its ROE-derived revenue.

135. Defendants can point to still other independent analyses supporting the use of ROE under GAAP. After the 1st Restatement was filed, the SEC continued to study the validity of ROE and noted that Xerox could determine its reasonableness by comparing ROE revenue allocations to "verifiable objective evidence" ("VOE") in the form of cash sales of similar equipment. Thereafter, Defendants engaged PwC to conduct tests on the validity of ROE using VOE. PwC concluded from its analysis that the ROE equipment values fell within the appropriate range of cash sales, summarizing those conclusions in a report that was submitted to the SEC.[22] Thus, according to PwC, Xerox's method of revenue calculation was as accurate – if not more accurate – than that which Xerox utilized in the 2nd Restatement.

136. Similarly, until just prior to Xerox's settlement with the SEC in March 2002, the 2001 PwC audit team was prepared to issue a clean audit opinion on Xerox's 2001 consolidated financial statements, which Xerox prepared in part using revenue derived from the ROE methodology.[23] As discussed *infra*, Xerox maintained that it only agreed to the 2nd Restatement

---

[22]     PwC subsequently modified its report in response to his ongoing dialogue with the SEC about the validity of ROE. None of the SEC's comments altered PwC's overall conclusion that the ROE equipment values were reasonable under GAAP.

[23]     Moreover, PwC's conclusion was buttressed by another outside accounting expert that Xerox retained, who opined at the time that ROE was an appropriate lease accounting methodology under GAAP.

so that it could file its Annual Report – which the SEC refused to accept without a restatement – so as to prevent the Company from defaulting on its bank loans and possibly threatening its solvency.

137.    Overall, Defendants had three separate independent investigations, two separate teams of auditors and an accounting expert available to testify as to their conclusions about the acceptability of the ROE methodology under GAAP.[24]  Although Lead Plaintiffs believes that they would have been able to convince a jury that the ROE methodology was a non-GAAP gimmick designed to permit Xerox's senior management to manage Xerox's earnings, there was no guarantee of success in light of substantial evidence to the contrary.

*ii.    Independent Approval of Xerox's MN Methodology*

138.    Another significant accounting trick that Defendants used throughout the Class Period was MN, which reallocated service revenue to the equipment portion of bundled lease transactions.  Defendants' MN methodology circumvented the SFAS 13 revenue allocation formula by reallocating service revenue to the equipment component of a bundled lease purportedly to create a profit margin differential that was assumed to exist between the service and equipment components of those leases.  Similar to ROE, although the MN justifications and calculations were difficult to grasp, their impact clearly was to shift revenue that was supposed to be recognized ratably (service) to a bundled lease component that could be recognized immediately (equipment), thereby allowing Xerox to claim greater current period revenues.

139.    Plaintiffs claimed that Defendants knowingly or recklessly used MN instead of SFAS 13 to overstate Xerox's equipment revenue by more than $600 million during the Class

---

[24]    Defendants were prepared to argue that the ROE-adjusted revenue figures were empirically more reasonable than the figures used in the 2nd Restatement.  Thus, Lead Counsel would have had to convince a jury that the 2nd Restatement figures were more reasonable despite deviating further from cash sale "normal selling prices" than ROE adjusted figures did.

Period.  Defendants argued, however, that MN was necessary to rectify an inherent bias against equipment revenue that resulted from Xerox's leasing system protocols, which purportedly overstated service revenue by allocating all discounts solely against the equipment portion of bundled lease transactions.

140.    Plaintiffs faced a significant litigation risk with respect to proving that Xerox's MN methodology was simply a gimmick used by Defendants to manage earnings.  First, due to SFAS 13's requirement that service revenue in sales-type lease accounting be allocated on a "cost plus profit" basis, Defendants' justification for MN was plausible.  Even more significant, however, was that KPMG repeatedly reviewed and approved MN in its audit opinions throughout the Class Period.  In addition, the Special Investigations reviewed Xerox's revenue reallocation methodologies – including MN – and did not take issue with any of them.  Finally, PwC was prepared to approve the MN methodology prior to the SEC settlement and 2nd Restatement.

141.    Although Plaintiffs believe that they could have convinced a jury that MN was used solely to manage earnings, Defendants' explanation for MN had support among multiple teams of accountants and experts.  As a result, Plaintiffs faced a substantial litigation risk in proving Defendants' scienter with respect to the fraudulent nature of MN revenue reallocation.

                    iii.    *Exoneration from Liability for the XMEX Fraud*

142.    The 1st Restatement corrected $170 million of fraudulent accounting related to XMEX.  Plaintiffs believe that they would have been able to convince a jury of Defendants' scienter with respect to XMEX, but Defendants would have cited to substantial evidence demonstrating that they had no prior knowledge of the fraud.  Most notably, Xerox retained the law firm of Akin Gump Strauss Hauer & Feld ("Akin Gump") to conduct an independent

investigation of the accounting issues at XMEX, which, in turn, hired PwC to assist with the investigation. Akin Gump and PwC interviewed numerous witnesses, reviewed many relevant documents, and ultimately issued a summary report in December 2000 ("Akin Gump Report").

