**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------x
                              :
RUSSELL CARLSON, Individually :
And On Behalf Of All Others   :
Similarly Situated,           :
                              :
      Plaintiffs,             :
                              :
v.                            :   Civil No. 3:00CV01621(AWT)
                              :
XEROX CORPORATION, KPMG LLP,  :
PAUL A. ALLAIRE, G. RICHARD   :
THOMAN, ANNE MULCAHY,         :
BARRY ROMERIL, GREGORY TAYLER,:
and PHILIP FISHBACH,          :
                              :
      Defendants.             :
                              :
------------------------------x
```

<u>**RULING ON MOTION FOR AWARD OF ATTORNEYS' FEES**</u>

Louisiana State Employees' Retirement System ("LASERS"), Dr. Paul Dantzig, and Thomas Zambito (collectively, the "Lead Plaintiffs"), on behalf of themselves and the Class have moved for an order granting: final approval of the proposed settlement ("Settlement") of the above-captioned action ("Action") against Xerox Corporation ("Xerox"), KPMG LLP ("KPMG"), and six of Xerox's former or current officers and/or directors (collectively, the "Defendants") for a payment of $750 million in cash, plus interest (the "Settlement Fund"); final approval of the proposed plan of allocation (the "Plan of Allocation") for the Settlement Fund; a reimbursement award to Lead Plaintiffs for the time, services, and expenses they incurred in prosecuting the

-1-

Action; and an award of attorneys' fees and reimbursement of expenses incurred in connection with the prosecution and settlement of the Action.

The Lead Plaintiffs seek an award of attorneys' fees equal to 20% of the Settlement Fund, plus reimbursement of expenses. A fairness hearing was held on October 7, 2008, and the only objections to the Settlement were with respect to the requested award of attorneys' fees. The court has issued a separate order granting final approval of the Settlement, final approval of the Plan of Allocation, and making a reimbursement award to the Lead Plaintiffs. After considering the papers submitted by the Lead Plaintiffs and by objectors, and the arguments made at the fairness hearing, the court has concluded that an award of attorneys' fees equal to 16% of the Settlement Fund, plus $3,314,399.90 for reimbursement of expenses, is most appropriate.

## I. **LEGAL STANDARD**

In Goldberger v. Integrated Resources, Inc., the Second Circuit held that "either the lodestar or percentage of the recovery methods may properly be used to calculate fees in common fund cases . . . ." 209 F.3d 43, 45 (2d Cir. 2000). These "two distinct methods" were described by the court as follows:

> The first is the lodestar, under which the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies

that figure by an appropriate hourly rate. See Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999). Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on "other less objective factors," such as the risk of the litigation and the performance of the attorneys. Id. (internal quotation marks omitted).

The second method is simpler. The court sets some percentage of the recovery as a fee. See id. In determining what percentage to award, courts have looked to the same "less objective" factors that are used to determine the multiplier for the lodestar. See Brown v. Phillips Petroleum Co., 838 F.2d 451, 454-55 (10th Cir. 1988).

Id. at 47. With respect to the use of the percentage of recovery method, however, the court noted that "the lodestar remains useful as a baseline even if the percentage method is eventually chosen.  Indeed, we encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage.  Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." Id. at 50 (internal citations omitted).  The court also observed that:

[N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Union Carbide, 724 F. Supp. at 163 (summarizing Grinnell opinions).

Id.

Goldberger contains an informative discussion of the evolution in the Second Circuit of the standard for awarding attorneys' fees in common fund cases.  Several points are made about the percentage of recovery method.  First, the court noted that "the routine award of fees in the 20% to 30% range had led to a perception that the percentage approach increasingly tended to yield too little for the client-class" and too much for the attorneys.  Id. at 48.  (internal citation omitted).  City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974) ("Grinnell I") was a response to this perception.  In that case, the court "revers[ed] and remand[ed] a 15% fee award with instructions to base future awards on counsel's lodestar."  Id.  In City of Detroit v. Grinnell Corp., 560 F.2d 1093 (2d Cir. 1977)("Grinnell II"), the court "again revers[ed] the fee award which, though based on lodestar, amounted to about 10% of recovery and was still excessive."  Id.

Second, although "the assumption that twenty-five percent is the benchmark that district courts should award in common fund cases" the court was "nonetheless disturbed by the essential notion of a benchmark."  Id. at 51-52.  The court took note of the problem of not knowing "precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel."

-4-

<u>Id.</u>

Third, also in the context of why the court was disturbed by the notion of a benchmark, but with its focus on cases where the common fund was between $50 million and $75 million, the court made an observation that suggested it would be reasonable to expect to see a general trend of lower percentages of the fund being awarded for attorneys' fees as the size of the fund increased:

> Starting an analysis with a benchmark could easily lead to routine windfalls where the recovered fund runs into the multi-millions. "Obviously, it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case." <u>Union Carbide</u>, 724 F. Supp. at 166. Indeed, empirical analyses demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts have traditionally accounted for these economies of scale by awarding fees in the lower range of about 11% to 19%. <u>See</u> Lynk, 23 J. Legal Stud. at 202; <u>see also</u> 1 Conte, Attorney Fee Awards § 2.09 (putting range at 13% to 20%).