143.    The Akin Gump Report concluded unequivocally that Xerox's corporate headquarters in the U.S., as well as the Company's senior officers, had no knowledge of fraudulent conduct that occurred at XMEX. As a consequence, there was a significant litigation risk that a jury would have found that Defendants lacked the requisite scienter with respect to the XMEX fraud.

<em>iv.        The SEC Required the 2nd Restatement</em>

144.    Plaintiffs believe that they would have been able to convince a jury that the 2nd Restatement was, in essence, an admission of Defendants' fraudulent conduct. Defendants consistently claimed, however, that the 2nd Restatement was not an admission of wrongdoing, but rather an action forced by the SEC that Xerox had no choice but to file.

145.    Substantial evidence supports Defendants' contention. According to both Xerox and KPMG, after Xerox filed the 1st Restatement, the SEC demanded that Xerox issue a much more substantial restatement. Xerox was in dire financial straits at the time, with creditors requiring a certified annual report for 2001 prior to agreeing to execute a revolving credit arrangement. Under those circumstances, with bankruptcy as Xerox's only other viable option, the SEC's threat of an injunction arguably caused Xerox to issue the $6.4 billion revenue restatement in June 2002.[25] Defendants (along with PwC) believed that Xerox's lease accounting methodology was more reasonable than the SEC's suggested approach, adamantly claiming that the SEC alone forced the restatement. Indeed, as Defendants were quick to remind

---

[25]    Illustrating Xerox's weak bargaining position at the time, the chair of the Xerox Audit Committee later quipped that Xerox would have presented the financial statements on brown wrapping paper with yellow crayons if the SEC so demanded.

Plaintiffs, certain evidence tended to support Defendants' contention that pre-restatement results were *closer* to actual sale values than the restated results under SEC-approved accounting methods.  In light of that fact, Plaintiffs would have had substantial difficulty convincing a jury that the 2nd Restatement amounted to evidence of scienter on the Defendants' part.

c.    <u>Difficulty of Proving Materiality</u>

146.    Another risk factor for Plaintiffs was the materiality of the alleged misstatements during the Class Period.  One of Plaintiffs' allegations was that Defendants designed their smorgasbord of accounting gimmicks to generate discrete amounts of revenue that purportedly did not give rise to disclosure requirements.  Plaintiffs believe that the proper analysis regarding materiality has always been to use the quantitative thresholds and qualitative standards articulated in the SEC's 1999 pronouncement, Staff Accounting Bulletin No. 99 ("SAB 99").  Defendants took the position, however, that SAB 99 represented a major change in previously accepted practice, altering the manner in which materiality judgments could be made by eliminating quantitative "rules of thumb" previously used by auditors and SEC registrants alike.  Accordingly, Lead Plaintiffs were at risk that the Court would adopt Defendants' view on materiality.

147.    Such a ruling would have made it very difficult for Plaintiffs to prove a necessary element of their claims, because prior to the issuance of SAB 99, Defendants spread out the impact of many of their accounting gimmicks over various reporting periods so as to ostensibly fit within quantitative "rule of thumb" thresholds.  Moreover, even if the Court accepted Lead Plaintiffs' view of the appropriate legal standard, Plaintiffs faced a substantial risk that Defendants would prevail in demonstrating factually that misstatements made in certain quarters

or annual reporting periods were not material, negatively impacting Plaintiffs' transaction causation and loss causation analysis.

    d.  <u>Difficulty of Proving Reliance</u>

  148.  Plaintiffs also bore the risk of not being able to establish reliance using the "fraud-on-the-market" theory.  Defendants argued that "fraud-on-the-market" was not a viable theory because Xerox made several pre-Class Period and Class Period disclosures about its accounting methodologies, including ROE and their use of certain securitizations of portfolios of leases to generate current period revenue.  Although Plaintiffs believe that those alleged disclosures were wholly inadequate, Defendants may have been able to persuade a jury otherwise.