<u>Id.</u> at 52.

Fourth, in the same context, the court commented on "the principal analytical flaw in . . . [the] assumption that there is a substantial contingency risk in every common fund case."  The court stated:

> We harbor some doubt that this assumption is justified in cases such as this. At least one empirical study has concluded that "there appears to be no appreciable risk of non-recovery" in securities class actions, because "virtually all cases are settled" . . . Of course, we are not suggesting that compensation for risk is never permitted, merely that it is not—under either the percentage or lodestar methods—an appropriate starting

> assumption. Even where there is some contingency risk but
> recovery remains virtually certain, we question whether
> a fully informed group of plaintiffs able to negotiate
> collectively would routinely agree to pay their lawyers
> a fee of 25% of a multi-million dollar settlement.

Id. (internal italics omitted).  The court then made the point

that "plaintiffs in common fund cases typically are not fully

informed.  Nor are they able to negotiate collectively, or at

arm's length."  Id. at 49.

The court also made several observations about the lodestar

method.  First, the court observed that district courts have

found that the lodestar method "created a temptation for lawyers

to run up the number of hours for which they could be paid."  Id.

at 48.  Second, "the lodestar created an unanticipated

disincentive to early settlements."  Third, the court noted that

the "primary source of dissatisfaction" was that the lodestar

method "compell[ed] district courts to engage in a gimlet-eyed

review of line-item fee audits," which led to "an inevitable

waste of judicial resources."  Id.

## II. DISCUSSION

### A. Fee Awards in Other Large PSLRA Settlements

In support of their fee application, the Lead Plaintiffs'

have submitted a report prepared by a retired federal judge.  See

Private Memorandum Opinion (the "Wolin Report")(Doc. No. 493, Ex.

1.)  The Wolin Report includes a chart of the Top 26 post-PSLRA

settlements, not including this case (the "Top 26 Chart").  The

settlement in this case will be the tenth largest post-PSLRA
settlement when included on this chart.  The Wolin Report
concludes that the fee request by Plaintiffs' Counsel is
consistent with fee awards in similar cases:

> The fee request at issue is on par with fee awards in
> similar cases in the Second Circuit.  See, e.g., In re
> Adelphia Communs. Corp. Sec. and Derivative Litig., No.
> 03 MDL 1529 (LMM), 2006 WL 3378705, at *1, *3 (S.D.N.Y.
> Nov. 16, 2006)(awarding 21.4% of $455 million fund); In
> re Freddie Mac Sec. Litig., No. 03-CV-4261 (JES), slip
> op. at 1 (S.D.N.Y. Oct. 27, 2006)(awarding 20% of $410
> million fund); In re Oxford Health Plans, Inc. Sec.
> Litig., No. MDL-1222 (CLB) slip op. at 7 (S.D.N.Y. June
> 12, 2003)(awarding 28% of $300 million fund); In re
> Priceline.com, Inc. Sec. Litig., Civ. No. 00-1884 (AVC),
> 2007 WL 2115592, at *5 (D. Conn. July 20, 2007)(awarding
> 30% of $80 million fund).
>
> Lead Counsel's fee request is also consistent with fee
> awards in other jurisdictions.  See, e.g., In re Rite Aid
> Corp. Sec. Litig., 146 F. Supp. 2d 706, 736, n.44 (E.D.
> Pa. 2001)(awarding 25% of $193 million fund); In re Rite
> Aid Corp. Sec. Litig., 362 F. Supp. 2d 587, 588-90 (E.D.
> Pa. 2005)(awarding 25% of $125 million fund); In re
> DaimlerChryslerAG Sec. Litig., No. Civ.A. 00-993, slip
> op. at 43-50 (D. Del. Feb. 5, 2004)(awarding 22.5% of
> $300 million fund); In re Williams Sec. Litig., No. 02-
> cv-072 (SPF)(FHM), slip op. at 2 (N.D. Okla. Feb. 12,
> 2003)(awarding 25% of $311 million fund).

Wolin Report at 17.  This summary from the Wolin Report only
lists cases where the fees awarded were 20% or more of the amount
of the common fund.  However, a review of the Top 26 Chart
reveals that in only 6 of the 26 cases were the fees awarded 20%
or more of the amount of the common fund.  The largest common
fund out of which fees equal to 20% or more of the amount of the
fund were awarded was the $480 million fund in the Adelphia case.

The size of the common fund in the other 5 of those cases ranged from $300 million to $410 million.