    *2.*  ***The Risks of Establishing Damages***

    a.  <u>Difficulty of Proving Loss Causation</u>

  149.  Proving loss causation in this case would have been a tall order for Plaintiffs.  As an initial matter, Lead Plaintiffs would have to have established that the price that each Class member paid for shares of Xerox common stock was artificially inflated on the date of purchase and, pursuant to the Supreme Court's decision in *Dura Pharmaceuticals Inc. v. Broudo,* 544 U.S. 336, 344-45 (2005), that such inflation was confirmed by post-purchase stock movements tied to disclosures related to the fraud.

  150.  To do so, Lead Plaintiffs had retained a damages expert, who would have opined on what the "true value" of Xerox shares would have been during the Class Period had there been no fraud and who, at trial, would have explained how stock movements in response to subsequent disclosures confirmed, per *Dura,* the extent of fraud-induced price inflation.

151.    Lead Plaintiffs' expert preliminarily estimated that damages suffered by the Class

could be as high as $6 billion.[26]  Although the economic and legal theories supporting Lead

Plaintiffs' expert's methodology and conclusions could have withstood scrutiny, Defendants

would have presented their own damages experts, with conflicting theories (and estimates) on

such issues as:  (i) whether and to what extent the alleged false and misleading statements

influenced (if at all) the trading price of Xerox common stock at various times during the Class

Period; (ii) the appropriate economic model for determining the amount by which Xerox's

common stock was allegedly inflated (if at all) during the Class Period; (iii) whether, pursuant to

*Dura*, the disclosures that dissipated the artificial inflation were, in fact, tied to the alleged fraud;

and (iv) whether the statements made, or facts allegedly omitted were false, material or otherwise

actionable under the federal securities laws.

152.    Moreover, the Supreme Court's *Dura* decision made clear that plaintiffs were

required to demonstrate the causal connection between the alleged fraud and the disclosures that

revealed the truth to the market.  One of Lead Plaintiffs' primary roadblocks to meeting that

standard was the tension between their allegations and the underlying facts alleged in *Xerox I*.

*Xerox I* concerned alleged misrepresentations about Xerox's restructuring and attendant reserve

accounting during a time period that was wholly subsumed within the Class Period.  The massive

drops in Xerox stock price surrounding the announcement of the Company's third quarter 1999

results were the largest that occurred during either class period.  To demonstrate adequate loss

causation as to the October 1999 drops, which were critical to Lead Plaintiffs' damages

---

[26]    Lead Plaintiffs' damages expert reached its estimate by assuming that Lead Plaintiffs would be successful
on their most speculative loss causation claims.  It should be noted, however, that Lead Plaintiffs' damages expert
also conducted an analysis using only highly supportable damages claims, estimating Plaintiffs' losses under that
more conservative approach at $3.5 billion.

calculations, Lead Plaintiffs had to prove that the October 1999 disclosures were tantamount to the materialization of the fraud alleged in *Carlson*.

153.     Although Lead Plaintiffs believes that empirical evidence would have demonstrated a connection between most or all of the October 1999 drops and the wrongdoing alleged in this case, it unquestionably would have been an uphill battle.  Indeed, Xerox's press releases expressly attributed the Company's earnings miss and reduced forecast to the very restructuring issues that formed the basis of the complaint in *Xerox I*.  Plaintiffs thus were left with the unenviable task of convincing a jury that, contrary to the express language of Xerox's statements, the earnings miss nevertheless related to the fraud alleged in *Carlson*.

154.     The degree of difficulty involved in that endeavor cannot be overstated.  To prove loss causation under those circumstances, Plaintiffs would have had to rely foremost on technical accounting and damages expert testimony demonstrating that: (1) the manual nature of Defendants' topside ROE and MN adjustments caused a significant accounting impact – namely, a growing amortized asset – to appear on Xerox's balance sheet and income statement; (2) the amortized asset increasingly handcuffed Xerox's ability to show growth throughout the Class Period; (3) the amortized asset overwhelmed Xerox's ability to show growth precisely during the third quarter of 1999; (4) at that time, Xerox was no longer able to find additional revenue from accounting actions to counteract the negative impact of the amortized asset; and (5) the restructuring issues had little or nothing to do with Xerox's earnings miss and reduced guidance. Although Lead Plaintiffs believes they would have been able to convince a jury of the foregoing points, there was a substantial risk that a jury may not have been persuaded.

155.     Plaintiffs also faced legal challenges with respect to demonstrating loss causation. Lead Plaintiffs had a legitimate concern that the "materialization of the risk" standard applied by

lower courts in this Circuit would not survive future court scrutiny.  In that event, Plaintiffs'

would have had to revise their damages estimate downward by more than 45%, because they

were able to include the October 1999 stock drops in their calculations largely on the basis of the

"materialization of the risk" theory of loss causation.

b.  Difficulty of Proving Damages as to KPMG

156.  Even assuming that Plaintiffs could have overcome the serious loss causation

issues in this case, damages attributable to KPMG would have been difficult to prove in the wake

of the Supreme Court's ruling in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 128 S.