| RANK | NAME | Settlement Amount | Fee Award |
|------|------|-------------------|-----------|
| 1 | Enron | $7,227,390,000.00 | 9.52% |
| 2 | WorldCom | $6,133,000,000.00 | 5.48% |
| 3 | Tyco | $3,200,000,000.00 | 14.50% |
| 4 | Cendant (2000) | $3,166,000,000.00 | 1.73% |
| 5 | AOL/Time Warner | $2,500,000,000.00 | 5.90% |
| 6 | Nortel I | $1,142,775,308.00 | 3.00% |
| 7 | Royal Ahold | $1,100,000,000.00 | 11.88% |
| 8 | Nortel II | $1,074,265,298.00 | 7.74% |
| 9 | McKesson | $1,042,500,000.00 | 7.64% |
| 10 | Cardinal Health | $600,000,000.00 | 18.00% |
| 11 | Lucent | $517,000,000.00 | 17.00% |
| 12 | BankAmerica | $490,000,000.00 | 18.00% |
| 13 | Dynegy, Inc. | $474,050,000.00 | 8.73% |
| 14 | Adelphia Comm. | $460,000,000.00 | 21.40% |
| 15 | Raytheon | $460,000,000.00 | 9.00% |
| 16 | Waste Management II | $457,000,000.00 | 7.93% |
| 17 | Global Crossing | $447,800,000.00 | 16.04% |
| 18 | HealthSouth | $445,000,000.00 | 15.25% |
| 19 | Freddie Mac | $410,000,000.00 | 20.00% |
| 20 | Qwest | $400,000,000.00 | 15.00% |
| 21 | Cendant (2006) | $374,000,000.00 | 7.71% |
| 22 | Rite Aid | $319,580,000.00 | 25.00% |
| 23 | Williams Co. | $311,000,000.00 | 25.00% |
| 24 | Oxford | $300,000,000.00 | 28.00% |
| 24 | DaimlerChrysler | $300,000,000.00 | 22.28% |
| 24 | Bristol-Myers Squibb | $300,000,000.00 | 3.96% |

| -- | Xerox | $750,000,000.00 | -- |

Based on an assumption that there would be a general trend (but not a pattern from which there would be no deviation) of the percentage of the fund awarded as attorneys' fees being smaller as the size of the fund increases, the court has placed the cases on the Top 26 Chart into three groups: (i) settlements below $500 million, (ii) settlements in the range of $500 million to $1.2 billion, and (iii) settlements of $2.5 billion or greater.

Of the fifteen cases in the first group, the fee award percentage was 20% or greater in six cases, 15% or greater but less than 20% in four others, and less than 10% in five of the cases.

Of the five cases in the third group, the fee award percentage was less than 10% in four of the cases. In <u>In re Tyco Intern., LTD. Multidistrict Litig.</u>, 535 F. Supp. 2d 249 (D.N.H. 2007)("<u>Tyco</u>"), it was 14.50%. In <u>Tyco</u>, co-lead counsel argued that the court "should compare their fee request with the fees that were awarded in connection with the sixteen post-PSLRA securities fraud cases with settlements at or above $400 million." <u>Id.</u> at 266. Two objectors argued that the court "should limit [its] comparative analysis to a subset of cases in which the settlements exceeded $1 billion." <u>Id.</u> The court observed:

> These "super mega-fund" cases are: <u>WorldCom</u>, <u>Cendant</u>, <u>AOL Time Warner</u>, <u>Nortel I</u>, <u>Royal Ahold</u>, and <u>Nortel II</u>. The objectors contend that the comparison set should be limited to such cases because super mega-fund cases are a distinct subclass in which the size of the recovery is explained more by the size of the class than the work expended by counsel. As a result, the objectors argue, super mega-fund cases—Tyco included—require comparatively lower POF awards to fairly compensate counsel than will be required in cases with smaller settlements.

<u>Id.</u> While 14.50% was greater than the fee award percentage in any of the super mega-fund cases, 14.50% was "in line with the POF awards for the other cases in the class (seventh out of seventeen)." <u>Id.</u> at 266-67. In determining whether to limit its

comparative analysis to super mega-fund cases, the court in <u>Tyco</u>
found it helpful to look at the lodestar expressed as a
percentage of the settlement amount:

> The objectors' contention that super mega-fund cases
> warrant lower POF awards than smaller cases because they
> require proportionally less work may well be true as a
> general matter.  <u>See generally</u> <u>In re Prudential Ins. Co.</u>
> <u>Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283,
> 339 (3d Cir. 1998)("the basis for this inverse
> relationship [between the settlement amount and the
> appropriate POF] is the belief that in many instances the
> increase [in recovery] is merely a factor of the size of
> the class and has no direct relationship to the efforts
> of counsel" (internal quotations omitted)). However, the
> generalization on which the objectors' argument depends
> does not hold in this case.  The best measure of the
> effort required to produce a particular result in a given
> case is the lodestar.  In this case, the lodestar
> expressed as a percentage of the settlement amount is
> 5.38%.  As Appendix 1 demonstrates, this "lodestar
> percentage" is substantially higher than the lodestar
> percentages for all but one of the super mega-fund cases
> and it is much more closely aligned with the lodestar
> percentages in the larger set of cases that Co-Lead
> Counsel have proposed for comparison purposes.  In other
> words, whether or not super mega-fund cases generally
> require proportionally less effort than smaller cases,
> the generalization is not true in this case.

<u>Id.</u> at 267.

In the instant matter, however, the lodestar is
$95,942,272.25 and the settlement amount is $750 million.  So the
lodestar expressed as a percentage of the settlement amount is
12.79%.  Of the eleven cases in the first and second groups, the
lodestar expressed as a percentage of the settlement amount
exceeds 5.34% in only one case: in <u>Lucent</u> it is 7.98%.  In the 15
cases in the third group, the lodestar expressed as a percentage

of the settlement amount exceeds 8.62% in only two cases.  See Appendix A.  In Williams Companies, where the settlement amount was $311 million, the percentage was 17.18%, and in Oxford, where the settlement amount was $300 million, the percentage was 15.64%.