Ct. 761, 768 (2008).  After *Stoneridge*, there was an increased risk that the District Court would

have found that KPMG was liable only for its own statements – the clean audit opinions included

in Xerox's annual financial statements and the 1st Restatement – and not its overall participation

in the entire alleged fraud.  Thus, KPMG would have strenuously argued that *Stoneridge*

confirmed that it had no liability for misstatements made in quarterly financial statements and

related press releases throughout the Class Period.  As a result, damages attributable to KPMG

would have been limited by the "transaction causation" element of the "fraud-on-the-market"

theory, because they could only derive from stock price increases associated with those filings

containing KPMG's misstatements.[27]

157.  Additionally, Defendants had strong arguments that certain disclosures could not

contribute to Plaintiffs' damages either because the market was already aware of the information

or because associated stock drops were not statistically significant.[28]

---

[27]     Although Lead Counsel does not believe that Plaintiffs faced a significant threat that this case would have been decided on summary judgment, there was a legitimate potential for partial summary judgment with respect to one or more Defendants on any one of a number of issues discussed herein.

[28]     Although Lead Counsel does not believe that Plaintiffs faced a significant threat that this case would have been decided on summary judgment, there was a legitimate potential for partial summary judgment with respect to one or more Defendants on any one of a number of issues discussed herein.

### 3. The Risks of Maintaining a Class Action Through Trial

158.  Plaintiffs were by no means guaranteed to bring this case to a jury as a class action.  Class certification proceedings have increasingly become a serious risk borne by Plaintiffs, and the putative class in this case had yet to be certified at the time of settlement.  Here, in advance of the parties' 2008 mediation, this Court informed the parties that, in light of the Second Circuit's *IPO* ruling, it intended to structure a rigorous class certification schedule in which the parties would identify relevant issues in advance, focusing their briefing and arguments on those issues alone.  As a consequence, Lead Plaintiffs would have had to contend with a higher burden in demonstrating compliance with Rule 23.  That increased burden undoubtedly would have impacted many aspects of Plaintiffs' case, including the amount of damages available for recovery at trial, the length of the Class Period, and the viability of the "fraud-on-the-market" theory.

### 4. The Ability of Defendants to Withstand Greater Judgment

159.  Assuming Plaintiffs overcame all of the hurdles in this case and obtained a jury verdict, there was a substantial risk that the amount awarded would have been uncollectible as to any one, or all, of the Defendants.  Even Plaintiffs' most conservative damages analysis estimated damages to be approximately $3.5 billion dollars.  There is simply no guarantee that Defendants would have been able to satisfy such a judgment.

160.  First of all, Plaintiffs' expert previously concluded that Xerox's financial viability was a substantial risk factor at various times during this litigation.[29]  In addition, it is Lead Plaintiffs' understanding that, at the time of the Settlement, Xerox had exhausted the Company's so-called "Directors' & Officers'" insurance related to the events giving rise to this Action

---

[29]     Although the passage of time between that evaluation and eventual settlement may have alleviated some acute constraints, such concerns were by no means eliminated altogether.

on defense costs in this and other cases.  Finally, according to the Company's Annual Report on Form 10-K for the year ending December 31, 2007, the Company only had about $1.01 billion in cash and cash equivalents at the time the Settlement was reached.[30]

### B.      The Reasonableness of the Settlement

161.      Berman DeValerio, Milberg and J&P all specialize, and have developed expertise, in complex corporate and commercial class actions.  The attorneys for our firms have tried cases and/or argued motions in numerous federal and state courts.  Copies of Berman DeValerio's, Milberg's and J&P's resumes, respectively, highlighting some of our more notable successes in the field of complex class action litigation, are attached as Exhibits to individual affidavits we have executed detailing the time and expenses our respective firms have contributed to the Action.  *See* Compendium of Fee and Expense Affidavits in Support of Final Approval of Class Action Settlement, Plan of Allocation, Award of Attorneys' Fees and Reimbursement of Expenses, and Reimbursement Award to Lead Plaintiffs, Tabs A, B, and C.  As set forth therein, the principals and associates in our firms working on this case have extensive experience in the prosecution of complex corporate and commercial class actions.  As a consequence, the opinion of such competent counsel in support of this Settlement bears serious consideration.

162.      By any measure, the one undying constant of this litigation has been the complexity and magnitude of the alleged accounting fraud.  As shown above, this case never concerned a single accounting machination in a single region or business unit.  Rather, the case involved multiple accounting standards that touched virtually all aspects of a multi-national Fortune 500 company's business, implicated nearly all of its operating units (as well as KPMG's audit units) around the world, and spanned five annual reporting periods.