The Top 26 Chart reflects that in Williams Companies, the case was at the summary judgment stage at the time of settlement and 18,000,000 pages of documents had been reviewed and 150 depositions had been taken.  It reflects that in Oxford, the case settled on the eve of trial and 1,000,000 pages of documents had been reviewed and 56 depositions had been taken.  In the instant case, settlement was at the stage where merits discovery was ongoing.

There are six other cases in the second group.  The court concludes that the second group of cases is the most appropriate set of cases to use for the purpose of comparative analysis because (i) the $2.5 billion dollar settlement in AOL-Time Warner is twice the settlement amount in Nortel I, and (ii) the settlement amount in the instant case falls fairly close to the midpoint of the range of settlement amounts in the cases in the second group, and there is a larger gap between the settlement amounts in Lucent and Bank of America than between the settlement amounts in Bank of America and Dynegy, Inc.

The Top 26 Chart reflects the following about the instant

case and the cases in the second group, with the multiplier for
the instant case being the proposed multiplier and the column
"Lodestar as Percentage" being the court's calculation based on
the numbers on the Top 26 Chart (except with respect to Xerox):

| Case | Multiplier | Fee Award % | Stage of Case Upon Settlement | Pages Reviewed | Depositions | Lodestar as Percentage |
|------|------------|-------------|-------------------------------|----------------|-------------|------------------------|
| Nortel I | 2.1 | 3.00 | Class Certification | 2,000,000 | 0 | 1.46 |
| Royal Ahold | 2.6 | 11.88 | Class Certification | 15,000,000 | 65 | 4.62 |
| Nortel II | 4.6 | 7.74 | Class Certification | 10,000,000 | 12 | 1.62 |
| McKesson | 2.1 | 7.64 | Merits Discovery | 2,000,000 | 0 | 3.68 |
| Cardinal Health | 5.9 | 18.00 | Merits Discovery | 7,200,000 | 0 | 3.06 |
| Lucent | 2.1 | 17.00 | Class Certification | 3,000,000 | 75 | 7.98 |
| Xerox | 1.56 | 20.00 | Merits Discovery | 4,000,000 | 7 | 12.40 |

The Top 26 Chart also reflects that in Royal Ahold and McKesson,
there were parallel criminal proceedings against company
executives.

     The Wolin Report also contains a comparison of the
settlement amount and the amount of the settlement with the
Securities and Exchange Commission ("SEC") in cases where there
were parallel SEC proceedings:

| Case | SEC Settlement | Class Settlement | Ratio of SEC/ Class Settlement |
|------|----------------|------------------|--------------------------------|
| Tyco | $50,000,000 | $3,200,000,000 | 1.6% |
| Xerox | $61,878,132 | $750,000,000 | 8.3% |
| AOL/Time Warner | $300,000,000 | $2,650,000,000 | 11.3% |
| WorldCom | $750,000,000 | $6,133,000,000 | 12.2% |
| Bristol-Myers Squibb | $150,000,000 | $300,000,000 | 50.0% |
| Qwest | $250,000,000 | $400,000,000 | 62.5% |

See Wolin Report, Exhibit C.  The Top 26 Chart reflects that in
each of these cases except the instant case and Bristol-Myers
Squibb, there were parallel criminal proceedings against company
executives.[1]

**B. <u>Objections to Request for a 20% Fee Award</u>**

A number of persons filed objections to the request for a
fee award equal to 20% of the Settlement Fund, and objectors
appeared and were heard at the fairness hearing.  Many of the
objections related to the use of contract attorneys.  There were
three points raised by objectors in this area.

Objectors argued that the lodestar is inflated because
contract attorneys performed "paralegal tasks" and were not
properly supervised.  The court finds these arguments
unpersuasive.  At the fairness hearing, Plaintiffs' Co-Lead
Counsel explained the document review program developed for this
case and the function performed by contract attorneys.
Plaintiffs' Co-Lead Counsel also explained the training given to
contract attorneys, how their work was monitored and reviewed,
and how they were supervised and in some instances removed

---

[1] Although the Top 26 Chart does not reference parallel
criminal proceedings for the Bristol-Myers Squibb case, the Wolin
Report states that there were parallel criminal proceedings.  See
Wolin Report at 31-32.  In fact, after the PSLRA settlement in
2004, the company entered into a deferred prosecution agreement
with the U.S. Attorney's Office in New Jersey.  See United States
Department of Justice, Deferred Prosecution Agreement,
http://www.usdoj.gov/usao/nj/ press/files/pdffiles/
deferredpros.pdf (last visited Jan. 14, 2009).

because their performance was not adequate.  An email from one of
the objectors to his supervising lawyer from one of the co-lead
counsel firms undermines both these arguments by objectors.  (See
Lead Plaintiffs' Second Supplemental Response to Objections
("Plaintiffs' Second Supp. Resp.") (Doc. No. 517, Ex. 3).)