---

[30]      In addition, Lead Plaintiffs' likely insistence on disgorgement of the Individual Defendants' personal assets in the event of a judgment would have further hindered any possibility of recovery.

163.     Despite that complexity and the many litigation risks described above, Lead Plaintiffs doggedly pursued Plaintiffs' interests at great expense and in the face of steep odds throughout the entire course of this aging case.  Through a combination of investigating and drafting the three voluminous amended complaints, overcoming three distinct motions to dismiss, educating themselves on a multitude of arcane lease accounting principles, digesting over four million pages of highly technical accounting documents, preparing detailed "issues memoranda," deposing key fact witnesses, and preparing for and engaging in arduous settlement negotiations, Lead Plaintiffs efficiently and effectively built a formidable case with which Defendants had to contend.

164.     Demonstrating the arm's-length nature of the negotiations and the reasonableness of the Settlement, the parties participated in three multi-day mediation sessions with experienced and highly respected mediators Professor Eric D. Green, Esq., of Resolutions, Inc., and Attorney Robert A. Meyer, Esq., of Loeb & Loeb LLP, whose assistance ultimately led to the Plaintiffs and Defendants reaching a global resolution of the Action.

165.     In addition, each of the Lead Plaintiffs in this Action has submitted a declaration in support of the Settlement.  The declarations of Lead Plaintiffs LASERS, Dr. Paul Dantzig, and Thomas Zambito are included in the Aff. Comp. as Tabs 1, 2 and 3, respectively.

166.     Pursuant to the Notice, the deadline for submitting objections to the Settlement and/or Plan of Allocation was July 1, 2008.  To date, however, no putative Class members have objected to the Settlement and/or Plan of Allocation.[31]

---

[31]     Three objectors made passing references to the Settlement, though none should reasonably be construed as an objection to its fairness, reasonableness and adequacy.  First, despite declaring that he "was a shareholder in Xerox Corporation between February, 1998 and June 2002 and therefore am a class member," Reeve Objection, Dkt. No. 467, at 1, Objector Reeve fails to demonstrate his standing to object as a Class member by complying with the requirement set forth in the Notice that he "identify the date(s), price(s), and number(s) of shares of all purchases and sales of Xerox common stock and/or bonds" made during the Class Period.  See Notice, Response to Question 18.  Reeve's other commentary can be summarized by his comment that "[t]he lawyers should get a coupon book at

167.    Furthermore, Class members holding a total of 1,733,007 shares, which represents .001% of the shares eligible to recover, have requested exclusion from the Class.  Opt-outs of such an infinitesimally small percentage of the eligible shares speak volumes as to the fairness of the Settlement.

### C.    The Reasonableness of the Plan of Allocation

168.    As detailed above, the Plan of Allocation is based on the estimated losses of Class members, which in turn depends upon the date on which the stock was purchased and whether the stock was sold or held through the various disclosures that occurred up until the end of the Class Period.  The proposed allocation weighs each claim depending on the artificial inflation attributable to the alleged misrepresentations on each particular date.  Thus, the allocation plan properly provides for different payments to Class members depending on their particular circumstances.

169.    The Plan of Allocation operates in precisely the manner which would have been utilized had Plaintiffs prevailed at trial.  Plaintiffs would have attempted to prove damages for each day of the Class Period through expert testimony of inflation per share on each date.  Those same calculations and opinions are utilized in the Plan of Allocation depending on what date a Class member purchased and sold his or her Xerox shares.  Lead Counsel developed a Plan of Allocation in close consultation with Lead Plaintiffs' damages expert.  The Plan of Allocation thus represents Lead Plaintiffs' and their damages expert's best estimate, based on their intimate

---

the local rodeo and those of us who were actually harmed should get all the money.  That would stop these stupid lawsuits in a hurry.  These stupid class action lawsuits are a waste of the court's time."  Reeve Obj., Dkt. No. 467, at 1.  Thus, on substantive grounds, Objector Reeve's "objection" is more akin to a diatribe against class actions generally than an objection to the recovery here.  Likewise, Objector Shattuck, who did not even claim to have standing here, offered an unsupported economic analysis of class actions generally, and requested that the Court dismiss the lawsuit.  *See* Shattuck Objection, Dkt. No. 468, at 1.  Lastly, Objector Bowen submitted an objection on September 2, 2008, well after the July 1, 2008 deadline.  Objector Bowen, like Objector Reeve, provided no basis for a conclusion that he is a member of the Class.  *See* Bowen Obj., Dkt. No. 485, at 1.  Nonetheless, Objector Bowen "move[s] that the case be dismissed with prejudice, with an order that no recovery, direct or punitive be paid to any of the 'plaintiffs' nor their attorneys by Xerox or other defendants.  *Id.* at 1.

knowledge of the record after eight years of living with this case, of the additional risks attendant to the 1934 Act claims.