Objectors also argued that the lodestar is inflated because
contract attorneys should have been billed as an expense instead
of contract attorney work being billed at the rate of $300 per
hour.

> A contract attorney is one hired "to work on a single
> matter or a number of different matters, depending upon
> the firm's staffing needs and whether the temporary
> attorney has special expertise not otherwise available to
> the firm . . . . Economics is the princip[al] reason for
> emergence of lawyer 'temping' because it permits a firm to
> service client needs during particularly busy periods by
> engaging an experienced attorney, without incurring the
> expense of hiring a permanent employee." George C. Rockas,
> Lawyers For Hire and Associations of Lawyers: Arrangements
> that Are Changing the Way Law is Practiced, 40 DEC B. B.J.
> 8 (November/December 1996).

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., No. H-01-1446,
2008 WL 4178130, at *34 (S.D. Tex. Sept. 8, 2008) ("In re
Enron").  "'[T]oday it is not uncommon for an employing law firm
to pay the temporary lawyer at one rate and charge that lawyer's
services to the client at a higher rate that covers overhead and
a contribution to firm profits.' Kathryn M. Fenton, Use of
Temporary or Contract Attorneys, 13-FALL Antitrust 23, 24
(1998)."  Id. at *35.  Also, "under ABA Formal Opinion No.

-14-

00-420, an attorney may bill the contract attorney's charges to the client as fees rather than costs when the client's reasonable expectation is that the retaining lawyer has supervised the work of the contract lawyer or adopted that work as her own." Id. (internal citations omitted). See also ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 08-451, at 5-6 (2008).

Plaintiffs' Co-Lead Counsel explained at the fairness hearing the process followed in hiring contract attorneys and the supervision given their work. This objection was rejected by the court in Enron, and was also rejected by the court in Tyco. See 535 F. Supp. 2d at 272. This court finds the objection unpersuasive for substantially the same reasons.

Objectors make a third argument, which is an extension of the second point. In addition to arguing that contract attorney time should not be included in the lodestar, they also argue that a multiplier should not be applied to $300 an hour contract attorney time. Objectors argue that contract attorneys here were paid $55 an hour or less and their hours were included in the lodestar at $300 an hour; different rates have been cited for what contract attorneys were paid but for purposes of discussion, the court uses the rate of $55 an hour. Objectors contend that in determining what the multiplier is in this case, the court should use $55 an hour for that portion of the lodestar attributable to contract attorney work instead of $300 an hour.

In effect, these objectors argue that including contract attorney time in the lodestar at the rate of $300 an hour sufficiently compensates Plaintiffs' Counsel for the risk of being paid nothing in this case, and that applying a multiplier to that portion of the lodestar results in excessive compensation, particularly in a case where the majority of the lodestar is made up of contract attorney time.  The objectors point to one portion of the lodestar that is an extreme situation.  One firm involved in the case has a lodestar of $4,716,187.50 and approximately 98% of that lodestar is attributable to work by contract attorneys.

Plaintiffs' Counsel's records reflect that of the total lodestar of $95,942,272.25, $60,452,031.00, i.e. 63.0%, is attributable to work by contract attorneys.  Of the 290,759.57 total hours, the portion attributable to work of the contract attorneys is 201,506.77 hours, i.e. 69.3%. (See Plaintiffs' Second Supp. Resp. at Ex. 2.)  Plaintiffs' Co-Lead Counsel point out that these percentages are in line with the percentage of the lodestar that represented contract attorney hours for lead counsel in the Tyco case. (See id. at 3-4.)  Plaintiffs' Co-Lead Counsel also point out that if the charges for the contract attorney time were decreased, the multiplier in this case would still be a reasonable multiplier.  They note that if 40% of the total hours of contract attorneys was eliminated, the total lodestar would be $71,761,462.20 and granting their request for a

20% fee award would equate to using a 2.09 multiplier.  (See id. at Ex. 2.)  They further note that making even a 90% reduction in contract attorney time and granting their request for a 20% fee award would equate to using a multiplier of only 3.59, which is about the 3.6 average, and not much above the 3.1 median, of the multipliers in the cases on the Top 26 Chart.  But the court notes that in Tyco the multiplier was only 2.70, and as discussed above, the lodestar as a percentage of the fund was 5.34%, compared to 12.79% in the instant case.  As to the other cases on the Top 26 Chart, the court does not have complete data showing to what extent, if any, the lodestar consists of work done by contract attorneys or what was the economic impact of using contract attorneys.  In fact, the court does not have all of the relevant data necessary to perform a quantitative analysis in this case.  Moreover, while those questions merit further study and analysis, undertaking such an analysis for this case, where there is sufficient information about other cases that can be used in determining a reasonable fee award percentage, would be the functional equivalent of a "gimlet-eyed review of line-item fee audits" in terms of a waste of judicial resources. Goldberger, 209 F.3d at 49.  Thus, the court concludes that it is not objectionable per se in this case to apply a multiplier to a lodestar that includes work performed by contract attorneys, even though the profit margin for the firms employing them was greater

than the profit margin the firms would have had for work done by full-time employees.