> **D.    The Reasonableness of the Request for Attorneys'
> Fees and Reimbursement of Expenses**

170.    In the Notice, Class members were advised that Lead Plaintiffs would be seeking an aggregate award for attorneys' fees of up to 20% of the Settlement Fund for services in connection with the initiation, prosecution, settlement and administration of the Settlement of the Action, and reimbursement of no more than $5 million in expenses.  The fee requested represents a modest multiplier of 1.56 times Lead Plaintiffs' aggregate time charges, excluding the time spent in preparing the fee application and in preparing for, and obtaining, Judge Wolin's analysis of the fee request in this case.  *See infra*.  Moreover, the requested fees and expenses fall well within the parameters of fees awarded in comparable securities class actions in this and other Circuits.

171.    Unlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Plaintiffs have not been compensated for any time or expenses since this case began more than eight years ago, having agreed to prosecute this case on a wholly contingent fee basis.  Moreover, we received no retaining fees from our clients.  Throughout the course of this lengthy case, Lead Plaintiffs incurred considerable out-of-pocket expenses and devoted approximately 290,759.57 hours of attorney time to prosecuting this case – with no assurance of success.  Moreover, Lead Plaintiffs would have received no compensation or reimbursement of $3,314,399.90 in expenses had this case not been successful.

172.    Lead Plaintiffs vigorously pursued this action, all the while being cognizant of our responsibility to the Class to conduct litigation proceedings in an efficient and cost-effective manner.  Thus, as described in detail herein, we implemented a litigation plan designed to divide

necessary work and avoid duplication of effort.  Accordingly, while the firms worked together cohesively and consistently conferred with one another, the bulk of the work assignments were done separately.  Lead Plaintiffs also used associates and other support staff with lower billing rates to perform tasks wherever possible.

173.    Lead Plaintiffs expressed confidence that Lead Plaintiffs' fee request was eminently reasonable in light of their efforts in obtaining the Settlement, the length and complexity of the Action, and the substantial risks it posed.  Nevertheless, to erase any doubt in that regard, Lead Plaintiffs retained the Honorable Alfred M. Wolin, Esq., a retired federal judge ("Judge Wolin"), to perform an independent analysis of the reasonableness of Lead Plaintiffs' fee request.  *See* Wolin Memorandum, at 3.  As part of that deliberative process, Lead Plaintiffs provided Judge Wolin with a synopsis of their efforts in connection with the Action.  *Id.*  To promote the objectivity of Judge Wolin's analysis, Lead Plaintiffs also provided each institutional and/or attorney-represented objector with a copy of their synopsis and notified them that Judge Wolin would accept any materials they deemed relevant for his consideration, if submitted to him within a reasonable deadline prior to preparing his report.  *Id.*  Judge Wolin issued a report recommending unequivocally that Lead Counsel request a fee of 20% of the gross Settlement Fund.  *See* Wolin Report (Wolin Memorandum at Ex. A), at 37.  Lead Plaintiffs sent a copy of Judge Wolin's final report to each objector on September 9, 2008.  *See* Wolin Memorandum, at 3.

174.    After reviewing the Wolin Report, each of the Lead Plaintiffs in this Action has submitted a Declaration in favor of Lead Plaintiffs' request for attorneys' fees and expenses. The Declarations of Lead Plaintiffs LASERS, Dr. Paul Dantzig, and Thomas Zambito in support

of the application for attorneys' fees and reimbursement of expenses are attached to the Aff. Comp., Tabs 1, 2, and 3.

175.    The quality of the work performed by Lead Plaintiffs in attaining the Settlement should also be considered in light of the quality of the opposition.  Internationally renowned firms including Skadden Arps Meager & Flom, Cravath Swaine & Moore, Hogan & Hartson, Wilmer Cutler Pickering Hale & Dorr and Day Pitney acted as counsel for various Defendants throughout this Action.

176.    In addition, this Court should consider the numerous occasions where plaintiffs' counsel in contingent-fee cases such as this receives no compensation – despite spending thousands of hours prosecuting the case through trial.  Indeed, Plaintiffs' law firms have suffered several major defeats after years of litigation and trial, where they expended millions of dollars of time and received no compensation at all.  Despite that risk, we rejected offers to settle the Action at levels below the amount ultimately recovered, turning instead to discovery and trial preparation.  Our willingness as leading members of the plaintiffs' Bar to prepare for trial – and actually try cases – when we cannot obtain a meaningful settlement unquestionably influenced Defendants to return to the bargaining table and ultimately resolve this matter.