Objections were also made to the effect that the notice given to the class was inadequate; that attorneys' fees should be paid out of the "net fund" (i.e. after payment of expenses) as opposed to the "gross fund";[2] that the amount of attorneys' fees requested was <u>per se</u> too much; and that no fees should be awarded because Milberg LLP participated in the case, and former Milberg LLP partner Melvyn Weiss (who filed an appearance in this case) and Seymour Lazar (who was never a named plaintiff in this case) were named in a federal indictment filed against Milberg LLP. The court has considered each of these objections and concluded that they lack merit for substantially the reasons set forth by Plaintiffs' Co-Lead Counsel in their memoranda.  There was also an objection to the effect that the attorneys' fee award should be limited to a 15% benchmark.  However, it is clear that under <u>Goldberger</u>, benchmarks should not be used.  Each case must be given individualized consideration.

Objectors also argue that the 1.56 multiplier is not reasonable because there was little risk to Plaintiffs' Counsel in taking the case and that this is a mega-fund case so a lower

---

[2] <u>See</u> <u>In re Enron</u>, 2008 WL 4178130, at *26 (stating that "under the agreement between Lead Counsel and the Regents, expenses were to be "netted" (deducted from the whole recovery) before applying fee percentages for fee award to Lead counsel").

percentage should be used.  These are factors that the court addresses in its discussion below of the <u>Goldberger</u> factors.

### C. The <u>Goldberger</u> Factors

The first <u>Goldberger</u> factor is the time and labor expended by counsel.  Here, Plaintiffs' Counsel have documented that 290,759.57 hours of attorney and litigation support time were devoted to the case.  The Top 26 Chart reflects that the average number of billable hours for those cases is 102,652 and the median is 44,075.  A greater number of billable hours is reported on the Top 26 Chart for only one case: <u>Tyco</u> (488,270 hours). <u>Enron</u> (289,593 hours), which the Top 26 Chart reflects was at the trial preparation stage, and <u>Worldcom</u> (277,861 hours) come close.

The second <u>Goldberger</u> factor is the magnitude and complexity of the litigation.  The court agrees with Plaintiffs' Co-Lead Counsel that the fraud alleged in this action involved multiple accounting standards that touched on numerous aspects of a multinational corporation's business, implicated operating units around the world, and spanned five annual reporting periods.  The court also agrees that the rudiments of the accounting principles at issue in the case were complex, as were numerous other aspects of the case.  Also, the Top 26 Chart reflects that the duration of this case was 3.58 years longer than the average duration of the cases on the chart.

-19-

The third Goldberger factor is the risk of the litigation. Approximately two months before any complaint was filed in this case, defendant Xerox reported that the SEC had begun an investigation of accounting issues related to its operations in Mexico, and approximately one month before any complaint was filed in this case, defendant Romeril told analysts during a conference call that several senior managers in Mexico had collaborated to circumvent Xerox accounting policies and administrative procedures.  In all, 22 separate lawsuits were filed seeking to assert the claims raised in this action.  The court originally appointed four firms as co-lead counsel, and after a contested motion was filed (which also resulted in LASERS being appointed as one of the Lead Plaintiffs), two of the original four co-lead counsel were replaced by one of the current lead counsel. (See Superseding Order Appointing Lead Plaintiffs, Lead Counsel, and Liaison Counsel (Doc. No. 92).)  Although this case was complex and of great magnitude, there was a surplus of experienced and knowledgeable counsel who presumably assessed the risks and wanted to serve as lead counsel.  Thus, it appears to the court that on balance the litigation risks here were at most those presented by a typical case, and that this case falls within the category of cases mentioned in Goldberger for which the presence of a substantial contingency risk is not an appropriate starting assumption.  See Goldberger, 209 F.3d at 52.

-20-

The fourth Goldberger factor is the quality of representation.  The court agrees with Plaintiffs' Co-Lead Counsel that the Class received high quality legal representation and obtained a very large settlement in the face of vigorous opposition by highly experienced and skilled defense counsel. With respect to this factor, the court also places weight on the fact that among the group of cases listed in the Wolin Report where there were parallel SEC proceedings, counsel in this case obtained a larger settlement in comparison to the SEC settlement than in any case except Tyco, and the fact that in those other cases, there were parallel criminal proceedings being pursued or apparently contemplated against company executives.

The fifth Goldberger factor is the requested fee in relation to the settlement.  As discussed above, in only six of the cases on the Top 26 Chart were the fees awarded 20% or more of the settlement amount.  A 20% fee award would be a higher percentage than in any other case in the second group, i.e. cases where the settlements were in the range of $500 million to $1.2 billion. On the other hand, Plaintiffs' Counsel are requesting that a multiplier of 1.56 be applied to the lodestar.  Such a multiplier would rank as the second lowest (higher only than the 1.5 multiplier used in Williams Companies) on the Top 26 Chart, and the lodestar would rank as the second highest on the Top 26 Chart.