177.    The following table provides the total amount of time spent by the attorneys and paralegals at Berman DeValerio, Milberg and J&P who were involved in this litigation.  A breakdown of the lodestar and time charges for each law firm, based on current billing rates in non-contingent matters, is attached to the following affidavits:  (1) Affidavit of Glen DeValerio in Support of Application for Attorneys' Fees and Reimbursement of Expenses on Behalf of Berman DeValerio Pease Tabacco Burt & Pucillo ("DeValerio Aff."); (2) Affidavit of Brad N. Friedman in Support of Application for Attorneys' Fees and Reimbursement of Expenses on

Behalf of Milberg LLP ("Friedman Aff."); and (3) Affidavit of Dennis J. Johnson in Support of

Application for Attorneys' Fees and Reimbursement of Expenses on Behalf of Johnson &

Perkinson ("Johnson Aff.").  The DeValerio Aff., the Friedman Aff. and the Johnson Aff. are

included as Tabs 1, 2, and 3, in the Compendium of Fee and Expense Affidavits Submitted in

Support of Plaintiffs' Request for Award of Attorneys' Fees and Reimbursement of Expenses

("Fee Aff. Comp.").  A summary of the hours and lodestar of Lead Counsel is:

| Firm | Hours | Lodestar ($) |
|------|-------|--------------|
| Berman DeValerio Pease Tabacco Burt & Pucillo | 74,290.35 | $23,633,312.00 |
| Milberg LLP | 82,313.75 | $26,818,461.25 |
| Johnson & Perkinson | 69,299.50 | $23,068,891.25 |
| **TOTAL** | **225,903.60** | **$73,520,664.50** |

178.    The following table provides the total amount of time spent by the attorneys and

paralegals at Izard Nobel, P.C., and Hurwitz Sagarin Slussberg & Knuff, LLC, Plaintiffs' Liaison

Counsel, who were involved in this litigation.  Breakdown of the lodestar and time charges for

Liaison Counsel, based on current billing rates in non-contingent matters, are attached to the

Affidavit of Jeffrey S. Nobel in Support of Fee Application on Behalf of Izard Nobel LLP and

the Affidavit of David A. Slossberg in Support of Fee Application on Behalf of Hurwitz,

Sagarin, Slossberg & Knuff, LLC, Fee Aff. Comp., Tabs 4 & 5, respectively.  A summary of the

hours and lodestar of Liaison Counsel is:

| Firm | Hours | Lodestar ($) |
|------|-------|--------------|
| Izard Nobel P.C. | 985 | $521,012.50 |
| Hurwitz Sagarin Slussberg & Knuff, LLC | 109.10 | $ 42,697.50 |
| **TOTAL** | **1,094.1** | **$563,710.00** |

179.    The following table provides the total amount of time spent by attorneys and paralegals at other law firms that have assisted Lead Plaintiffs in prosecuting this action.  A breakdown of the lodestar and time charges for Plaintiffs' additional counsel, based on current billing rates in non-contingent matters, is attached to the following affidavits:  (1) Affidavit of Peter A. Lagorio in Support of Fee Application on Behalf of Law Office of Peter A. Lagorio; (2) Affidavit of James P. Bonner in Support of Fee Application on Behalf of Shalov Stone Bonner & Rocco LLP; (3) Affidavit of Marc S. Henzel in Support of Fee Application on Behalf of The Law Offices of Marc S. Henzel; (4) Affidavit of Francis P. Karam in Support of Fee Application on Behalf of Bernstein Leibhard & Lifshitz, LLP; (5) Affidavit of Jules Brody in Support of Fee Application on Behalf of Stull, Stull & Brody; (6) Affidavit of Steven B. Singer in Support of Fee Application of Bernstein Litowitz Berger & Grossmann LLP; (7) Affidavit of Marc I. Gross in Support of Fee Application on Behalf of Pomerantz Haudek Block Grossman & Gross, LLP; (8) Declaration of Klari Neuwelt in Support of Fee Application on Behalf of Law Office of Klari Neuwelt, Fee Aff. Comp., Tabs 6, 7, 8, 9, 10, 11, 12, and 13.  A summary of the hours and lodestar of Plaintiffs' additional counsel is:

| Firm | Hours | Lodestar ($) |
|---|---|---|
| Law Office of Peter A. Lagorio | 2,143.60 | $  643,940.00 |
| Shalov Stone Bonner & Rocco LLP | 1,700 | $   511,168.75 |
| Law Office of Marc A. Henzel | 4,201.60 | $1,272,270.00 |
| Bernstein Liebhard & Lifshitz, LLP | 17,108.50 | $5,452,897.50 |
| Stull Stull & Brody | 17,747.92 | $7,433,904.00 |
| Bernstein Litowitz Berger & Grossmann LLP | 15,300.50 | $4,716,187.50 |
| Pomerantz Haudek Block Grossman & Gross | 4,533.95 | $1,459,606.50 |

| | | |
|---|---|---|
| Law Office of Klari Neuwelt | 1,025.80 | $ 367,923.50 |
| **TOTAL** | **63,761.37** | **$21,857,897.75** |