All the cases in the second group were either at the stage of class certification or "merits discovery ongoing."[3]  Two of the cases had fee award percentages approaching 20%.  In <u>Cardinal Health</u>, the percentage was 18%, and 7,200,000 pages of documents had been reviewed and no depositions had been taken.  In <u>Lucent</u>, the fee award percentage was 17%, and 3,000,000 pages of documents had been reviewed and 75 depositions had been taken.  Here, 4,000,000 pages of documents have been reviewed and 7 depositions have been taken.  However, when comparing this case to <u>Cardinal Health</u> and <u>Lucent</u>, the figures of 4,000,000 pages of documents reviewed and 7 for the number of depositions taken does not adequately reflect either the effort or value of the work

_____

[3] The court notes that in comparing the instant case to the cases in the second group, the court does not place weight on <u>Nortel I</u>, where the fee award percentage was 3%.  There, the Second Circuit concluded that the district court had carefully weighed the six <u>Goldberger</u> factors before concluding that a fee award percentage of 8.5% was excessive.  <u>See</u> <u>In re Nortel Networks Corp. Sec. Litig.</u>, 539 F.3d 129, 134 (2d Cir. 2008). However, the court noted:

> Milberg also argues that the district court erred by not using the 8% Nortel II award as a "benchmark," especially because, according to Milberg, Nortel II presented fewer litigation risks than Nortel I.  We have little doubt that a 3% fee award, with a 2.04 lodestar multiplier, is toward the lower end of reasonable fee awards, and we are troubled by the district court's failure to discuss Nortel II and why it believed the fee award here to be more reasonable.  But the question before us is not whether we would have awarded a different fee, but rather whether the district court abused its discretion in awarding this fee.

<u>Id.</u>

performed by Plaintiffs' Counsel.  Pursuant to the discovery
program adopted by Plaintiffs' Co-Lead Counsel, the 4,000,000
pages of documents produced by the Defendants consisted of key
documents on which the SEC had focused its attention.
Ordinarily, a much greater number of documents would have been
produced before lead counsel had obtained 4,000,000 pages of key
documents.  In addition, Plaintiffs' Counsel reviewed and
digested all of the deposition transcripts produced by the
Defendants from the SEC litigation and prior investigations.
There were 68 days of deposition transcripts taken from 48
witnesses during the SEC litigation, and, in addition, 87 days of
investigative deposition transcripts taken from 39 witnesses
during the SEC investigations.

       In Tyco, where a multiplier that was below the average and a
number of billable hours that were the most in any case on the
Top 26 Chart resulted in a requested fee award percentage that
was materially higher than that in any case with a comparable
total settlement amount, the court found it helpful to look at
the lodestar as a percentage of the settlement amount.  The court
also finds such an approach to be helpful here.  The fee award
percentage is obtained by taking the product of the multiplier
times the lodestar, and dividing that product by the settlement
amount.  When one focuses on the multiplier, one is focusing on
the components of the fee award percentage other than the

lodestar as a percentage of the total settlement amount.  Thus, in assessing a multiplier, looking at the lodestar as a percentage of the settlement amount provides perspective on the other parts of the equation.

As noted above, the lodestar expressed as a percentage of the settlement amount for this case, i.e. 12.79%, is higher than in all but two of the cases on the Top 26 Chart, i.e. <u>Williams Companies</u> and <u>Oxford</u>, which settled at the summary judgment stage and on the eve of trial, respectively.  A significant gap exists between 12.79% and the next three highest numbers: <u>Freddie Mac</u> (8.62%), <u>HealthSouth</u> (7.99%), and <u>Lucent</u> (7.98%).  Based on the fact that Plaintiffs' Counsel in this case accomplished such a good result when the settlement amount in the Action is compared to the amount of the settlement with the SEC, the court concludes that it is reasonable for the lodestar as a percentage of the settlement amount to be higher than in the cases on the Top 26 Chart other than <u>Williams Companies</u> and <u>Oxford</u>.  Having reviewed the results of using various fee award percentages other than 20%, the court has determined that using a fee award percentage of 16% and assuming a multiplier of 1.56 would have the same effect as adjusting the lodestar so that the lodestar expressed as a percentage of the settlement amount would be 10.26%.  This percentage would be higher than the percentage in all the cases on the Top 26 Chart except <u>Williams Companies</u> and <u>Oxford</u>, and

higher than the 7.98% in <u>Lucent</u>, which is the only other case in
the second group that has a percentage that is greater than one-
half of 10.26%.

Using a fee award percentage of 16% would also be in the
upper range of the cases in the second group, lower than only the
18% in <u>Cardinal</u> <u>Health</u>, where the total settlement amount was
$600 million, and the 17% in <u>Lucent</u>, where the settlement amount
was $517 million.  Also, a fee award percentage of 16% would
equate to $120 million of the $750 million settlement amount.
With a lodestar of $95,942,272.25, this would equate to a
multiplier of 1.25 as opposed to 1.56.  The only argument against
such a multiplier is that it is simply too low.  However, looking
at the totality of the circumstances, the court concludes that
increasing the fee award percentage above 16% just so the
multiplier can be larger is not merited.  In any event, a fee
award percentage of 16% results in an increase over the lodestar
of almost $25 million, which is not insignificant.

Although LASERS is one of the Lead Plaintiffs, it was
initially not a Lead Plaintiff, and the court has not been
presented with any retainer agreement in this case, unlike
<u>Cendant</u> and <u>WorldCom</u>, where retainer letters provided some
guidance as to the market for legal services.  However, 16% is a
higher percentage than was awarded in either of those cases.