180.     In total, Plaintiffs' counsel's attorneys, paralegals, investigators, forensic accountants and other support staff spent 290,759.57 hours prosecuting this action through September 5, 2008 for a total lodestar $95,942,272.25 and an average hourly rate of $329.97.  As a result, Lead Plaintiffs' attorneys' fee request at 20% of the Settlement Fund translates into a lodestar risk multiplier of 1.56.  As required in this Circuit, the hourly rates for the attorneys and paralegals set forth above are the same as the regular current rates charged for their services in non-contingent matters that have been approved in other complex class action litigation.

181.     As set forth in the table below, Lead Counsel have incurred $3,074,719.98 in unreimbursed litigation expenses in connection with the prosecution of the Action.  A breakdown of those expenses, as reflected in our firms' respective books and records, is given in the DeValerio Aff., the Friedman Aff. and the Johnson Aff., Fee Aff. Comp., Tabs 1, 2, and 3.  As further set forth below, other Plaintiffs' counsel incurred $239,679.92 in unreimbursed litigation expenses in connection with the prosecution of the Action.  A breakdown of those expenses, as reflected in the respective books and records of those firms, is given in the affidavits of non-Lead Plaintiffs' counsel, Fee Aff. Comp., Tabs 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13.  Collectively, Plaintiffs' counsel have advanced expenses totaling $3,314,399.90, as follows:

| Firm | Expenses |
|---|---|
| Berman DeValerio Pease Tabacco Burt & Pucillo | $  831,235.84 |
| Milberg LLP | $  962,475.02 |
| Johnson & Perkinson | $1,281,009.12 |

| | | |
|---|---|---|
| Izard & Nobel P.C. | $ | 7,918.85 |
| Hurwitz Sagarin Slussberg & Knuff, LLC | $ | 2,684.15 |
| Law Office of Peter A. Lagorio | $ | 374.71 |
| Shalov Stone Bonner & Rocco LLP | $ | 789.63 |
| Law Office of Marc A. Henzel | $ | 566.38 |
| Bernstein Liebhard & Lifshitz, LLP | $ | 110,401.32 |
| Stull Stull & Brody | $ | 110,647.68 |
| Bernstein Litowitz Berger & Grossmann | $ | 3,681.77 |
| Pomerantz Haudek Block Grossman & Gross | $ | 2,485.61 |
| Law Office of Klari Neuwelt | $ | 129.82 |
| **TOTAL** | | **$3,314,399.90** |

182.     Pursuant to the terms of the Stipulation, Lead Counsel has also paid $996,110.22 out of the Settlement Fund in connection with printing and mailing the Notice and publishing the Summary Notice.

## VI.     CONCLUSION

183.     In view of the very substantial benefit conferred on the Class, the risks of this litigation, the enormous efforts of counsel, the quality of the work performed, the contingent nature of the fee, the complexity of the case, and the standing of Lead Counsel at the Bar, it is respectfully submitted that: (1) the Settlement and Plan of Allocation should be approved as fair, reasonable and adequate; (2) the requested attorneys' fees of 20% of the Settlement Fund should be approved; (3) the requested reimbursement of litigation expenses in the amount of $3,314,399.90 should be approved; and (4) the requested reimbursement award to Lead Plaintiffs LASERS, Mr. Zambito, and Dr. Dantzig in the amount of $43,000, $20,000 and $20,870

respectively, for their time, services and expenses (including lost wages) relating to their representation of the Class should be approved.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on September 22, 2008.

_Glen DeValerio_

Glen DeValerio

_____

Brad N. Friedman

_____

Dennis J. Johnson

67

respectively, for their time, services and expenses (including lost wages) relating to their representation of the Class should be approved.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on September 22, 2008.

_____
Glen DeValerio

_____
Brad N. Friedman

_____
Dennis J. Johnson

67

respectively, for their time, services and expenses (including lost wages) relating to their representation of the Class should be approved.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on September 22, 2008.

_____

Glen DeValerio

_____

Brad N. Friedman

_____

Dennis J. Johnson