Notably, in <u>Cendant</u> "two leading class action firms agreed to a

fee scale, for settlement during discovery, of 17.5 percent for a recovery up to $100 million; 10 percent between $100 and $300 million; 7.5 percent between $300 and $500 million; and 5 percent above $500 million." In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., No. 02 Civ. 5575(SWK), MDL 1500, 2006 WL 3057232, at *13, (S.D.N.Y. Oct. 25, 2006). Also, in WorldCom, the "retainer agreement contained a tiered percentage structure, depending upon the size of the recovery and the stage at which it was achieved . . . ." Id. at *12. The structure was: 12% to 14% of any amount up to $100 million; plus 11% to 13% of any amount in the range of $100 million to $250 million; plus 9% to 12.5% of any amount in the range of $250 million to $500 million; plus 5.5% to 7.5% of any amount in the range of $500 million to $1 billion; plus 4.0% to 5.5% of any amount over $1 billion. Id.

The sixth Goldberger factor is public policy considerations. "[P]ublic policy supports granting attorneys['] fees that are sufficient to encourage . . . counsel to bring securities class actions that supplement the efforts of the SEC." In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d 229, 236 (S.D.N.Y. 2005). Such a policy does not translate into granting a fee award in the amount requested in every case. Rather, the court must give individualized consideration to each case. If the court utilizes a fee award percentage of 16% in this case, $120 million is larger than the fee awards in all of the cases in

the second group, i.e. cases where the settlement amount was $500 million to $1.2 billion, except Royal Ahold, where the fee award was $130,647,868.98 and the settlement amount was $1.1 billion. It would also be larger than the fee award in any case in the third group of cases, i.e. cases where the total settlements were below $500 million, and it would be $65 million greater than the fee award in Cendant, where the total settlement was in excess of $3.166 billion.  Thus, the court concludes that a fee award percentage of 16% here is sufficient to encourage counsel to continue to represent individuals in cases such as this one.

## III. **CONCLUSION**

For the reasons set forth above, the court hereby awards Plaintiffs' Counsel attorneys' fees equal to 16% of the Settlement Fund, plus $3,314,399.90 for reimbursement of expenses.

It is so ordered.

Dated this 14th day of January 2009 at Hartford, Connecticut.

_____
/s/ AWT
Alvin W. Thompson
United States District Judge

## Appendix A

| RANK | NAME | Settlement Amount | Lodestar | Lodestar as POF |
|------|------|-------------------|----------|-----------------|
| 1 | Enron | $7,227,390,000.00 | $127,000,000.00 | 1.76% |
| 2 | WorldCom | $6,133,000,000.00 | $83,183,239.00 | 1.36% |
| 3 | Tyco | $3,200,000,000.00 | $170,742,994.00 | 5.34% |
| 4 | Cendant (2000) | $3,166,000,500.00 | $13,038,825.00 | 0.41% |
| 5 | AOL/Time Warner | $2,500,000,000.00 | $46,861,731.00 | 1.87% |
| 6 | Nortel I | $1,142,775,308.00 | $16,655,971.00 | 1.46% |
| 7 | Royal Ahold | $1,100,000,000.00 | $50,858,606.00 | 4.62% |
| 8 | Nortel II | $1,074,265,298.00 | $17,429,370.00 | 1.62% |
| 9 | McKesson | $1,042,500,000.00 | $38,339,176.00 | 3.68% |
| 10 | Cardinal Health | $600,000,000.00 | $18,378,123.00 | 3.06% |
| 11 | Lucent | $517,000,000.00 | $41,260,585.00 | 7.98% |
| 12 | BankAmerica | $490,000,000.00 | $28,805,991.00 | 5.88% |
| 13 | Dynegy, Inc. | $474,050,000.00 | $10,162,042.00 | 2.14% |
| 14 | Adelphia Comm. | $460,000,000.00 | $33,686,468.00 | 7.32% |
| 15 | Raytheon | $460,000,000.00 | $13,160,578.00 | 2.86% |
| 16 | Waste Management II | $457,000,000.00 | $6,842,457.00 | 1.50% |
| 17 | Global Crossing | $447,800,000.00 | $28,242,915.00 | 6.31% |
| 18 | Health South | $445,000,000.00 | $35,551,918.00 | 7.99% |
| 19 | Freddie Mac | $410,000,000.00 | $35,353,395.00 | 8.62% |
| 20 | Qwest | $400,000,000.00 | $18,547,454.00 | 4.64% |
| 21 | Cendant (2006) | $374,000,000.00 | $6,038,717.00 | 1.61% |
| 22 | Rite Aid | $319,580,000.00 | $10,237,106.00 | 3.20% |
| 23 | Williams Co. | $311,000,000.00 | $53,435,010.00 | 17.18% |
| 24 | Oxford | $300,000,000.00 | $46,910,652.00 | 15.64% |
| 24 | DaimlerChrysler | $300,000,000.00 | $15,865,520.00 | 5.29% |
| 24 | Bristol-Myers Squibb | $300,000,000.00 | $5,192,155.00 | 1.73% |

| | Xerox | $750,000,000.00 | $95,942,272.25 | 12.79% |
|--|-------|-----------------|----------------|--------|